No. 2025-1434

_____

*In the*

# United States Court of Appeals
## *for the*
## Federal Circuit

_____

VANDA PHARMACEUTICALS INC.,
*Plaintiff-Appellant,*

– v. –

UNITED STATES,
*Defendant-Appellee.*

_____

On Appeal from the United States Court of Federal Claims
Case No. 23-cv-629, Hon. Armando O. Bonilla

_____

## NONCONFIDENTIAL PRINCIPAL BRIEF
## FOR PLAINTIFF-APPELLANT

_____

PAUL W. HUGHES
SARAH P. HOGARTH
ANDREW A. LYONS-BERG
CHARLES SEIDELL
ALEX C. BOOTA
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

  *Counsel for Plaintiff-Appellant*
  *Vanda Pharmaceuticals Inc.*

# CERTIFICATE OF INTEREST

I certify the following information is accurate and complete to the best of my knowledge.

Dated: June 13, 2025          */s/ Paul W. Hughes*

| 1. Represented entities. Fed. Cir. R. 47.4(a)(1). | 2. Real party in interest. Fed. Cir. R. 47.4(a)(2) | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Vanda Pharmaceuticals Inc. | None | Blackrock, Inc. |

| 4. Legal representatives. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4) | | |
|---|---|---|
| Edward B. Diskant, McDermott Will & Emery LLP | Jennifer B. Routh, McDermott Will & Emery LLP | |

**5. Related Cases.** Other than the originating case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?
☒No.

**6. Organizational victims and bankruptcy cases.** Fed. R. Civ. P. 47.4(a)(6).
☒ None/Not Applicable

# TABLE OF CONTENTS

Certificate of Interest ................................................................. i

Statement of Related Cases ..................................................... ix

Introduction ............................................................................. 1

Jurisdiction .............................................................................. 2

Issue Statement ....................................................................... 2

Statement of the Case .............................................................. 3

    A.  Legal background ........................................................... 3

    B.  Factual background ....................................................... 6

        1.  Vanda and its marketed products ...................... 6

        2.  FDA's disclosure of the Fanapt® dissolution specification to competitors ................................. 7

        3.  FDA's disclosure of the Hetlioz® dissolution specification to competitors ............................... 11

        4.  FDA's references to the Impurities Patent Application ....................................................... 12

    C.  Procedural background ............................................... 14

Summary of Argument ......................................................... 20

Standard of Review .............................................................. 25

Argument .............................................................................. 26

I.  The lower court erred in granting the government judgment on the pleadings .................................................................. 27

    A.  FDA regulations cannot modify or eliminate Vanda's property interests. ..................................................... 28

    B.  The lower court's analysis rests on improperly resolved factual disputes. ...................................................... 38

    C.  The lower court cannot both disregard the Robbins declaration and deny Vanda leave to amend. .......................... 48

    D.  The lower court similarly erred as to Vanda's impurities and micronization theories. ...................................... 53

II.  Vanda adequately alleged the remaining elements of an unlawful taking. .......................................................... 59

    A.   FDA's disclosure of Vanda's protected information was an "authorized" act for takings purposes. ....................................59

    B.   Vanda alleged a *per se*, or alternatively, regulatory taking. .......................................................................................60

    C.   Vanda's Inventia-based claims were not time-barred. ............61

III. The lower court erred in dismissing Vanda's implied-in-fact contract claim. ..................................................................................64

Conclusion ............................................................................................68

Addendum

## Confidential Material Omitted

The material omitted on pages 13 and 19 describes Vanda's confidential manufacturing processes for Hetlioz®. The material omitted on page 37 describes Vanda's proposed and adopted dissolution specifications for Fanapt® and Hetlioz®. The material omitted on pages 53 and 55-59 describes Vanda's confidential manufacturing processes for Hetlioz®.

# TABLE OF AUTHORITIES

**Cases**

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014) ........................................................ 48

*Adera v. United States*,
2023 WL 3768645 (Fed. Cir. 2023) .................................................. 63

*Agility Pub. Warehousing Co. K.S.C.P. v. United States*,
969 F.3d 1355 (Fed. Cir. 2020) .............................................. 25, 26, 28

*Airborne Data, Inc. v. United States*,
702 F.2d 1350 (Fed. Cir. 1983) ................................................ *passim*

*Armenian Assembly of Am., Inc. v. Cafesjian*,
692 F. Supp. 2d 20 (D.D.C. 2010) .................................................... 43

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 38

*Brown v. Davenport*,
596 U.S. 118 (2022) .......................................................................... 33

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ...................................................................... 60

*Cent. Pines Land Co. v. United States*,
61 Fed. Cl. 527 (2004) ...................................................................... 62

*ChargePoint, Inc. v. SemaConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) .......................................................... 39

*City of Cincinnati v. United States*,
153 F.3d 1375 (Fed. Cir. 1998) ........................................................ 65

*Clark v. Bunker*,
453 F.2d 1006 (9th Cir. 1972) .......................................................... 31

*Clevinger v. Advocacy Holdings, Inc.*,
2024 WL 3359508 (D.D.C. 2024) .................................................... 43

*Darby Dev. Co., Inc. v. United States*,
112 F.4th 1017 (Fed. Cir. 2024) .............................................. 24, 26, 59

*DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*,
990 F.3d 1364 (Fed. Cir. 2021) ........................................................ 52

*DSMC, Inc. v. Convera Corp.*,
479 F. Supp. 2d 68 (D.D.C. 2007) .................................................... 43

## Cases—continued

*Foman v. Davis*,
371 U.S. 178 (1962)................................................48

*Forest Lab'ys, Inc. v. United States*,
476 F.3d 877 (Fed. Cir. 2007) ............................38

*Gal-Or v. United States*,
470 F. App'x 879 (Fed. Cir. 2012) .....................34

*Garland v. Cargill*,
602 U.S. 406 (2024)..............................................46

*Hercules Inc. v. United States*,
516 U.S. 417 (1996)..............................................64

*Hicks v. Feiock*,
485 U.S. 624 (1988) .............................................33

*HIRECounsel D.C., LLC v. Connolly*,
2021 WL 5998365 (D.D.C. 2021) ................42, 43

*Ingrum v. United States*,
560 F.3d 1311 (Fed. Cir. 2009) ..........................62

*Judicial Watch, Inc. v. FDA*,
449 F.3d 141 (D.C. Cir. 2006) ............................67

*Katzin v. United States*,
908 F.3d 1350 (Fed. Cir. 2018) ..........................62

*Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*,
464 F.3d 1339 (Fed. Cir. 2006) ..........................52

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974)..............................................31

*King Instruments Corp. v. Perego*,
65 F.3d 941 (Fed. Cir. 1995) ..............................56

*Lariscey v. United States*,
949 F.2d 1137 (Fed. Cir. 1991) ..........................53

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)..............................................60

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..............................................33

## Cases—continued

Lucas v. S.C. Coastal Council,
505 U.S. 1003 (1992)...............................................30, 34, 60

Lumbermens Mut. Cas. Co. v. United States,
654 F.3d 1305 (Fed. Cir. 2011) .........................................65

Merck & Co. v. SmithKline Beecham Pharms. Co.,
1999 WL 669354 (Del. Ch. 1999)....................................54

Mobile Med. Int'l Corp. v. United States,
95 Fed. Cl. 706 (2010)......................................................54

Padbloc Co. v. United States,
161 Ct. Cl. 369 (1963) .......................................................68

Paralyzed Veterans of Am. v. West,
138 F.3d 1434 (Fed. Cir. 1998) .......................................63

Penn Cent. Transp. Co. v. City of New York,
438 U.S. 104 (1978).............................................................61

Perry v. United States,
149 Fed. Cl. 1 (2020) ...............................................67, 68

Renda Marine, Inc. v. United States,
509 F.3d 1372 (Fed. Cir. 2007) ........................................26

Rsch., Analysis & Dev., Inc. v. United States,
8 Cl. Ct. 54 (1985) ..............................................................66

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984)..................................................... passim

Shoshone Indian Tribe of Wind River Rsrv. v. United States,
71 Fed. Cl. 172 (2006)......................................................52

Sikorsky Aircraft Corp. v. United States,
122 Fed. Cl. 711 (2015)....................................................38

Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.,
293 F.3d 1062 (8th Cir. 2002)....................................57, 58

Tex. Advanced Optoelec. Sols., Inc. v. Renesas Elecs. Am., Inc.,
895 F.3d 1304 (Fed. Cir. 2018) ........................................47

Town of Castle Rock v. Gonzales,
545 U.S. 748 (2005)...........................................................29

## Cases—continued

*United States v. Fuller*,
  409 U.S. 488 (1973) .................................... 32, 34, 35

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ............................. 51

*Young v. United States*,
  529 F.3d 1380 (Fed. Cir. 2008) ......................... 62, 63

## Statutes

5 U.S.C. § 552(b)(4) ....................................... 12, 45

18 U.S.C.
  § 1839(3) ............................................... 30
  § 1905 .................................................. 4

21 U.S.C.
  § 355-2(b)(1) ........................................... 5, 42
  § 355(a) ................................................ 3
  § 355(b) ................................................ 3
  § 355(b)(1)(A) .......................................... 25, 67
  § 355(b)(1)(A)(iv) ...................................... 3
  § 355(d) ................................................ 3
  § 355(j) ................................................ 5
  § 355(j)(2)(A)(iv) ...................................... 5

§ 393(b) ................................................... 66
  § 393(b)(1) ............................................. 66
  § 393(f)(2) ............................................. 66

28 U.S.C.
  § 1295(a)(3) ............................................ 2
  § 1491 .................................................. 2
  § 2501 .................................................. 62

D.C. Code
  § 36-401 ................................................ 27, 30
  § 36-401(4) ............................................. 54
  § 36-401(4)(A) .......................................... 41

Md. Code Com. Law § 11-1201(e) ............................. 30

## Regulations and rules

21 C.F.R.

§ 20.61 ......................................................................... 29

§ 20.61(a) .............................................. 17, 18, 31, 40

§ 20.61(c) .............................................. 4, 25, 63, 67

§ 20.61(d) .................................................... 25, 67

§ 314.50(d)(1) ............................................... 3, 35

§ 314.50(d)(1)(i) .................................................. 36

§ 314.50(d)(1)(ii) ................................................. 36

§ 314.430(g)(1) ..................................................... 4

U.S. Ct. Fed. Claims R.

12 ................................................................. 42, 61

12(b)(6) ................................................. 25, 26, 38

12(c) .......................................... 25, 26, 38, 49

15 ...................................................................... 48

## Other Authorities

CDER, *Clinical Pharmacology and Biopharmaecutics Reviews, App. No. 205677Orig1s000* ................................ 45

Congressional Budget Office, *Research and Development in the Pharmaceutical Industry* (Apr. 2021) ................................ 6

Ctr. For Drugs & Biologics, *Guideline for Submitting Documentation for the Manufacture of and Controls for Drug Products*, FDA (Feb. 1987) ...................................... 4

FDA, Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances (Aug. 2018) ................ 8

Mot. for Stay, *Pfizer v. FDA*, No. 03-cv-2346 (D.D.C. Feb. 18, 2004) ................................ 5

Part, *Merriam-Webster* (2025) ............................................ 40

*Restatement of Torts* (1939) ........................................ 31, 53

Richard A. Epstein, *The Constitutional Protection of Trade Secrets and Patents under the Biologics Price Competition and Innovation Act of 2009*, 66 Food & Drug L.J. 285 (2011) ............ 5

U.S. Const. amend. V .......................................... *passim*

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. Counsel for Plaintiff-Appellant is not aware of any other case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision.

## INTRODUCTION

Through a series of FOIA requests, Vanda Pharmaceuticals Inc.—a small drug innovation company focused on the development of novel therapies for underserved diseases—discovered that the Food and Drug Administration (FDA) has divulged Vanda's trade secrets and other confidential proprietary information to Vanda's direct competitors. Rather than use its own knowledge and experience to help generic applicants succeed in obtaining approval for copies of Vanda's products, FDA impermissibly provided Vanda's trade secrets to those generic competitors to enable them to cross the finish line.

The Supreme Court and this Court have long recognized that the disclosure by an agency of such confidential, trade-secret information gives rise to a compensable taking of private property under the Fifth Amendment. The lower court, however, disposed of this action at the pleading stage, concluding that various aspects of Vanda's drug manufacturing process were not trade secrets—but in doing so, it relied on the wrong law; impermissibly resolved factual disputes in favor of the government; and inexplicably denied leave to amend the complaint to add factual information that completely undermines the key premises of the lower court's reasoning. That decision is legally unsupportable and must be reversed.

1

## JURISDICTION

This is an action against the United States for uncompensated takings and breach of implied-in-fact contract. The United States Court of Federal Claims had jurisdiction under 28 U.S.C. § 1491.

The Court of Federal Claims entered judgment for the United States on January 8, 2025. Appx38. It earlier dismissed Vanda's breach of implied-in-fact contract claim (Appx15) and then granted judgment on the pleadings as to Vanda's takings claim (Appx36). This is a final judgment disposing of all claims. Vanda noticed this appeal on February 6, 2025. Appx1334. This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## ISSUE STATEMENT

1. Whether Vanda has alleged trade secrets—which FDA disclosed to Vanda's competitors—giving rise to a compensable property interest under the Takings Clause?

2. Whether the Court of Federal Claims abused its discretion in denying Vanda leave to amend its complaint?

3. Whether the lower court erred in dismissing the breach of implied-in-fact contract claim?

**STATEMENT OF THE CASE**

**A.    Legal background**

**1.**  Before a drug innovator can begin recouping its research and development costs for a new drug, the Federal Food, Drug, and Cosmetic Act (FDCA) requires it to secure regulatory approval from FDA. *See* 21 U.S.C. § 355(a). Innovators must submit a new drug application (NDA) to FDA, which must include sensitive information about the drug's chemical composition, its manufacture and quality control, its safety and effectiveness shown through clinical studies, and much more. *Id.* § 355(b). Ultimately, the sponsor of an NDA must demonstrate by "substantial evidence," based on the sponsor's clinical trials and other supportive evidence, that the new drug is safe and effective for its intended use. *Id.* § 355(d).

Among other things, an NDA must include "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packaging of [the] drug." 21 U.S.C. § 355(b)(1)(A)(iv); Appx52 (Compl. ¶ 28). FDA's implementing regulations require that each NDA contain a "Chemistry, manufacturing, and controls" (CMC) section, which must describe the physical and chemical characteristics of the drug substance. 21 C.F.R. § 314.50(d)(1); Appx53 (Compl. ¶¶ 29-31). And FDA's Manufacturing Guidance requires, among

3

other things, applicants to disclose components used in the manufacturing process, each production step, and tests and specifications for impurities, and—for solid dosage forms—proof of compliance with certain other regulatory specifications. Appx53-55 (Compl. ¶¶ 32-36); *see* Ctr. For Drugs & Biologics, *Guideline for Submitting Documentation for the Manufacture of and Controls for Drug Products*, FDA (Feb. 1987), perma.cc/A82V-YJR8 (Manufacturing Guidance).

As FDA itself recognizes, much of this information is highly sensitive and confidential. FDA regulations assure applicants that "[d]ata and information submitted or divulged to [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c). Other regulations prohibit FDA from disclosing "[m]anufacturing methods or processes, including quality control procedures," even after approval. *Id.* § 314.430(g)(1). And Congress has endeavored to protect such sensitive information from disclosure by generally prohibiting agencies from disclosing confidential information submitted to them in the course of their work. 18 U.S.C. § 1905.

**2.** Federal law authorizes generic drug manufacturers, after certain periods of patent and other exclusivities have elapsed, to seek approval to sell generic versions of drugs by submitting an abbreviated new

drug application (ANDA). *See* 21 U.S.C. § 355(j). To gain approval, a generic manufacturer must prove its product is "bioequivalent," i.e., has a sufficiently similar effect in the body as the original drug. *Id.* § 355(j)(2)(A)(iii)-(iv). Although Congress requires an innovator to supply sample product to generic manufacturers to facilitate bioequivalence testing (*id.* § 355-2(b)(1)), Congress does not obligate brand manufacturers to disclose confidential information regarding their products' composition, their manufacturing process, or the results of their testing. Appx49; Appx59 (Compl. ¶¶ 13, 55).

Once a generic applicant submits an ANDA, FDA reviews the submission, which typically begins an iterative process between the agency and the generic manufacturer regarding steps it must take to achieve an approvable product. Appx49-50 (Compl. ¶ 14). Consistent with FDA's legal obligations to maintain the confidentiality of the innovator's NDA submission, FDA has "conceded" in litigation that it may not rely on or disclose "the data in" an approved NDA "when reviewing" another company's follow-on application. Richard A. Epstein, *The Constitutional Protection of Trade Secrets and Patents under the Biologics Price Competition and Innovation Act of 2009*, 66 Food & Drug L.J. 285, 289-291 (2011) (citing Mot. for Stay 3, *Pfizer v. FDA*, No. 03-cv-2346 (D.D.C. Feb. 18, 2004)); *see* Appx56-57 (Compl. ¶¶ 41-44).

### B. Factual background

#### 1. *Vanda and its marketed products*

Vanda is a global biopharmaceutical company focused on the development of innovative therapies to address unmet medical needs. Appx50-51 (Compl. ¶ 18). Drug innovators like Vanda invest enormous sums—often hundreds of millions, if not billions of dollars—and many years of labor into the development of each new product. Appx46 (*Id.* ¶ 2); *see* Congressional Budget Office, *Research and Development in the Pharmaceutical Industry* (Apr. 2021), perma.cc/B284-YTM2 (*CBO Report*) (finding that "[t]he development process often takes a decade or more" and costs on average $1 to $2 billion).

Two of Vanda's products are implicated here. Fanapt® (iloperidone) is a drug that helps patients with schizophrenia (particularly those who have not benefitted from other antipsychotic therapies) think more clearly, feel less nervous, and experience fewer hallucinations. Appx52; Appx60 (Compl. ¶¶ 24, 57-58). Vanda also markets Hetlioz® (tasimelteon), which was the first FDA-approved therapy to treat two rare and debilitating sleep-related conditions: Non-24-Hour Sleep-Wake Disorder and nighttime sleep disturbances in Smith-Magenis Syndrome. Appx61 (*Id.* ¶ 68).

### 2. FDA's disclosure of the Fanapt® dissolution specification to competitors

Vanda's Fanapt® NDA contained highly confidential details about its manufacturing process. Among other sensitive information regarding the drug's formulation, the NDA included a "dissolution specification," which defines how much of the drug must dissolve by a specified point after administration for a given batch to pass quality assurance. Appx60 (Compl. ¶¶ 63-64). Vanda expended significant resources to research and develop this dissolution specification, including generating the date required to derive it. Appx60 (*Id.* ¶ 64). The details of Vanda's manufacturing process for Fanapt®, including its dissolution specification and composition, are not public and are not readily ascertainable by any member of the public. Appx61 (*Id.* ¶ 65).

After reviewing Vanda's data underlying its proposed dissolution specification in the Fanapt® NDA, FDA countered by proposing a partially different specification with a slightly higher rate. Appx616; Appx637; Appx641. Vanda agreed to modify the dissolution specification to this rate. Appx641.

The dissolution specification ensures that manufactured drugs have consistent safety and efficacy for patients. The effects a drug has on a patient depend on the rate at which the drug is absorbed in the body;

the absorption rate, in turn, depends on the rate at which a drug's active ingredient is released from the drug product. *See* FDA, *Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances* 2 (Aug. 2018), perma.cc/5VWC-3W4E. It is thus critical that manufactured batches of drug products exhibit consistent dissolution behavior to ensure consistent pharmaceutical effects.

A drug's dissolution *specification* cannot be ascertained simply from knowledge of the drug's formulation. Appx73 (Compl. ¶ 117). Rather, a manufacturer can only make supportable conclusions about a drug's dissolution profile based on data from dissolution testing, which requires significant investment. Appx73 (Compl. ¶ 117). In other words, knowing the confidential dissolution specification greatly accelerates generic manufacturers' efforts to copy a drug's formulation. Appx74 (*Id.* ¶ 121); *see also* Appx850 (Robbins Decl. ¶¶ 24-25) ("The dissolution specification for any given drug is based on that particular drug's unique formulation and composition, including its solubility, permeability, dissolution, and pharmacokinetics. Knowledge of a drug's dissolution specification therefore provides substantial information to a generic company about a drug's underlying manufacturing process.").

FDA has approved at least five ANDAs seeking permission to market generic versions of Fanapt®. Appx63 (Compl. ¶ 83). Relevant here, FDA issued a final approval for ANDA No. 206890, submitted by Lupin Limited and/or Lupin Pharmaceuticals, Inc., on May 5, 2022. Appx63 (*Id.* ¶¶ 83-85). FDA issued final approval for ANDA No. 207231, submitted by Inventia, on November 28, 2016. Appx64 (*Id.* ¶¶ 92-93).

Vanda obtained information relating to FDA's review of Lupin's iloperidone ANDA through a FOIA request. Appx64 (Compl. ¶ 97). In response to Vanda's request, FDA produced documents revealing that it sent Lupin a notice of deficiency during its review of Lupin's ANDA. Appx64 (*Id.* ¶¶ 97-98). In that notice, FDA informed Lupin that its proposed dissolution specification was "not acceptable" and requested that Lupin "acknowledge" a specified "FDA-recommended dissolution method and specification." Appx64 (*Id.* ¶ 98).

In the Division of Bioequivalence Dissolution Review, an FDA reviewer explained the origin of FDA's substitute dissolution specification for Lupin: "the reviewer checked the NDA Annual report for the above mentioned specification for the RLD." Appx66-67 (Compl. ¶ 101). "RLD" means "reference listed drug" or the previously approved drug—here, Fanapt®. Appx67 (*Id.* ¶ 102). In other words, the documents show that

FDA took the confidential dissolution specification from Vanda's NDA and provided it to Lupin.

