**No. 2025-1434**

---

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

---

VANDA PHARMACEUTICALS INC.,
*Plaintiff-Appellant,*

– v. –

UNITED STATES,
*Defendant-Appellee.*

---

On Appeal from the United States Court of Federal Claims
Case No. 23-cv-629, Hon. Armando O. Bonilla

---

## NONCONFIDENTIAL REPLY BRIEF
## FOR PLAINTIFF-APPELLANT

---

PAUL W. HUGHES
SARAH P. HOGARTH
ANDREW A. LYONS-BERG
CHARLES SEIDELL
ALEX C. BOOTA
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

  *Counsel for Plaintiff-Appellant*
  *Vanda Pharmaceuticals Inc.*

# TABLE OF CONTENTS

Table of Authorities .................................................................. ii

Introduction ........................................................................... 1

Argument ............................................................................... 3

I.   Vanda plausibly alleged that components of its manufacturing
     process are trade secrets. .................................................. 3

     A.   Vanda alleged a protectible interest in dissolution
          specifications embedded in its manufacturing processes. ......... 4

          1.   Vanda has the required possessory interest in its
               dissolution specifications ....................................... 4

          2.   The government's "creatorship" requirement cannot
               defeat Vanda's property interest. ............................ 12

          3.   FDA regulations cannot redefine trade secrets for
               purposes of state law. .......................................... 16

          4.   Vanda adequately alleged the actual requirements
               for trade-secret protection. ................................... 19

          5.   The government's approach is antithetical to the
               Takings Clause and to innovation and fair
               competition in highly regulated industries. ................. 20

     B.   Vanda has not forfeited trade secret protection for its
          impurities and micronization techniques. ......................... 27

     C.   Vanda at minimum should have been allowed to amend
          its complaint. ......................................................... 29

II.  Vanda's claims based on disclosures to Inventia are not time-
     barred. ...................................................................... 29

III. Vanda adequately stated an implied-in-fact contract claim. ......... 31

Conclusion ............................................................................ 33

## Confidential Material Omitted

The material omitted on page 28 describes a trade secret Vanda alleges

was disclosed to its competitors, previously redacted by the lower court.

# TABLE OF AUTHORITIES

**Cases**

*Advanced Fluid Sys. v. Huber*,
958 F.3d 168 (3d Cir. 2020) ........................................ 6, 7, 18

*Airborne Data, Inc. v. United States*,
702 F.2d 1350 (Fed. Cir. 1983) ................................ 31, 32, 33

*Armenian Assembly of Am., Inc. v. Cafesjian*,
692 F. Supp. 2d 20 (D.D.C. 2010) ................................... 19

*BladeRoom Grp. v. Facebook, Inc.*,
219 F. Supp. 3d 984 (N.D. Cal. 2017) ............................... 6

*Bond v. PolyCycle, Inc.*,
732 A.2d 970 (Md. Sp. App. 1999) ................................... 18

*Bowser, Inc. v. Filters, Inc.*,
398 F.2d 7 (9th Cir. 1968) ............................................. 14

*Cedars Sinai Med. Ctr. v. Quest Diagnostics Inc.*,
2019 WL 12521480 (C.D. Cal. 2019) ................................. 6

*Cent. Pines Land Co. v. United States*,
61 Fed. Cl. 527 (2004) ................................................. 30

*Clark v. Bunker*,
453 F.2d 1006 (9th Cir. 1972) ....................................... 12

*Clevinger v. Advoc. Holdings, Inc.*,
2024 WL 3359508 (D.D.C. 2024) ................................... 19

*DaimlerChrysler Servs. v. Summit Nat'l*,
2006 WL 1420812 (E.D. Mich. 2006) ............................... 6

*De Simone v. VSL Pharms., Inc.*,
352 F. Supp. 3d 471 (D. Md. 2018) ................................. 6

*DTM Rsch., LLC v. AT & T Corp.*,
245 F.3d 327 (4th Cir. 2001) ...................................... 4, 5, 6

*Gaedeke Holdings VII LTD v. Baker*,
683 F. App'x 677 (10th Cir. 2017) ................................. 6, 7

*HIRECounsel D.C., LLC v. Connolly*,
2021 WL 5998365 (D.D.C. 2021) ................................... 19

## Cases—continued

*Ingrum v. United States*,
560 F.3d 1311 (Fed. Cir. 2009) .................................................... 30, 31

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ................................................................. 12

*Members of Peanut Quota Holders Ass'n v. United States*,
421 F.3d 1323 (Fed. Cir. 2005) ............................................. 16

*Napoleon v. Heard*,
455 A.2d 901 (D.C. 1983) .......................................................... 6

*NSEM, LLC v. Butler*,
2018 WL 3910961 (S.D. Miss. 2018) ...................................... 6

*Parking Co. v. R.I. Airport Corp.*,
2005 WL 419827 (R.I. Super. Ct. 2005) ................................ 6

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ...................................................... *passim*

*Teller v. Teller*,
53 P.3d 240 (Haw. 2002) ........................................................ 6

*Tex. Advanced Optoelec. Sols. v. Renesas Elecs. Am., Inc.*,
895 F.3d 1304 (Fed. Cir. 2018) ............................................ 25

*Tlapek v. Chevron Oil Co.*,
407 F.2d 1129 (8th Cir. 1969) ............................................... 14

*United States v. Fuller*,
409 U.S. 488 (1973) .......................................................... 14, 15

*UOP LLC v. Exterran Energy Sols., L.P.*,
2021 WL 4096560 (W.D. Tex. 2021) ...................................... 6

*US Trinity Def., LLC v. DTV Arms, LLC*,
2023 WL 3681686 (E.D. Tex. 2023) ...................................... 6

*Williams Consol. I, Ltd. v. Smith*,
2009 WL 10698215 (S.D. Tex. 2009) ...................................... 6

*Williams-Sonoma Direct, Inc. v. Arhaus, LLC*,
304 F.R.D. 520 (W.D. Tenn. 2015) ........................................ 6