Vanda also obtained information relating to FDA's review of Inventia's iloperidone ANDA (No. 207231) through a FOIA request submitted on March 27, 2023. Appx68 (Compl. ¶ 106). As with the Lupin ANDA, during its review of Inventia's iloperidone ANDA, FDA sent Inventia a notice of a deficiency. Appx68-69 (*Id.* ¶ 107). In that notice, FDA similarly informed Inventia that its proposed dissolution specification was "not acceptable" and requested that Inventia "acknowledge" a specified "FDA recommended dissolution method and specification." Appx68-69 (*Id.* ¶ 107).

In the Division of Bioequivalence Dissolution Review conducted as part of FDA's review of Inventia's ANDA, the FDA reviewer again noted that "[t]he reviewer checked the NDA Annual report for the above mentioned specification for the RLD product." Appx70 (*Id.* ¶ 108). Again, FDA provided Vanda's Fanapt® dissolution specification to the generic manufacturer, after determining that the generic's own submission was "not acceptable." Appx68-69 (*Id.* ¶ 107).

Despite these disclosures to Lupin and Inventia, FDA has otherwise continued to treat Fanapt®'s dissolution specification as trade secret and confidential. *See* Appx70-71 (Compl. ¶¶ 109-110, 113).

### 3. *FDA's disclosure of the Hetlioz® dissolution specification to competitors*

Like Fanapt®, Vanda's Hetlioz® NDA also contained highly confidential information about its manufacturing process, including a dissolution specification. Again, after reviewing Vanda's data underlying its proposed dissolution specification in the Hetlioz® NDA, FDA countered by proposing a partially different specification with a slightly faster rate. Appx650-651. Vanda agreed to modify the dissolution specification to this rate. Appx651. The details of Vanda's overall manufacturing process for tasimelteon, including its dissolution specification and composition, are not public and are not readily ascertainable by any member of the public. Appx62 (Compl. ¶ 79).

FDA has approved three ANDAs for generic versions of Hetlioz®, including from generic manufacturers Teva and Apotex. Appx77 (Compl. ¶¶ 132-134). As with Lupin and Inventia, FDA corresponded with these applicants about their proposed dissolution specifications. Appx78 (*Id.* ¶ 139). In a discipline review letter to Teva dated July 16, 2018, and a discipline review letter to Apotex dated July 12, 2018—again obtained by Vanda via FOIA—FDA rejected each generic's proposed dissolution specification and asserted that "'not less than [b4]%(q) of label claimed amount of Tasimelteon dissolved in 15 min' is recommended." Appx78

(*Id.* ¶¶ 140-141).[1] FDA instructed each generic manufacturer to "[u]pdate the drug product specification table and other relevant section of [the] ANDA accordingly." Appx78 (*Id.*). Vanda alleged on information and belief that the recommended specification is in fact Vanda's confidential specification for Hetlioz®. Appx79 (*Id.* ¶¶ 142-143).

### 4.    *FDA's references to the Impurities Patent Application*

Vanda's Hetlioz® NDA also included confidential information regarding the synthesis of tasimelteon and composition of Hetlioz®. Appx62 (Compl. ¶ 73). Vanda explained, for example, its process for detecting and controlling for impurities in tasimelteon and the methods through which Vanda controls the size of tasimelteon crystals, known as micronization. Appx62 (*Id.* ¶¶ 74, 78).

Separately, processes for impurities control were published in a patent application, US 2017-0190683 A1 (the Impurities Patent Application), which covered a process for preparing pharmaceutical grade tasimelteon. Appx80-81 (Compl. ¶ 149). The application discloses seven impurities that may be "by-products of certain steps of the synthesis of

---

[1]    In the documents it released under FOIA, FDA redacted the numerical specification pursuant to 5 U.S.C. § 552(b)(4), which exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential."

tasimelteon" or "degradation products." Appx81 (*Id.* ¶ 150). The impurities are specific to the manufacturing process disclosed in the application, and nothing in the application discloses which portions match the methods listed in Vanda's NDA for the commercial manufacture of Hetlioz®. Appx81 (*Id.* ¶¶ 152, 154).

During its review of Apotex's tasimelteon ANDA, FDA issued a complete response letter (CRL) stating that the application would not be approved. In its CRL, FDA highlighted five impurities that are "possible impurities of the drug substance reported in patent US20170190683A1." Appx80 (Compl. ¶ 147). FDA asked Apotex to "clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities" and instructed Apotex to "control these impurities in the drug substance release specification at justified limits, or provide justification as to why controls are not needed." Appx80 (*Id.*). FDA further asked whether Apotex's "drug substance may be subject to any particle size reduction"—an implied reference to information in Vanda's NDA that its drug is Manufacturing process. Appx83 (*Id.* ¶ 162).

During its review of Teva's tasimelteon ANDA, FDA issued a CRL to the drug manufacturer that produces the tasimelteon used in Teva's ANDA product. Appx80 (Compl. ¶ 146). FDA made a similar demand as

with Apotex, pointing out impurities from the Impurities Patent Application and instructing Teva's manufacturer to "clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities" and to "control these impurities in the drug substance specification at justified limits, or provide justification as to why controls are not needed." Appx80 (*Id.* ¶ 148).

## C. Procedural background

**1.** After receiving materials through FOIA that revealed FDA's disclosure of its confidential information, Vanda brought two claims against the United States in the Court of Federal Claims, alleging that FDA's disclosure of Vanda's trade secrets and confidential commercial information constituted (1) an uncompensated taking under the Fifth Amendment and (2) a breach of implied-in-fact contract. Appx50; Appx85-88 (Compl. ¶¶ 17, 167-188).

**2.** The government moved to dismiss for lack of jurisdiction and failure to state a claim. Appx101-146. It argued that Vanda failed to allege a cognizable takings claim, that the alleged contract was implied-in-law, and thus beyond the court's jurisdiction, and that Vanda's claims involving one manufacturer, Inventia, were time-barred. Appx2.

The court granted in part and denied in part. It denied the motion as to the takings claim, concluding that "FDA's review and approval of

NDAs and ANDAs falls squarely within the scope of the federal agency's statutorily authorized duties, even if certain acts taken during the review process are ultimately found to be unlawful." Appx10. Then, having found the government had waived any argument that Vanda lacked a proprietary interest in the information disclosed, the court reasoned it was "premature to resolve" whether Vanda had properly alleged a *per se* taking or a regulatory taking. Appx12.

The court dismissed the breach of contract claim, however, reasoning that the alleged disclosure was a violation of "confidentiality requirements imposed by statute and regulation rather than a breach of an implied-in-fact contract," making it "an implied-in-law contract outside the Court's jurisdiction." Appx13. Finally, the court dismissed Vanda's claims involving Inventia as time-barred, declining to suspend claim accrual because Vanda "wait[ed] six years and four months after Inventia's drug approval to submit its FOIA request." Appx15.

**3.** The government filed an answer, and discovery commenced. Appx304-329. Vanda's initial discovery requests sought documents pertaining to, among other things, "the FDA's treatment of the information at issue … as confidential and as trade secret" (Appx703) and thus "whether or not there's a property interest at issue" (Appx706).

The court held a status conference in which it set a briefing schedule for the government's anticipated dispositive motion and denied the government's request for a discovery stay. Appx694-717. Upon learning that the government had not yet produced any documents in response to Vanda's discovery requests, the court directed the government "to respond to all outstanding discovery requests," while Vanda agreed not to issue any "new discovery requests until the Court rules on … the planned dispositive motion." Appx712-713.

**4.** The government then moved for judgment on the pleadings, or alternatively for summary judgment, as to the takings claim. Appx490-688. This time around, it argued that Vanda lacked a cognizable property interest in its dissolution specifications, impurities testing, and micronization techniques. Appx518-534.

Vanda opposed the motion, which inappropriately raised factual disputes with Vanda's allegations, especially in light of the government's failure to respond to Vanda's discovery requests. Appx807-818. In the alternative, Vanda requested leave to amend its complaint if the court were to grant the dispositive motion. Appx838.

On October 21, 2024, after the government's motion had been fully briefed, Vanda moved to compel production because the government had still not meaningfully responded to Vanda's initial discovery requests.

Appx1058-1108. Vanda reiterated that the requests "bear[] directly on the issues of whether Vanda can assert a cognizable property interest in the disclosed information." Appx1063. Despite the court's instructions, however, the government unilaterally asserted that Vanda's requests "do not concern the existence of a cognizable property interest," and therefore were "irrelevant unless and until the Court determines that the information is, in fact, the kind of property interest protected by the Takings Clause." Appx1106.

**5.** The court granted the government judgment on the pleadings, denied Vanda's request for leave to amend, and denied Vanda's motion to compel. Appx36.

The court concluded that the dissolution specifications were not trade secrets because "they were generated by the FDA and proposed to and accepted by Vanda during the NDA process." Appx27. The court reasoned that the specifications "do not satisfy" FDA's regulatory trade-secret definition, 21 C.F.R. § 20.61(a), because they were "generated by" FDA. Appx28. Despite acknowledging that "FDA used information included in Vanda's NDA to generate the alternative rates," the court concluded that "[l]ogic dictates" that the ultimate dissolution specifications were not "the 'end product' of Vanda's innovation or effort," nor "directly

related to Vanda's productive process, and therefore do not qualify as trade secrets. Appx28 (quoting 21 C.F.R. § 20.61(a)).

The court also concluded that the specifications were not trade secrets under state and federal statutes for the sole reason that, in the court's view, "there is no independent economic value in a drug's dissolution specification." Appx30. In reaching that conclusion, the court stated that "dissolution specifications are not unique to the end product or the productive process employed" because "an identical manufacturing process can yield multiple dissolution specifications." Appx29. The court also stated that "the record … strongly suggests that, like Vanda, none of the generic manufacturers modified the … characteristics of their drugs after the FDA recommended an alternative dissolution specification." Appx30-31.

Finally, the court weighed "practical considerations." Appx31. In its view, because FDA must use Vanda's dissolution specifications as "benchmarks for … subsequent ANDA reviews and approvals of generic drugs," it would be "impractical" for "FDA to align dissolution specifications between brand-name and generic drugs if the agency is prohibited from accessing or referencing the NDA-approved dissolution specification in its subsequent ANDA review." Appx31.

As to the impurities testing and micronization information, the court concluded that they were "already in the public domain at the time of the agency's alleged disclosures" because they were cited in a patent application. Appx27. The court acknowledged Vanda's argument that FDA's "referencing [its] patent application in the course of [generic manufacturers'] ANDA reviews improperly … revealed … that Vanda ▮▮▮▮ Manufacturing process the patent in its production of Hetlioz®." Appx33 (emphasis added). But without addressing this distinction, the Court concluded that "[c]omparing the detailed information included in Vanda's patent application with the more general inquiry the FDA posed to … generic manufacturers' comparable capabilities does not yield the improper disclosure of any novel or unknown part of Vanda's production process." Appx33.

The court also declined Vanda's request to amend its complaint and denied its motion to compel, despite the outstanding discovery dispute pertaining to the existence of trade secrets. Appx35. The court chided the government's "apparent slow-walking" of discovery, noting that it "unjustifiably ceased" document production even after the court "denied" the government's "informal request" to stay discovery. Appx35. But it declined to give Vanda a chance to allege additional facts because, it stated,

"Vanda does not … proffer what those facts are," and it perceived a "disconnect between the requested discovery and the factual and legal issues material to the resolution of this case." Appx34-35.

## SUMMARY OF ARGUMENT

**I.** The lower court was wrong to hold that integral components of Vanda's manufacturing processes were not entitled to protection as trade secrets.

Principally, the lower court erroneously focused on FDA regulations as the source of requirements for the relevant property interest, rather than state law. It therefore effectively grafted a novelty requirement onto the trade secret analysis, despite that such an approach has been roundly rejected by state courts and the Supreme Court. Vanda properly alleged the *actual* elements of a trade secret, which the Supreme Court has recognized is governed by state law; the FDA regulations the lower court seized on are simply irrelevant. But, in any event, any fair reading of those regulations makes clear that Vanda's allegations meet those standards as well.

Beyond that legal error, the lower court erred by resolving numerous factual disputes against Vanda, which is inappropriate at the pleading stage. In particular, the core of the court's analysis was to simply disagree with Vanda's well-pleaded allegation that key components of its

manufacturing process have value as a result of being secret. But the existence of a trade secret and the value of that secret are quintessential fact questions that should not be resolved against a plaintiff at the pleading stage. Vanda alleged (and even produced evidence) that the disclosed information was valuable to it and its competitors—which was consistent with longstanding FDA practice. Nothing more was required at this stage.

And beyond simply disagreeing with Vanda's allegations, the court's analysis was flawed on its face. The court appears to have confused dissolution *rate*—a physical property of Vanda's drug that could be approximated by competitors through reverse-engineering—with the dissolution *specification*, which is an independently valuable element of Vanda's manufacturing process. And the court rested heavily on its apparent policy view that FDA *should* be able to provide this information to generic manufacturers—but it overlooked proposed legislation that would expressly allow FDA to do exactly that, demonstrating both that such disclosure is currently prohibited and that it is up to Congress, not the courts, to change that fact.

In addition to its pleadings, Vanda produced a declaration by Dr. Mark Robbins, a respected Ph.D pharmacologist with more than forty years' experience in the pharmaceutical industry. Dr. Robbins avowed

that each element of the trade secret requirements was satisfied by the information disclosed here. But rather than credit or even engage with Dr. Robbins's explanations, the lower court simply disregarded it. Even if that approach were acceptable (it is not), it certainly cannot be squared with the court's denial of Vanda's request to amend its complaint. Vanda specifically identified the Robbins declaration as material it would add in an amended complaint—and the lower court never offered any explanation for how his detailed and clear declaration would not satisfy the pleading requirements.

Principally, the lower court erroneously focused on FDA regulations as the source of requirements for the relevant property interest, rather than state law. In doing so, it effectively grafted a novelty requirement onto the trade secret analysis, despite that such an approach has been roundly rejected by state courts and the United States Supreme Court. Vanda properly alleged the *actual* elements of a trade secret, and the FDA regulations the district court seized on are simply irrelevant. But, in any event, any fair reading of those regulations makes clear that Vanda's allegations meet those standards as well.

Beyond that legal error, the lower court erred in resolving numerous factual disputes against Vanda—which is inappropriate at the pleadings stage. In particular, the court dismissed Vanda's well-pled allegation

that key components of its manufacturing process have value as a result of being secret. The existence of a trade secret and the value of that secret are quintessential fact questions that should not be resolved against a plaintiff at the pleading stage. Vanda alleged (and produced evidence) that the disclosed information was valuable to it and its competitors—which was consistent with longstanding FDA practice. That is all that was required at this stage.

In addition to its pleadings, Vanda produced a declaration by Dr. Robbins, a respected Ph.D pharmacologist with more than forty years' experience in the pharmaceutical industry. Dr. Robbins avowed that each element of the trade secret requirements was satisfied by the information disclosed here. Rather than credit or even engage with Dr. Robbins' explanations, the lower court simply ignored it. But even if that approach were acceptable, it cannot be squared with the court's denial of Vanda's request to amend its complaint. Vanda specifically identified the Robbins declaration as material it would add to the complaint—and the lower court never offered any explanation for how his detailed and clear declaration would not satisfy the pleading requirements.

**II.** Vanda plausibly alleged the remaining elements of a taking claim. As the lower court correctly held, FDA's actions were "authorized" for purposes of a takings claim because the agency's review of NDAs and

ANDAs falls within the scope of its statutorily authorized duties, regardless whether the agency's disclosures of Vanda's trade secrets to its competitors was unlawful. *See Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1027 (Fed. Cir. 2024).

Vanda alleged a direct appropriation of its trade secrets, which constitutes a *per se* taking. In the alternative, Vanda stated a plausible claim for a regulatory taking. Because the lower court did not address these remaining elements, the Court should remand for the trial court to resolve these questions in the first instance.

The lower court also erred in holding Vanda's claims regarding FDA's disclosure to Inventia were time-barred. The statute of limitations does not bar Vanda's Inventia-based claims because Vanda did not know and could not determine from any publicly available information the facts at the heart of this claim. The lower court's holding that the claim accrued upon the theoretical possibility of uncovering misconduct through FOIA creates untenable, perverse incentives that would force all manufacturers to submit FOIA requests just to ensure their rights have not been violated. The accrual rule was developed to avoid precisely such absurd consequences.

**III.**    Finally, the lower court erred in dismissing Vanda's breach of contract claim. Vanda plausibly alleged that FDA's disclosure of Vanda's

confidential commercial and trade secret information was a breach of an implied-in-fact contract. Appx87-88.

This Court's precedent provides that, when an agency invites applications and crafts a regulatory scheme of confidentiality to obtain them, an implied-in-fact contract is created when a party submits an application containing confidential information. *See Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1359 (Fed. Cir. 1983). That is what FDA has done. FDA maintains a standing offer under which "[a]ny person may file with the Secretary an application" for a new drug. 21 U.S.C. § 355(b)(1)(A). Because these applications contain trade secrets, FDA has recognized that it must protect such information if it wishes to receive any applications. *See* 21 C.F.R. § 20.61(c)-(d). Vanda thus understood that in exchange for its unsolicited application, FDA would keep the submitted information secret in accordance with its regulations. Appx57; Appx88 (Compl. ¶¶ 46, 186). There was thus a meeting of the minds—an implied-in-fact contract—notwithstanding the agency's independent confidentiality obligations under the law.

## STANDARD OF REVIEW

This Court reviews *de novo* the Court of Federal Claims' entry of judgment on the pleadings under Rule 12(c) and dismissal under Rule 12(b)(6). *Agility Pub. Warehousing Co. K.S.C.P. v. United States*, 969 F.3d

1355, 1364 (Fed. Cir. 2020); *Darby*, 112 F.4th at 1023. Under both rules, the Court "must presume that the facts are as alleged in the complaint[] and make all reasonable inferences in favor of the plaintiff." *Agility*, 969 F.3d at 1364 (Rule 12(c)); *accord Darby*, 112 F.4th at 1023 (Rule 12(b)(6)). The Court reviews the denial of leave to amend a complaint for abuse of discretion. *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1379 (Fed. Cir. 2007).

## ARGUMENT

The lower court erred in resolving both claims in the government's favor at the pleading stage. *First*, the court was wrong to grant the government judgment on the pleadings for Vanda's takings claim. Vanda sufficiently alleged that the information FDA disclosed to Vanda's competitors are trade secrets, and thus compensable property interests. Not only that, but the court also did not even allow Vanda to amend its complaint, disregarding the relevant additions Vanda would have made. *Second*, the court erred in dismissing the breach of contract claim for lack of jurisdiction. Vanda stated a claim for a breach of implied-in-fact contract, not an implied-in-law contract outside the lower court's jurisdiction.

This Court should reverse both rulings and remand for further proceedings. At a minimum, the Court should remand to allow Vanda its first opportunity to amend its complaint.

## I. THE LOWER COURT ERRED IN GRANTING THE GOVERNMENT JUDGMENT ON THE PLEADINGS.

The crux of Vanda's claim is that FDA disclosed key aspects of Vanda's process for manufacturing several of its drugs to competitors. The information FDA disclosed revealed Vanda's trade secrets and confidential commercial information.

It is settled that a trade secret is property and that its disclosure by the government—and therefore its destruction as a trade secret—can support a takings claim. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004-1014 (1984). And whether information constitutes a trade secret or is otherwise entitled to treatment as intellectual property is a quintessentially fact-based inquiry that is rarely appropriate for resolution on the pleadings.

Here, Vanda pleaded that the information FDA provided to its generic competitors—specifically, Vanda's confidential numerical dissolution specifications for Fanapt® and Hetlioz®, along with manufacturing information about impurities testing and micronization—are trade secrets: Those specifications constitute "information" that "[d]erives actual or potential independent economic value," from the fact that Vanda keeps them secret. D.C. Code § 36-401. Indeed, as Vanda's expert opined, "[k]nowledge of a drug's dissolution specification … provides substantial

information to a generic company about a drug's underlying manufacturing process," enabling them to develop their copies more cheaply and efficiently. Appx850 (Robbins Decl. ¶¶ 24-25). And indeed, *FDA itself* treats this very information as trade secret, routinely redacting dissolution specifications in public disclosures of internal documents. *See* pages 44-45, *infra*.

Because a "court should only grant the defendant's motion for judgment on the pleadings if the defendant is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them (*Agility*, 969 F.3d at 1364), the government's motion should have been denied.

In deciding otherwise, the lower court departed wholesale from the state-law definitions of trade secrets, grafting on new requirements untethered from traditional or contemporary practice. And rather than accept as true the well-supported allegations in Vanda's complaint, the court substituted the government's representations and its own supposition. Neither was permissible at this early stage in litigation, and both require reversal.

## A. FDA regulations cannot modify or eliminate Vanda's property interests.

The lower court's analysis began by applying FDA's regulatory definition of trade secrets to Vanda's dissolution specifications. That alone

was error—the regulatory requirements relied on by the court are found nowhere in state law. But the court also erred in the application, finding that the dissolution specifications were "recommended *to Vanda by the FDA*" and therefore were not the "end product" of Vanda's effort. Appx28 (quoting 21 C.F.R. § 20.61). Not only is that wrong as a factual matter, especially in light of Vanda's allegations at this stage (see pages 39-40, *infra*), but it would also be catastrophic for drug manufacturers and other highly regulated entities if this logic were applied in other cases.