**Statutes and Legislative Materials**

18 U.S.C.
    § 1836(b)(1) .................................................................... 9
    § 1838 .............................................................................. 9
    § 1839 .............................................................................. 9

21 U.S.C.
    § 355(k)(5) ..................................................................... 26
    § 356c(c) ......................................................................... 26

42 U.S.C. § 282(j) ............................................................... 26

D.C. Code
    § 36-401 .......................................................................... 3
    § 36-401(4) ............................................................... 7, 12
    § 36-408 .......................................................................... 6

Md. Code Com. Law § 11-1201(e) ................................ 3, 7, 12

Minn. Stat. Ann. § 325C.01 ................................................. 7

H.R. Rep. No. 114-529 (2016) ............................................. 9

1995 Mo. Legis. Serv. S.B. 80 & 88 ..................................... 8

**Regulations**

21 C.F.R.
    § 20.61(a) ...................................................................... 17
    § 20.101(a) .................................................................... 26
    § 314.50(d)(1)(i) ........................................................... 21

42 C.F.R. § 11.48(a)(5) ...................................................... 26

**Other Authorities**

FDA, *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms* (Aug. 1997) ................. 23

Given, *Merriam-Webster* (2025) ..................................... 13

Milgrim on Trade Secrets (2025) ................................ *passim*

Restatement of Torts (1939) ......................................... 12, 13

Restatement (Third) of Unfair Competition (1995) ............... 20

## INTRODUCTION

FDA reviewed Vanda's new drug applications and took confidential information it found there—three different details about Vanda's processes for manufacturing its drugs—and disclosed it to Vanda's competitors seeking to market generic copies of Hetlioz® and Fanapt®. Those allegations plausibly establish both a claim under the Takings Clause and breach of the parties' implied-in-fact contract to maintain the secrecy of information FDA solicits from drug manufacturers. The lower court should not have dismissed those claims at the pleadings stage, and the government provides no persuasive reason it could have.

*First*, Vanda adequately alleged protectible trade secret interests in the dissolution specifications used in manufacturing Vanda's drugs. The government's principal response to Vanda's Takings claim is to advance "ownership" and "creatorship" requirements absent from the lower court's analysis and found nowhere in D.C. or Maryland law. Additionally, FDA's basic premise—that Vanda does not own or did not adequately contribute to the dissolution specifications that Vanda uses in *its own* manufacturing processes and that were developed by analyzing data *about Vanda's drugs*—is incorrect as a matter of fact. The government cannot disregard Vanda's allegations about its dissolution specifications' nature and economic value as a component of Vanda's manufacturing

1

processes—facts substantiated in Vanda's expert declaration and by FDA's own consistent practice of treating dissolution specifications as trade secrets.

*Second*, Vanda adequately alleged its Takings claims based on impurities and micronization processes. The government mischaracterizes the trade secrets Vanda alleges were misappropriated and disregards Vanda's factual allegations regarding the nonpublic nature of the information that Vanda claims as secret.

*Third*, Vanda's Inventia-based claims are not time-barred. The government cannot analogize to cases of open and notorious intrusions on real property when FDA's disclosure of Vanda's trade secrets to a competitor happened behind closed doors and could only be discovered through a FOIA request and substantial document review.

*Fourth*, the government cannot distinguish the key precedent that authorizes Vanda's implied-in-fact contract claim.

At bottom, the government cannot rehabilitate the lower court's errors. The Court should reverse and remand.

# ARGUMENT

## I. VANDA PLAUSIBLY ALLEGED THAT COMPONENTS OF ITS MANUFACTURING PROCESS ARE TRADE SECRETS.

The crux of Vanda's Takings claim is that FDA disclosed three key aspects of Vanda's manufacturing processes for two of its drugs to generic competitors: specific values Vanda uses in its quality controls, the impurities for which Vanda controls, and the mechanism by which Vanda controls for particle size. Vanda alleged that it takes industry-standard measures to maintain the secrecy of this information (which FDA customarily treats as confidential), that the information derives economic value from its secrecy, and that it cannot be determined by proper means by Vanda's competitors. *See* D.C. Code § 36-401; Md. Code Com. Law § 11-1201(e); Opening Br. 27-48. Each relevant component of Vanda's manufacturing processes thus qualifies as a trade secret—which the government acknowledges (at 22) is a cognizable property interest for purposes of the Takings Clause. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002-1004 (1984).

The government's defense of the lower court's opinion and new arguments on appeal cannot overcome the simple and obvious fact that confidential drug manufacturing processes are quintessential trade secrets.

## A. Vanda alleged a protectible interest in dissolution specifications embedded in its manufacturing processes.

The government presents (at 23-38) novel arguments on appeal: that trade secret protection requires a narrow type of "ownership" or some form of "creatorship," and that Vanda cannot satisfy those requirements because FDA created the dissolution specifications at issue. It then claims (at 28-29) that the lower court was right to rely on FDA's regulatory definition of a trade secret to dismiss Vanda's claims. It is wrong on all counts. Neither the government's new requirements nor FDA's regulations undermine Vanda's property interest in confidential components of its drug manufacturing processes derived from its own data.

### 1. Vanda has the required possessory interest in its dissolution specifications.

The government's principal argument is that "ownership" by "legal title" or "licensure" is an *independent* requirement for property rights to adhere in confidential information. *See* Gov't Br. 24-25. Not so—trade secret law requires only *possession* of a trade secret, which is demonstrated by knowledge of secret information and derivation of value from it. Vanda's allegations more than suffice.