**1.** The lower court erred right out of the gate by analyzing Vanda's asserted property interest under "FDA regulations" rather than state law, which it addressed only as an afterthought. Appx28; *cf.* pages 40-44, *infra* (discussing errors in lower court's brief state-law analysis). But the property interests Vanda asserts are created and defined by *state* law, not federal regulation. Indeed, that was the premise of the Court's decision in *Monsanto*. As the Court put it in summarizing its holding: "We hold that to the extent that Monsanto has an interest in its … data cognizable as a trade-secret  property right *under Missouri law*, that property right is protected by the Taking Clause of the Fifth Amendment." *Monsanto*, 467 U.S. at 1003-1004 (emphasis added); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("[P]roperty interest[s]" for purposes of constitutional protections "are created and their dimensions

are defined by existing rules … that stem from an independent source such as state law"); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (similar).

Vanda thus need not show that its dissolution specification satisfies FDA's *regulatory* definition of trade secret for it to be a protectible property interest under the Fifth Amendment, so long as the state-law definition applies.

The particular regulatory requirements the lower court seized on, moreover, are untethered from state law. D.C. law (like Maryland law and the most analogous federal statute) defines a trade secret simply as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that … [d]erives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use[] and … [i]s the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401; *accord* Md. Code Com. Law § 11-1201(e) (materially identical Maryland definition); 18 U.S.C. § 1839(3) (parallel federal definition).[2]

---

[2]  Because the law of D.C. (where Vanda is based) and Maryland (where FDA is headquartered) are in accord—as is federal law—the Court need not decide which state law governs.

FDA's regulations, by contrast, require both that the information be "the end product of either innovation or substantial effort" and that "[t]here must be a direct relationship between the trade secret and the productive process." 21 C.F.R. § 20.61(a). No such requirement is found in the state-law definition. Yet the lower court relied on these regulatory requirements to reject Vanda's claims, insisting that FDA had proposed the relevant dissolution specifications in various back-and-forths with Vanda, and therefore that they "cannot be said to be the 'end product' of Vanda's innovation or effort, let alone directly related to Vanda's productive process." Appx28 (citing 21 C.F.R. § 20.61(a)).

There can be no doubt that the lower court's analysis is incompatible with that required under state and federal statutes. Indeed, the Supreme Court has explained that "[n]ovelty, in the patent law sense, is not required for a trade secret." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). Nor is "invention … requisite for a trade secret." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting *Restatement of Torts* § 757 cmt. b (1939)). Rather, "[t]he protection [for trade secrets] is merely against breach of faith and reprehensible means of learning another's secret. For this limited protection it is not appropriate to require also the kind of novelty and invention which is a requisite of patentability." *Restatement of Torts* § 757.

This makes logical sense—the premise of a trade secret is that the information is valuable because it is *kept secret* from others who could commercially gain from knowing it, unlike patents which offer protection in exchange for valuable disclosure. The lower court was therefore wrong to limit Vanda's trade secret property rights through application of an FDA regulatory requirement that is absent from the relevant state law.

**2.** The lower court's discussion of *Monsanto* and *United States v. Fuller* (Appx28) does not save its reliance on the wrong legal standard.

First, the court seized on the phrase "labour and invention" (467 U.S. at 1002-1003) to suggest that *Monsanto* held that trade secrets for takings purposes *require* those elements, such that a trade secret is protected only when it is, in the Court of Federal Claims' words, "wholly generated by the claimant and presented to the regulatory agency." Appx28.

But *Monsanto* draws no such line. Instead, the passage in question quotes Blackstone simply for the high-level proposition that "property … extends beyond land and tangible goods," which the Court found "consonant with" the "general perception of trade secrets as property" that it had already discerned from various state and common-law sources. 467 U.S. at 1002-1003. The purported distinction played no part in the Supreme Court's reasoning, and the remainder of the opinion certainly does

not suggest the Court was somehow constraining the scope of state-law trade secrets when asserted against the government. By attributing significant unstated meaning to this stray language, the court below thus committed the fundamental "mistake" of "read[ing] judicial opinions like statutes." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring); *accord, e.g.*, *Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("This Court has long stressed that the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.") (quotation marks omitted).

Moreover, the *Monsanto* Court *could not* have issued a holding on the scope of information that can be protected as a trade secret, because whether information was a trade secret was a function of "Missouri law." 467 U.S. at 1001, 1003. As the Supreme Court lacks the authority to issue binding pronouncements of state law (*Hicks v. Feiock*, 485 U.S. 624, 629 (1988)), nothing in *Monsanto* could have determined whether a regulated party has a protected interest under state law.

Nor did the Supreme Court condition protection by the Fifth Amendment on compliance with some additional, federal requirement. To the contrary, the Court was clear in its "hold[ing]": The Fifth Amendment protected Monsanto "to the extent that Monsanto has an interest … under Missouri law." *Monsanto*, 467 U.S. at 1003-1004. That is, the

*Monsanto* Court left the definition of the trade secret entirely to state law, in keeping with the Court's "traditional resort to existing rules or understandings that stem from an independent source such as state law" when determining "the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas*, 505 U.S. at 1030. And this Court has understood this unmistakably clear statement to mean exactly what it says: it is "undisputed that trade secrets are protected by the Taking Clause of the Fifth Amendment." *Gal-Or v. United States*, 470 F. App'x 879, 884 (Fed. Cir. 2012).

The lower court's analysis cannot find support in *United States v. Fuller*, 409 U.S. 488 (1973), either. The court cited *Fuller* for "the general principle the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created." *Id.* at 492; *see* Appx28-29. But the Supreme Court expressly disclaimed "that such a general principle can be pushed to its ultimate logical conclusion." *Fuller*, 409 U.S. at 492. *Fuller* held only that property value fully attributable to a permit issued by the government (and therefore "revocable" by the government as well) is not compensable under the Fifth Amendment. *Id.* at 492-493. But where value is added to property by something the government *builds* or *does*, such as a public works project, "the Government must pay." *Id.* at 492.

*Fuller*, then, supports the notion that the dissolution specification qualifies for protection even if it had originated from FDA. *But see* pages 39-40, *infra*. It is not a permit that has value only because of the government's grace in not rescinding it; instead, it is (under the lower court's theory) an element with independent value that the government contributed to Vanda's manufacturing process—for which compensation is still due. And in any event, *Fuller* is a case about the "just compensation" that must be paid upon a completed taking (409 U.S. at 490); it says nothing about the logically prior element of whether a property right exists to begin with.

**3.** The bottom line is that neither state nor federal law precludes drug sponsors from claiming trade secret protections in aspects of their processes that they adopted at the suggestion of their regulators. Indeed, to hold otherwise would be disastrous for drug manufacturers and other highly regulated entities whose businesses are subject to governmental inspection and oversight.

Consider the extraordinary consequences in just the pharmaceutical context. Drug manufacturers must submit documentation of their entire manufacturing processes as part of their new drug applications. 21 C.F.R. § 314.50(d)(1). That submission must include "[a] full description of the drug substance including its physical and chemical characteristics

and stability;" "the method of synthesis (or isolation) and purification of the drug substance;" "and the specifications necessary to ensure the identity, strength, quality, and purity of the drug substance … including, for example, tests, analytical procedures, and acceptance criteria relating to stability, sterility, particle size, and crystalline form." *Id.* § 314.50(d)(1)(i). It must also disclose "all components used in the manufacture of the drug product (regardless of whether they appear in the drug product);" "the specifications for each component;" "the name and address of each manufacturer of the drug product;" and "a description of the manufacturing and packaging procedures and in-process controls for the drug product." *Id.* § 314.50(d)(1)(ii).

As is evident from the pleadings in this very case, FDA can and does make suggestions to drug sponsors about each aspect of their processes. It routinely makes suggestions about the controls that should be used to ensure drug quality and consistency. Appx64-69 (Compl. ¶¶ 98-107). It makes suggestions concerning the methods sponsors use to manufacture drugs whose particles are the correct size. Appx83 (*Id.* ¶ 162). And it makes suggestions about which impurities should be controlled for in manufacturing processes. Appx80 (*Id.* ¶ 147). This back-and-forth between FDA and a drug manufacturer reflects an iterative, collaborative

process that often is the most efficient way "to achieve an approvable product." Appx49-50 (*Id.* ¶ 14).

Of course, as even the lower court recognized, FDA only makes such suggestions based on "information included in [the sponsor's] NDA," which is the product of the drug innovator's enormous investment. Appx28. Take dissolution specifications, for example. FDA does not "generate" them from scratch based on its own knowledge and research; it is instead suggesting alternative specifications—here, dissolution specification ▮—based on the data that the innovator itself generated. Appx28; *see* Appx60 (Compl. ¶¶ 63-64) (alleging that Vanda's proposed dissolution specification was "the result of significant research expenditures"); Appx650 (FDA finding that "[t]he proposed dissolution acceptance criterion is not supported by [Vanda's] data" and therefore "recommend[ing]" a new one). FDA's recommendation is thus only made possible by the innovator's submission of data and proprietary information that the *innovator*, not FDA, "generates." Appx28.

Yet the lower court's holding would mean that any time FDA suggests *anything* as to *any* component of a sponsor's manufacturing process, and the sponsor adopts that recommendation, the sponsor loses *all* property rights it might have in that component of its manufacturing process. This is as implausible as it is intolerable. In drug manufacturing as in

other regulated industries, manufacturers must submit their highly secret processes for review by a federal agency. That the agency—whose regulations prevent it from disclosing those processes—makes suggestions during its review can hardly strip the eventual manufacturing processes of protections guaranteed by state and federal law.

## B. The lower court's analysis rests on improperly resolved factual disputes.

The lower court's judgment on the pleadings must also be reversed because it resolves disputed factual issues in the government's favor. At this early stage in litigation, courts may grant judgment on the pleadings only if there are "no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Lab'ys, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007). To establish a factual dispute, a plaintiff need only plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citation omitted); *see Sikorsky Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 719 (2015) (tests for Rule 12(c) and Rule 12(b)(6) are "substantially the same."). That is, judgment on the pleadings "is appropriate only when there are no factual allegations that, taken as true, prevent resolving the … question as a matter of law"

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019).

Despite this well-established guidance, the lower court's decision is replete with instances in which it resolved factual disputes of central importance in favor of the government, rather than accepting Vanda's well-pleaded allegations. Had it conducted the proper analysis, the court would have concluded that Vanda adequately pleaded a protected interest.

**1.** First, though Vanda need not meet this burden (*supra* pages 28-38), the dissolution specifications *do* satisfy FDA's regulatory requirements for trade secret protection based on the facts Vanda alleged. Vanda explained that its dissolution specifications are "the result of significant research expenditures by Vanda." Appx60, Appx86 (Compl. ¶¶ 64, 173). That is because "the specification is derived from the Sponsor's underlying data." Appx850 (Robbins Decl. ¶ 26). That data was gathered through painstaking research and expensive drug trials. Though the "drug approval process" is "iterative and collaborative, reflecting back-and-forth between Sponsors and the FDA," the resulting drug product and manufacturing process are ultimately based on the hard work of the sponsor, regardless whether FDA or the sponsor first suggested each component. Appx850.

Moreover, there can be no doubt that there is a "direct relationship" between the dissolution specification and Vanda's "productive process." 21 C.F.R. § 20.61(a). The complaint alleged that the "dissolution specification" is an "*integral part* of Vanda's manufacturing process." Appx74 (Compl. ¶ 119) (emphasis added). A declaration attached to Vanda's 12(c) opposition reinforced that point. Appx849 (Robbins Decl. ¶ 23) ("One critical attribute of the drug product and quality control process is the dissolution specification."). And FDA itself has considered the manufacture and controls for drug products to be an integrated process since at least 1987. *See generally* Manufacturing Guidance. A "part" is "one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and *which together constitute the whole*." Part, *Merriam-Webster* (2025). The lower court's conclusion that this "integral part of Vanda's manufacturing process" (Appx74 (Compl. ¶ 119)) has no direct relation to the whole (Appx30-31) thus contradicts the allegations.

**2.** The lower court likewise improperly resolved factual disputes by the time it found its way to the actual state-law elements of trade secret. The court's entire reasoning for why the state-law definition was not satisfied was a single-sentence assertion that "there is no inherent independent economic value in a drug's dissolution specification." Appx30. But that *directly contravenes* Vanda's allegations that "[a]s an integral

part of Vanda's manufacturing process, the dissolution specification had economic value to Vanda." Appx74 (Compl. ¶ 119); *see also* Appx76; Appx86 (*id.* ¶¶ 126, 173-174).

More, Vanda alleged facts showing that the dissolution specification meets the statutory requirement of "[d]eriv[ing] actual or potential independent economic value, from not being generally known to … another who can obtain economic value from its disclosure or use." D.C. Code § 36-401(4)(A). As Vanda explained in its complaint, "[a] drug's dissolution profile cannot be ascertained simply from knowledge of the drug's formulation"; rather "conclusions about dissolution profile and appropriate dissolution specifications can only be made by reliance on data from dissolution testing." Appx73 (Compl. ¶ 117). Vanda thus used "reasonable efforts … to maintain [the] secrecy" of its dissolution specifications, which provided "economic value to Vanda … from its secrecy." Appx74 (*Id.* ¶¶ 118-119); *see also* Appx74 (*Id.* ¶ 120) ("Disclosure of the confidential dissolution specification would greatly accelerate Vanda's competitors' efforts to copy the formulation of Fanapt®.").

If generic manufacturers are simply told the RLD's dissolution specification, then they would not have to invest in calculating their own specification based on their own dissolution testing. Congress rejected such a scheme: The Hatch-Waxman Act requires drug innovators *only* to

provide sample product to generic manufacturers to facilitate their bioequivalence testing. 21 U.S.C. § 355-2(b)(1). As Vanda explained, Congress chose not to obligate brand manufacturers to disclose confidential information regarding their products' composition, their manufacturing process, or the results of their testing. Appx49; Appx59 (Compl. ¶¶ 13, 55). Congress instead decided that while a generic manufacturer must have reasonable access to a RLD, it "must do [its] *own* dissolution and bioequivalence testing on the product." Appx49 (*Id.* ¶ 13 n.1). The lower court's reasoning disregards these allegations and Congress's calibration.[3]

In any event, other federal courts applying D.C. law have routinely rejected Rule 12 motions asserting that a plaintiff did not specify "how it derives economic value from the secrecy of [its] information, or how such information is not readily ascertainable." *HIRECounsel D.C., LLC v. Connolly*, 2021 WL 5998365, at *6 (D.D.C. 2021). Because "[w]hether a particular piece of information is a trade secret is generally a question of fact," it is inappropriate to override a plaintiff's allegations that it *treats*

---

[3] Indeed, consider the result if a generic's next commercial batch of drug product does not meet the proper specification—the product cannot be sold. The specification is therefore critical to commercializing the drug, and, moreover, is the result of costly experimentation. *See* pages 7-8, *supra*.

information as confidential until "after full presentation of the evidence from each side." *Id.* (quoting *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 78 (D.D.C. 2007)) (alteration in original); *accord Clevinger v. Advocacy Holdings, Inc.*, 2024 WL 3359508 (D.D.C. 2024) (finding sufficient allegation of trade secret based on claim that the information was "valuable"); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 43-44 (D.D.C. 2010) (finding a material dispute of fact that information was a trade secret, even for *summary judgment* purposes, based only on evidence that plaintiff "restricted public access" to it and "considered use by third parties to be a serious problem").

Accordingly, Vanda easily satisfied its pleading burden. And those allegations were reinforced by Dr. Robbins's declaration. *See* Appx850 (Robbins Decl. ¶ 25) ("Because each step of a drug manufacturing process, including quality control mechanisms, would at least require substantial investment by competitors to discover, manufacturing processes and their component steps afford Sponsors a competitive advantage by virtue of being unknown to their competitors."); *cf.* pages 48-53, *infra* (discussing the lower court's improper treatment of this declaration).

In dismissing these allegations, the lower court appears to have confused dissolution *rate*, which is a physical property of a drug, with the

dissolution *specification*, which is part of Vanda's confidential manufacturing process. Appx29-30. As the court below elsewhere seemed to recognize (and as the authority it cited makes plain, *see* Appx20 n.5), the dissolution specification is a value Vanda uses to ensure that its drugs have a consistent dissolution rate; though it is related to the drug's physical properties, it is not itself a physical property of the drug and cannot be conclusively determined by testing available products. *See* Appx60; Appx66; Appx73 (Compl. ¶¶ 63, 99-100, 117). And the court was incorrect about the import of FDA's disclosure. Its assertion that none of the manufacturers changed their manufacturing processes in response to FDA's suggestion requires rejecting Vanda's allegation (supported by Dr. Robbins's declaration) that the dissolution specification is *part* of the manufacturing process.

The factual dispute about the existence of a trade secret is highlighted by FDA's consistent, uncontested practice of withholding this precise information from its publications. At the hearing on the government's motion, the government confirmed that FDA only submits dissolution data to the U.S. Pharmacopoeia *when the sponsor consents*—and Vanda emphatically has not. Appx1176.

Similarly, in response to Vanda's own FOIA requests, FDA specifically redacted the relevant dissolution specifications, marking the redactions with the FOIA exemption for "trade secrets" and "privileged or confidential" information. 5 U.S.C. § 552(b)(4); Appx 64-70 (Compl. ¶¶ 98-101, 107-108); Appx78 (*Id.* ¶¶ 140-141). And it does the same in approval packages it publishes for approved drugs, including Vanda's. Appx70-71 (Compl. ¶ 100); *see also, e.g.*, CDER, *Clinical Pharmacology and Biopharmaceutics Reviews, App. No. 205677Orig1s000*, at PDF page 152 (redacted dissolution specification for Hetlioz®), tinyurl.com/4n5ek5fh.

This practice, which the lower court's opinion does not acknowledge, supports Vanda's allegations that its information warrants trade secret protection.[4] And it undercuts the lower court's conclusion that FDA's role in developing dissolution specifications for drug products eliminates all protection for that information.

---

[4]    As Vanda noted below, documents produced by the government show that FDA routinely prespecifies information to be redacted by marking it "Not for FOIA." While the court refused to "ascribe nefarious intent" to this unexplained practice (Appx33 (n.29)), it is in tension with the government's claim that FDA's decisions concerning FOIA redactions are matters of convenience made without assessing the confidential nature of the specific information. Instead, it supports Vanda's view that FDA knew it could not disclose information from Vanda's application, so it looked for public references it could use to give the generics hints as to the contents. *See* pages 55-56, *infra*.

In all, the court offered no justification for dismissing Vanda's allegations at this stage, and its holding resting on contrary conclusions must be reversed.

**3.** Finally, the lower court was wrong to base its analysis of Vanda's property interests on its own assessment of unrelated policy arguments. *See* Appx31-32. Such policy preferences cannot dictate federal law, much less state law, which defines the property interests here. Indeed, proposed legislation *would* authorize FDA to provide precisely this sort of information to generic manufacturers. *See* S. 775, 118th Cong. (2023) (proposed legislation that would authorize FDA to provide confidential details about a branded manufacturer's product to a generic). This unenacted legislation makes clear that both FDA and Congress recognize that the status quo restricts the scope of information FDA may share. *Cf., e.g.*, *Garland v. Cargill*, 602 U.S. 406, 427 (2024) ("Congress presumably does not enact useless laws."). To the extent that the government believes this a policy concern, that is an issue for Congress—which is considering precisely these issues.

Nor are the lower court's concerns about "FDA's … obligations of ensuring bioequivalence" well founded. Appx31. Even under Vanda's approach, nothing prevents a generic manufacturer from using the same dissolution specification, controlling for the same impurities, or using the

same particle-control techniques as Vanda. Nor is there anything that would prevent FDA from deriving the same dissolution specification based on data submitted by multiple manufacturers and suggesting that same specification to each.

The issue instead arises when, rather than reaching that result independently, a competitor is tipped off by FDA about a confidential portion of Vanda's manufacturing process, which the agency obtained directly from Vanda's NDA. In trade secret law, it is fundamental that "independently possessed information" poses no problem; it is the act of "misappropriat[ing]" otherwise secret information that is prohibited. *Tex. Advanced Optoelec. Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1313 (Fed. Cir. 2018). And here, we know that FDA did not independently develop the dissolution specification that it gave to Vanda's competitors, because FDA staff *admitted that it came from Vanda's NDA*. Appx66-67; Appx70; pages 9-10, *supra*.[5]

---

[5] At the very least, the review documents (which suggest that the specification to which FDA tipped off the generics was lifted straight from Vanda's NDA) make it imperative to explore through discovery what happened within the agency. Yet the government stonewalled Vanda's discovery requests even after the lower court denied its request for a discovery stay. *See* pages 15-17, *supra*. And FDA never produced an individual for a deposition.

In sum, "Vanda's assertions of proprietary secrecy in the dissolution specifications" do not undermine "FDA's regulatory authority." Appx31. Congress has already calibrated these interests, and to the extent there is a policy problem with that calibration, Congress—not the judicial branch—is positioned to change it.

### C.    The lower court cannot both disregard the Robbins declaration and deny Vanda leave to amend.

Finally, even if the lower court were otherwise correct to dismiss Vanda's claims (it was not), the court abused its discretion by denying leave to amend.

The Rules of the Court of Federal Claims (RCFC) permit plaintiffs to amend their pleadings at any time before trial with leave of the court. RCFC 15(a)(2). More than that, Rule 15 instructs the court to give leave "freely" whenever "justice so requires." *Id.*; *accord A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014). In the seminal case on the parallel instruction in the Federal Rules of Civil Procedure, the Supreme Court forcefully emphasized that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, all of the facts discussed above with respect to the substance of Vanda's claims are reinforced by the declaration of Dr. Robbins, a Ph.D

pharmacologist with more than forty years' experience in the pharmaceutical industry who has spearheaded numerous NDA and ANDA development and approval processes. Appx843-845 (Robbins Decl. ¶¶ 7-15). But although this declaration was attached to, and extensively discussed in, Vanda's opposition to the government's Rule 12(c) motion (*see, e.g.*, Appx809-811; Appx814; Appx822-823), the lower court completely disregarded it and reached conclusions directly contrary to the facts attested therein.