**a.** In the trade secret context, "one 'owns' a trade secret when one knows of it, as long as it remains a secret." *DTM Rsch., LLC v. AT & T*

*Corp.*, 245 F.3d 327, 332 (4th Cir. 2001) (discussing Maryland law). "The 'proprietary aspect' of a trade secret flows, not from the knowledge itself, but from its secrecy." *Id.* at 332. And "[i]t is the secret aspect of the knowledge that provides value to the person having the knowledge." *Id.* "Thus, one who possesses non-disclosed knowledge may demand remedies … against those who 'misappropriate' the knowledge." *Id.*

The government's strict ownership requirement, akin to "the concept of a 'fee simple' interest in a trade secret," makes little sense. *DTM*, 245 F.3d at 332. To the extent such an ownership requirement ever existed at common law, it has since been replaced in jurisdictions that have adopted the Uniform Trade Secrets Act (UTSA). A leading treatise, on which the government relies (at 25), confirms as much: "The historical requirement making ownership a prerequisite of standing is increasingly being replaced with a recognition that because the gravamen of a UTSA misappropriation action is wrongful acquisition or improper use of information gained from a plaintiff, lawful *possession* even absent ownership suffices." 4 Milgrim on Trade Secrets § 15.01[a1][ii] (2025).

In fact, the Fourth Circuit has interpreted Maryland law—which the parties agreed was materially identical to D.C. law and defined the

trade secret at issue (Appx1323, Appx1170-1171)[1]—to omit any such requirement. *DTM*, 245 F.3d at 332.[2] That conclusion follows from basic

---

[1]  D.C. courts, even if facing the question anew, would likely apply the same principles as Maryland. D.C.'s trade secret statute is to be "applied and construed to make uniform the law with respect to trade secrets among the District of Columbia and those states enacting it" (D.C. Code § 36-408), and Maryland authority has long been "especially persuasive" in interpreting D.C. common law due to their shared foundation (*Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983)).

[2]  Contrary to the government's suggestion (at 35 n.14), *DTM* has been cited favorably by numerous courts across the country specifically for the holding that UTSA states do not have ownership requirements. *See, e.g.*, *Advanced Fluid Sys. v. Huber*, 958 F.3d 168, 177 (3d Cir. 2020; *Gaedeke Holdings*, 683 F. App'x 677, 683-684 (10th Cir. 2017); *US Trinity Def., LLC v. DTV Arms, LLC*, 2023 WL 3681686, at *6 n.6 (E.D. Tex. 2023); *UOP LLC v. Exterran Energy Sols., L.P.*, 2021 WL 4096560, at *5 (W.D. Tex. 2021); *Cedars Sinai Med. Ctr. v. Quest Diagnostics Inc.*, 2019 WL 12521480, at *5 (C.D. Cal. 2019); *NSEM, LLC v. Butler*, 2018 WL 3910961, at *9 (S.D. Miss. 2018); *BladeRoom Grp. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 990 (N.D. Cal. 2017); *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 527 (W.D. Tenn. 2015); *Williams Consol. I, Ltd. v. Smith*, 2009 WL 10698215, at *6 (S.D. Tex. 2009), *R.&R. adopted*, 2009 WL 10698262 (S.D. Tex. 2009); *DaimlerChrysler Servs. v. Summit Nat'l*, 2006 WL 1420812, at *8 (E.D. Mich. 2006); *Parking Co. v. R.I. Airport Corp.*, 2005 WL 419827, at *3 (R.I. Super. Ct. 2005); *Teller v. Teller*, 53 P.3d 240, 249 (Haw. 2002).

*De Simone v. VSL Pharms., Inc.* is not to the contrary. 352 F. Supp. 3d 471, 484 (D. Md. 2018). There, the complaint sought "only a declaration on which party owns the rights to the Know-How, not whether the Know-How currently qualifies for protection as a trade secret." *Id.* In such a case, ownership *is* at issue and trade secret status is not—the court had no occasion to opine on the relation between the two inquiries because of how the parties framed the case.

statutory interpretation. The language of the UTSA, adopted by both D.C. and Maryland, omits any reference to ownership. *See* D.C. Code § 36-401(4); Md. Code Com. Law § 11-1201(e). This stands in contrast to other states' laws specifically referencing "the owner" of a trade secret. *E.g.*, Minn. Stat. Ann. § 325C.01. Thus, as the Third Circuit has explained:

> While ownership of the sort traditionally associated with real or personal property is sufficient to maintain a trade secret misappropriation claim because the complete bundle of rights related to trade secrets includes the right to enjoy the value of the information's secrecy, it is not a necessary condition. A *per se* ownership requirement for misappropriation claims is flawed since it takes account neither of the substantial interest that lawful possessors of the secrets have in the value of that secrecy, nor of the statutory language that creates the protection for trade secrets while saying nothing of ownership as an element of a claim for misappropriation.

*Advanced Fluid Sys.*, 958 F.3d at 177; *accord Gaedeke Holdings*, 683 F. App'x at 683-684.

The government offers no textual analysis of D.C. or Maryland law to counter *DTM* or the overwhelming weight of authority interpreting the UTSA to have eliminated any rigid ownership requirement. Instead, it principally cites (at 25) to an isolated passage from *Monsanto* using the word "owner." 467 U.S. at 1002 ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the

extent to which *the owner of the secret* protects his interest from disclosure to others.") (emphasis added). But that language cannot bear the weight the government wishes. The best reading of *Monsanto* is that the Court was using "owner" as shorthand for someone who possesses an interest in a trade secret. And it would later describe the "owner" of a trade secret as the person to whom the secret gives competitive advantage over competitors (*id.* at 1011 n.15) and accept that Monsanto was the "owner" of data about its products (*id.* at 998). Vanda's position is indistinguishable from Monsanto's ownership there—Vanda owns information about its products and processes that it keeps secret, just like Monsanto owned data about its products that it kept secret. That *is* how one owns a trade secret.

Suffice to say, the Supreme Court nowhere articulated some heightened "ownership" requirement for trade secret law. Nor could it have. *Monsanto* was decided in 1984, more than a decade before Missouri adopted the UTSA. *See* 1995 Mo. Legis. Serv. S.B. 80 & 88. Because the Court was applying Missouri property-law rules (467 U.S. at 1013), any narrowed ownership announced in *Monsanto*—again, there was none—

would not have survived the state's abandonment of its prior trade secret definition.[3]

In all, the government is wrong that Vanda had to allege a "legal title"[4] or a "license" to components of its manufacturing process; neither D.C. nor Maryland law includes such an element. Vanda adequately alleged its own interest in its manufacturing processes regardless, but under the governing law it is enough that Vanda alleged a secret, from which it derives economic value due to the secrecy and which it takes reasonable precautions to protect.