Most critically, the court's sole reasoning with respect to the state-law definition of trade secrets (as opposed to the FDA regulation on which the court improperly relied) was that, "[c]ontrary to the arguments advanced by Vanda, there is no inherent independent value to a drug's dissolution specification." Appx30. We have already explained that this conclusion, on which the court's analysis turns, disregards the complaint's allegations. *See* pages 38-48, *supra*. But it *even more clearly* contravenes Dr. Robbins's testimony.

As Dr. Robbins explains: "The dissolution specification for any given drug is based on that particular drug's unique formulation and composition, including its solubility, permeability, dissolution, and pharmacokinetics. Knowledge of a drug's dissolution specification therefore

*provides substantial information to a generic company about a drug's underlying manufacturing process*," which otherwise "would at least require substantial investment by competitors to discover." Appx850 (Robbins Decl. ¶¶ 24-25) (emphasis added). In other words—and directly contrary to the lower court's central premise—knowledge of the dissolution specification *does* have "inherent independent value" to generic competitors (Appx30), because it provides them with information that otherwise would require "substantial investment to discover" (Appx 850 (Robbins Decl. ¶ 25)).[6]

The information in Dr. Robbins's declaration is therefore obviously relevant (indeed, dispositive) material that could be added to Vanda's complaint in an amendment. Yet the court below both completely disregarded the declaration's content—it is discussed or cited nowhere in the court's opinion—*and* denied Vanda's request for leave, on the sole basis

---

[6]   Dr. Robbins's analysis also rebuts the lower court's assertion that the dissolution specification is simply given to sponsors by FDA, which he described as "an inaccurate characterization." Appx850-851 (Robbins Decl. ¶ 26). As he explained, a dissolution specification "does not exist in a regulatory vacuum separate from the drug product itself." Appx850-851 (*Id.*). Instead, "the ultimate dissolution specification is based off the Sponsor's manufacturing process and dissolution data and not independently determined by the FDA." Appx851 (*Id.* ¶ 27).

that "Vanda does not … proffer what … facts" it would add in an amendment. Appx35.

First and foremost, that is simply wrong as a historical matter. At the hearing on the 12(c) motion, Vanda explicitly "proffer[ed]" (Appx35) Dr. Robbins's declaration as material that would be included in an amended complaint:

> THE COURT:    And so if the Court were inclined to allow you leave to amend your complaint, what would you add that you haven't already added?

> MR. HUGHES: So there are several things that we might want to add. … We have material from Dr. Robbins that FDA somehow says you shouldn't consider in this context. That would appear in an amended complaint.

Appx1270; *see also* Appx1271 ("[A]s we've shown in Dr. Robbins['s] testimony … there are many factual issues that pervade this, [and] we'd be prepared to allege any of that."). The lower court's stated basis for its denial of leave—that Vanda never proffered what facts it would amend into the complaint—is therefore factually incorrect, and the denial itself thus constitutes an abuse of discretion. *Cf., e.g.*, *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) ("[A]buse of discretion" occurs when "the decision was based on clearly erroneous findings of fact.").

Moreover, the lower court's own authorities make clear the commonsense point that leave should be denied for lack of proffered additional facts only when the plaintiff has failed to provide those facts *after being given notice* of the specific deficiency in its pleading. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-1355 (Fed. Cir. 2006) ("Although [counter-claimant] had ample opportunity to defend the sufficiency of its proposed counterclaims and to point to facts in the record supporting its revised counterclaims, it made no attempt to do so."). Here, Vanda had no such opportunity prior to the lower court's decision, since that decision was the first time the court explained what it thought the *specific* factual deficiencies in Vanda's existing complaint were.[7]

Because Vanda identified the Robbins Declaration as factual matter it would allege in an amendment and because the declaration would

---

[7]  Moreover, because "whether information constitutes a trade secret is a question of fact" (*DePuy Synthes Prod., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1371 (Fed. Cir. 2021)), any deficiency in Vanda's complaint is necessarily one of missing factual allegations that can be cured with more allegations, not an impossible-to-cure "legal defect" justifying denial of leave (*Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 71 Fed. Cl. 172, 176 (2006)). *Cf.* Appx24-25 n.11 (acknowledging that the existence of a trade secret "is typically a question of fact").

necessarily alter the lower court's analysis—indeed, it directly contradicts the core factual premises of the lower court's reasoning—it was error for the court to deny Vanda's request for leave to amend.

### D. The lower court similarly erred as to Vanda's impurities and micronization theories.

The lower court also erred in holding that Vanda separately failed to state a cognizable takings claim based on FDA's disclosure to generic competitors of Vanda's use of impurities testing and micronization in Hetlioz®'s production process. Although related processes were published in the Impurities Patent Application, whether and how Vanda ███ manufacturing process in its manufacturing was confidential and never publicly disclosed. The lower court did not engage with this distinction, but it makes all the difference.

To start, the substantive information at issue—the impurities Vanda controls for and whether and how it controls for particle size—are appropriate subjects of trade secret protection. "A trade secret … may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be … *a process of manufacturing.*" *Lariscey v. United States*, 949 F.2d 1137, 1141-1142 (Fed. Cir. 1991) (quoting *Restatement of Torts* § 757 cmt.

b) (emphasis added); *accord* D.C. Code § 36-401(4) (defining trade secrets to include "method[s], technique[s], or process[es]").

A confidential manufacturing process is thus a protectible trade secret, even where "components" of it are "in the public domain." *Mobile Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 734 (2010). This is because "the choice of individually known components and techniques to create a working manufacturing process is often … a difficult undertaking," with "a variety of alternatives," and "th[ose] choice[s] made" to create "an actual, working process constitute[] a trade secret." *Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354, at *15 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000), and *aff'd*, 766 A.2d 442 (Del. 2000).

Vanda alleged that its manufacturing processes—including whether it practices various approved and unapproved patents as part of those processes—are the crux of its business. Drug innovators like Vanda invest enormous sums into the development of new therapies. Appx46 (Compl. ¶ 2). The ins and outs of Vanda's overall manufacturing process, including how it controls for impurities and whether and how it uses micronization techniques in producing Hetlioz®, provide it a competitive edge precisely because this information cannot be readily discerned through public means. Appx81-82 (*Id.* ¶¶ 154-156).

FDA's reference to the Impurities Patent Application during review of Teva's and Apotex's ANDAs disclosed to those generic manufacturers elements of Vanda's manufacturing process which were not disclosed by the Impurities Patent Application itself. Appx80 (Compl. ¶¶ 147-148). In its CRL to Apotex, FDA highlighted five impurities that are "possible impurities of the drug substance reported in [the Impurities Patent Application]," and it asked Apotex to "clarify whether" its current method "is capable of detecting and quantifying these impurities" and instructed Apotex to "control these impurities in the drug substance release specification at justified limits, or provide justification as to why controls are not needed." Appx80 (Compl. ¶ 147). FDA made a similar demand in its CRL to Teva. Appx80 (*Id.* ¶ 148). FDA further asked whether Apotex's "drug substance may be subject to any particle size reduction"—a reference to information in Vanda's NDA that it is manufacturing process. Appx83 (*Id.* ¶ 162).

As Vanda alleged, the generics understood *why* FDA was asking the question—it was signaling in clear terms what mfg process they needed to do to mfg process Hetlioz®'s mfg process and gain approval. Appx82 (Compl. ¶ 158). It was as if FDA helped a child find an easter egg in an expansive lawn by asking whether she had checked under that big rock by the back fence—the question is not really a question, but an instruction. And in

doing so, FDA disclosed Vanda's confidential manufacturing process. Appx82 (*Id.* ¶¶ 158-160).

Of course, a method that is publicly disclosed in a patent cannot *itself* be a trade secret. Vanda never claimed that it could. Rather, it alleged that FDA revealed Vanda's actual confidential methods in its manufacturing process by referencing the Impurities Patent Application in communications to its competitors, implying that Vanda was ████████ ███mfg process███████ of impurities testing and micronization techniques described therein. "Nothing in the Impurities Patent Application discloses which portions of the Application match the methods listed in Vanda's NDA for Hetlioz® for the commercial manufacture of tasimelteon." Appx81 (Compl. ¶ 154). Nor does the filing of a patent application disclose whether a patentee actually practices the patent. *Cf. King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995) ("A patentee need not make, use, or sell an invention.").

The lower court overlooked this distinction, concluding that Vanda failed to plead a takings claim because FDA had not revealed "any novel or unknown part of Vanda's production process." Appx33; *see also* Appx34 ("[N]o cognizable Fifth Amendment takings claim can be based on a government agency's regulatory use of information already made public by its reported owner."). As the lower court apparently viewed it, Vanda's

allegations raised only "variations on widely used [information]," which "cannot be trade secrets." Appx33 (quoting *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002)).

Again, Vanda never "made public" that it was ███mfg process███ either of these particular techniques in Hetlioz®'s manufacturing process. Appx34. The Eighth Circuit case relied upon by the lower court—the only case it cited in purportedly addressing this distinction—is inapposite; it held that a company's survey questions were not trade secrets under Minnesota law because they "were readily ascertainable" and "repeatedly placed … in the public domain," including in the company's "public seminars" and "[a]nyone calling the toll-free telephone number." *Strategic Directions*, 293 F.3d at 1065.

That is nothing like Vanda's impurities testing and micronization. Vanda has never publicly disclosed whether it uses those methods in Hetlioz®'s production. Appx81-82; Appx86 (Compl. ¶¶ 154-156, 172). Nor does the passage the court quoted bear on the distinction Vanda has pressed—it merely noted that "the questions, individually or in combination, were not secret," and therefore no "variation[]" of the questions could be a trade secret. *Strategic Directions*, 293 F.3d at 1065. But Vanda has never argued that it is a "variation[]" of the processes in its patent

application that is the trade secret; the trade secret is whether it is ███ [mfg process] ███ those exact processes (a fact which it has never publicly disclosed). Appx81-82; Appx86 (Compl. ¶¶ 154-156, 172). On this point, the lower court offered no authority.

The lower court's reasoning, moreover, misses the obvious: If it "were readily ascertainable" whether Vanda ███ [mfg process] the disclosed impurities testing and micronization in Hetlioz®'s production, the generic competitors would have simply duplicated those processes in their ANDAs. *Strategic Directions*, 293 F.3d at 1065. But they did not, because Impurities Patent Application does not disclose "which portions of [it] match the methods listed in Vanda's NDA for Hetlioz®." Appx81 (Compl. ¶ 154). Instead, FDA had to prod them to ███ [mfg process] these production steps by disclosing this confidential portion of the NDA (Appx82-83 (*id.* ¶¶ 158-162)), which FDA itself has otherwise continued to recognize is confidential (Appx82 (*id.* ¶ 157)). Vanda has therefore stated a takings claim based upon FDA's disclosure.

\*     \*     \*

Vanda adequately alleged protectible property interests to support a takings claim. Its dissolution specifications were trade secrets under state law and thus protected under the Fifth Amendment. The lower

court's contrary conclusion misapplies the wrong law and improperly resolves factual disputes at the pleading stage. And Vanda's impurities testing and micronization techniques were also protectible trade secrets. FDA's disclosure of all these trade secrets is thus a compensable taking.

## II. VANDA ADEQUATELY ALLEGED THE REMAINING ELEMENTS OF AN UNLAWFUL TAKING.

Vanda plausibly alleged the remaining elements for its takings claim. The lower court correctly ruled that Vanda alleged an authorized act. And the remaining elements, whether they state a *per se* or regulatory taking, are satisfied. The Court should reverse, however, the lower court's dismissal of Vanda's Inventia-based claims as time-barred.

### A. FDA's disclosure of Vanda's protected information was an "authorized" act for takings purposes.

The lower court correctly rejected the government's argument that Vanda's takings claim failed because it is premised on an unlawful disclosure. Appx9-10. Although "[a] compensable taking arises only if the government action in question is authorized," in this context, "'authorized' is not synonymous with 'lawful.'" *Darby*, 112 F.4th at 1023. "[E]ven if an action by a government agent is unlawful, it will likely be deemed authorized for takings-claim purposes if it was done within the normal scope of the agent's duties." *Id.* at 1027.

As the lower court correctly reasoned, "FDA's review and approval of NDAs and ANDAs falls squarely within the scope of the federal agency's statutorily authorized duties, even if certain acts taken during the review process are ultimately found to be unlawful." Appx10. The authorized-act element of a takings claim is satisfied.

## B. Vanda alleged a *per se*, or alternatively, regulatory taking.

Vanda alleged a direct appropriation of its trade secrets, which constitutes a *per se* taking. It provided confidential information to FDA under circumstances giving rise to a duty to maintain its secrecy and limit its use. Appx83; Appx87 (Compl. ¶¶ 164, 178). FDA nonetheless relied upon—and disclosed—Vanda's confidential information during its evaluation of competitors seeking approval to market copies of Vanda's drugs. Appx50; Appx66-70; Appx82-83 (*Id.* ¶¶ 16, 101-108, 158-160, 162). This use tramples on Vanda's "right to exclude," which is "'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).

FDA's use and disclosure, moreover, "completely deprive[s]" Vanda "of '*all* economically beneficial us[e]' of [its] property," which also qualifies as a *per se* taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas*, 505 U.S. at 1019); *see Monsanto*, 467 U.S. at 1012

("The economic value of [Monsanto's trade-secret] property right lies in the competitive advantage over others that Monsanto enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge.")

In the alternative, Vanda stated a viable claim for a regulatory taking. Relevant to the *Penn Central* balancing test, Vanda alleged that FDA improperly used and disclosed its trade secrets (Appx76 (Compl. ¶¶ 125-126)), which caused Vanda irreparable economic harm (Appx76; Appx87 (*id.* ¶¶ 127, 181)) and upended its investment backed expectations (*id.* ¶¶ 2, 173-174). *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

The lower court decided it was "premature" to resolve which takings theory was properly alleged. Appx12. If this Court holds that Vanda properly alleged a cognizable property interest, it should remand to allow the lower court to resolve this threshold question in the first instance and to engage with the "factual inquiries" required under *Penn Central*—which cannot be resolved at the Rule 12 stage. 438 U.S. at 124.

## C. Vanda's Inventia-based claims were not time-barred.

The lower court erred in dismissing as untimely Vanda's claims regarding FDA's disclosure to Inventia of Vanda's dissolution specification for Fanapt®. Appx14-15. Although a claim under the Tucker Act must be

brought "within six years after such claim first accrues" (*Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018) (quoting 28 U.S.C. § 2501)), the accrual of a claim is suspended "where the facts giving rise to a claim were either inherently unknowable or intentionally concealed" (*Cent. Pines Land Co. v. United States*, 61 Fed. Cl. 527, 533 (2004)). *See Ingrum v. United States*, 560 F.3d 1311, 1315 (Fed. Cir. 2009).

Here, the statute of limitations does not bar Vanda's Inventia-based claims because Vanda "did not have a sufficient opportunity to discover the facts giving rise to its claim on the accrual date." *Central Pines*, 61 Fed. Cl. at 534. Though "any matter of public record is by definition knowable" (*id.*), FDA did not make public any version of the Inventia ANDA documents until it responded to Vanda's FOIA request on April 20, 2023. Appx68 (Compl. ¶ 106). Because "[i]t is a plaintiff's knowledge of the facts of the claim that determines the accrual date" (*Young v. United States*, 529 F.3d 1380, 1385 (Fed. Cir. 2008)) and because Vanda did not know and could not determine from any publicly available information the facts at the heart of this claim, the claim did not accrue for statute of limitations purposes until at least 2023.

The lower court disagreed, stating that this Court "has squarely rejected attempts to invoke the accrual suspension rule based solely on additional information received through Privacy Act and FOIA requests."

Appx15 (citing *Adera v. United States*, 2023 WL 3768645, at *4 (Fed. Cir. 2023)). But not only is *Adera* nonprecedential, it also does not stand for that proposition. Rather, *Adera* simply held that the plaintiff "had sufficient knowledge that the Department denied his discharge applications" *prior to filing* his FOIA request, and any "additional information" he learned from that request "alone does not support suspending the accrual of his claims." *Id.* Vanda, by contrast, alleged that it did not learn any of the information supporting its Inventia-based claim until after it received a response to its FOIA request. Appx68 (Compl. ¶ 106).

Adopting the lower court's holding, moreover, would lead to absurdities. The court reasoned that Vanda should not have waited so long to submit its FOIA request. Appx15. But taking that reasoning to its logical end would result in a grotesque waste of the agency's and manufacturers' resources. FDA's own regulations prohibit the disclosure of trade secret and confidential commercial information. 21 C.F.R. § 20.61(c). And it is "axiomatic" that "an agency must act in accordance with applicable statutes and its regulations." *Paralyzed Veterans of Am. v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998).

Thus, if the facts here trigger claim accrual simply because they became theoretically available through FOIA when Inventia's application was approved, drug innovators will have to submit FOIA requests as

a matter of course for *all* of the discipline reviews and regulatory communications (and other FDA memoranda) for *all* generic applications with respect to *all* of their drugs. Then, they will have to scour those thousands of documents just to double-check whether FDA complied with its legal obligations. The accrual rule exists precisely to foreclose such wasteful incentives.

## III. THE LOWER COURT ERRED IN DISMISSING VANDA'S IMPLIED-IN-FACT CONTRACT CLAIM.

The lower court also erred in dismissing Vanda's breach of contract claim. Vanda alleged that FDA's disclosure of Vanda's confidential commercial and trade secret information is a breach of an implied-in-fact contract. Appx87-88 (Compl. ¶¶ 182-188). The lower court concluded, however, that Vanda had instead alleged "an implied-in-*law* contract outside the Court's jurisdiction" because FDA's disclosure "is a failure to duly adhere to the legal confidentiality requirements imposed by statute and regulation." Appx13 (emphasis added); *see Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996) (Tucker Act's waiver of sovereign immunity "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law").

That is wrong: This Court has recognized jurisdiction over implied-in-fact contract claims stemming from an agency's use or disclosure of

trade secret information in violation of regulations—precisely the situation here.

The distinction between implied-in-fact and implied-in-law contracts is straightforward in theory. "Generally speaking, implied-in-law contracts 'impose duties that are deemed to arise by operation of law,'" while "implied-in-fact contracts are 'founded upon a meeting of the minds, which … is inferred, as a fact, from conduct of the parties.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011) (quoting *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998)).

The lower court oversimplified this distinction, and therefore reached the wrong conclusion. It held that the very fact that FDA has an obligation "imposed by statute and regulation" to refrain from disclosing Vanda's confidential information means that any contract touching on the agency's disclosures must be implied in law. Appx13. But this Court has already recognized in similar circumstances that where an agency invites applications or proposals, and crafts a regulatory scheme of confidentiality in order to obtain them, an implied-in-fact contract is created when a party submits an application containing confidential information. *Airborne Data*, 702 F.2d at 1359.

In *Airborne Data*, it was the "official policy" of the agency "to encourage the submission of unsolicited proposals containing relevant new ideas." *Id.* at 1359. And "valid departmental regulations" prohibited public disclosure or the use of submitted information "for any purpose other than evaluation of a proposal." *Id.* Yet despite the existence of these privacy regulations, this Court held that when the government "extend[s] … [an] invitation to submit" an application containing confidential information, and an invited party does so, there is a "meeting of the minds," and thus an implied-in-*fact* contract prohibiting disclosure. 702 F.2d at 1360-1361; *see also Rsch., Analysis & Dev., Inc. v. United States*, 8 Cl. Ct. 54, 58 (1985) (similarly rejecting the government's argument that "at most an implied-in-law contract existed between the parties based on the pertinent regulations" and "conclud[ing] that an implied-in-fact contract did exist obligating defendant to maintain the confidentiality of plaintiff's proprietary data").

Under these cases, Vanda has adequately pleaded the breach of an implied-in-fact contract. FDA's mission is "to promote the public health" by ensuring access to safe and effective drugs. 21 U.S.C. § 393(b). It accomplishes this goal by "promptly and efficiently reviewing clinical research" in drug applications. *Id.* § 393(b)(1); *see id.* § 393(f)(2). FDA thus maintains a standing offer under which "[a]ny person may file with the

Secretary an application" for a new drug. 21 U.S.C. § 355(b)(1)(A). Because these applications contain confidential commercial information and trade secrets, FDA has recognized that it must protect such sensitive information if it wishes to receive any applications. 21 C.F.R. § 20.61(c)-(d); *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 149 (D.C. Cir. 2006) ("Applicants spend a great deal of resources to obtain data for an IND or NDA, and the FDA could not expect full and frank disclosure if it later released such proprietary information into the public domain.").

The lower court attempted to distinguish *Airborne Data* solely on the basis that "there is a clear difference between" "(a) submitting a proposal seeking a government contract" and "(b) filing an application for regulatory approval." Appx13. But it is entirely unclear from the court's opinion what the relevant difference might be: As in *Airborne Data*, Vanda's NDA was an "unsolicited proposal" submitted pursuant to a regulatory regime developed by the agency to safeguard confidential information submitted to it in order to incentivize such applications. *Id.* at 1352. Those are the relevant features of this Court's decision, and they are present here.

Nor does the court's citation to *Perry v. United States*, 149 Fed. Cl. 1 (2020), shed any light. *See* Appx13. That case does not even discuss *Airborne Data*, presumably because the *pro se* plaintiff there did not

bring this binding precedent to the court's attention. *See Perry*, 149 Fed. Cl. at 9-10 (plaintiff proceeding *pro se*), *cf. id.* at 17 ("The Court cannot discern whether Mr. Perry asserts that he formed an express or implied-in-fact contract with the United States).