**b.** The government's attempt to undermine Vanda's allegations of ownership relies on sleight of hand. It repeatedly suggests (at 23-26, 29-

---

[3] The government notes (at 33 n.13) that the federal Defend Trade Secrets Act defines "owner" and restricts that federal cause of action to such "owner." 18 U.S.C. §§ 1836(b)(1), 1839(3). But that term does not support the government—it includes "equitable title" (18 U.S.C. § 1839(4)) and is not limited only to "legal title" or "license." *Contra* Gov't Br. 25. The DTSA is also immaterial to D.C.'s and Maryland's statutes; Congress disclaimed any intent to displace state law with the DTSA. 18 U.S.C. § 1838; H.R. Rep. No. 114-529, *reprinted at* 2016 U.S.C.C.A.N. 195, 199 (2016) ("[T]he legislation is designed to avoid disruption of legitimate businesses, without preempting State law.").

[4] The government nowhere addresses what it believes a "legal title" to require. To the extent the government thinks this would require some formal government document, a "legal title" limitation would make little sense in the trade secret context. Unlike for patents, no registry and accompanying documentation typically exists for trade secrets.

31, 35-36) that the dissolution specifications are not actually part of Vanda's manufacturing processes but instead freestanding expressions of regulatory judgment by FDA. But, as Vanda explained (at 43-44, 49-51)—and its expert confirmed—"the ultimate dissolution specification is based off the Sponsor's manufacturing process and dissolution data and not independently determined by the FDA." Appx851 (Robbins Decl. ¶ 27); *accord* Appx73 (Compl. ¶ 117); Opening Br. 8. The dissolution specification is part of Vanda's manufacturing process—the government below described it as an "acceptance criterion for a manufactured batch of drug product." Appx111; *accord* Appx849-850 (Robbins Decl. ¶¶ 23-24). It "does not exist in a regulatory vacuum separate from the drug product itself." Appx851 (Robbins Decl. ¶ 26).

The government's claim (at 26) that Vanda alleges disclosure of the "dissolution specifications assigned to Fanapt and Hetlioz, not some unspecified aspect of Vanda's process for making, using, or selling its drug products" thus makes no sense—the dissolution specifications *are* the specified parts of Vanda's manufacturing processes that FDA disclosed to Vanda's competitors. The government cannot assert as fact that a *component* of Vanda's manufacturing process through which it creates its drug and ensures it is fit for distribution is not "associated with developing the underlying drug product." Gov't Br. 24.

The government also provides no support for its assertion (at 26) of a "limited number of available dissolution specification[s]." True, the agency has published default values that result in fifteen commonly-used specifications. But Vanda has never conceded these are the *only* possible specifications—in fact, it has consistently argued that a manufacturer may select values exceeding the floor FDA suggests. *See, e.g.*, Appx245-246. The government is thus wrong (at 27) to suggest that "only a narrow range of dissolution specifications" may be employed for any given drug, and that a manufacturer's chosen quality control measures are matters of public knowledge that deprive them of a possessory interest.[5]

At bottom, Vanda alleged that it "possessed" the relevant information and thus "owns" the trade secrets and confidential information at issue. Appx85 (Compl. ¶ 169). Even if the government could contest those allegations at this stage, it could not seriously argue that Vanda does not possess knowledge of its own manufacturing processes. Vanda has thus alleged a sufficient possessory interest.

---

[5] That FDA took the dissolution specifications directly from Vanda's NDAs to share with generic competitors (Appx66-79 (Compl. ¶¶ 101-103, 108, 140-143))—rather than simply recommending one based on alleged "public knowledge"—underscores the lack of factual merit in FDA's argument.

### 2. The government's "creatorship" requirement cannot defeat Vanda's property interest.

The government is also wrong (at 28-31) to import a "creatorship" or novelty element into trade secret law. None exists, and, regardless, Vanda has alleged that its specifications were the result of its investments and efforts.

**a.** Neither D.C. nor Maryland statute includes creatorship or novelty requirements—and the government points to no such requirement in either state's law. *See* D.C. Code § 36-401(4); Md. Code Com. Law § 11-1201(e). Nor is a novelty element more generally required for a trade secret; as we explained (at 31-32), "[n]ovelty, in the patent law sense, is not required for a trade secret." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). Nor is "invention … requisite." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting Restatement of Torts § 757 cmt. b (1939)). Instead, "[a] process may … be maintained in secrecy and be entitled to equitable protection even though invention is not present." 1 Milgrim on Trade Secrets § 1.08[4]. Trade secret law has never required anything like the "creatorship" requirement the government advances. *See* Gov't Br. 29-31.

The government provides no compelling support for rewriting trade secret statutes. Its citation (at 29) to 1939's *Restatement of Torts* certainly

does not suffice, not least because the government simply misreads the relevant language. The full sentence is: "Although *given information is not a trade secret*, one who receives the information in a confidential relation or discovers it by improper means may be under some duty not to disclose or use that information." Restatement of Torts § 757 cmt. b (1939) (emphasis added). "Given information" in that sentence does not mean "information that is given from one person to another" cannot be a trade secret, as the government implies—instead, it means some "particular, specified" information consistent with the primary meaning of "given." Given, *Merriam-Webster* (2025). The same *Restatement* section repeatedly uses the phrase "given information" in this sense, not the government's. Restatement of Torts § 757 (thrice discussing "determining whether given information" is a trade secret).

The sentence upon which the government bases its entire argument means only that even if *some particular* information is not a trade secret, someone who receives "*the* information" may still be obligated to keep it confidential. Restatement of Torts § 757 cmt. b (emphasis added). The language's actual meaning confirms why the two 50-year-old cases the government identifies as citing this language did not understand it to create an independent invention requirement for trade secret protection.