In sum, Vanda understood that in exchange for its unsolicited application, FDA would keep the submitted information secret in accordance with its regulations. Appx57; Appx88 (Compl. ¶¶ 46, 186). "That is certainly what plaintiff reasonably thought and what the defendant had every reason to believe the plaintiff would think." *Airborne Data*, 702 F.2d at 1360 (quoting *Padbloc Co. v. United States*, 161 Ct. Cl. 369, 378 (1963)). There was thus "a meeting of the minds"—and an implied-in-fact contract—notwithstanding the agency's independent obligations under the law.

## CONCLUSION

The Court should reverse and remand.

Dated: June 13, 2025        Respectfully submitted,

/s/ *Paul W. Hughes*
PAUL W. HUGHES
SARAH P. HOGARTH
ANDREW A. LYONS-BERG
CHARLES SEIDELL
ALEX C. BOOTA
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Plaintiff-Appellant*
*Vanda Pharmaceuticals Inc.*

# NONCONFIDENTIAL ADDENDUM

# INDEX TO ADDENDUM

| Description | Appx No. |
|---|---|
| Opinion and order denying-in-part and granting-in-part defendant's motion to dismiss | Appx1-15 |
| Opinion and order granting defendant's motion for judgment on the pleadings and denying plaintiff's provisional request for leave to file an amended complaint and motion to compel discovery **[CONFIDENTIAL MATERIAL REDACTED]** | Appx16-37 |
| Judgment | Appx38 |

This nonconfidential addendum redacts confidential material on pages Appx20-22, Appx28-30, Appx33-34.

# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 23-629C
(Filed: January 18, 2024)

| | |
|---|---|
| **VANDA PHARMACEUTICALS, INC.,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES**, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Paul W. Hughes, III* (argued), McDermott Will & Emery, Washington, DC, for plaintiff. With him on the briefs were *Andrew A. Lyons-Berg* and *Charles Seidell*, McDermott Will & Emery, Washington, DC.

*Igor Helman* (argued), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Samuel R. Bagenstos*, General Counsel, and *Wendy Vicente*, Deputy Chief Counsel, Litigation, U.S. Department of Health and Human Services, Washington, DC, and *James Allred*, Associate Chief Counsel, and *Jonathan Silberman*, Associate Chief Counsel, Office of the Chief Counsel, U.S. Food and Drug Administration, Silver Spring, MD, Of Counsel.

## OPINION AND ORDER

***BONILLA, Judge***.

This case presents novel issues of first impression, including whether a brand pharmaceutical company can assert a viable Fifth Amendment takings claim and/or a breach of an implied-in-fact contract based upon a government official's alleged disclosure–intentional or inadvertent–of claimed trade secrets and confidential commercial information to competitors seeking Food and Drug Administration (FDA)

approval of generic drugs.  Pending before the Court is defendant's motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).  Specifically, defendant maintains plaintiff fails to allege a cognizable takings claim; the alleged contract is, at best, implied-in-law which is outside this Court's jurisdiction; and plaintiff's claims involving one generic manufacturer are time-barred.  For the reasons set forth below, defendant's motion is DENIED-IN-PART and GRANTED-IN-PART.

## BACKGROUND[1]

Vanda Pharmaceuticals, Inc. (Vanda) is an international biopharmaceutical company that researches, develops, and markets high impact medications to address unmet medical needs.[2]  Founded in 2003, the corporation is headquartered in Washington, DC and maintains a self-described business model of "acquiring compounds that other companies failed to develop into treatments, identifying potential medical uses for them, devoting substantial resources to developing them, seeking FDA approval, and commercializing them."  ECF 1 at 6–7.  At issue in this case are two brand name drugs developed by Vanda: Fanapt® (iloperidone) tablets approved to treat schizophrenia in adults and Hetlioz® (tasimelteon) capsules approved to treat the circadian rhythm sleep disorder known as non-24-hour sleep-wake disorder.  The FDA approved Vanda's New Drug Applications (NDAs) relating to Fanapt® and Hetlioz® on May 6, 2009, and January 31, 2014, respectively.  In the years since, the FDA considered and approved several Abbreviated New Drug Applications (ANDAs) for generic versions of the brand name drugs.  Vanda's lawsuit focuses on the information FDA officials purportedly shared with manufacturers of these generics in evaluating and approving their applications.

## I.    Drug Approval Process

To market drugs in the United States, pharmaceutical companies must secure approval from the FDA for each new product pursuant to the Food, Drug, and Cosmetic Act (FDCA).  21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an

---

[1] In resolving defendant's motion to dismiss, the facts are largely drawn from plaintiff's complaint, corroborating administrative proceedings appended to defendant's dispositive motion (cited and quoted in plaintiff's complaint), and undisputed publicly available information.  *See Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (In evaluating a complaint for sufficiency under RCFC 12(b)(6), the court is "not limited to the four corners of the complaint.  [The court] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'") (citations omitted); *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) (In assessing an RCFC 12(b)(1) motion to dismiss, "[t]he court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts' to confirm jurisdiction.") (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

[2] *See* https://perma.cc/DS79-PV8H (last viewed Jan. 17, 2024).

application filed [in accordance with this Act] is effective with respect to such drug."). The FDCA outlines the extensive data and information manufacturers must provide the Secretary of the Department of Health and Human Services (delegated to the FDA) in an NDA to amply demonstrate consumer safety and effectiveness and gain FDA approval of a new drug.  *See id.* § 355(b)(1)(A)(i)–(viii).  In addition to the statutory requirements, by regulation, NDAs must include information on a product's chemistry, manufacturing, and controls, a meticulous technical review of the drug's manufacturing procedures, and "the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including . . . acceptance criteria relating to . . . dissolution rate . . . ." 21 C.F.R. § 314.50(d)(1)(i)–(ii)(a).  Of relevance to the brand name and generic drugs developed here is the requirement for dissolution specifications, which refer to the rate at which a drug dissolves into the body.

The FDA publishes a list of new drugs approved for safety and effectiveness in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), along with their associated patents and exclusivity information.  *See Janssen Pharmaceutica, N.V. v. Apotex*, 540 F.3d 1353, 1355 (Fed. Cir. 2008) (citing 21 U.S.C § 355(b)(1), (c)(2) & (j)(2)(A)(i)).  Drugs approved by the FDA, and included in the Orange Book, are referred to as "listed drugs."  *See id.* "Inclusion of products in the Orange Book is independent of any current regulatory action being taken administratively or judicially against a drug product."[3]

The research and development phases and ensuing FDA approval process for a new drug is expensive and time consuming.[4]  To incentivize pharmaceutical research and development, as well as scientific and medical advancements, a pioneer or brand name drug manufacturer generally receives a statutory period of market exclusivity following FDA approval.  Further protecting their intellectual property, manufacturers typically secure patents issued by the United States Patent and Trademark Office (USPTO), including patents listed in the Orange Book, which, in some cases, impact the timing of relevant generic drugs entering the market.  The time afforded a brand drug to market exclusivity does not always run concurrently with germane patent terms.  Beyond market exclusivity and patent terms, as relevant to this case, certain data and information in NDA disclosures (e.g., trade secrets, manufacturing methods and processes, production and sales distribution) are kept confidential unless previously disclosed to the public.  *See* 21 C.F.R. § 314.430(g).

---

[3] *See* https://perma.cc/QLQ7-JPY4 (last viewed Jan. 17, 2024).

[4] According to a 2015 report published by the Pharmaceutical Research and Manufacturers of America (PhRMA), on average, pharmaceutical manufacturers spend $2.6 billion over the course of more than a decade to bring a new drug to market.  *See* https://perma.cc/WMZ4-YHAA (last viewed Jan. 17, 2024); *cf. Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (describing FDA approval process alone as "long, comprehensive, and costly").

In 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, 21 U.S.C. § 355(j), to balance the vital public policy interest of encouraging new scientific development with competitors' ability to bring inexpensive generic copies to the marketplace. *See Caraco Pharms. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008) ("The goal of the [Hatch-Waxman] Act is to [strike] a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market.") (quotations omitted). Under the Act, upon filing an ANDA, the timing of generic drug approval may be subject to patent and market exclusivity protections, and the ANDA must provide appropriate patent certifications or statements for each patent listed in the Orange Book.[5]

Employing the ANDA process, generic competitors may bypass much of the costly and time-consuming research and development brand manufacturers undergo. *See* 21 U.S.C. § 355(j); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). Through an ANDA, a competitor can secure FDA approval by demonstrating that the proposed generic shares the same active ingredients and bioequivalence as the brand name drug. In doing so, competitors must provide data establishing the administration, dosage, and strength of the generic is comparable to the brand name drug. Through the streamlined ANDA process, generics effectively piggyback off the pioneer's proven research and development and due diligence from manufacturing, testing, and approving the brand name drug.

By statute, the unauthorized disclosure of trade secrets and confidential and proprietary information by federal government officials who obtain that information in the course of their official duties or employment is expressly prohibited. 18 U.S.C. § 1905. Governing FDA regulations pointedly state: "Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c); *accord id.* § 314.430(g) ("The following data and information in an application or abbreviated application are not available for public disclosure unless they have been previously disclosed to the public . . . or they relate

---

[5] An ANDA applicant must certify or state: (1) the patent information is not listed in the Orange Book (Paragraph I certification); (2) the patent listed in the Orange Book has expired (Paragraph II certification); (3) the date the patent will expire (Paragraph III certification); and/or (4) that an Orange Book-listed "patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the [generic] drug" (Paragraph IV certification). *See Report to Congress: The Listing of Patent Information in the Orange Book* at 8–9 (last viewed Jan. 17, 2024). Although not relevant to deciding the issues before this Court, as discussed *infra*, the parties engaged in Paragraph IV certifications and resulting ANDA patent infringement litigation related to the brand and generic drugs discussed herein.

to a product or ingredient that has been abandoned and they do not represent a trade secret or confidential commercial or financial information . . . : (1) Manufacturing methods or processes, including quality control procedures."). These protections are intended to promote full and transparent engagement between drug manufacturers and the FDA throughout the application and approval process. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1010–11 (1984) (nondisclosure protections afforded under the Trade Secrets Act, 18 U.S.C. § 1905, are intended to protect "reasonable investment-backed expectation[s]").

## II.    Vanda's Brand Name Drugs

Vanda filed NDA No. 022192 for Fanapt® on September 27, 2007. In reviewing the application for the brand name drug, the FDA rejected Vanda's proffered dissolution specification and instead proposed an alternative specification (i.e., a rate of not less than Q where "Q = [b4%] in 30 minutes for all strengths of the Tablet").[6] Vanda adopted the FDA's proposed dissolution rate and the agency approved Fanapt® as safe and effective for consumers on May 6, 2009.

The FDA similarly rejected Vanda's proffered dissolution specification for Hetlioz®, included in NDA No. 205677 and filed on May 31, 2013. In reviewing Vanda's application, the agency found that "[t]he proposed dissolution criterion is not supported by the data and is not acceptable."[7] As with Fanapt®, the FDA proposed an alternative specification for dissolution of Hetlioz® (i.e., a rate of not less than Q where "Q = [b4%] at 15 minutes").[8] Of note, Vanda's NDA included claimed confidential information regarding the manufacturer's processes for detecting and controlling impurities in Hetlioz®'s active ingredient (i.e., tasimelteon) as well as "the methods through which it controls the size of tasimelteon crystals in its drug product," otherwise known as micronization. ECF 1 at 17. Following Vanda's adoption of the FDA's proposed dissolution rate, FDA approved Hetlioz® as safe and effective on January 31, 2014.

## III.    Claimed ANDA Disclosures and Parallel Litigation

Vanda's claims arise from the FDA's alleged engagement with four competitors who filed ANDAs seeking approval to bring generic versions of Fanapt® and Hetlioz® to market. More specifically, Vanda alleges FDA officials disclosed the brand

---

[6] *See* https://perma.cc/V9YV-9PSN at 41 (last viewed Jan. 17, 2024). The specific dissolution rates the FDA recommended to Vanda for each brand name drug and, later, to the generic manufacturers, detailed *infra*, were classified "Trade Secret / Confidential" and redacted from the record presented in this matter using a "b4" designation. Because the parties stipulate the percentage values identified herein as "b4" are identical for the respective brand name drugs and generics, disclosure of the specific dissolution rates is therefore unnecessary to resolve this motion.

[7] *See* https://perma.cc/AGW8-W4DU at 152 (last viewed Jan. 17, 2024).

[8] *Id.* at 153.

pharmaceutical company's confidential trade secret information in correspondence with the following competitors: Lupin Limited and/or Lupin Pharmaceuticals (Lupin), Inventia Healthcare Private Limited (Inventia), Teva Pharmaceuticals (Teva), and Apotex Corporation (Apotex). The alleged disclosures, summarized below, relate to proposed dissolution specifications, impurities analysis, and micronization.

Lupin submitted ANDA No. 206890 for generic Fanapt® (iloperidone) on May 8, 2014. Rejecting Lupin's proposed dissolution specification, the FDA explained, "[t]he firm's proposed specification . . . is too broad and not supported by their data and therefore not acceptable." ECF 7-2 at 1. Instead, the FDA proposed the same specification for dissolution the agency recommended and approved for Fanapt® (i.e., a rate of not less than [b4]% (Q) dissolved in 30 minutes). *Id.* at 2. A contemporaneous note confirms that an FDA official consulted the June 29, 2012 annual report produced for Fanapt® in determining what dissolution specification to recommend to Lupin. ECF 7-2 at 2 ("Reviewer's Note: the reviewer checked the NDA Annual report for the above mentioned specification for the [reference listed drug]." (footnote omitted). Following Lupin's adoption of the FDA's proposed dissolution rate, on May 5, 2022, its generic was formally approved as safe and effective.

Within two weeks of Lupin's application, on May 21, 2014, Inventia submitted ANDA No. 207231 for generic Fanapt® (iloperidone). Rejecting Inventia's proposed dissolution specification as "too liberal and not acceptable," *see* ECF 7-1 at 16, the FDA again recommended a dissolution rate of not less than [b4]% (Q) dissolved in 30 minutes. Internal records note the FDA's proposed specification "is the same as recommended by the NDA applicant for the [reference listed drug] product." *Id.* at 14. As in Lupin's review, the FDA official consulted the annual report produced for Fanapt® in determining what dissolution specification to recommend to Inventia. *See id.* ("The reviewer checked the NDA Annual report for the above mentioned specification for the [reference listed drug] product."). Following Inventia's adoption of the FDA's proposed dissolution rate, its generic was approved as safe and effective on November 28, 2016.

In the interim, in January 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon). The FDA rejected Teva's proposed dissolution specification, instead recommending the specification the agency previously proposed and approved for Hetlioz® (i.e., a rate of not less than [b4]% (Q) dissolved in 15 minutes). Citing Vanda's U.S. Patent Application No. 20170190683A1 (Highly Purified Pharmaceutical Grade Tasimelteon) (published July 6, 2017),[9] the agency also

---

[9] The USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020. The abstract provides: "A process for preparing a batch of highly purified, pharmaceutical grade tasimelteon comprises analyzing a batch of tasimelteon synthesized under [good manufacturing practice (GMP)] conditions for the presence of one or more identified impurities." *See* https://perma.cc/8FEV-3W6L at 1 (last viewed Jan. 18, 2024).

inquired whether the generic manufacturer was capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed Teva to produce supporting data including limits of detection and quantification and linearity. Following Teva's adoption of the FDA's proposed dissolution rate, and the company's submission of the requested impurity information, its generic was approved by the FDA as safe and effective on December 12, 2022.

Concomitantly, Apotex submitted ANDA No. 211607 for generic Hetlioz® (tasimelteon) in January 2018. As with Teva's application, the FDA rejected Apotex's proposed dissolution specification and recommended the brand name drug rate of not less than [b4]% (Q) dissolved in 15 minutes. Likewise, the FDA instructed Apotex to clarify its capabilities related to detecting, quantifying, and controlling specified impurities in the drug and, if applicable, instructed Apotex to produce supporting data including limits of detection and quantification and linearity. The FDA also inquired whether its generic drug was "subject to any particle size reduction," suggesting "tasimelteon 'may be subject to micronization.'" ECF 1 at 38. On December 20, 2022, following Apotex's adoption of the FDA's proposed dissolution rate, and the manufacturer's submission of the requested impurity data and micronization information, its generic was approved by the FDA as safe and effective.

Regarding the FDA's review of these ANDAs, Vanda alleges the agency improperly disclosed its trade secrets by offering recommendations to the generic competitors and thus breached its duty of confidentiality. More specifically, Vanda alleges the FDA's communications regarding dissolution rates, impurities, and micronization to the ANDA applicants revealed Vanda's confidential manufacturing information and caused economic injury to the company.[10] In sum, the generic ANDAs and FDA's alleged disclosures of confidential trade secrets, include:

| Competitor | Pioneer Model | ANDA Submitted | FDA's Alleged Disclosures | FDA Approval |
|---|---|---|---|---|
| Lupin | Fanapt® (Iloperidone) | May 8, 2014 | • Dissolution Rate | May 5, 2022 |
| Inventia | Fanapt® (Iloperidone) | May 21, 2014 | • Dissolution Rate | Nov. 28, 2016 |
| Teva | Hetlioz® (Tasimelteon) | Jan. 2018 | • Dissolution Rate<br>• Impurities Inquiry | Dec. 12, 2022 |
| Apotex | Hetlioz® (Tasimelteon) | Jan. 2018 | • Dissolution Rate<br>• Impurities Inquiry<br>• Particle Size/ Micronization Inquiry | Dec. 20, 2022 |

---

[10] Throughout its complaint, Vanda also references additional competitors seeking to bring generic versions of Fanapt® and Hetlioz® to market, including: Alembic Pharmaceuticals Ltd., MSN Pharmaceuticals Inc. (MSN), Roxanne Laboratories Inc. n/k/a Hikma Labs Inc. (transferred to West-Ward Pharmaceuticals Corp.), and Taro Pharmaceutical Industries Ltd. However, at this time, Vanda has not alleged any improper FDA disclosures to these generic manufacturers.

Following the FDA's approval of the generic competitors' ANDAs, Vanda initiated ANDA patent infringement suits against the companies in federal district court.[11]  Prior to commencing this action against the United States on May 1, 2023, Vanda also filed a number of civil suits against the FDA in federal district court.[12]

## DISCUSSION

### I.    Standards of Review

This Court's statutorily prescribed jurisdiction to adjudicate claims and grant relief requires an affirmative waiver of sovereign immunity.  *United States v. Testan*, 424 U.S. 392, 399 (1976).  When the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the onus is on plaintiff to present preponderant evidence that jurisdiction is proper.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In evaluating the jurisdictional propriety of a claim, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1568–69 (Fed. Cir. 1993)).

---

[11] *See, e.g.*, *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 18-651, 2022 WL 17593282 (D. Del. Dec. 13, 2022) (judgment entered for defendants Teva and Apotex following four-day bench trial), *aff'd*, No. 23-1247, 2023 WL 3335538, at *2 (Fed. Cir. May 10, 2023), *pet'n for cert. docketed*, __ U.S.L.W. __ (U.S. Jan. 17, 2024) (No. 23-768); *Vanda Pharms., Inc. v. Lupin Ltd.*, No. 15-1073 (D. Del.) (voluntarily dismissed following settlement wherein Lupin deferred commercialization of generic product until Nov. 2, 2027); *Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del.) (case remains pending despite confidential stipulation wherein Inventia has not launched or commercialized generic drug); *see also* https://perma.cc/4WDE-ZFPS at 18–19 (Vanda's Quarterly Report (Form 10-Q) for the period ending March 31, 2022, noting the above-referenced confidential stipulation with Inventia and non-exclusive licensing agreement with MSN and Impax Laboratories, LLC to manufacture and market MSN's generic version of Hetlioz®) (last viewed Jan. 17, 2024).

[12] *See, e.g.*, *Vanda Pharms., Inc. v. FDA*, No. 23-1674 (D.D.C.) (Freedom of Information Act (FOIA) litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 23-1673 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-938 (D.D.C.) (summary judgment granted in favor of plaintiff in FOIA litigation); *Vanda Pharms., Inc. v. FDA*, No. 23-280 (D.D.C.) (Administrative Procedures Act (APA) challenge to FDA's decision to approve Teva's ANDA of generic Hetlioz® remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3808 (D.D.C.) (FOIA litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3807 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-3413 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-3052 (D.D.C.) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-2775 (D.D.C.) (APA challenge  to FDA's alleged failure to issue a decision on Vanda's December 2018 Supplemental NDA for Hetlioz® and delay in scheduling a hearing remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-1432 (D.D.C.) (summary judgment for defendant in APA challenge to FDA's decision denying Vanda "Fast Track" designation for tradipitant–a drug to treat gastroparesis); *Vanda Pharms., Inc. v. FDA*, No. 22-1405 (D.D.C.) (FOIA litigation voluntarily dismissed following settlement).

In turn, when considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), courts "must accept as true all the factual allegations in the complaint and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quotation marks omitted) (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)). Assertions of legal conclusions are not credited during this assessment, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to merely a conceivable–claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

## II.    Fifth Amendment Taking (Count I)

The government seeks dismissal of plaintiff's Fifth Amendment takings claim (Count I) under RCFC 12(b)(6), principally citing Vanda's claims that FDA officials violated governing statutes and regulations generally prohibiting the disclosure of trade secrets and confidential commercial information. Upon this ground, defendant avers Vanda's claims of *ultra vires* conduct fails to plead a viable taking under the law of this circuit. The government further contends that any surviving constitutional claim should be limited to a regulatory taking, citing Vanda's failure to adequately plead a per se taking. Relatedly, the government maintains Vanda failed to adequately plead the requisite economic harm or interference with the company's reasonable investment-backed expectations. For the following reasons, the Court denies the government's motion to dismiss Count I of Vanda's complaint.