*See Tlapek v. Chevron Oil Co.*, 407 F.2d 1129, 1135 (8th Cir. 1969) (holding that misappropriation of information disclosed in confidence can support relief even absent a finding that the information was a trade secret); *Bowser, Inc. v. Filters, Inc.*, 398 F.2d 7, 10 (9th Cir. 1968) (similar).

To shore up its misreading, the government invokes (at 29) *Monsanto*'s reference to "labour and invention." 467 U.S. at 1002-1003. As we explained (at 32-34), that single quotation from Blackstone, which played no part in the Court's holding, did not announce any sweeping principle of law. It could not have—the question before the court was whether an uncompensated taking had occurred "to the extent that Monsanto has an interest … under Missouri law." *Id.* at 1003-1004. The government later admits as much. Gov't Br. 30 ("The Supreme Court thus had no reason to scrutinize creatorship in *Monsanto*."). The government cannot turn the Court's historical analogy into anything resembling a legal holding about the D.C. or Maryland trade secret statutes.

Nor, as we explained (at 34-35), can the government take refuge in a line of cases establishing that the government is not liable for increases in value of condemned property attributable to federal permits. Gov't Br. 31. The property at issue here is not a permit right "revocable" by the government at will. *United States v. Fuller*, 409 U.S. 488, 492-493 (1973). *Fuller* suggests that where, by contrast, *property* has value because of

something the government builds or does—like the government says it did for the dissolution specifications—the government *is* liable for the increased value. *Id.* at 492. And in any event, *Fuller* concerned the amount of compensation, not the existence of a cognizable property right; the government admits (at 31) that *Fuller* and its progeny "do not implicate trade secrets" and defy the Court's express warning that *Fuller*'s holding must not be "pushed to its ultimate logical conclusion" lest it eviscerate the protections of the Takings Clause. 409 U.S. at 492.

**b.** In any event, the government is incorrect to suggest that FDA created the dissolution specification on its own. It is undisputed here that FDA proposed dissolution specifications to Vanda only after reviewing data that Vanda compiled and submitted as part of a collaborative back-and-forth on Vanda's applications. Gov't Br. 42-43; Opening Br. 36-38; *see* Appx60 (Compl. ¶¶ 63-64). A leading treatise explains that where a plaintiff "jointly developed secret matter with a third party," the "plaintiff may by reason of such development have the requisite ownership status" to support trade secret protection even where ownership is a requirement. 4 Milgrim on Trade Secrets § 15.01[a1][i] (2025).

That is, at most, what occurred here. Vanda submitted proposals for its manufacturing process (including its quality controls) to FDA, and the agency suggested modifications, which Vanda adopted. And, as Dr.

Robbins explained, because "[t]he dissolution specification for any given drug is based on that particular drug's unique formulation and composition, including its solubility, permeability, dissolution, and pharmacokinetics," "[k]nowledge of a drug's dissolution specification therefore provides substantial information to a generic company about a drug's underlying manufacturing process." Appx850 (Robbins Decl. ¶ 24). Because Vanda's process was and remains secret, the mere fact that FDA participated in tweaking parameters does not eliminate Vanda's property interest.

At bottom, the Takings inquiry "focus[es] on the nature of [Vanda]'s relationship to the alleged property" rather than FDA's relation to it. *Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005); *see* Gov't Br. 22. The dissolution specifications here describe a component of Vanda's manufacturing processes and were developed in coordination with Vanda and based on Vanda's own data; Vanda therefore holds a protectible interest.

### 3. *FDA regulations cannot redefine trade secrets for purposes of state law.*

Finally, the government defends the district court's reliance on FDA's regulatory definition of a trade secret (at 23-24, 28-29, 33). But

that is the wrong analysis. *See* Opening Br. 29-32. The regulation's factors—that "[t]here must be a direct relationship between the trade secret and the productive process" and that the secret must be "the end product of either innovation or substantial effort" (21 C.F.R. § 20.61(a))—are a federal creation that the government nowhere grounds in state trade-secret law. And while the government is correct (at 32) that federal law can independently create a cognizable property interest for a Takings claim, it is mistaken to suggest that it can *supersede* existing state-law protections. The Supreme Court has rejected this very proposition. *Monsanto*, 467 U.S. at 1012 (explaining that if federal law could "'pre-empt' state property law … then the Taking Clause has lost all vitality").

The government's complaint (at 32) that Vanda "focus[es] myopically on statutory definitions of trade secret" thus makes no sense—and, if anything, admits the viability of Vanda's claims. D.C. and Maryland statutes (identical here) are the *source* of the property interest Vanda asserts. While the complaint cited federal regulations and statutes, it did so only to illustrate that federal law prohibits the disclosure of *existing* trade secrets (Appx55 (Compl. ¶¶ 38-40)), not to limit the law applicable to Vanda's claims for which it expressly invoked "District of Columbia, Maryland, and/or federal law" (Appx74-75 (Compl. ¶ 123)). It is the "statutory language" of the state laws "that creates the protection for trade

secrets while saying nothing" of the additional elements the government now tries to tack onto the analysis. *Advanced Fluid Sys.*, 958 F.3d at 177.

The government also fundamentally misunderstands (at 34) the relevance of FDA's FOIA practices. As we explained (at 45-46), this practice is strong evidence for trade secret protection under *any* governing law. One "alternative method of proof" of trade-secret status is a "showing that the defendant himself, in past dealings, regarded the matter as a trade secret." 4 Milgrim on Trade Secrets § 15.01[a][v] (2025). And "the defendant may, as an evidentiary matter, be estopped from denying the trade secret status that he had, himself, previously acknowledged." *Id.* Maryland courts have adopted this principle. *See Bond v. PolyCycle, Inc.*, 732 A.2d 970, 974-975 (Md. Sp. App. 1999).