### A.  Unauthorized v. Unlawful

As recently stated by this Court in *Darby Development Co. v. United States*,

> To assert a viable takings claim against the United States, the government action in issue must be duly authorized by Congress. Where . . . a federal agency's actions are not authorized, the actions "may be enjoinable, but they do not constitute [a] taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner."

160 Fed. Cl. 45, 51–52 (2022) (citations omitted), *appeal docketed*, No. 22-1929 (Fed. Cir. June 24, 2022). Although seemingly counterintuitive, unlawful acts are not per se unauthorized for purposes of engaging in a Fifth Amendment takings analysis.

In *Del-Rio*, the United States Court of Appeals for the Federal Circuit distinguished an unauthorized government act for which a takings claim is legally

infirm from an authorized government act later deemed unlawful which may constitute a compensable taking, explaining:

> In a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, *i.e.*, if their actions are a "natural consequence of Congressionally approved measures," or are pursuant to "the good faith implementation of a Congressional Act[.]" The principle underlying this rule is that when a government official engages in *ultra vires* conduct, the official "will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government 'founded upon the Constitution.'"

> In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is "unauthorized" and conduct that is authorized but nonetheless unlawful. Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law.

146 F.3d at 1362 (citations omitted). As in *Del-Rio*, where the challenged agency action involved the Department of the Interior's review and approval of mining leases, *see id.* at 1360, the FDA's review and approval of NDAs and ANDAs falls squarely within the scope of the federal agency's statutorily authorized duties, even if certain acts taken during the review process are ultimately found to be unlawful. *Id.* at 1362–63; *compare, e.g.*, *Darby Dev.*, 160 Fed. Cl. at 51–55 (Fifth Amendment takings claim failed as a matter of law because the Centers for Disease Control and Prevention lacked the requisite authority to issue contested nationwide residential eviction moratoria to combat the spread of COVID-19). As such, the Court must deny defendant's motion to dismiss on this basis.

### B. Proprietary Interest

The more vexing issue in this case is whether Vanda can assert a cognizable property interest in the alternative dissolution specification the FDA proposed to Vanda during the approval process. Although the FDA generated the alternative dissolution specifications in evaluating Vanda's data, it is not axiomatic that the alternative data points became Vanda's trade secrets or confidential commercial information simply because the company adopted them. After all, Vanda was incentivized to accept the FDA counterproposal to expedite approval and bring its branded drugs to the marketplace. Similar inquiries must be asked regarding whether and to what extent the FDA is precluded from inquiring about a generic

manufacturer's impurity detection and micronization capabilities simply because Vanda addressed them in their NDA.

Consideration should also be given to the potential consequences of crediting Vanda's proprietary claims. Such a ruling may adversely impact (or preclude altogether) the FDA's ability to provide other brand name and generic manufacturers with comparable assistance. As raised by the Court during oral argument, without comparing the data and information of an approved NDA to the proposed data and information included in a generic's ANDA under review, the FDA may authorize inconsistent results. In that case, Vanda might claim the FDA improvidently delayed the brand name product to market or, in the alternative, hastened the generic drug's review and approval. The FDA could also reject a generic's proposed dissolution specification previously accepted for a brand manufacturer or another generic, subjecting the agency to accusations of delaying a generic drug's approval.

For now, these theoretical issues must wait. As highlighted by Vanda at oral argument (and conceded by the government), defendant effectively waived these issues for purposes of the pending dispositive motion. *See* ECF 14 at 10 n.3 ("To be clear, we reserve the right to contest Vanda's alleged property interest in any of the information at issue if this case proceeds beyond the pending motion, including Vanda's alleged property interest in the dissolution specifications that FDA provided to Vanda."). The parties must address these issues as this case proceeds.

### C. Per Se v. Regulatory Taking

Vanda alleges the FDA's disclosure of the brand manufacturer's trade secrets and confidential commercial information to competitors "substantially diminished their value," ECF 1 at 42, and infringed upon Vanda's "right to exclude" generics from the market. ECF 11 at 29. Such claims strongly suggest Vanda is pursuing a regulatory takings claim under *Monsanto*, 467 U.S. at 986, as opposed to a per se invasion. *See 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) ("A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint.") (later citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.")). If true, Vanda's constitutional claim, valued "in excess of millions of dollars," ECF 1 at 42, must be assessed under the three-part test articulated in *Penn Central Transportation Co. v. City of New York*: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." 438 U.S. 104, 124 (1978).

Notwithstanding the Court's first impression, Vanda seeks to assert in the first instance a per se invasion of the brand manufacturer's trade secrets and confidential commercial information and alternatively claim a regulatory taking. While Vanda is

correct that the government's infringement of its right to exclude can certainly constitute a per se taking, *Cedar Point Nursery v. Hassid,* 594 U.S. __, 141 S. Ct. 2063 (2021)–which Vanda relied heavily upon at oral argument–is readily distinguishable from this case.  In *Cedar Point*, the government infringed upon the landowners' real property by allowing union representatives to physically enter the land on a regular cadence to engage workers in union activities. *See* 141 S. Ct. at 2074.  The Supreme Court held that the physical nature of the union's presence on the land constituted an invasion of the property, since union representatives could "traverse it at will." *See id.*  Although Vanda may have the right to exclude others from its trade secrets and confidential commercial information, the Court is nevertheless unconvinced that *Cedar Point*'s ultimate holding extends to intangible property interests as plaintiff alleges.  However, in light of the uncertainty of Vanda's cognizable interest in the claimed FDA-generated trade secrets and confidential proprietary information, as discussed *supra*, it is premature to resolve this issue now.

## III.    Breach of Contract (Count II)

To resolve defendant's dispositive motion as to Count II of Vanda's complaint, the Court must address the true nature of the alleged contract at issue in this case, regardless of the legal obligations Vanda attributes to the FDA.  If, as alleged in the complaint, Vanda's NDA submissions created implied-in-fact contracts with the FDA, any breach of those agreements would fall within this Court's jurisdiction. In contrast, the Court lacks jurisdiction over Count II if the alleged contractual relationship is implied-in-law as the government avers.  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) ("Implied-in-fact contracts, which are within the jurisdiction of the Court of Federal Claims, differ significantly from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims.") (citing cases).

As summarized by the Federal Circuit in *City of Cincinnati*:

> An implied-in-fact contract is one founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. Like an express contract, an implied-in-fact contract requires (1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance. When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract.

*Id.* (citations and quotation marks omitted). Vanda avers the FDA maintains a statutory "standing offer" to review NDAs (and ANDAs), which Vanda accepted by submitting NDAs for Fanapt® on September 27, 2007, and Hetlioz® on May 31, 2013. According to Vanda, the drug manufacturer's worldclass data and application fees

are exchanged in consideration for the government's confidential review and potential approval of the brand name drugs. As discussed *supra*, the requisite contractual authority and asserted confidentiality requirements are presumably codified in the statutory and regulatory scheme.

In support of the claimed implied-in-fact contract, Vanda primarily relies upon the Federal Circuit's decision in *Airborne Data, Inc. v. United States*, 702 F.2d 1350 (Fed. Cir. 1983) (per curiam). In that case, the Federal Circuit affirmed the trial court's conclusions that a company's submission of an unsolicited proposal for a government contract–which included trade secrets and a confidentiality restriction– formed an implied-in-fact contract to safeguard the confidential information, breached when the receiving agency used the company's proposal to solicit bids from third parties for similar services. *Id.* at 1352–53. Vanda also cites a decision by this Court's predecessor in *Research, Analysis, & Development, Inc. v. United States*, 8 Cl. Ct. 54 (1985). This case similarly involved a company's submission of an unsolicited proposal for a military contract–including proprietary information and a confidentiality statement–ultimately compromised when the Air Force published the proprietary information in seeking comparable technological proposals from third parties. *Id.* at 56–57. Finding the material facts indistinguishable from *Airborne Data*'s binding precedent, the trial court in *Research Analysis* likewise found an implied-in-fact confidentiality contract was consummated and subsequently breached. *Id.* at 61.

The implied-in-fact contractual relationships in *Airborne Data* and *Research Analysis* are readily distinguishable from the facts in this case. Put simply, there is a clear difference between: (a) submitting a proposal seeking a government contract with a particular federal agency; and (b) filing an application for regulatory approval to bring a product to market as required by federal law. *Compare Airborne Data*, 702 F.2d at 1352–53 *and Research Analysis*, 8 Cl. Ct. at 56–61 *with Perry v. United States*, 149 Fed. Cl. 1, 17–20 (2020) (inventor's submission of patent applications to the USPTO does not consummate a contract claim within the jurisdictional authority of the Court of Federal Claims, warranting dismissal under RCFC 12(b)(1); alternatively, "any attempt to construe the relationship between the USPTO and a patent applicant as contractual is legally implausible on its face," subject to dismissal under RCFC 12(b)(6)), *aff'd*, No. 20-2084, 2021 WL 2935075 (Fed. Cir. July 13, 2021) (per curiam).

At most, any claimed disclosure of Vanda's purported trade secrets or confidential commercial information is a failure to duly adhere to the legal confidentiality requirements imposed by statute and regulation rather than a breach of an implied-in-fact contract. Vanda's characterization notwithstanding, Count II must be dismissed as either an implied-in-law contract outside the Court's jurisdiction or an improvidently pleaded claim that is facially implausible as a matter of law.

## IV.   Time-Barred Claims

The government finally argues that any claims related to Inventia are time-barred and should be dismissed.  The Court agrees.  "A claim under the Tucker Act, 28 U.S.C. § 1491, . . . must be brought 'within six years after such claim first accrues.'" *Adera v. United States*, No. 22-1074, 2023 WL 3768645, at *2 (Fed. Cir. June 2, 2023) (quoting *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018) (citing 28 U.S.C. § 2501)).  Otherwise, the claim is time-barred and must be dismissed for lack of jurisdiction.  *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006) ("Pursuant to 28 U.S.C. § 2501, claims brought in the Court of Federal Claims under the Tucker Act are 'barred unless the petition thereon is filed within six years after such claim first accrues.'"), *aff'd*, 552 U.S. 130 (2008).  A claim first accrues "when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *Conner v. United States*, No. 23-1316, 2023 WL 5011753, at *2 (Fed. Cir. Aug. 7, 2023) (citing *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (citations omitted)).  In this case, the FDA's alleged disclosure of Vanda's claimed trade secrets and confidential commercial information to Inventia took place on or before November 28, 2016, when the generic drug was approved.  Yet Vanda failed commence this action until May 1, 2023–over five months after the six-year jurisdictional deadline.

In an effort to salvage the Inventia-based claims, Vanda now seeks to invoke the accrual suspension rule.  "[S]trictly and narrowly applied," the rule is triggered only when a plaintiff can demonstrate the government "concealed its acts," resulting in plaintiff's lack of awareness, or the alleged injury was "'inherently unknowable' . . . at the time the cause of action accrued."  *Ingrum v. United States*, 560 F.3d 1311, 1314–15 (Fed. Cir. 2009) (citing cases); *accord Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985) (quoting *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 256, 358–59 (Ct. Cl. 1967)).  Relevant here, "[t]he phrase 'inherently unknowable' has been construed to mean that the factual basis for the claim is 'incapable of detection by the wronged party through the exercise of reasonable diligence.'"[13] *Texas Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009) (quoting *Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)); *accord Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) ("According to the accrual suspension rule, 'the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed.'") (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003)).

Vanda contends it first became aware of the FDA's purported disclosures to Inventia on or about April 20, 2023, when the FDA responded to Vanda's March 27, 2023 FOIA request related to the generic manufacturer's ANDA approval.  But Vanda

---

[13] Vanda does not allege the FDA took any steps to conceal its actions.

is silent as to its decision to wait six years and four months after Inventia's drug approval to submit its FOIA request or otherwise inquire about the generic's ANDA. Considering Vanda commenced directly related ANDA litigation against Inventia on October 13, 2015–over a year before the ANDA was approved and made public–this time gap is particularly notable here.[14]   *See Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del. filed Oct. 13, 2015).   Additionally, upon approval of Inventia's ANDA on November 28, 2016, the information Vanda ultimately secured through its FOIA request was "immediately available for public disclosure."   *See, e.g.*, 21 C.F.R. § 314.430(e) ("After FDA sends an approval letter to the applicant, the following data and information in the application or abbreviated application are immediately available for public disclosure, unless the applicant shows that extraordinary circumstances exist. . . . (7) All correspondence and written summaries of oral discussions between FDA and the applicant relating to the application . . . .").   Lastly, the Federal Circuit has squarely rejected attempts to invoke the accrual suspension rule based solely on additional information received through Privacy Act and FOIA requests after the six-year statute of limitations expired.   *See Adera*, 2023 WL 3768645, at *4.

For these reasons, Vanda's assertion that the alleged FDA disclosures to Inventia were incapable of detection prior to November 28, 2022–within six years of the generic's FDA approval–rings hollow.   Accordingly, the company's claims relating to Inventia are time-barred.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF 7) is **DENIED-IN-PART** and **GRANTED-IN-PART** as follows: defendant's motion to dismiss Count I (Fifth Amendment taking) is **DENIED**; and defendant's motion to dismiss Count II (breach of contract) and plaintiff's claims involving Inventia are **GRANTED**.   In accordance with RCFC 12(a)(4)(A)(i), defendant shall file an answer on or before February 1, 2024.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[14] As noted *supra*, although Vanda and Inventia have reportedly settled the ANDA litigation, the district court matter remains pending.

# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 23-629C
(Filed: January 22, 2025[*])

|  |  |
|---|---|
| **VANDA PHARMACEUTICALS, INC.**, | ) |
|  | ) |
| *Plaintiff,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| **UNITED STATES**, | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

*Paul W. Hughes, III*, McDermott Will & Emery, Washington, DC, for plaintiff. With him on the briefs were *Edward B. Diskant*, *Jennifer B. Routh*, and *Charles Seidell*, McDermott Will & Emery, Washington, DC.

*Borislav Kushnir*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. On the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Igor Helman*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Samuel R. Bagenstos*, General Counsel, and *Wendy Vicente*, Deputy Chief Counsel, Litigation, U.S. Department of Health and Human Services, Washington, DC, and *James Allred*, Associate Chief Counsel, and *Leah A. Edelman*, Associate Chief Counsel, Office of the Chief Counsel, U.S. Food and Drug Administration, Silver Spring, MD, Of Counsel.

---

[*] This opinion was originally filed under seal on January 7, 2025, in accordance with the protective order entered in this case. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. On January 17, 2025, both parties proposed a series of redactions. To be clear, the Court's adoption of the parties' proposed redactions should not be interpreted as sanctioning their assertions that the information is in fact a trade secret or otherwise qualifies as proprietary and/or confidential commercial information. Redactions are denoted using "[■]."

*Joshua R. Turner*, Goodwin Procter LLP, Washington, DC, for amicus curiae Association for Accessible Medicines.  With him on the brief were *Brian T. Burgess* and *Gabriel B. Ferrante*, Goodwin Procter LLP, Washington, DC.

## OPINION AND ORDER

**BONILLA, Judge**.

Biopharmaceutical company Vanda Pharmaceuticals, Inc. (Vanda) alleges the U.S. Food and Drug Administration (FDA) improperly disclosed the brand manufacturer's trade secrets and confidential commercial and proprietary information to competitors seeking approval of generic drugs.  Whether intentional or inadvertent, Vanda claims the FDA's disclosures of dissolution specifications and impurities testing and micronization information developed and learned in evaluating Vanda's new drug applications (NDAs) to three generic competitors in the course of reviewing their abbreviated new drug applications (ANDAs) constitute a Fifth Amendment taking (Count I) and breach of an implied-in-fact contract (Count II).

On January 18, 2024, the Court granted-in-part and denied-in-part the government's motion to dismiss Vanda's complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).  *Vanda Pharms., Inc. v. United States*, 169 Fed. Cl. 196 (2024).  Specifically, the Court dismissed Vanda's breach of contract claim "as either an implied-in-law contract outside the Court's jurisdiction or an improvidently pleaded claim that is facially implausible as a matter of law."  *Id.* at 208.  The Court also declared Vanda's claims time-barred as they relate to disclosures purportedly made to generic competitor Inventia Healthcare Private Limited (Inventia).  *Id.* at 208–10.  However, the Court denied the government's effort to construe and summarily dismiss Vanda's Fifth Amendment claim as an *unauthorized* taking.  *Id.* at 205–06.  Instead, the Court posed and deferred—until today—the following novel questions: whether Vanda can assert a cognizable property interest in an alternative dissolution specification *the FDA proposed to Vanda* during the drug approval process; whether and to what extent the FDA is precluded from inquiring about a generic drug manufacturer's impurity detection and micronization capabilities during the ANDA process simply because Vanda addressed them in its NDA; and the potential adverse impacts of crediting Vanda's proprietary claims on the FDA's administration of the NDA and ANDA processes.  *Id.* at 206–07.

Pending before the Court is defendant's motion for judgment on the pleadings pursuant to RCFC 12(c) or, in the alternative, for summary judgment under RCFC 56

by operation of RCFC 12(d).  For the reasons set forth below, defendant's motion for judgment on the pleadings is GRANTED.[1]

## BACKGROUND

Vanda is an international biopharmaceutical company that researches, develops, and markets high-impact medications to address unmet medical needs. Founded in 2003, the corporation is headquartered in Washington, DC and maintains a self-described business model of "acquiring compounds that other companies failed to develop into treatments, identifying potential medical uses for them, devoting substantial resources to developing them, seeking FDA approval, and commercializing them."  ECF 1 at 6–7.  At issue in this case are two brand-name drugs developed by Vanda: Fanapt® (iloperidone) tablets approved to treat schizophrenia in adults, and Hetlioz® (tasimelteon) capsules approved to treat the circadian rhythm sleep disorder known as non-24-hour sleep-wake disorder.  The FDA approved Vanda's NDAs relating to Fanapt® and Hetlioz® on May 6, 2009, and January 31, 2014, respectively.  In the years since, the FDA considered and approved several ANDAs for generic versions of the brand-name drugs.  Vanda's claims focus on the information FDA officials purportedly shared with manufacturers of these generics in evaluating and approving their applications.

## I.    Drug Approval Process

To market drugs in the United States, pharmaceutical companies must secure approval from the FDA for each new product pursuant to the Food, Drug, and Cosmetic Act (FDCA).  21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed [in accordance with this Act] is effective with respect to such drug."). The FDCA outlines the extensive data and information manufacturers must provide the Secretary of the U.S. Department of Health and Human Services (delegated to the FDA) in an NDA to demonstrate consumer safety and effectiveness and gain government approval to market a new drug.  *See id.* § 355(b)(1)(A)(i)–(viii).  In addition to the statutory requirements, by regulation, NDAs must include information on a product's chemistry, manufacturing, and controls, a meticulous technical review of the drug's manufacturing procedures, and "the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including . . . acceptance criteria relating to . . . dissolution rate . . . ."  21 C.F.R. § 314.50(d)(1)(i)–(ii)(a).  Of relevance to the brand-name and generic drugs in issue here is the requirement for dissolution specifications: the rate at which a drug dissolves.  This data point is designed to measure consistency across batches and with the drug product presented from the clinical batch.

---

[1] As discussed *infra*, in deciding this case under RCFC 12(c), the Court does not reach defendant's alternative dispositive motion under RCFC 56.

**Appx18**

The FDA publishes a list of new drugs approved for safety and effectiveness in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), along with their associated patents and exclusivity information. *See Janssen Pharmaceutica, N.V. v. Apotex*, 540 F.3d 1353, 1355 (Fed. Cir. 2008) (citing 21 U.S.C § 355(b)(1), (c)(2) & (j)(2)(A)(i)). Drugs approved by the FDA, and included in the Orange Book, are referred to as "listed drugs." *See id.* "Inclusion of products in the Orange Book is independent of any current regulatory action being taken administratively or judicially against a drug product."[2]

The research and development phases and ensuing FDA approval process for a new drug is expensive and time consuming.[3] To incentivize pharmaceutical research and development as well as scientific and medical advancements, a pioneer or brand-name drug manufacturer generally receives a statutory period of market exclusivity following FDA approval. To further protect their intellectual property, manufacturers typically secure patents issued by the U.S. Patent and Trademark Office (USPTO)—including patents listed in the Orange Book—which, in some cases, impact the timing of generic drugs entering the market. A brand-name drug's market exclusivity does not always run concurrently with germane patent terms. Relevant to this case, market exclusivity can also be maintained by companies keeping confidential certain data and information in NDA disclosures (e.g., trade secrets, manufacturing methods and processes, production and sales distribution). *See* 21 C.F.R. § 314.430(g).

To better balance the vital public policy interests of encouraging new scientific development with competitors' ability to bring inexpensive generics to market, Congress passed the 1984 Drug Price Competition and Patent Term Restoration Act (commonly known as the Hatch-Waxman Act), 21 U.S.C. §355(j). *See Caraco Pharms. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008) ("The goal of the [Hatch-Waxman] Act is to [strike] a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market.") (quotation marks omitted). Under the Hatch-Waxman Act, upon filing an ANDA, the timing of generic drug approval is subject to patent and market exclusivity protections, and the ANDA must provide appropriate patent certifications or statements for each patent listed in the Orange Book.[4] But generic competitors may bypass much of the costly

---

[2] *See* https://perma.cc/QLQ7-JPY4 (Orange Book Preface) (last visited Dec. 31, 2024).