The government's attempt (at 34) to downplay its decades of consistent practice affording confidential treatment to all the information Vanda alleges was disclosed as "practical necessity" is unsupported and contrary to Vanda's allegations, which must be accepted as true. Appx66 (Compl. ¶ 100 n.2) ("FDA's designation of this information as (b)(4) confidential thus confirms FDA's own awareness of the confidentiality of this sort of information."). "[E]xplicit and repeated recognition of the subject

18

matter as a valuable trade secret" thus undercuts the government's arguments and further supports Vanda's protectible interest in its dissolution specifications. 4 Milgrim on Trade Secrets § 15.01[a][v].

### 4. *Vanda adequately alleged the actual requirements for trade-secret protection.*

As we demonstrated (at 27-48), Vanda alleged the required elements for trade-secret protection. The government, for the most part, does not argue otherwise. But it asserts (at 35-36) that the dissolution specifications lack "independent economic value"—the only real element under D.C. and Maryland law that the government addresses. As Vanda explained at length (at 23, 40-44, 49-50), it specifically alleged the value of its secrets, which is a quintessential factual inquiry. *See HIRECounsel D.C., LLC v. Connolly*, 2021 WL 5998365, at *6 (D.D.C. 2021); *Clevinger v. Advoc. Holdings, Inc.*, 2024 WL 3359508, at * 8 (D.D.C. 2024); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 43-44 (D.D.C. 2010). The government does not acknowledge these cases, much less rebut Vanda's point.

The government's preferred secondary sources once again support Vanda. Vanda alleged that FDA disclosed several components of its drugs' manufacturing processes. But a "plaintiff's use of the trade secret in the operation of its business is itself some evidence of the information's

value." Restatement (Third) of Unfair Competition § 39 cmt. e (1995). That is why manufacturing processes (including controls) are "trade secret[s]" for which "a high degree of protection would normally be provided to their developer." 3 Milgrim on Trade Secrets § 12.02[1]. Value can exist even where all of the individual components of a process are widely known so long as "a party has been able to accomplish the assembly of a product superior to that of competitors" (*id.* § 1.08[4]), like Vanda alleges here (Appx74 (Compl. ¶ 119)). Vanda's allegations are more than enough for pleading purposes to show independent economic value.

> ### 5. *The government's approach is antithetical to the Takings Clause and to innovation and fair competition in highly regulated industries.*

The analysis above requires reversal of the lower court's judgment on the pleadings. And the Court should not hesitate to apply the law in the face of the government's bare policy arguments. *See* Gov't Br. 37-38. But those arguments are also misguided: the government's position would fundamentally reshape trade secret law in the drug manufacturing context. Opening Br. 35-38.

**a.** It cannot be that any component of a drug sponsor's manufacturing process that FDA approves loses trade-secret protection, leaving the government free to disseminate the information to competitors. Yet that is what the government argues, insisting that a sponsor cannot protect

information "regardless of whether FDA approves a drug maker's propos[al] … or recommends" a change. Gov't Br. 24. Such a holding would be staggering.

Drug manufacturers must submit every component of their manufacturing process to FDA for approval, including methods of synthesis and "specifications necessary to ensure the identity, strength, quality, and purity of the drug substance." 21 C.F.R. § 314.50(d)(1)(i). The agency routinely makes recommendations for every part of the proposed process. Opening Br. 36. And each time FDA approves a drug application, it exercises its regulatory judgment just as it did here. The inevitable consequence of the government's argument would allow FDA to disclose, for example, the precise techniques a manufacturer uses to create a drug (including the drug's exact chemical makeup) simply because the agency determines that those techniques satisfy basic regulatory requirements.

This intolerable result highlights that the government's arguments here are not the law. In fact, the government's own "authoritative treatise" (Gov't Br. 29) notes that a provision of the Federal Food, Drug, and Cosmetic Act requiring disclosure of "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of [a] drug" "probes the trade secret area in its most

sensitive posture." 3 Milgrim on Trade Secrets § 12.02[1] (2025). "Methods, *controls*, and manufacturing processes are all internal matters for which a high degree of protection would normally be provided to their developer." *Id.* (emphasis added). FDA cannot lay claim to these secrets by dint of involvement in their approval any more than it can eliminate trade secret protection for Vanda's dissolution specifications.

**b.** The government does not address the striking consequences of its position. It instead attempts (at 36-38) to parry with a countervailing concern: that Vanda is attempting to monopolize the value it uses for its dissolution specifications. Vanda thoroughly debunked that theory. Opening Br. 47. Indeed, "matter can be known by more than one competitor in a trade" and still receive trade-secret protection. 1 Milgrim on Trade Secrets § 1.08[6]. Nothing prevents Vanda's competitors from using the same dissolution specification as Vanda so long as they arrive at those specifications through independent effort rather than improper disclosure by FDA.

The government's response to this fundamental point is to once again improperly contest Vanda's allegations:

- It insists (at 36) that dissolution specifications "do not reveal specifics about a drug maker's 'manufacturing process,'" despite Vanda's allegation that "[t]he dissolution specification in an NDA or ANDA is an important component of the manufacturing

process." Appx66 (Compl. ¶ 99); Appx848 (Robbins Decl. ¶ 20) ("The process of creating a finished pharmaceutical product involves numerous steps, from formulating the product to quality controls which ensure that the end product is stable and meets necessary parameters.").

- It states (at 36) that FDA did not obtain the specifications it disclosed from Vanda's NDA, despite Vanda's allegation that the relevant reviews expressly noted that reviewers, for example, "checked" Vanda's NDA "for the above mentioned specification for the RLD." Appx66-67, 70 (Compl. ¶ 101, 108).

- It claims (without any support) that the reviewers consulted Vanda's NDA only as a "cross-check," despite the ambiguity of the documents and Vanda's contrary allegations, and despite the government's refusal to comply with the lower court's order to allow Vanda discovery. Opening Br. 47.