[3] According to a 2015 report published by the Pharmaceutical Research and Manufacturers of America (PhRMA), on average, pharmaceutical manufacturers spend $2.6 billion over the course of more than a decade to bring a new drug to market. *See* https://perma.cc/WMZ4-YHAA at 4 (last visited Dec. 31, 2024); *cf. Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (describing FDA approval process as "long, comprehensive, and costly").

[4] An ANDA applicant must certify or state: (1) the patent information is not listed in the Orange Book (Paragraph I certification); (2) the patent listed in the Orange Book has expired (Paragraph II

CONFIDENTIAL MATERIAL REDACTED

and time-consuming research and development brand manufacturers undergo. *See* 21 U.S.C. § 355(j); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). Through an ANDA, a competitor can secure FDA approval by demonstrating that the proposed generic drug shares the same active ingredients and bioequivalence as the brand-name drug. In doing so, competitors must provide data establishing that the administration, dosage, and strength of the generic drug is comparable to the brand-name drug. Through the streamlined ANDA process, generics effectively piggyback off the pioneer's proven research and development and due diligence from manufacturing, testing, and approving the brand-name drug.

The unauthorized disclosure of trade secrets and confidential and proprietary information by government officials who obtain that information in the course of their official duties or employment is prohibited under federal law. 18 U.S.C. § 1905. Governing FDA regulations pointedly state: "Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c); *accord id.* § 314.430(g) ("The following data and information in an application or abbreviated application are not available for public disclosure unless they have been previously disclosed to the public . . . or they relate to a product or ingredient that has been abandoned and they do not represent a trade secret or confidential commercial or financial information . . . : (1) Manufacturing methods or processes, including quality control procedures."). These protections are intended to promote full and transparent engagement between drug manufacturers and the FDA throughout the application and approval process. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1010–11 (1984) (nondisclosure protections afforded under the Trade Secrets Act, 18 U.S.C. § 1905, are intended to protect "reasonable investment-backed expectation[s]").

## II. Vanda's Brand-Name Drugs

Vanda filed NDA No. 22-192 for Fanapt® on September 27, 2007. In reviewing the application, the FDA rejected Vanda's proffered dissolution specification of Q = ▮% in ▮ minutes and proposed an alternative rate of Q = ▮% in

---

certification); (3) the date the patent will expire (Paragraph III certification); and/or (4) the "[Orange Book-listed] patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the [generic] drug" (Paragraph IV certification). *See Report to Congress: The Listing of Patent Information in the Orange Book* at 8–9 (Dec. 2021). Although not relevant to deciding the issues before this Court, as noted *infra*, Vanda filed Paragraph IV certification and ANDA patent infringement litigation related to the brand-name and generic drugs discussed herein.

CONFIDENTIAL MATERIAL REDACTED

{██} minutes.[5]  Vanda adopted the FDA's alternative dissolution criterion and the agency approved Fanapt® as safe and effective for consumers on May 6, 2009.

The FDA similarly rejected and proposed an alternative to Vanda's proffered dissolution specification for Hetlioz®.  In NDA No. 205-677, filed on May 31, 2013, Vanda proffered a dissolution specification of Q = {██}% in {██} minutes.  In reviewing Vanda's application, the agency found: "The proposed dissolution criterion is not supported by the data and is not acceptable."  ECF 29-3 at 2, 6.  The agency proposed an alternative rate of Q = {██}% in {██} minutes.  Following Vanda's adoption of the FDA's alternative dissolution specification, on January 31, 2014, the agency approved Hetlioz® as safe and effective.  Of note, Vanda's May 31, 2013 NDA included information it now claims is confidential and proprietary regarding the brand manufacturer's processes for detecting and controlling impurities in Hetlioz®'s active ingredient (i.e., tasimelteon), as well as "the methods through which it controls the size of tasimelteon crystals in its drug product" (also known as "micronization").  ECF 1 at 17.

## III.    ANDA Disclosures and Parallel Litigation

Following the Court's January 18, 2024 decision, Vanda's remaining claims arise from the FDA's alleged engagement with three competitors seeking approval to bring generic versions of Fanapt® and Hetlioz® to market.  More specifically, Vanda alleges FDA officials disclosed the brand manufacturer's trade secret and confidential and proprietary information in ANDA correspondence with Lupin Limited and/or Lupin Pharmaceuticals, Inc. (collectively, Lupin), Teva Pharmaceuticals (Teva), and Apotex Corporation (Apotex).[6]  The alleged disclosures, summarized below, relate to dissolution specifications and impurities testing and micronization information.

Lupin submitted ANDA No. 206890 for generic Fanapt® (iloperidone) tablets on May 8, 2014.  The FDA rejected Lupin's proposed dissolution specification of Q = {██}% in {██} minutes and explained: "The firm's proposed specification . . . is too broad and not supported by their data and therefore not acceptable."  ECF 7-2 at 1; ECF 29-2 at 2.  Instead, the FDA proposed the same dissolution specification the agency recommended and approved for Fanapt® (i.e., Q = {██}% in {██} minutes).  A contemporaneous note recorded in the agency file confirms an FDA official consulted the June 29, 2012 annual report produced for Fanapt® in determining what dissolution specification to recommend to Lupin.  ECF 7-2 at 2 ("Reviewer's Note: the

---

[5] As used in the above formula, "Q" denotes the "Quantity (Q) of active substance dissolved in a specified time, expressed as the percentage of product label claim."  *See* National Institutes of Health, National Library of Medicine, *Developing Clinically Relevant Dissolution Specifications for Oral Drug Products—Industrial and Regulatory Perspectives* at 11 (Dec. 23, 2019), *available at* https://perma.cc/K8CH-TKC6 (last visited Dec. 31, 2024).

[6] As noted *supra*, Vanda's claims involving Inventia are time-barred.

reviewer checked the NDA Annual report for the above-mentioned specification for the [reference listed drug (RLD)].") (footnote omitted).  Following Lupin's adoption of the FDA's alternative dissolution rate, its generic drug was formally approved as safe and effective on May 5, 2022.

In the interim, on January 31, 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon).  The FDA rejected Teva's proposed dissolution specification of Q = {█}% in {█} minutes, instead recommending the rate previously proposed and approved for Hetlioz® (i.e., Q = {█}% in {█} minutes).  Citing Vanda's U.S. Patent Application No. 20170190683A1 (Highly Purified Pharmaceutical Grade Tasimelteon) (published July 6, 2017),[7] the agency also inquired whether the generic manufacturer was capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed Teva to produce supporting data including limits of detection and quantification and linearity.  The FDA also suggested that tasimelteon "may be subject to micronization" and, upon that assumption, directed the generic manufacturer to describe their micronization procedures and submit batch and stability data.  ECF 29-7 at 2.  Following Teva's adoption of the FDA's proposed alternative dissolution specification, and the generic manufacturer's submission of the requested impurity and micronization information, its generic drug was approved by the FDA as safe and effective on December 12, 2022.

Concomitantly, Apotex submitted ANDA No. 211607 for generic Hetlioz® (tasimelteon) on January 31, 2018.  As with Teva's application, the FDA rejected Apotex's proposed dissolution specification of Q = {█}% in {█} minutes and, instead, recommended the rate previously proposed and approved for Hetlioz® (i.e., Q = {█}% in {█} minutes).  Likewise, the FDA instructed Apotex to clarify its capabilities related to detecting, quantifying, and controlling specified impurities in the generic drug and, if applicable, instructed Apotex to produce supporting data, including limits of detection and quantification and linearity.  The FDA also inquired:

> Please clarify whether your drug substance may be subject to any particle size reduction. If so, please provide the following:
> a.  [x-ray diffraction (XRD)] data for a batch of micronized drug substance.
> b.  Stability data for a micronized batch of drug substance to ensure solid form stability.
> c.  A detailed process description of the micronization procedure . . . .

ECF 29-6 at 3, *quoted in part in* ECF 1 at 38.  On December 20, 2022, following Apotex's adoption of the FDA's proposed dissolution rate, and the manufacturer's

---

[7] *See* https://perma.cc/8TF3-E3H9 (last visited Dec. 31, 2024).  The USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020.  *See* https://perma.cc/8FEV-3W6L at 1 (last visited Dec. 31, 2024).

submission of the requested impurity data and micronization information, its generic drug was approved by the FDA as safe and effective.

Vanda alleges the FDA improperly disclosed the brand manufacturer's trade secrets and confidential and proprietary information by offering recommendations to generic competitors and, thus, breached its duty of confidentiality.  More specifically, Vanda alleges the FDA's communications to the ANDA applicants regarding dissolution rates, impurities testing, and micronization revealed Vanda's confidential manufacturing information and caused economic injury to the brand manufacturer.[8] In sum, the FDA's alleged improper disclosures of Vanda's claimed confidential trade secrets and confidential and proprietary information to generic competitors, include:

| Competitor | Pioneer Model | ANDA Submitted | FDA's Alleged Disclosures | FDA Approval |
|---|---|---|---|---|
| Lupin | Fanapt® (Iloperidone) | May 8, 2014 | • Dissolution Rate | May 5, 2022 |
| Teva | Hetlioz® (Tasimelteon) | Jan. 31, 2018 | • Dissolution Rate<br>• Impurities Testing<br>• Particle Size/ Micronization | Dec. 12, 2022 |
| Apotex | | | | Dec. 20, 2022 |

Following the FDA's approval of these generic drugs, Vanda initiated ANDA patent infringement suits against the companies in federal district court.[9]  Prior to

---

[8] Throughout its complaint, Vanda references additional competitors seeking to bring generic versions of Fanapt® and Hetlioz® to market, including Alembic Pharmaceuticals Ltd., MSN Pharmaceuticals Inc. (MSN), Roxanne Laboratories Inc. (n/k/a Hikma Labs Inc. and transferred to West-Ward Pharmaceuticals Corp.), and Taro Pharmaceutical Industries Ltd.  To date, Vanda has not alleged any improper FDA disclosures to these generic manufacturers.  Accordingly, any such claims are waived.

[9] *See, e.g.*, *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 18-651, 2022 WL 17593282 (D. Del. Dec. 13, 2022) (judgment entered for defendants Teva and Apotex following four-day bench trial), *aff'd*, No. 23-1247, 2023 WL 3335538 (Fed. Cir. May 10, 2023), *cert. denied*, __ U.S. __, 144 S. Ct. 1393 (2024); *Vanda Pharms., Inc. v. Lupin Ltd.*, No. 15-1073 (D. Del. July 15, 2020) (voluntarily dismissed following settlement wherein Lupin deferred commercialization of generic product until Nov. 2, 2027); *compare Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del. Dec. 5, 2024), *with* https://perma.cc/4WDE-ZFPS at 18–19 (Vanda's Quarterly Report (Form 10-Q) for the period ending March 31, 2022) (district court litigation remains pending despite confidential stipulation wherein Inventia has not launched or commercialized generic drug) (last visited Dec. 31, 2024); *see also* https://vandapharmaceuticalsinc.gcs-web.com/node/16186/html at 21 (Vanda's Q-10 for the period ending Sept. 30, 2024) (noting non-exclusive licensing agreement with MSN and Impax Laboratories, LLC to manufacture and market MSN's generic version of Hetlioz®) (last visited Dec. 31, 2024); *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 23-152 (D. Del. filed Dec. 27, 2022) (pending patent litigation against Teva and Apotex); *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 24-18 (D. Del. filed Jan. 29, 2023) (pending false advertising case against Teva); *Vanda Pharms. Inc. v. MSN Pharms. Inc.*, No. 24-815 (D. Del. filed July 12, 2024) (pending patent litigation against MSN).

commencing this action against the United States on May 1, 2023, Vanda also filed several civil suits against the FDA in federal district court.[10]

## DISCUSSION

### I.    Standard of Review

"[W]hen considering a motion under RCFC 12(c), the court applies substantially the same test as it does for a motion to dismiss for failure to state a claim under RCFC 12(b)." *Sikorski Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 719 (2015) (citing *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011)). That is, "the court must assume 'each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (quoting *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988)). Legal conclusions presented as factual assertions are not, however, entitled to such deference. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Upon these premises, "[j]udgment on the pleadings is appropriate where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Lab'ys, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007) (citing *N.Z. Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994)).

Relevant here, "[w]hen deciding a motion for judgment on the pleadings, the court may review 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice.'" *T.H.R. Enters., Inc. v. United States*, 160 Fed. Cl. 236, 239 (2022) (quoting 5C Charles

---

[10] *See, e.g., Vanda Pharms., Inc. v. FDA*, No. 23-1674 (D.D.C. Oct. 1, 2024) (Freedom of Information Act (FOIA) voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-938 (D.D.C. Mar. 27, 2023) (summary judgment granted in favor of plaintiff in FOIA litigation); *Vanda Pharms., Inc. v. FDA*, No. 23-280 (D.D.C. filed Jan. 31, 2023) (Administrative Procedures Act (APA) challenge to FDA's decision to approve Teva's ANDA of generic Hetlioz® remains pending); *Vanda Pharms., Inc. v. FDA*, Nos. 22-3413, 22-3807, 22-3808, 24-2203 to -2205 (D.D.C. filed Nov. 7, 2022) (FOIA litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3052 (D.D.C. Aug. 29, 2023) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-2775 (D.D.C. Oct. 30, 2024) (summary judgment granted in favor of Vanda in APA challenge to FDA's alleged failure to issue a decision on Vanda's December 2018 Supplemental NDA for Hetlioz® and delay in scheduling a hearing); *Vanda Pharms., Inc. v. FDA*, No. 22-1432 (D.D.C. Aug. 2, 2023) (summary judgment for defendant in APA challenge to FDA's decision denying Vanda "Fast Track" designation for tradipitant–a drug to treat gastroparesis), *appeal docketed*, No. 23-5200 (D.C. Cir. Sept. 11, 2023); *Vanda Pharms., Inc. v. FDA*, No. 22-1405 (D.D.C. June 21, 2023) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 23-2325 (D.D.C. Apr. 22, 2024) (same); *Vanda Pharms., Inc. v. FDA*, No. 23-2884 (D.D.C. Jan. 17, 2024) (same); *Vanda Pharms., Inc. v. FDA*, No. 23-2327 (D.D.C. filed Aug. 11, 2023) (FOIA litigation pending); *Vanda Pharms., Inc. v. FDA*, No. 23-2812 (D.D.C. filed Sept. 25, 2023) (APA challenge to FDA's approval of MSN's tasimelteon ANDA remains pending).

A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2004)). Documents considered "central to the complaint" can include exhibits "whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Toon v. United States*, 96 Fed. Cl. 288, 298–99 (citing cases). The facts material to deciding this case are rooted in the detailed accounts included in Vanda's pleading, matters of public record, or otherwise uncontroverted. Accordingly, the Court need not convert defendant's motion to one for summary judgment.[11] *See id.* at 299.

## II.    Fifth Amendment Taking

The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. AMEND. V, cl. 4. In determining whether a viable takings claim has been adequately pled, courts apply a two-part test. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citing cases). Where, as here, the claimant fails to assert a cognizable property interest, the court's inquiry begins and ends on the first step. *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275 (Fed. Cir. 2023) (quoting *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir 2004)).

As explained by the United States Court of Appeals for the Federal Circuit:

> The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 (1992).

---

[11] The Court rejects Vanda's contention that the issues raised in this case are too fact-intensive to be resolved under RCFC 12(c). *See Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004) ("Whether a compensable taking has occurred is a question of law based on factual underpinnings.") (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003)); *Econ. Rsch. Servs. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016) ("Although the question of whether a piece of information is a trade secret is typically a question of fact, information is not a trade secret as a matter of law if it is 'easily ascertainable by the public or generally known within an industry.'") (citation omitted).

*Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (footnote omitted).  Under these principles, cognizable property interests extend to both tangible and intangible property, including commercial data.  *Acceptance*, 583 F.3d at 854 ("Real property, tangible property, and intangible property, all may be the subject of takings claims.").

Over forty years ago, the United States Supreme Court expressly extended Fifth Amendment protections to legally recognized trade secrets.  *Monsanto*, 467 U.S. at 1003–04.  In *Monsanto*, the Supreme Court considered whether a pesticide inventor, developer, and producer had a cognizable property interest in research and test data the company generated and submitted to the U.S. Environmental Protection Agency (EPA) during the pesticide registration process.  *Id.* at 1000–01.  As authorized by statute, EPA officials used the submitted data to evaluate a competitor's registration application and then published certain data.  *Id.* at 990 (citing Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq.).  Citing state law defining property as including trade secrets protected from disclosure, the Supreme Court held that the claimant had a vested property interest in the intangible asset.  *Id.* at 1002–04.

As in *Monsanto*, applicable local law recognizes trade secrets consistent with the definition of property included in the Restatement of Torts.  In Washington, DC where Vanda is headquartered:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of reasonable efforts to maintain its secrecy.

D.C. Code § 36-401(4) (2024).[12]  Federal law includes a similar definition:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–

---

[12] Under Maryland state law, where the FDA is headquartered, the definition of trade secret is nearly identical.  *See* Md. Code, Com. Law § 11-1201(e).

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C. § 1839(3) (2016).  Comparatively cited in *Monsanto*, the Restatement of Torts includes the following definition: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Restatement (First) of Torts § 757 (1939), *quoted with approval in* 467 U.S. at 1001–02.  These definitions, as well as the intended confidentiality of trade secret information submitted to the FDA as part of the drug approval process, is codified by the federal agency's regulations.  21 C.F.R. § 20.61(a) (2022) ("A trade secret may consist of any commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort. There must be a direct relationship between the trade secret and the productive process."); *id*. § 20.61(c) ("Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure.").[13]

Notwithstanding the foregoing, Vanda fails to plead a viable Fifth Amendment taking based upon the claimed government disclosures of dissolution specifications and impurities testing and micronization information.  The dissolution specifications ultimately adopted for Fanapt® and Hetlioz® were not developed by Vanda or submitted to the FDA.  Rather, they were generated by the FDA and proposed to and accepted by Vanda during the NDA process in order to secure approval to market.[14] In turn, the impurities testing and micronization information related to the active pharmaceutical ingredient in Hetlioz® (i.e. tasimelteon) was already in the public domain at the time of the agency's alleged disclosures: Vanda included the cited data in a publicly filed patent application six months before the FDA reportedly used the

---

[13] The FDA regulation similarly defines (and protects) confidential and privileged commercial and financial information as "valuable data or information which is used in one's business and is of a type customarily held in strict confidence or regarded as privileged and not disclosed to any member of the public by the person to whom it belongs."  21 C.F.R. § 20.61(b).

[14] During oral argument, the government acknowledged that a dissolution specification proffered by a drug manufacturer and approved (as originally submitted) by the FDA "may qualify for some [nondisclosure] protection."  ECF 57 at 44–45.  The government immediately qualified the statement, explaining: "That's not the case here. That's not to say that we are conceding the matter, but we're not making this argument. I think [the Court's hypothetical presents] a much more complicated argument."  *Id*. at 45.

CONFIDENTIAL MATERIAL REDACTED

information in reviewing ANDAs.  Accordingly, defendant is entitled to judgment on the pleadings.[15, 16]

## A. Dissolution Specifications

Whether an adopted dissolution specification constitutes a property interest cognizable under the Fifth Amendment is an issue of first impression.  In answering this question in the negative, the Court examines Vanda's claims in the context of the governing regulatory scheme, applicable federal and state law, and relevant caselaw.  None support Vanda's claim.

FDA regulations define trade secret as "the end product of either innovation or substantial effort," adding that "[t]here must be a direct relationship between the trade secret and the productive process."  21 C.F.R. § 20.61(a).  The dissolution specifications in issue do not satisfy either criterion.  Vanda did not develop or propose the approved rates to the FDA.  Instead, as captured in the chart below, the FDA rejected Vanda's proffered dissolution rates for both Fanapt® and Hetlioz® and proposed an alternative for each brand-name drug.  Vanda then adopted the FDA-recommended dissolution rates and secured NDA approval.

| Drug | Vanda's Proposed Rate | | | FDA's Alternative Rate | | |
|------|------|------|------|------|------|------|
| Fanapt® | Q = { | }% at { | } minutes | Q = { | }% at { | } minutes |
| Hetlioz® | Q = { | }% at { | } minutes | Q = { | }% at { | } minutes |

While Vanda developed the brand-name drugs, the trade secret and confidential and proprietary information claimed to have been taken by the government was, in fact, proposed and recommended *to Vanda by the FDA*.  Though the FDA used information included in Vanda's NDA to generate the alternative rates, the revised dissolution specifications cannot be said to be the "end product" of Vanda's innovation or effort, let alone directly related to Vanda's productive process.  Logic dictates that the

---

[15] The Court rejects Vanda's assertion that the pending dispositive motion must be limited to trade secret claims due to defendant's alleged failure to separately address Vanda's simultaneous assertions that the contested information also qualifies as confidential and proprietary.  Throughout these proceedings the government's position has been clear: no matter the label, Vanda fails to assert a cognizable property interest in the contested dissolution specifications and impurity testing and micronization information.

[16] In resolving the pending dispositive motion, the Court similarly rejects defendant's blanket assertion that Vanda's reported disclosures of the subject dissolution specifications in collateral litigation extinguishes plaintiff's claims that the information qualifies as a trade secret and confidential and proprietary information.  Vanda's reported disclosures (whether inadvertent or intentional) took place in early 2023—over four years *after* the FDA's purportedly shared the information with Vanda's competitors and over a year *after* the generic drugs hit the marketplace.  By then, any claimed damage was done.  *See CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 835 (D. Minn. 2007) ("[I]nformation that become[s] publicly available after the time of the misappropriation is irrelevant to the existence of a trade secret at the time of the misappropriation.") (citing *B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500, 505–06 (9th Cir. 2006)).