Finally, the government states (at 37-38) that it is critical that FDA be able to compare values from Vanda's NDAs against competitors' ANDAs to ensure bioequivalence. But while dissolution specifications are "generally the same" for brand and generic drugs, FDA omits that there is no *requirement* that they be identical. FDA, *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms* 3 (Aug. 1997), perma.cc/K4QU-3EXX. Indeed, the fact that the specifications are "generally the same" is a result of bioequivalence rather than a requirement for it—the specifications frequently match because generic drugs must approximately match the brand drug's dissolution behavior.

The government provides no explanation for why cross-checks are required or necessary. Treating "like cases alike" in this context does not mean that generic specifications must match those of the brand drug—it means only that FDA must apply the same procedures to recommending dissolution specifications based on the submitter's data. For Vanda, that was Vanda's data; for its competitors, FDA should base its recommendations on the generics' submission, not on Vanda's confidential processes. Again, nothing prevents FDA from recommending the same dissolution specification to a generic as Vanda uses, so long as that recommendation comes from FDA's analysis of the generic's data rather than from Vanda's NDA. And if FDA believes it needs a shortcut by referencing Vanda's NDAs to advise generic competitors, FDA need only pay just compensation as the Takings Clause directs.

**c.** The government's amici similarly focus on fictitious and overinflated policy concerns. AAM Br. 5-18; Profs. Br. 14-33.

First, amici echo the government's meritless assertion that imposing barriers to FDA's disclosure of Vanda's proprietary information would hamper the agency's ability to approve generic drugs. In doing so, they echo the government's refusal to engage with Vanda's actual allegation—that the dissolution specifications Vanda actually uses in its manufacturing processes and that were adopted based on Vanda's data are a

trade secret and not FDA's regulatory judgment in a vacuum. There is, accordingly, no merit to AAM's claim (at 11) that FDA would be "effectively preclude[d]" from "communicating with generic manufacturers about the dissolution specification of their ANDA products." FDA can recommend the *exact same* dissolution specification to the generic so long as that recommendation comes from FDA's analysis of the generic's submission rather than from FDA's files containing Vanda's confidential manufacturing process. AAM's argument overlooks the basic proposition that "independently possessed information" will not constitute a taking unless that information is "misappropriate[d]." *Tex. Advanced Optoelec. Sols. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1313 (Fed. Cir. 2018).[6]

AAM is similarly wrong to suggest (at 15-18) that trade-secret protection of Vanda's information serves no purpose. AAM fails to grapple with the consequences of the government's position, which sweep beyond quality control specifications to cover *any* component of a manufacturing process that FDA approves—which is nearly everything. It is the government that upsets the balance Congress struck in the Hatch-Waxman

---

[6]  AAM's argument (at 13-15) that FDA must cross-check dissolution specifications fails for the same reasons the government's does. *See* pages 23-24, *supra*.

amendments. Congress recognized that it must maintain sufficient property protections to incentivize pharmaceutical innovation and thus authorized generics to obtain brand drugs for reverse engineering but did *not* require confidential details of the drug's manufacture or composition to be shared with the would-be competitors. Opening Br. 41-42. While generic manufacturers may disagree with trade-secret protection, such protections are a critical part of innovation in a free and competitive market. Vanda's claim to property rights in components of its manufacturing process is wholly consistent with that balance.

Finally, the professors' brief largely comprises speculation that acknowledging property rights in a manufacturing process would undermine FDA's ability to communicate unrelated information to the public. Profs. Br. 16-32. They nowhere substantiate the claim that adverse events reports, FDA-generated manufacturing inspection reports, study protocols, or information about drug shortages are trade secrets or property under state or federal law. Indeed, none is; statutes and regulations provide ample notice that FDA will disclose such information. *See* 21 U.S.C. § 355(k)(5) (adverse events); 21 C.F.R. § 20.101(a) (all "administrative enforcement action" records including Form 483); 42 U.S.C. § 282(j) (clinical study protocols); 42 C.F.R. § 11.48(a)(5) (clinical study protocols); 21 U.S.C. § 356c(c) (drug availability information). It has been

decades since the Supreme Court decided *Monsanto*, but the dire consequences the professors anticipate have yet to materialize. And they will not. The existence of a valid property interest is a prerequisite to a claim like Vanda's—recognizing that Vanda's claim falls within the scope of existing state-law trade-secret protections does not expand the category of protected information or restrict government communications writ large for information the government does not commit to keeping secret.[7]

### B. Vanda has not forfeited trade secret protection for its impurities and micronization techniques.

In addition to its dissolution specifications, Vanda plausibly alleged a property interest in and unauthorized disclosure of manufacturing processes for the control of impurities and particle size of Hetlioz®. Opening Br. 53-58. The government's arguments (at 38-42) merely restate the lower court's flawed analysis.

Vanda does not dispute—and has never disputed—that publicly disclosed information cannot receive trade-secret protection. Nor does it dispute that the '734 patent application describes techniques for synthesizing tasimelteon. But the government's logical leap from this shared

---

[7] The professors make an additional argument: that there is no guarantee of secrecy here. Profs. Br. 4-14. But the lower court expressly concluded that such a guarantee of secrecy exists, and the government nowhere argues otherwise on appeal. Appx1317, Appx1324.

foundation—that the application contained "impurities testing and micronization information related to the production of *Hetlioz*" (Gov't Br. 39) (emphasis added)—minimizes the real dispute. Vanda alleges that the FDA communications at issue here ███ Manufacturing Process ███ ███ Manufacturing Process ███ that would not have been possible absent FDA's insider knowledge. Appx80 (Compl. ¶¶ 147-148).

Vanda made this distinction abundantly clear. Opening Br. 55-57. But the government does not actually address Vanda's arguments or the law on which it relies. The government instead argues (at 41-42) that "the mere combination of public information" cannot amount to a trade secret. That is wrong; trade-secret protection can attach if "by combining common, commercially available components a party has been able to accomplish the assembly of a product superior to that of competitors." 1 Milgrim on Trade Secrets § 1.08[4]. And it is irrelevant—the information Vanda alleges was disclosed was *not* public. Appx80.