**Appx28**

CONFIDENTIAL MATERIAL REDACTED

government cannot be credibly accused of taking information generated by a federal agency in the course of its regulatory review and then proposed to the applicant to secure regulatory approval. This case is readily distinguishable from *Monsanto*, where the contested trade secret data was wholly generated by the claimant and presented to the regulatory agency. *See* 467 U.S. at 1002–03 ("Th[e] general perception of trade secrets as property is consonant with a notion of 'property' that extends beyond land and tangible goods and includes the products of an individual's 'labour and invention.'") (citation omitted); *cf. United States v. Fuller*, 409 U.S. 488, 492 (1973) ("[T]he Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain."), *cited in Conti*, 291 F.3d at 1340–41 (no cognizable property right lies in increased property value attributable to revokable permits and licenses).[17]

Further highlighting the implausibility of Vanda's claimed compensable property interest in the dissolution specifications adopted to secure regulatory approval is the disconnect between the alleged trade secret and the company's productive process. As this case illustrates, dissolution specifications are not unique to the end product or the productive process employed. In adopting the alternative FDA-recommended dissolution specifications, nothing in the record suggests—nor has there been any representation—that Vanda altered the composition of Fanapt® or Hetlioz® or modified the production of the brand-name drugs. It cannot be said that there is a direct relationship between the dissolution specification and the productive process if an identical manufacturing process can yield multiple dissolution specifications. In response, Vanda argues the company's proposed dissolution rates were close to the ones the FDA ultimately required: a ██-minute delta for Hetlioz® and a ██-percent dissolution delta for Fanapt®. Proposing dissolution specifications requires more precision than horseshoes and hand grenades particularly where, as here, Vanda claims that the rates are the company's trade secrets and confidential and proprietary information.

In the realm of dissolution specifications for immediate release solid oral drugs, the array of dissolution specifications is narrow. The specification is generally limited to the following combinations: 75%, 80%, or 85% over 15-, 30-, or 45-minutes.[18] As

---

[17] On this point, Vanda's citation to *Carpenter v. United States*, 484 U.S. 19 (1987), and *Formax, Inc. v. United States*, 841 F.2d 388 (Fed. Cir. 1988), is not persuasive. In *Carpenter*, the contested confidential business information was the contents of as yet published financial columns generated by a newspaper reporter, who repeatedly misappropriated the information in a stock tip fraud conspiracy. 484 U.S. at 20–23. *Formax* involved a terminated employee's theft of company-generated drawings claimed to be trade secrets. 841 F.2d at 389. The courts in both matters noted that the claimant owned the contested information. *Carpenter*, 484 U.S. at 26; *Formax*, 841 F.2d at 389.

[18] *See* McAllister et al., *Developing Clinically Relevant Dissolution Specifications for Oral Drug Products—Industrial and Regulatory Perspectives*, PHARMS. at 4 (Dec. 2019) ("For immediate release solid oral dosage forms . . . the mean dissolution of 12 units minus 10%, rounded to the nearest 5%,

CONFIDENTIAL MATERIAL REDACTED

illustrated in the chart below, the dissolution specifications included in the generic manufacturers' ANDAs were about as close as Vanda's original NDA proposals to the FDA-sanctioned rates. And, in Apotex's case, the generic manufacturer was more closely aligned with the FDA's alternative dissolution specification than Vanda.

| Drug | Vanda NDA | Generic ANDA | FDA Approved |
|------|-----------|--------------|--------------|
| Fanapt® | Q = {███}% at {███} minutes | Lupin: Q = {███}% at {███} minutes | Q = {███}% at {███} minutes |
| | | Teva: Q = {███}% at {███} minutes | |
| Hetlioz® | Q = {███}% at {███} minutes | Apotex: Q = {███}% at {███} minutes | Q = {███}% at {███} minutes |

Put simply, the FDA-generated and recommended dissolution specifications lack the regulatory hallmarks of a drug manufacturer's trade secret or confidential and proprietary information.[19]

Vanda's claims fare no better under federal and state law. As quoted *supra*, relevant here, federal and Washington, DC (and Maryland) trade secret laws were enacted to protect scientific formulas, methods, techniques, and processes that derive independent economic value from their secrecy. 18 U.S.C. § 1839(3); D.C. Code § 36-401(4); Md. Code, Com. Law § 11-1201(e); *cf. Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 771 (4th Cir. 2023) ("[F]or information to constitute a 'trade secret' under Virginia and federal law, it must '[d]erive[ ] independent economic value' from its secrecy.") (quoting Va. Code § 59.1-336; 18 U.S.C. § 1839(3)(B)). Contrary to the arguments advanced by Vanda, there is no inherent independent economic value in a drug's dissolution specification. Nor can the FDA be reasonably expected to withhold from generic manufacturers the dissolution specifications generated by the agency and provided to the brand manufacturer in carrying out its regulatory obligation of ensuring bioequivalence between brand-name and generic drugs.

Vanda's assertion that the FDA-recommended dissolution specification of a brand-name drug provides generic manufacturers significant insight and information about the manufacturing process is undermined by the reality of the situation and

---

should be used as the Q value and set as Q = 75%, 80% or 85% in 15/30/45 min."), *available at* https://perma.cc/5ZFY-BCQJ (last visited Dec. 31, 2024); U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances*, at 8 (Aug. 2018) ("For immediate release solid oral drug products containing a high solubility drug substance . . . the dissolution criterion is Q=80% in 30 minutes."), *quoted in Collaza v. Johnson & Johnson Consumer, Inc.*, No. 23-6030, 2024 WL 3965933, at *2 (S.D.N.Y. Aug. 27, 2024), *appeal docketed*, No. 24-2568 (2d Cir. Sept. 27, 2024), *and Musikar-Rosner v. Johnson & Johnson Consumer Inc.*, No. 23-11746, 2024 WL 3596897, at *4 (D. Mass. July 31, 2024), *and Bischoff v. Albertsons Cos.*, 678 F. Supp. 3d 518, 524 (S.D.N.Y. 2023). During oral argument Vanda's counsel suggested that a 20- or 60-minute interval could be used, raising the total standard combinations from nine to fifteen. ECF 57 at 94–95.

[19] As discussed *infra*, Vanda's assertions that the FDA-generated and recommended dissolution specifications qualify as the company's confidential and privileged information seemingly fail for the additional reason that they have no inherent independent value as required under 21 C.F.R. § 20.61(b).

the facts presented. Because the brand-name drug is first to market, generic manufacturers can determine, or at least approximate, the dissolution rate through independent lab testing. This is particularly true where, as here, the dissolution test method is publicly available for replication.[20] Moreover, the record presented strongly suggests that, like Vanda, none of the generic manufacturers modified the composition, dosage, form, strength, or performance characteristics of their drugs after the FDA recommended an alternative dissolution specification. They simply revised their originally proposed specifications to reflect the FDA-generated and approved dissolution specification.[21] As such, no independent economic value can be readily ascribed to the claimed information.

Vanda's assertions of proprietary secrecy in the dissolution specifications in issue further run afoul of the FDA's regulatory authority and obligations of ensuring bioequivalence in brand-name and generic drugs and in uniformly treating market competitors. To this end, the FDA's dissolution testing guidelines publicly state: "In the case of a generic drug product, the dissolution specifications are generally the same as the reference listed drug (RLD) [or brand-name drug]."[22] It is seemingly impractical if not impossible for the FDA to align dissolution specifications between brand-name and generic drugs if the agency is prohibited from accessing or referencing the NDA-approved dissolution specification in its subsequent ANDA review.[23] As initially raised in the Court's prior decision in this matter:

> [W]ithout comparing the data and information of an approved NDA to the proposed data and information included in a generic's ANDA under review, the FDA may authorize inconsistent results. In that case, Vanda might claim the FDA improvidently delayed the brand[-]name product to market or, in the alternative, hastened the generic drug's review and approval. The FDA could also reject a generic's proposed dissolution

---

[20] *Compare* ECF 29-2 at 3 (Lupin dissolution testing data), *with* U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances*, at 7–8 (Aug. 2018) (Standard Dissolution Testing Conditions).

[21] *Compare* ECF 29-1 at 102–03 (Fanapt®) *and* ECF 29-3 at 6–9 (Hetlioz®), *with* ECF 29-2 at 2–6 (Lupin) *and* ECF 29-4 at 3–4 (Teva) *and* ECF 29-5 at 8 (Apotex). This comparative information was referenced in Vanda's complaint. *See* ECF 1 at 19–20, 33.

[22] *See* U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms* at 3 (Aug. 1997), *available at* https://perma.cc/K4QU-3EXX (last visited Dec. 31, 2024).

[23] On this point, agency guidance further provides: "Once the specifications are established in an NDA, the dissolution specifications for batch-to-batch quality assurance are published in the United States Pharmacopeia (USP) as compendial standards, which become the official specifications for all subsequent [immediate release] products with the same active ingredients." *Id.* at 2. During oral argument counsel clarified that Vanda did not consent to the "optional" USP publication. ECF 57 at 27 (government), 81–82 (Vanda).

specification previously accepted for a brand manufacturer or another generic, subjecting the agency to accusations of delaying a generic drug's approval.

*Vanda*, 169 Fed. Cl. at 206. *See Am. Wild Horse Preservation Campaign v. Perdue,* 873 F.3d 914, 927–28 (D.C. Cir. 2017) (federal agency's failure to acknowledge or explain departure from past practice found "arbitrary and capricious" (citing cases). Despite advanced notice of the Court's practical considerations, Vanda has failed to allay these concerns.[24] The FDA-recommended dissolution specifications adopted by Vanda to gain approval to bring the brand-name drugs to market necessarily served as the benchmarks for the FDA's subsequent ANDA reviews and approvals of generic drugs. As such, Vanda's claimed proprietary interest in this regulatory-generated data is unfounded.[25]

## B. Impurities Testing

On July 6, 2017, Vanda publicly filed U.S. Patent Application No. 2017/0190683 A1, titled Highly Purified Pharmaceutical Grade Tasimelteon. The abstract provides: "A process for preparing a batch of highly purified, pharmaceutical grade tasimelteon comprises analyzing a batch of tasimelteon synthesized under [good manufacturing practice (GMP)] conditions for the presence of one or more identified impurities."[26] Under Field of the Invention, Vanda's patent application states: "The disclosure relates generally to the synthesis of tasimelteon. In some embodiments, impurities, which may be by-products or degradation products, are analyzed and controlled in order to keep the impurities below pre-set specifications."[27]

---

[24] In fact, in ongoing collateral litigation, Vanda seeks to invalidate the FDA's approval of MSN's generic version of Hetlioz® (tasimelteon), citing the federal agency's claimed failure to compare the proffered dissolution specification and other bioequivalence data to the brand-name drug (a/k/a RLD) and an FDA-approved generic drug. *See Vanda Pharms., Inc. v. FDA*, No. 23-2812 (D.D.C.) (ECF 24-1 at 33 filed Apr. 22, 2024). The government's counterargument in that case—that "there is no *requirement* that the agency look outside the confines of the ANDA" so long as the FDA performs the necessary due diligence and treats all applicants equally, *see id.* (ECF 27-1 at 21–22 filed May 20, 2024) (emphasis in original)—does not move the proverbial needle on this issue in Vanda's direction. *See* ECF 57 at 106–07 ("THE COURT: So to the extent that they are arguing the opposite of what they're arguing today, Vanda seems to be doing the same of no, no, you have to look at that stuff and you have to make sure that they're bioequivalent.").

[25] The fact that the FDA redacted the dissolution specifications in response to a FOIA request—perhaps out of an abundance of caution—does not confer on Vanda a compensable Fifth Amendment property interest in the information. Put simply, an agency's FOIA redaction policies and practices—as well as a specific employee's good faith adherence to them—are not dispositive regarding the Court's independent conclusion that the FDA-generated and recommended dissolution specifications are not trade secrets or protected confidential or proprietary information.

[26] *See* https://perma.cc/NM95-EZ9Z at 1 (last visited Dec. 31, 2024). As noted *supra*, the USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020.

[27] *Id.* at 2.

CONFIDENTIAL MATERIAL REDACTED

The Summary of the Invention and Detailed Description of the Invention go on to identify specific impurities generally found in tasimelteon through testing, claiming Vanda's ability to purify the bulk drug substance to within fixed acceptable levels.[28]

Six months later, on January 31, 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon).  That same day, Apotex followed with ANDA No. 211607.  Citing Vanda's July 6, 2017 patent application, the agency inquired whether Teva and Apotex were likewise capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed the generic manufacturers to produce supporting data, including limits of detection and quantification and linearity.  Vanda maintains that referencing the brand manufacturer's patent application in the course of Teva's and Apotex's ANDA reviews improperly or, at a minimum, improvidently revealed a trade secret and proprietary and confidential information: the fact that Vanda {█████████████} in its production of Hetlioz®.

Under similar circumstances, the Supreme Court stated: "Information that is public knowledge or that is generally known in an industry cannot be a trade secret. If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  *Monsanto*, 467 U.S. at 1002 (citations omitted).  In the patent context, the Federal Circuit aptly explained:

> "It is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law."

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (quoting *Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (additional citation omitted)).  Comparing the detailed information included in Vanda's patent application with the more general inquiry the FDA posed to Teva and Apotex regarding the generic manufacturers' comparable capabilities does not yield the improper disclosure of any novel or unknown part of Vanda's production process.  *See, e.g.*, *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) ("In some cases, a novel or unique combination of elements may constitute a trade secret. However, as here, 'mere variations on widely used [information] cannot be trade secrets.' . . . 'Simply to assert a trade secret resides in some combination of otherwise known data, is not sufficient . . . .'") (citations omitted).  Accordingly, Vanda's claimed trade secret and confidential and proprietary interest in the brand manufacturer's self-publicized impurities

---

[28] *Id.* at 3–12.

CONFIDENTIAL MATERIAL REDACTED

testing information involving the precise drug in issue (tasimelteon) fails to plead a viable Fifth Amendment takings claim.

### C. Micronization

Next, Vanda claims the FDA further disclosed to Teva and Apotex the brand manufacturer's trade secret and confidential and proprietary interest in particle size control techniques used in milling the active pharmaceutical ingredient in Hetlioz® (tasimelteon). In support, Vanda cites the FDA's July 12, 2018 responses to Teva's and Apotex's January 31, 2018 ANDAs, wherein the federal agency: suggested that tasimelteon "may be subject to micronization" and, upon that assumption, directed the generic manufacturers to describe their micronization procedures and submit batch and stability data. ECF 29-7 at 2 (FDA letter to Teva); *accord* ECF 29-6 at 3 (FDA letter to Apotex inquiring whether their generic drug "may be subject to any particle size reduction"). Vanda also cites an internal FDA memorandum reviewing Teva's ANDA, wherein the federal agency documented: "The [generic drug substance (DS)] is {■■■■■■■■■} . . . . [The reference listed drug (RLD)] is {■■■■■■■■}."[29] ECF 47-4 at 4.

Vanda's micronization-based claims fail for the same reason as their impurities testing claims: Vanda's July 6, 2017 Highly Purified Pharmaceutical Grade Tasimelton patent application, discussed *supra*, specifies the brand manufacturer's particle size reduction techniques—including {■■■■■■}. In fact, the publicly filed patent application describes the particle size reduction techniques {■■■■■■■■} in preparing highly purified, pharmaceutical grade tasimelteon in greater detail than included in the cited FDA correspondence.[30] The fact that Teva's generic drug is {■■■■■■} rather than {■■■■■■■} does not preclude the FDA from inquiring about comparable capabilities derived from other techniques highlighted in related patent applications or discussed in scientific literature. Under the caselaw summarized in the previous section, no cognizable Fifth Amendment takings claim can be based on a government agency's regulatory use of information already made public by its reported owner.[31]

---

[29] Nothing in the record presented suggests the internal FDA memorandum was shared with Vanda's competitors or otherwise made public. Further, contrary to Vanda's current assertion, the Court does not ascribe nefarious intent to the agency's decision to redact the above-quoted second sentence in a collateral FOIA response. ECF 47-4 at 4 ("NOT for FOIA: RLD is {■■■■■■■■}"). The unredacted version of this document was produced in discovery in this case.

[30] *See, e.g.*, https://perma.cc/8TF3-E3H9 at 10 ("It has been found that use of a jet mill and a dry nitrogen atmosphere is advantageous in achieving uniform particle size with good handling characteristics and minimal loss.") (last visited Dec. 31, 2024); *id.* at 11–12 ("A process for preparing a batch of highly purified tasimelteon that comprises . . . milling the tasimelteon to meet particle size specifications . . . .").

[31] Vanda's reliance upon a cherry-picked quote in *Delice Global, Inc. v. Coco Int'l, Inc.*, No. 90-3541, 2009 WL 2905466 (D.N.J. Sept. 9, 2009), is misplaced and otherwise unpersuasive. In *Delice Global,*

### III.    Leave to Amend

In closing out its brief, Vanda generally requests leave to amend its complaint to allege additional facts in the event the Court is inclined to grant defendant's dispositive motion.  Vanda does not, however, proffer what those facts are or otherwise tie them to the record currently before the Court or the fundamental issues resolved today.  Three months later—after the Court scheduled oral argument— Vanda filed a motion to compel discovery.  The discovery demanded relates back to Vanda's initial request to produce documents, propounded in February 2024 following the Court's partial dismissal of Vanda's claims.  As with the conditional request to amend, Vanda's motion to compel is not focused on the foundational issues raised in the dispositive motion addressed herein—i.e., Vanda's claimed compensable property interests in the dissolution specifications and impurities testing and micronization information.  Instead, the broad production request seeks documents pertaining to the FDA's regulatory review of Vanda's NDAs and several generics' ANDAs as well as the federal agency's suspected disclosures to third parties.[32]  Vanda's entitlement to these documents presumes that which the Court finds critically lacking: a compensable Fifth Amendment property interest.  This litigative approach is particularly troubling given that the Court placed Vanda on formal written notice a year ago regarding the perceived shortcomings of the brand manufacturer's claimed property interests in the contested data and information.

To be clear, defendant's apparent slow-walking and eventual suspension of the FDA's responses to Vanda's discovery request does not represent the government's finest hour.  Prior to filing the dispositive motion decided herein, defendant informally requested a stay of discovery.  It was denied.  In a compromise proposed by the Court, defendant agreed to continue producing documents in response to Vanda's pending production request in exchange for plaintiff's agreement not to propound further discovery.  The arrangement was expected to continue throughout briefing and the Court's resolution of defendant's dispositive motion.  After several months of production, and coinciding with the completion of briefing in July 2024, document production unjustifiably ceased. Following an exchange of formal discovery letters initiated by plaintiff, and the scheduling of oral argument on defendant's

---

the district court distinguished between a product's recipe and the patented device used to manufacture it, stating: "a patent regarding an instrument of production does not preclude the assertion of a trade secret concerning the formula of production." *Id.* at *5. Here, the FDA did not share the formula Vanda used to produce Hetlioz®. Rather, the regulatory agency simply asked the generic manufacturers about their respective capabilities regarding what Vanda publicly described as "advantageous" techniques "in achieving uniform particle size [in tasimelton] with good handling characteristics and minimal loss." *Compare* ECF 29-7 at 2 (FDA letter to Teva) *and* ECF 29-6 at 3 (FDA letter to Apotex), *with* https://perma.cc/8TF3-E3H9 at 10 (Vanda's patent application) (last visited Dec. 31, 2024).

[32] Vanda's production request also seeks documents related to drugs never in issue in this case as well as claims previously dismissed by this Court.

dispositive motion,[33] the discovery dispute was brought to the Court's attention. The more judicious approach would have been for the government to file a renewed (formal) motion to stay discovery pending the once-briefed dispositive motion. Nevertheless, given the disconnect between the requested discovery and the factual and legal issues material to the resolution of this case, Vanda's demand for additional documents must fail. *See Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim. That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request") (emphasis in original; collecting cases).

At bottom, the Court concludes Vanda's generic (and provisional) request for leave to file an amended complaint and subsequent motion to compel discovery are insufficient and futile efforts to further prolong this case. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed. Cir. 2006) ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.") (citing cases); *Shoshone Indian Tribe of the Wind River Rsrv., Wyoming v. United States*, 71 Fed. Cl. 172, 176 (2006) ("Where the proposed amendment would be subject to the same legal defect found by the court to justify dismissal of claims under the original complaint, leave to amend may be denied.") (first citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed. Cir. 2000); and then citing *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1404 (Fed. Cir. 1989)). Vanda simply cannot overcome the fundamental hurdles that the dissolution specifications and impurities testing and micronization information do not constitute cognizable property interests under the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings (ECF 29) is GRANTED. Plaintiff's provisional request for leave to file an amended complaint (ECF 47) and motion to compel discovery (ECF 51) are DENIED. The Clerk of Court is directed to enter judgment accordingly. No costs.

---

[33] The Court proposed to schedule oral argument in mid-November 2024. At the parties' joint request, the matter was continued to December 17, 2024.

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge

# In the United States Court of Federal Claims

**No. 23-629 C**

**Filed: January 8, 2025**

**************************************

| | | |
|---|---|---|
| **VANDA PHARMACEUTICALS, INC.,** | * | |
| **Plaintiff,** | * | **JUDGMENT** |
| | * | |
| **v.** | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |

**************************************

Pursuant to the court's Opinion and Order, filed January 7, 2025, granting defendant's motion for judgment on the pleadings,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant. No costs.

Lisa L. Reyes
Clerk of Court

By:   s/ Ashley Reams
Deputy Clerk

<u>NOTE</u>: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, *see* RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Effective December 1, 2023, the appeals fee is $605.00.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32(b)(1) because it contains 14,000 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(b)(2); and

(ii)     complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in size 14 points.

Dated: June 13, 2025                    */s/ Paul W. Hughes*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2025, I electronically filed the fore-going brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: June 13, 2025                    /s/ *Paul W. Hughes*