Neither *Strategic Directions* nor any of the other cases the government cites (at 41-42) is to the contrary. Unlike in those cases, Vanda *has* alleged that some nonpublic information was disclosed. Appx80. That the government's strongest formulation (at 42, emphasis added) is that the disclosed information "would have been *unlikely* to qualify as a trade se-

cret" speaks volumes; that is the key dispute in the case and a fact-intensive inquiry inappropriate for resolution on the pleadings. The lower court could not resolve such factual disputes in the government's favor.

### C. Vanda at minimum should have been allowed to amend its complaint.

As Vanda explained at length (at 48-53), it presented an unrebutted expert declaration and made clear that it would amend the complaint to expressly incorporate Dr. Robbins's testimony if required. The government spends a single paragraph (at 44-45) on the conclusory assertion that leave to amend would have been futile. The government does not even mention Dr. Robbins's declaration, despite its obvious relevance to (and contradiction of) the issues the government claims Vanda cannot cure. Nor does the government respond to the numerous, on-point authorities Vanda cited, all of which require leave to amend in situations just like this. The government's failure to address Vanda's arguments confirms the lower court departed from the typical, liberal amendment standard and that Vanda should have such opportunity.

## II. VANDA'S CLAIMS BASED ON DISCLOSURES TO IN-VENTIA ARE NOT TIME-BARRED.

Vanda demonstrated (at 62-64) that its Inventia-related claims were timely because it filed mere months after unearthing FDA's disclosure via a FOIA request, and accrual of the Tucker Act's six-year statute

of limitations is suspended "where the facts giving rise to a claim were either inherently unknowable or intentionally concealed" (*Cent. Pines Land Co. v. United States*, 61 Fed. Cl. 527, 533 (2004)).

The government's response (at 46-49) elides the approval of Inventia's application with the trade-secret disclosure at issue. But unlike the "open and notorious act" at issue in *Ingrum v. United States*, 560 F.3d 1311, 1316 (Fed. Cir. 2009), FDA's disclosure to Inventia occurred in a private communication not referenced in any published document and only uncovered years later when FDA turned over internal documents in response to Vanda's FOIA request. That is nothing like a bombing exercise or the digging of a physical pit on unvisited property. *Id.* at 1315-1316. *Ingrum* held only that "a landowner is on inquiry as to open and notorious activities conducted on his property." *Id.* at 1317. The activities FDA "conducted on [Vanda's] property" were referencing Vanda's NDA and disclosing Vanda's secrets to Vanda's competitors—both of which occurred behind closed doors.

Unlike the property owner who must inquire into activities on his land, it is not "fair to charge" Vanda "with knowledge" of FDA's nonpublic use of its intellectual property. *Ingrum*, 560 F.3d at 1317 (quoting *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 408 (1994)). While drug manufacturers do often submit targeted FOIA requests to FDA, that

is a far cry from what will occur if courts hold that it is *compulsory* to do so to detect any unlawful disclosures of trade secrets in *any* document within FDA—especially not when FDA has promised secrecy. That result is unreasonable, which is why neither *Ingrum* nor any other case requires it. Vanda timely filed its claims after discovering FDA's disclosures in documents obtained through FOIA, requiring reversal of the dismissal of this claim.

## III. VANDA ADEQUATELY STATED AN IMPLIED-IN-FACT CONTRACT CLAIM.

In addition to its Fifth Amendment claim, Vanda adequately alleged a breach of an implied-in-fact contract between it and FDA. Opening Br. 64-68. FDA has created a regime encouraging the submission of unsolicited applications from drug developers. To that end, its regulations prohibit the disclosure of trade secret information. This case is thus on all fours with *Airborne Data, Inc. v. United States*, in which this Court held that where the government "extend[s] … [an] invitation to submit" an application containing confidential information, and an invited party does so, there is a "meeting of the minds," and thus an implied-in-*fact* contract prohibiting disclosure. 702 F.2d 1350, 1360-1361 (Fed. Cir. 1983).

The government is thus wrong to suggest (at 50) that Vanda "has conceded" that the existence of statutory and regulatory obligations to maintain confidentiality foreclose an implied-in-fact contract. The agency in *Airborne Data* had the same statutory and regulatory duties. 702 F.2d at 1359. The government is also wrong that it took no action to accept the contract.[8] It "accepted" Vanda's application and "studied it." *Id.* And it "recognized and undertook to fulfill an obligation to safeguard its contents against public disclosure" when it redacted the relevant secrets in publications and productions. *Id.*

The government cannot distinguish *Airborne Data*. It says only (at 51) that drug approval is a "distinct[] regulatory setting." But that is nothing more than a repackaging of the lower court's unexplained distinction between "submitting a proposal seeking a government contract" and "filing an application for regulatory approval." Appx13. In both situations, the submitter "reasonably thought" and "the [agency] had every reason to believe the [submitter] would think" that confidentiality would be respected. *Airborne Data*, 702 F.2d at 1360 (quoting *Padbloc Co. v. United States*, 161 Ct. Cl. 369, 378 (1963)). "The real difficulty is that a

---

[8]   It is not obvious why some other FDA acceptance would be required; FDA's standing policy of accepting unsolicited applications in exchange for respecting confidentiality is a unilateral contract.

breach of that obligation occurred." *Id.* But that is a difficulty of FDA's making, not Vanda's. Dismissal of Vanda's implied-in-fact contract claim should be reversed.

## CONCLUSION

The Court should reverse and remand.

Dated: December 19, 2025      Respectfully submitted,

/s/ *Paul W. Hughes*
PAUL W. HUGHES
SARAH P. HOGARTH
ANDREW A. LYONS-BERG
CHARLES SEIDELL
ALEX C. BOOTA
  *McDermott Will & Schulte LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Plaintiff-Appellant*
*Vanda Pharmaceuticals Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32(b)(1) because it contains 6.960 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(b)(2); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft 365 MSO and is set in New Century Schoolbook LT Std font in size 14 points.

Dated: December 19, 2025            */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: December 19, 2025

_/s/ Paul W. Hughes_