No. 2025-1434

*In the*

# United States Court of Appeals
## *for the*
### Federal Circuit

VANDA PHARMACEUTICALS INC.,
*Plaintiff-Appellant,*

– v. –

UNITED STATES,
*Defendant-Appellee.*

On Appeal from the United States Court of Federal Claims
Case No. 23-cv-629, Hon. Armando O. Bonilla

## CORRECTED NONCONFIDENTIAL JOINT APPENDIX

BRETT A. SHUMATE
  *Assistant Attorney General*
PATRICIA M. MCCARTHY
  *Director*
ELIZABETH HOSFORD
BORISLAV KUSHNIR
  *Civil Division*
  *U.S. Department of Justice*
  *P.O. Box 480*
  *Ben Franklin Station*
  *Washington, DC 20044*
  *(202) 307-5928*

*Counsel for Defendant-Appellee*
*United States of America*
(additional counsel inside cover)

PAUL W. HUGHES
SARAH P. HOGARTH
ANDREW A. LYONS-BERG
CHARLES SEIDELL
ALEX C. BOOTA
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for Plaintiff-Appellant*
*Vanda Pharmaceuticals Inc.*

WENDY VICENTE
  *Deputy Chief Counsel*
JAMES ALLRED
LEAH A. EDELMAN
  *Associate Chief Counsels*
  *Office of the Chief Counsel*
  *Food and Drug Administration*

*Counsel for Defendant-Appellee*
*United States of America*

# TABLE OF CONTENTS

| Date Filed | Dkt. No. | Document | Appx. No. |
|---|---|---|---|
| 01/18/2024 | 17 | Opinion and Order Denying-in-Part and Granting-in-Part Defendant's Motion to Dismiss | Appx1-15 |
| 1/22/2025 | 62 | [Redacted] Public Reissued Opinion and Order Granting Defendant's motion for judgment on the pleadings and denying Plaintiff's provisional request for leave to file an amended complaint and motion to compel discovery | Appx16-37 |
| 01/08/2025 | 59 | Judgment | Appx38 |
| | | Civil Docket Sheet | Appx39-45 |
| | | | |
| 05/01/2023 | 1 | Complaint filed by Vanda Pharmaceuticals Inc. | Appx46-90 |
| 08/01/2023 | 7 | Motion to Dismiss pursuant to Rules 12 (b)(1) and (6) filed by USA (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) | Appx101 Appx151 Appx160-163 |
| 09/28/2023 | 11 | Response to Motion to Dismiss pursuant to Rules 12 (b)(1) and (6), filed by Vanda Pharmaceuticals Inc. | Appx218 Appx244-247 |
| 03/01/2024 | 23 | Answer to Complaint, filed by USA | Appx304-329 |

| Date Filed | Dkt. No. | Document | Appx. No. |
|---|---|---|---|
| 06/11/2024 | 29 | [Redacted] Public Redacted Document redacting Motion for Judgment on the Pleadings, filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7) | Appx490 Appx517-535 Appx539-652 Appx659-688 |
| 05/07/2024 | 34 | Certified Transcript of proceedings held on 04/23/2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-24. | Appx694-717 |
| 07/22/2024 | 47 | **SEALED** Response to Motion for Judgment on the Pleadings, filed by Vanda Pharmaceuticals Inc. (Attachments: # 1 Affidavit Declaration of Mark Robbins, # 2 Affidavit Declaration of Paul W. Hughes, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4) | Appx792 Appx806-819 Appx821-824 Appx837-853 |
| 10/21/2024 | 51 | Motion to Compel Discovery, filed by Vanda Pharmaceuticals Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) | Appx1058 Appx1062-1064 Appx1104-1107 |
| 12/19/2024 | 57 | **SEALED** Certified Transcript of Proceedings held on December 17, 2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-158. | Appx1150-1153 Appx1166-1180 Appx1266-1275 |

| Date Filed | Dkt. No. | Document | Appx. No. |
|---|---|---|---|
| 01/17/2025 | 61 | **SEALED** NOTICE, filed by Vanda Pharmaceuticals Inc., USA re Order on Motion to Compel, Order on Motion for Judgment on the Pleadings, Sealed Opinion/ Order (Attachments: # 1 Proposed Redactions) | Appx1313 Appx1316-1318 Appx1322-1325 |
| 02/06/2025 | 63 | Notice of Appeal as to Judgment, filed by Vanda Pharmaceuticals Inc. Filing fee $ 605, receipt number AUSFCC-10194672. Copy to CAFC. | Appx1334 |

Pages Appx65, Appx67, Appx69–71, Appx151, and Appx160–163 are documents that were submitted to the district court with the government's previously applied redactions already included; no unredacted or confidential version of these documents was submitted to the court, and no additional redactions have been applied to these pages.

The "Confidential" designation is redacted on the public version of pages Appx490, Appx539, Appx643, Appx649, Appx659, Appx664, Appx673, and Appx681. No additional redactions have been applied to these pages.

The material omitted on pages Appx20–22, Appx28–30, Appx33–34, Appx521, Appx543–544, Appx546–547, Appx550–641, Appx645, Appx650–652, Appx662, Appx665, Appx667–671, Appx792, Appx806–819, Appx821–824, Appx837–853, Appx1150–1153, Appx1166–1180, Appx1266–1275, Appx1313, Appx1316–1318 and Appx1322–1325 was designated confidential by the parties under the terms of the Protective Order entered by the district court as relating to the parties' trade secrets, highly confidential technical information, and/or other nonpublic information the disclosure of which could result in harm.

# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 23-629C
(Filed: January 18, 2024)

| | |
|---|---|
| **VANDA PHARMACEUTICALS, INC.**, | ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant.* | ) ) |

*Paul W. Hughes, III* (argued), McDermott Will & Emery, Washington, DC, for plaintiff. With him on the briefs were *Andrew A. Lyons-Berg* and *Charles Seidell*, McDermott Will & Emery, Washington, DC.

*Igor Helman* (argued), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Samuel R. Bagenstos*, General Counsel, and *Wendy Vicente*, Deputy Chief Counsel, Litigation, U.S. Department of Health and Human Services, Washington, DC, and *James Allred*, Associate Chief Counsel, and *Jonathan Silberman*, Associate Chief Counsel, Office of the Chief Counsel, U.S. Food and Drug Administration, Silver Spring, MD, Of Counsel.

## OPINION AND ORDER

***BONILLA, Judge***.

This case presents novel issues of first impression, including whether a brand pharmaceutical company can assert a viable Fifth Amendment takings claim and/or a breach of an implied-in-fact contract based upon a government official's alleged disclosure–intentional or inadvertent–of claimed trade secrets and confidential commercial information to competitors seeking Food and Drug Administration (FDA)

**Appx1**

approval of generic drugs.  Pending before the Court is defendant's motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).  Specifically, defendant maintains plaintiff fails to allege a cognizable takings claim; the alleged contract is, at best, implied-in-law which is outside this Court's jurisdiction; and plaintiff's claims involving one generic manufacturer are time-barred.  For the reasons set forth below, defendant's motion is DENIED-IN-PART and GRANTED-IN-PART.

## BACKGROUND[1]

Vanda Pharmaceuticals, Inc. (Vanda) is an international biopharmaceutical company that researches, develops, and markets high impact medications to address unmet medical needs.[2]  Founded in 2003, the corporation is headquartered in Washington, DC and maintains a self-described business model of "acquiring compounds that other companies failed to develop into treatments, identifying potential medical uses for them, devoting substantial resources to developing them, seeking FDA approval, and commercializing them."  ECF 1 at 6–7.  At issue in this case are two brand name drugs developed by Vanda: Fanapt® (iloperidone) tablets approved to treat schizophrenia in adults and Hetlioz® (tasimelteon) capsules approved to treat the circadian rhythm sleep disorder known as non-24-hour sleep-wake disorder.  The FDA approved Vanda's New Drug Applications (NDAs) relating to Fanapt® and Hetlioz® on May 6, 2009, and January 31, 2014, respectively.  In the years since, the FDA considered and approved several Abbreviated New Drug Applications (ANDAs) for generic versions of the brand name drugs.  Vanda's lawsuit focuses on the information FDA officials purportedly shared with manufacturers of these generics in evaluating and approving their applications.

## I.    Drug Approval Process

To market drugs in the United States, pharmaceutical companies must secure approval from the FDA for each new product pursuant to the Food, Drug, and Cosmetic Act (FDCA).  21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an

---

[1] In resolving defendant's motion to dismiss, the facts are largely drawn from plaintiff's complaint, corroborating administrative proceedings appended to defendant's dispositive motion (cited and quoted in plaintiff's complaint), and undisputed publicly available information.  *See Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (In evaluating a complaint for sufficiency under RCFC 12(b)(6), the court is "not limited to the four corners of the complaint.  [The court] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'") (citations omitted); *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) (In assessing an RCFC 12(b)(1) motion to dismiss, "[t]he court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts' to confirm jurisdiction.") (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

[2] *See* https://perma.cc/DS79-PV8H (last viewed Jan. 17, 2024).

application filed [in accordance with this Act] is effective with respect to such drug."). The FDCA outlines the extensive data and information manufacturers must provide the Secretary of the Department of Health and Human Services (delegated to the FDA) in an NDA to amply demonstrate consumer safety and effectiveness and gain FDA approval of a new drug. *See id.* § 355(b)(1)(A)(i)–(viii). In addition to the statutory requirements, by regulation, NDAs must include information on a product's chemistry, manufacturing, and controls, a meticulous technical review of the drug's manufacturing procedures, and "the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including . . . acceptance criteria relating to . . . dissolution rate . . . ." 21 C.F.R. § 314.50(d)(1)(i)–(ii)(a). Of relevance to the brand name and generic drugs developed here is the requirement for dissolution specifications, which refer to the rate at which a drug dissolves into the body.

The FDA publishes a list of new drugs approved for safety and effectiveness in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), along with their associated patents and exclusivity information. *See Janssen Pharmaceutica, N.V. v. Apotex*, 540 F.3d 1353, 1355 (Fed. Cir. 2008) (citing 21 U.S.C § 355(b)(1), (c)(2) & (j)(2)(A)(i)). Drugs approved by the FDA, and included in the Orange Book, are referred to as "listed drugs." *See id.* "Inclusion of products in the Orange Book is independent of any current regulatory action being taken administratively or judicially against a drug product."[3]

The research and development phases and ensuing FDA approval process for a new drug is expensive and time consuming.[4] To incentivize pharmaceutical research and development, as well as scientific and medical advancements, a pioneer or brand name drug manufacturer generally receives a statutory period of market exclusivity following FDA approval. Further protecting their intellectual property, manufacturers typically secure patents issued by the United States Patent and Trademark Office (USPTO), including patents listed in the Orange Book, which, in some cases, impact the timing of relevant generic drugs entering the market. The time afforded a brand drug to market exclusivity does not always run concurrently with germane patent terms. Beyond market exclusivity and patent terms, as relevant to this case, certain data and information in NDA disclosures (e.g., trade secrets, manufacturing methods and processes, production and sales distribution) are kept confidential unless previously disclosed to the public. *See* 21 C.F.R. § 314.430(g).

---

[3] *See* https://perma.cc/QLQ7-JPY4 (last viewed Jan. 17, 2024).

[4] According to a 2015 report published by the Pharmaceutical Research and Manufacturers of America (PhRMA), on average, pharmaceutical manufacturers spend $2.6 billion over the course of more than a decade to bring a new drug to market. *See* https://perma.cc/WMZ4-YHAA (last viewed Jan. 17, 2024); *cf. Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (describing FDA approval process alone as "long, comprehensive, and costly").

In 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, 21 U.S.C. § 355(j), to balance the vital public policy interest of encouraging new scientific development with competitors' ability to bring inexpensive generic copies to the marketplace. *See Caraco Pharms. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008) ("The goal of the [Hatch-Waxman] Act is to [strike] a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market.") (quotations omitted). Under the Act, upon filing an ANDA, the timing of generic drug approval may be subject to patent and market exclusivity protections, and the ANDA must provide appropriate patent certifications or statements for each patent listed in the Orange Book.[5]

Employing the ANDA process, generic competitors may bypass much of the costly and time-consuming research and development brand manufacturers undergo. *See* 21 U.S.C. § 355(j); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). Through an ANDA, a competitor can secure FDA approval by demonstrating that the proposed generic shares the same active ingredients and bioequivalence as the brand name drug. In doing so, competitors must provide data establishing the administration, dosage, and strength of the generic is comparable to the brand name drug. Through the streamlined ANDA process, generics effectively piggyback off the pioneer's proven research and development and due diligence from manufacturing, testing, and approving the brand name drug.

By statute, the unauthorized disclosure of trade secrets and confidential and proprietary information by federal government officials who obtain that information in the course of their official duties or employment is expressly prohibited. 18 U.S.C. § 1905. Governing FDA regulations pointedly state: "Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c); *accord id.* § 314.430(g) ("The following data and information in an application or abbreviated application are not available for public disclosure unless they have been previously disclosed to the public . . . or they relate

---

[5] An ANDA applicant must certify or state: (1) the patent information is not listed in the Orange Book (Paragraph I certification); (2) the patent listed in the Orange Book has expired (Paragraph II certification); (3) the date the patent will expire (Paragraph III certification); and/or (4) that an Orange Book-listed "patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the [generic] drug" (Paragraph IV certification). *See Report to Congress: The Listing of Patent Information in the Orange Book* at 8–9 (last viewed Jan. 17, 2024). Although not relevant to deciding the issues before this Court, as discussed *infra*, the parties engaged in Paragraph IV certifications and resulting ANDA patent infringement litigation related to the brand and generic drugs discussed herein.

**Appx4**

to a product or ingredient that has been abandoned and they do not represent a trade secret or confidential commercial or financial information . . . : (1) Manufacturing methods or processes, including quality control procedures."). These protections are intended to promote full and transparent engagement between drug manufacturers and the FDA throughout the application and approval process. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1010–11 (1984) (nondisclosure protections afforded under the Trade Secrets Act, 18 U.S.C. § 1905, are intended to protect "reasonable investment-backed expectation[s]").

## II.   Vanda's Brand Name Drugs

Vanda filed NDA No. 022192 for Fanapt® on September 27, 2007. In reviewing the application for the brand name drug, the FDA rejected Vanda's proffered dissolution specification and instead proposed an alternative specification (i.e., a rate of not less than Q where "Q = [b4%] in 30 minutes for all strengths of the Tablet").[6] Vanda adopted the FDA's proposed dissolution rate and the agency approved Fanapt® as safe and effective for consumers on May 6, 2009.

The FDA similarly rejected Vanda's proffered dissolution specification for Hetlioz®, included in NDA No. 205677 and filed on May 31, 2013. In reviewing Vanda's application, the agency found that "[t]he proposed dissolution criterion is not supported by the data and is not acceptable."[7] As with Fanapt®, the FDA proposed an alternative specification for dissolution of Hetlioz® (i.e., a rate of not less than Q where "Q = [b4%] at 15 minutes").[8] Of note, Vanda's NDA included claimed confidential information regarding the manufacturer's processes for detecting and controlling impurities in Hetlioz®'s active ingredient (i.e., tasimelteon) as well as "the methods through which it controls the size of tasimelteon crystals in its drug product," otherwise known as micronization. ECF 1 at 17. Following Vanda's adoption of the FDA's proposed dissolution rate, the FDA approved Hetlioz® as safe and effective on January 31, 2014.

## III.   Claimed ANDA Disclosures and Parallel Litigation

Vanda's claims arise from the FDA's alleged engagement with four competitors who filed ANDAs seeking approval to bring generic versions of Fanapt® and Hetlioz® to market. More specifically, Vanda alleges FDA officials disclosed the brand

---

[6] *See* https://perma.cc/V9YV-9PSN at 41 (last viewed Jan. 17, 2024). The specific dissolution rates the FDA recommended to Vanda for each brand name drug and, later, to the generic manufacturers, detailed *infra*, were classified "Trade Secret / Confidential" and redacted from the record presented in this matter using a "b4" designation. Because the parties stipulate the percentage values identified herein as "b4" are identical for the respective brand name drugs and generics, disclosure of the specific dissolution rates is therefore unnecessary to resolve this motion.

[7] *See* https://perma.cc/AGW8-W4DU at 152 (last viewed Jan. 17, 2024).

[8] *Id.* at 153.

pharmaceutical company's confidential trade secret information in correspondence with the following competitors: Lupin Limited and/or Lupin Pharmaceuticals (Lupin), Inventia Healthcare Private Limited (Inventia), Teva Pharmaceuticals (Teva), and Apotex Corporation (Apotex). The alleged disclosures, summarized below, relate to proposed dissolution specifications, impurities analysis, and micronization.

Lupin submitted ANDA No. 206890 for generic Fanapt® (iloperidone) on May 8, 2014. Rejecting Lupin's proposed dissolution specification, the FDA explained, "[t]he firm's proposed specification . . . is too broad and not supported by their data and therefore not acceptable." ECF 7-2 at 1. Instead, the FDA proposed the same specification for dissolution the agency recommended and approved for Fanapt® (i.e., a rate of not less than [b4]% (Q) dissolved in 30 minutes). *Id.* at 2. A contemporaneous note confirms that an FDA official consulted the June 29, 2012 annual report produced for Fanapt® in determining what dissolution specification to recommend to Lupin. ECF 7-2 at 2 ("Reviewer's Note: the reviewer checked the NDA Annual report for the above mentioned specification for the [reference listed drug].") (footnote omitted). Following Lupin's adoption of the FDA's proposed dissolution rate, on May 5, 2022, its generic was formally approved as safe and effective.

Within two weeks of Lupin's application, on May 21, 2014, Inventia submitted ANDA No. 207231 for generic Fanapt® (iloperidone). Rejecting Inventia's proposed dissolution specification as "too liberal and not acceptable," *see* ECF 7-1 at 16, the FDA again recommended a dissolution rate of not less than [b4]% (Q) dissolved in 30 minutes. Internal records note the FDA's proposed specification "is the same as recommended by the NDA applicant for the [reference listed drug] product." *Id.* at 14. As in Lupin's review, the FDA official consulted the annual report produced for Fanapt® in determining what dissolution specification to recommend to Inventia. *See id.* ("The reviewer checked the NDA Annual report for the above mentioned specification for the [reference listed drug] product."). Following Inventia's adoption of the FDA's proposed dissolution rate, its generic was approved as safe and effective on November 28, 2016.

In the interim, in January 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon). The FDA rejected Teva's proposed dissolution specification, instead recommending the specification the agency previously proposed and approved for Hetlioz® (i.e., a rate of not less than [b4]% (Q) dissolved in 15 minutes). Citing Vanda's U.S. Patent Application No. 20170190683A1 (Highly Purified Pharmaceutical Grade Tasimelteon) (published July 6, 2017),[9] the agency also

---

[9] The USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020. The abstract provides: "A process for preparing a batch of highly purified, pharmaceutical grade tasimelteon comprises analyzing a batch of tasimelteon synthesized under [good manufacturing practice (GMP)] conditions for the presence of one or more identified impurities." *See* https://perma.cc/8FEV-3W6L at 1 (last viewed Jan. 18, 2024).

inquired whether the generic manufacturer was capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed Teva to produce supporting data including limits of detection and quantification and linearity. Following Teva's adoption of the FDA's proposed dissolution rate, and the company's submission of the requested impurity information, its generic was approved by the FDA as safe and effective on December 12, 2022.

Concomitantly, Apotex submitted ANDA No. 211607 for generic Hetlioz® (tasimelteon) in January 2018.  As with Teva's application, the FDA rejected Apotex's proposed dissolution specification and recommended the brand name drug rate of not less than [b4]% (Q) dissolved in 15 minutes.  Likewise, the FDA instructed Apotex to clarify its capabilities related to detecting, quantifying, and controlling specified impurities in the drug and, if applicable, instructed Apotex to produce supporting data including limits of detection and quantification and linearity.  The FDA also inquired whether its generic drug was "subject to any particle size reduction," suggesting "tasimelteon 'may be subject to micronization.'"  ECF 1 at 38.  On December 20, 2022, following Apotex's adoption of the FDA's proposed dissolution rate, and the manufacturer's submission of the requested impurity data and micronization information, its generic was approved by the FDA as safe and effective.

Regarding the FDA's review of these ANDAs, Vanda alleges the agency improperly disclosed its trade secrets by offering recommendations to the generic competitors and thus breached its duty of confidentiality.  More specifically, Vanda alleges the FDA's communications regarding dissolution rates, impurities, and micronization to the ANDA applicants revealed Vanda's confidential manufacturing information and caused economic injury to the company.[10]  In sum, the generic ANDAs and FDA's alleged disclosures of confidential trade secrets, include:

| Competitor | Pioneer Model | ANDA Submitted | FDA's Alleged Disclosures | FDA Approval |
|---|---|---|---|---|
| Lupin | Fanapt® (Iloperidone) | May 8, 2014 | • Dissolution Rate | May 5, 2022 |
| Inventia | Fanapt® (Iloperidone) | May 21, 2014 | • Dissolution Rate | Nov. 28, 2016 |
| Teva | Hetlioz® (Tasimelteon) | Jan. 2018 | • Dissolution Rate<br>• Impurities Inquiry | Dec. 12, 2022 |
| Apotex | Hetlioz® (Tasimelteon) | Jan. 2018 | • Dissolution Rate<br>• Impurities Inquiry<br>• Particle Size/ Micronization Inquiry | Dec. 20, 2022 |

---

[10] Throughout its complaint, Vanda also references additional competitors seeking to bring generic versions of Fanapt® and Hetlioz® to market, including: Alembic Pharmaceuticals Ltd., MSN Pharmaceuticals Inc. (MSN), Roxanne Laboratories Inc. n/k/a Hikma Labs Inc. (transferred to West-Ward Pharmaceuticals Corp.), and Taro Pharmaceutical Industries Ltd.  However, at this time, Vanda has not alleged any improper FDA disclosures to these generic manufacturers.

**Appx7**

Following the FDA's approval of the generic competitors' ANDAs, Vanda initiated ANDA patent infringement suits against the companies in federal district court.[11]  Prior to commencing this action against the United States on May 1, 2023, Vanda also filed a number of civil suits against the FDA in federal district court.[12]

## DISCUSSION

### I.   Standards of Review

This Court's statutorily prescribed jurisdiction to adjudicate claims and grant relief requires an affirmative waiver of sovereign immunity.  *United States v. Testan*, 424 U.S. 392, 399 (1976).  When the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the onus is on plaintiff to present preponderant evidence that jurisdiction is proper.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In evaluating the jurisdictional propriety of a claim, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1568–69 (Fed. Cir. 1993)).

---

[11] *See, e.g.*, *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 18-651, 2022 WL 17593282 (D. Del. Dec. 13, 2022) (judgment entered for defendants Teva and Apotex following four-day bench trial), *aff'd*, No. 23-1247, 2023 WL 3335538, at *2 (Fed. Cir. May 10, 2023), *pet'n for cert. docketed*, __ U.S.L.W. __ (U.S. Jan. 17, 2024) (No. 23-768); *Vanda Pharms., Inc. v. Lupin Ltd.*, No. 15-1073 (D. Del.) (voluntarily dismissed following settlement wherein Lupin deferred commercialization of generic product until Nov. 2, 2027); *Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del.) (case remains pending despite confidential stipulation wherein Inventia has not launched or commercialized generic drug); *see also* https://perma.cc/4WDE-ZFPS at 18–19 (Vanda's Quarterly Report (Form 10-Q) for the period ending March 31, 2022, noting the above-referenced confidential stipulation with Inventia and non-exclusive licensing agreement with MSN and Impax Laboratories, LLC to manufacture and market MSN's generic version of Hetlioz®) (last viewed Jan. 17, 2024).

[12] *See, e.g.*, *Vanda Pharms., Inc. v. FDA*, No. 23-1674 (D.D.C.) (Freedom of Information Act (FOIA) litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 23-1673 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-938 (D.D.C.) (summary judgment granted in favor of plaintiff in FOIA litigation); *Vanda Pharms., Inc. v. FDA*, No. 23-280 (D.D.C.) (Administrative Procedures Act (APA) challenge to FDA's decision to approve Teva's ANDA of generic Hetlioz® remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3808 (D.D.C.) (FOIA litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3807 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-3413 (D.D.C.) (same); *Vanda Pharms., Inc. v. FDA*, No. 22-3052 (D.D.C.) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-2775 (D.D.C.) (APA challenge  to FDA's alleged failure to issue a decision on Vanda's December 2018 Supplemental NDA for Hetlioz® and delay in scheduling a hearing remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-1432 (D.D.C.) (summary judgment for defendant in APA challenge to FDA's decision denying Vanda "Fast Track" designation for tradipitant–a drug to treat gastroparesis); *Vanda Pharms., Inc. v. FDA*, No. 22-1405 (D.D.C.) (FOIA litigation voluntarily dismissed following settlement).

In turn, when considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), courts "must accept as true all the factual allegations in the complaint and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quotation marks omitted) (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)). Assertions of legal conclusions are not credited during this assessment, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to merely a conceivable–claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

## II.    Fifth Amendment Taking (Count I)

The government seeks dismissal of plaintiff's Fifth Amendment takings claim (Count I) under RCFC 12(b)(6), principally citing Vanda's claims that FDA officials violated governing statutes and regulations generally prohibiting the disclosure of trade secrets and confidential commercial information. Upon this ground, defendant avers Vanda's claims of *ultra vires* conduct fails to plead a viable taking under the law of this circuit. The government further contends that any surviving constitutional claim should be limited to a regulatory taking, citing Vanda's failure to adequately plead a per se taking. Relatedly, the government maintains Vanda failed to adequately plead the requisite economic harm or interference with the company's reasonable investment-backed expectations. For the following reasons, the Court denies the government's motion to dismiss Count I of Vanda's complaint.

### A.  Unauthorized v. Unlawful

As recently stated by this Court in *Darby Development Co. v. United States*,

> To assert a viable takings claim against the United States, the government action in issue must be duly authorized by Congress. Where . . . a federal agency's actions are not authorized, the actions "may be enjoinable, but they do not constitute [a] taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner."

160 Fed. Cl. 45, 51–52 (2022) (citations omitted), *appeal docketed*, No. 22-1929 (Fed. Cir. June 24, 2022). Although seemingly counterintuitive, unlawful acts are not per se unauthorized for purposes of engaging in a Fifth Amendment takings analysis.

In *Del-Rio*, the United States Court of Appeals for the Federal Circuit distinguished an unauthorized government act for which a takings claim is legally

infirm from an authorized government act later deemed unlawful which may constitute a compensable taking, explaining:

> In a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, *i.e.*, if their actions are a "natural consequence of Congressionally approved measures," or are pursuant to "the good faith implementation of a Congressional Act[.]" The principle underlying this rule is that when a government official engages in *ultra vires* conduct, the official "will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government 'founded upon the Constitution.'"
>
> In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is "unauthorized" and conduct that is authorized but nonetheless unlawful. Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law.

146 F.3d at 1362 (citations omitted).  As in *Del-Rio*, where the challenged agency action involved the Department of the Interior's review and approval of mining leases, *see id.* at 1360, the FDA's review and approval of NDAs and ANDAs falls squarely within the scope of the federal agency's statutorily authorized duties, even if certain acts taken during the review process are ultimately found to be unlawful. *Id.* at 1362–63; *compare, e.g.*, *Darby Dev.*, 160 Fed. Cl. at 51–55 (Fifth Amendment takings claim failed as a matter of law because the Centers for Disease Control and Prevention lacked the requisite authority to issue contested nationwide residential eviction moratoria to combat the spread of COVID-19).  As such, the Court must deny defendant's motion to dismiss on this basis.

### B. *Proprietary Interest*

The more vexing issue in this case is whether Vanda can assert a cognizable property interest in the alternative dissolution specification the FDA proposed to Vanda during the approval process.  Although the FDA generated the alternative dissolution specifications in evaluating Vanda's data, it is not axiomatic that the alternative data points became Vanda's trade secrets or confidential commercial information simply because the company adopted them.  After all, Vanda was incentivized to accept the FDA counterproposal to expedite approval and bring its branded drugs to the marketplace.  Similar inquiries must be asked regarding whether and to what extent the FDA is precluded from inquiring about a generic

manufacturer's impurity detection and micronization capabilities simply because Vanda addressed them in their NDA.

Consideration should also be given to the potential consequences of crediting Vanda's proprietary claims. Such a ruling may adversely impact (or preclude altogether) the FDA's ability to provide other brand name and generic manufacturers with comparable assistance. As raised by the Court during oral argument, without comparing the data and information of an approved NDA to the proposed data and information included in a generic's ANDA under review, the FDA may authorize inconsistent results. In that case, Vanda might claim the FDA improvidently delayed the brand name product to market or, in the alternative, hastened the generic drug's review and approval. The FDA could also reject a generic's proposed dissolution specification previously accepted for a brand manufacturer or another generic, subjecting the agency to accusations of delaying a generic drug's approval.

For now, these theoretical issues must wait. As highlighted by Vanda at oral argument (and conceded by the government), defendant effectively waived these issues for purposes of the pending dispositive motion. *See* ECF 14 at 10 n.3 ("To be clear, we reserve the right to contest Vanda's alleged property interest in any of the information at issue if this case proceeds beyond the pending motion, including Vanda's alleged property interest in the dissolution specifications that FDA provided to Vanda."). The parties must address these issues as this case proceeds.

### C. Per Se v. Regulatory Taking

Vanda alleges the FDA's disclosure of the brand manufacturer's trade secrets and confidential commercial information to competitors "substantially diminished their value," ECF 1 at 42, and infringed upon Vanda's "right to exclude" generics from the market. ECF 11 at 29. Such claims strongly suggest Vanda is pursuing a regulatory takings claim under *Monsanto*, 467 U.S. at 986, as opposed to a per se invasion. *See 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995) ("A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint.") (later citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.")). If true, Vanda's constitutional claim, valued "in excess of millions of dollars," ECF 1 at 42, must be assessed under the three-part test articulated in *Penn Central Transportation Co. v. City of New York*: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." 438 U.S. 104, 124 (1978).

Notwithstanding the Court's first impression, Vanda seeks to assert in the first instance a per se invasion of the brand manufacturer's trade secrets and confidential commercial information and alternatively claim a regulatory taking. While Vanda is

correct that the government's infringement of its right to exclude can certainly constitute a per se taking, *Cedar Point Nursery v. Hassid,* 594 U.S. __, 141 S. Ct. 2063 (2021)–which Vanda relied heavily upon at oral argument–is readily distinguishable from this case.  In *Cedar Point*, the government infringed upon the landowners' real property by allowing union representatives to physically enter the land on a regular cadence to engage workers in union activities.  *See* 141 S. Ct. at 2074.  The Supreme Court held that the physical nature of the union's presence on the land constituted an invasion of the property, since union representatives could "traverse it at will." *See id.*  Although Vanda may have the right to exclude others from its trade secrets and confidential commercial information, the Court is nevertheless unconvinced that *Cedar Point*'s ultimate holding extends to intangible property interests as plaintiff alleges.  However, in light of the uncertainty of Vanda's cognizable interest in the claimed FDA-generated trade secrets and confidential proprietary information, as discussed *supra*, it is premature to resolve this issue now.

### III.    Breach of Contract (Count II)

To resolve defendant's dispositive motion as to Count II of Vanda's complaint, the Court must address the true nature of the alleged contract at issue in this case, regardless of the legal obligations Vanda attributes to the FDA.  If, as alleged in the complaint, Vanda's NDA submissions created implied-in-fact contracts with the FDA, any breach of those agreements would fall within this Court's jurisdiction. In contrast, the Court lacks jurisdiction over Count II if the alleged contractual relationship is implied-in-law as the government avers.  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) ("Implied-in-fact contracts, which are within the jurisdiction of the Court of Federal Claims, differ significantly from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims.") (citing cases).

As summarized by the Federal Circuit in *City of Cincinnati*:

> An implied-in-fact contract is one founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. Like an express contract, an implied-in-fact contract requires (1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance. When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract.

*Id.* (citations and quotation marks omitted). Vanda avers the FDA maintains a statutory "standing offer" to review NDAs (and ANDAs), which Vanda accepted by submitting NDAs for Fanapt® on September 27, 2007, and Hetlioz® on May 31, 2013. According to Vanda, the drug manufacturer's worldclass data and application fees

are exchanged in consideration for the government's confidential review and potential approval of the brand name drugs. As discussed *supra*, the requisite contractual authority and asserted confidentiality requirements are presumably codified in the statutory and regulatory scheme.

In support of the claimed implied-in-fact contract, Vanda primarily relies upon the Federal Circuit's decision in *Airborne Data, Inc. v. United States*, 702 F.2d 1350 (Fed. Cir. 1983) (per curiam). In that case, the Federal Circuit affirmed the trial court's conclusions that a company's submission of an unsolicited proposal for a government contract–which included trade secrets and a confidentiality restriction– formed an implied-in-fact contract to safeguard the confidential information, breached when the receiving agency used the company's proposal to solicit bids from third parties for similar services. *Id.* at 1352–53. Vanda also cites a decision by this Court's predecessor in *Research, Analysis, & Development, Inc. v. United States*, 8 Cl. Ct. 54 (1985). This case similarly involved a company's submission of an unsolicited proposal for a military contract–including proprietary information and a confidentiality statement–ultimately compromised when the Air Force published the proprietary information in seeking comparable technological proposals from third parties. *Id.* at 56–57. Finding the material facts indistinguishable from *Airborne Data*'s binding precedent, the trial court in *Research Analysis* likewise found an implied-in-fact confidentiality contract was consummated and subsequently breached. *Id.* at 61.

The implied-in-fact contractual relationships in *Airborne Data* and *Research Analysis* are readily distinguishable from the facts in this case. Put simply, there is a clear difference between: (a) submitting a proposal seeking a government contract with a particular federal agency; and (b) filing an application for regulatory approval to bring a product to market as required by federal law. *Compare Airborne Data*, 702 F.2d at 1352–53 *and Research Analysis*, 8 Cl. Ct. at 56–61 *with Perry v. United States*, 149 Fed. Cl. 1, 17–20 (2020) (inventor's submission of patent applications to the USPTO does not consummate a contract claim within the jurisdictional authority of the Court of Federal Claims, warranting dismissal under RCFC 12(b)(1); alternatively, "any attempt to construe the relationship between the USPTO and a patent applicant as contractual is legally implausible on its face," subject to dismissal under RCFC 12(b)(6)), *aff'd*, No. 20-2084, 2021 WL 2935075 (Fed. Cir. July 13, 2021) (per curiam).

At most, any claimed disclosure of Vanda's purported trade secrets or confidential commercial information is a failure to duly adhere to the legal confidentiality requirements imposed by statute and regulation rather than a breach of an implied-in-fact contract. Vanda's characterization notwithstanding, Count II must be dismissed as either an implied-in-law contract outside the Court's jurisdiction or an improvidently pleaded claim that is facially implausible as a matter of law.

## IV.    Time-Barred Claims

The government finally argues that any claims related to Inventia are time-barred and should be dismissed.  The Court agrees.  "A claim under the Tucker Act, 28 U.S.C. § 1491, . . . must be brought 'within six years after such claim first accrues.'" *Adera v. United States*, No. 22-1074, 2023 WL 3768645, at *2 (Fed. Cir. June 2, 2023) (quoting *Katzin v. United States*, 908 F.3d 1350, 1358 (Fed. Cir. 2018) (citing 28 U.S.C. § 2501)).  Otherwise, the claim is time-barred and must be dismissed for lack of jurisdiction. *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006) ("Pursuant to 28 U.S.C. § 2501, claims brought in the Court of Federal Claims under the Tucker Act are 'barred unless the petition thereon is filed within six years after such claim first accrues.'"), *aff'd*, 552 U.S. 130 (2008).  A claim first accrues "when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *Conner v. United States*, No. 23-1316, 2023 WL 5011753, at *2 (Fed. Cir. Aug. 7, 2023) (citing *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (citations omitted)).  In this case, the FDA's alleged disclosure of Vanda's claimed trade secrets and confidential commercial information to Inventia took place on or before November 28, 2016, when the generic drug was approved.  Yet Vanda failed commence this action until May 1, 2023–over five months after the six-year jurisdictional deadline.

In an effort to salvage the Inventia-based claims, Vanda now seeks to invoke the accrual suspension rule.  "[S]trictly and narrowly applied," the rule is triggered only when a plaintiff can demonstrate the government "concealed its acts," resulting in plaintiff's lack of awareness, or the alleged injury was "'inherently unknowable' . . . at the time the cause of action accrued."  *Ingrum v. United States*, 560 F.3d 1311, 1314–15 (Fed. Cir. 2009) (citing cases); *accord Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985) (quoting *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 256, 358–59 (Ct. Cl. 1967)).  Relevant here, "[t]he phrase 'inherently unknowable' has been construed to mean that the factual basis for the claim is 'incapable of detection by the wronged party through the exercise of reasonable diligence.'"[13] *Texas Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009) (quoting *Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)); *accord Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) ("According to the accrual suspension rule, 'the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed.'") (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003)).

Vanda contends it first became aware of the FDA's purported disclosures to Inventia on or about April 20, 2023, when the FDA responded to Vanda's March 27, 2023 FOIA request related to the generic manufacturer's ANDA approval.  But Vanda

---

[13] Vanda does not allege the FDA took any steps to conceal its actions.

is silent as to its decision to wait six years and four months after Inventia's drug approval to submit its FOIA request or otherwise inquire about the generic's ANDA. Considering Vanda commenced directly related ANDA litigation against Inventia on October 13, 2015–over a year before the ANDA was approved and made public–this time gap is particularly notable here.[14]   *See Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del. filed Oct. 13, 2015).  Additionally, upon approval of Inventia's ANDA on November 28, 2016, the information Vanda ultimately secured through its FOIA request was "immediately available for public disclosure."  *See, e.g.*, 21 C.F.R. § 314.430(e) ("After FDA sends an approval letter to the applicant, the following data and information in the application or abbreviated application are immediately available for public disclosure, unless the applicant shows that extraordinary circumstances exist. . . .  (7) All correspondence and written summaries of oral discussions between FDA and the applicant relating to the application . . . .").  Lastly, the Federal Circuit has squarely rejected attempts to invoke the accrual suspension rule based solely on additional information received through Privacy Act and FOIA requests after the six-year statute of limitations expired.  *See Adera*, 2023 WL 3768645, at *4.

For these reasons, Vanda's assertion that the alleged FDA disclosures to Inventia were incapable of detection prior to November 28, 2022–within six years of the generic's FDA approval–rings hollow.  Accordingly, the company's claims relating to Inventia are time-barred.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss (ECF 7) is **DENIED-IN-PART** and **GRANTED-IN-PART** as follows: defendant's motion to dismiss Count I (Fifth Amendment taking) is **DENIED**; and defendant's motion to dismiss Count II (breach of contract) and plaintiff's claims involving Inventia are **GRANTED**.  In accordance with RCFC 12(a)(4)(A)(i), defendant shall file an answer on or before February 1, 2024.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[14] As noted *supra*, although Vanda and Inventia have reportedly settled the ANDA litigation, the district court matter remains pending.

# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 23-629C
(Filed: January 22, 2025[*])

|  |  |
|---|---|
| **VANDA PHARMACEUTICALS, INC.**, | ) )  ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| **UNITED STATES**, | ) ) |
| *Defendant.* | ) ) ) |

*Paul W. Hughes, III*, McDermott Will & Emery, Washington, DC, for plaintiff. With him on the briefs were *Edward B. Diskant*, *Jennifer B. Routh*, and *Charles Seidell*, McDermott Will & Emery, Washington, DC.

*Borislav Kushnir*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. On the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Igor Helman*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Samuel R. Bagenstos*, General Counsel, and *Wendy Vicente*, Deputy Chief Counsel, Litigation, U.S. Department of Health and Human Services, Washington, DC, and *James Allred*, Associate Chief Counsel, and *Leah A. Edelman*, Associate Chief Counsel, Office of the Chief Counsel, U.S. Food and Drug Administration, Silver Spring, MD, Of Counsel.

---

[*] This opinion was originally filed under seal on January 7, 2025, in accordance with the protective order entered in this case. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. On January 17, 2025, both parties proposed a series of redactions. To be clear, the Court's adoption of the parties' proposed redactions should not be interpreted as sanctioning their assertions that the information is in fact a trade secret or otherwise qualifies as proprietary and/or confidential commercial information. Redactions are denoted using "{█}."

**Appx16**

*Joshua R. Turner*, Goodwin Procter LLP, Washington, DC, for amicus curiae Association for Accessible Medicines. With him on the brief were *Brian T. Burgess* and *Gabriel B. Ferrante*, Goodwin Procter LLP, Washington, DC.

**OPINION AND ORDER**

***BONILLA, Judge****.*

Biopharmaceutical company Vanda Pharmaceuticals, Inc. (Vanda) alleges the U.S. Food and Drug Administration (FDA) improperly disclosed the brand manufacturer's trade secrets and confidential commercial and proprietary information to competitors seeking approval of generic drugs. Whether intentional or inadvertent, Vanda claims the FDA's disclosures of dissolution specifications and impurities testing and micronization information developed and learned in evaluating Vanda's new drug applications (NDAs) to three generic competitors in the course of reviewing their abbreviated new drug applications (ANDAs) constitute a Fifth Amendment taking (Count I) and breach of an implied-in-fact contract (Count II).

On January 18, 2024, the Court granted-in-part and denied-in-part the government's motion to dismiss Vanda's complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). *Vanda Pharms., Inc. v. United States*, 169 Fed. Cl. 196 (2024). Specifically, the Court dismissed Vanda's breach of contract claim "as either an implied-in-law contract outside the Court's jurisdiction or an improvidently pleaded claim that is facially implausible as a matter of law." *Id.* at 208. The Court also declared Vanda's claims time-barred as they relate to disclosures purportedly made to generic competitor Inventia Healthcare Private Limited (Inventia). *Id.* at 208–10. However, the Court denied the government's effort to construe and summarily dismiss Vanda's Fifth Amendment claim as an *unauthorized* taking. *Id.* at 205–06. Instead, the Court posed and deferred—until today—the following novel questions: whether Vanda can assert a cognizable property interest in an alternative dissolution specification *the FDA proposed to Vanda* during the drug approval process; whether and to what extent the FDA is precluded from inquiring about a generic drug manufacturer's impurity detection and micronization capabilities during the ANDA process simply because Vanda addressed them in its NDA; and the potential adverse impacts of crediting Vanda's proprietary claims on the FDA's administration of the NDA and ANDA processes. *Id.* at 206–07.

Pending before the Court is defendant's motion for judgment on the pleadings pursuant to RCFC 12(c) or, in the alternative, for summary judgment under RCFC 56

by operation of RCFC 12(d).  For the reasons set forth below, defendant's motion for judgment on the pleadings is GRANTED.[1]

## BACKGROUND

Vanda is an international biopharmaceutical company that researches, develops, and markets high-impact medications to address unmet medical needs. Founded in 2003, the corporation is headquartered in Washington, DC and maintains a self-described business model of "acquiring compounds that other companies failed to develop into treatments, identifying potential medical uses for them, devoting substantial resources to developing them, seeking FDA approval, and commercializing them."  ECF 1 at 6–7.  At issue in this case are two brand-name drugs developed by Vanda: Fanapt® (iloperidone) tablets approved to treat schizophrenia in adults, and Hetlioz® (tasimelteon) capsules approved to treat the circadian rhythm sleep disorder known as non-24-hour sleep-wake disorder.  The FDA approved Vanda's NDAs relating to Fanapt® and Hetlioz® on May 6, 2009, and January 31, 2014, respectively.  In the years since, the FDA considered and approved several ANDAs for generic versions of the brand-name drugs.  Vanda's claims focus on the information FDA officials purportedly shared with manufacturers of these generics in evaluating and approving their applications.

## I.    Drug Approval Process

To market drugs in the United States, pharmaceutical companies must secure approval from the FDA for each new product pursuant to the Food, Drug, and Cosmetic Act (FDCA).  21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed [in accordance with this Act] is effective with respect to such drug."). The FDCA outlines the extensive data and information manufacturers must provide the Secretary of the U.S. Department of Health and Human Services (delegated to the FDA) in an NDA to demonstrate consumer safety and effectiveness and gain government approval to market a new drug.  *See id.* § 355(b)(1)(A)(i)–(viii).  In addition to the statutory requirements, by regulation, NDAs must include information on a product's chemistry, manufacturing, and controls, a meticulous technical review of the drug's manufacturing procedures, and "the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including . . . acceptance criteria relating to . . . dissolution rate . . . ."  21 C.F.R. § 314.50(d)(1)(i)–(ii)(a).  Of relevance to the brand-name and generic drugs in issue here is the requirement for dissolution specifications: the rate at which a drug dissolves.  This data point is designed to measure consistency across batches and with the drug product presented from the clinical batch.

---

[1] As discussed *infra*, in deciding this case under RCFC 12(c), the Court does not reach defendant's alternative dispositive motion under RCFC 56.

The FDA publishes a list of new drugs approved for safety and effectiveness in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), along with their associated patents and exclusivity information.   *See Janssen Pharmaceutica, N.V. v. Apotex*, 540 F.3d 1353, 1355 (Fed. Cir. 2008) (citing 21 U.S.C § 355(b)(1), (c)(2) & (j)(2)(A)(i)).   Drugs approved by the FDA, and included in the Orange Book, are referred to as "listed drugs."   *See id.* "Inclusion of products in the Orange Book is independent of any current regulatory action being taken administratively or judicially against a drug product."[2]

The research and development phases and ensuing FDA approval process for a new drug is expensive and time consuming.[3]   To incentivize pharmaceutical research and development as well as scientific and medical advancements, a pioneer or brand-name drug manufacturer generally receives a statutory period of market exclusivity following FDA approval.   To further protect their intellectual property, manufacturers typically secure patents issued by the U.S. Patent and Trademark Office (USPTO)—including patents listed in the Orange Book—which, in some cases, impact the timing of generic drugs entering the market.   A brand-name drug's market exclusivity does not always run concurrently with germane patent terms.   Relevant to this case, market exclusivity can also be maintained by companies keeping confidential certain data and information in NDA disclosures (e.g., trade secrets, manufacturing methods and processes, production and sales distribution).   *See* 21 C.F.R. § 314.430(g).

To better balance the vital public policy interests of encouraging new scientific development with competitors' ability to bring inexpensive generics to market, Congress passed the 1984 Drug Price Competition and Patent Term Restoration Act (commonly known as the Hatch-Waxman Act), 21 U.S.C. §355(j).   *See Caraco Pharms. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282 (Fed. Cir. 2008) ("The goal of the [Hatch-Waxman] Act is to [strike] a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market.") (quotation marks omitted).   Under the Hatch-Waxman Act, upon filing an ANDA, the timing of generic drug approval is subject to patent and market exclusivity protections, and the ANDA must provide appropriate patent certifications or statements for each patent listed in the Orange Book.[4]   But generic competitors may bypass much of the costly

---

[2] *See* https://perma.cc/QLQ7-JPY4 (Orange Book Preface) (last visited Dec. 31, 2024).

[3] According to a 2015 report published by the Pharmaceutical Research and Manufacturers of America (PhRMA), on average, pharmaceutical manufacturers spend $2.6 billion over the course of more than a decade to bring a new drug to market.   *See* https://perma.cc/WMZ4-YHAA at 4 (last visited Dec. 31, 2024); *cf. Fed. Trade Comm'n v. Actavis, Inc.*, 570 U.S. 136, 142 (2013) (describing FDA approval process as "long, comprehensive, and costly").

[4] An ANDA applicant must certify or state: (1) the patent information is not listed in the Orange Book (Paragraph I certification); (2) the patent listed in the Orange Book has expired (Paragraph II

**CONFIDENTIAL MATERIAL REDACTED**

and time-consuming research and development brand manufacturers undergo. *See* 21 U.S.C. § 355(j); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). Through an ANDA, a competitor can secure FDA approval by demonstrating that the proposed generic drug shares the same active ingredients and bioequivalence as the brand-name drug. In doing so, competitors must provide data establishing that the administration, dosage, and strength of the generic drug is comparable to the brand-name drug. Through the streamlined ANDA process, generics effectively piggyback off the pioneer's proven research and development and due diligence from manufacturing, testing, and approving the brand-name drug.

The unauthorized disclosure of trade secrets and confidential and proprietary information by government officials who obtain that information in the course of their official duties or employment is prohibited under federal law. 18 U.S.C. § 1905. Governing FDA regulations pointedly state: "Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c); *accord id.* § 314.430(g) ("The following data and information in an application or abbreviated application are not available for public disclosure unless they have been previously disclosed to the public . . . or they relate to a product or ingredient that has been abandoned and they do not represent a trade secret or confidential commercial or financial information . . . : (1) Manufacturing methods or processes, including quality control procedures."). These protections are intended to promote full and transparent engagement between drug manufacturers and the FDA throughout the application and approval process. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1010–11 (1984) (nondisclosure protections afforded under the Trade Secrets Act, 18 U.S.C. § 1905, are intended to protect "reasonable investment-backed expectation[s]").

## II.   Vanda's Brand-Name Drugs

Vanda filed NDA No. 22-192 for Fanapt® on September 27, 2007. In reviewing the application, the FDA rejected Vanda's proffered dissolution specification of $Q =$ {█}% in {█} minutes and proposed an alternative rate of $Q =$ {█}% in

---

certification); (3) the date the patent will expire (Paragraph III certification); and/or (4) the "[Orange Book-listed] patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the [generic] drug" (Paragraph IV certification). *See Report to Congress: The Listing of Patent Information in the Orange Book* at 8–9 (Dec. 2021). Although not relevant to deciding the issues before this Court, as noted *infra*, Vanda filed Paragraph IV certification and ANDA patent infringement litigation related to the brand-name and generic drugs discussed herein.

**CONFIDENTIAL MATERIAL REDACTED**

{██} minutes.[5]  Vanda adopted the FDA's alternative dissolution criterion and the agency approved Fanapt® as safe and effective for consumers on May 6, 2009.

The FDA similarly rejected and proposed an alternative to Vanda's proffered dissolution specification for Hetlioz®.  In NDA No. 205-677, filed on May 31, 2013, Vanda proffered a dissolution specification of $Q = \{██\}$% in {██} minutes.  In reviewing Vanda's application, the agency found: "The proposed dissolution criterion is not supported by the data and is not acceptable."  ECF 29-3 at 2, 6.  The agency proposed an alternative rate of $Q = \{██\}$% in {██} minutes.  Following Vanda's adoption of the FDA's alternative dissolution specification, on January 31, 2014, the agency approved Hetlioz® as safe and effective.  Of note, Vanda's May 31, 2013 NDA included information it now claims is confidential and proprietary regarding the brand manufacturer's processes for detecting and controlling impurities in Hetlioz®'s active ingredient (i.e., tasimelteon), as well as "the methods through which it controls the size of tasimelteon crystals in its drug product" (also known as "micronization").  ECF 1 at 17.

## III.    ANDA Disclosures and Parallel Litigation

Following the Court's January 18, 2024 decision, Vanda's remaining claims arise from the FDA's alleged engagement with three competitors seeking approval to bring generic versions of Fanapt® and Hetlioz® to market.  More specifically, Vanda alleges FDA officials disclosed the brand manufacturer's trade secret and confidential and proprietary information in ANDA correspondence with Lupin Limited and/or Lupin Pharmaceuticals, Inc. (collectively, Lupin), Teva Pharmaceuticals (Teva), and Apotex Corporation (Apotex).[6]  The alleged disclosures, summarized below, relate to dissolution specifications and impurities testing and micronization information.

Lupin submitted ANDA No. 206890 for generic Fanapt® (iloperidone) tablets on May 8, 2014.  The FDA rejected Lupin's proposed dissolution specification of $Q = \{██\}$% in {██} minutes and explained: "The firm's proposed specification . . . is too broad and not supported by their data and therefore not acceptable."  ECF 7-2 at 1; ECF 29-2 at 2.  Instead, the FDA proposed the same dissolution specification the agency recommended and approved for Fanapt® (i.e., $Q = \{██\}$% in {██} minutes).  A contemporaneous note recorded in the agency file confirms an FDA official consulted the June 29, 2012 annual report produced for Fanapt® in determining what dissolution specification to recommend to Lupin.  ECF 7-2 at 2 ("Reviewer's Note: the

---

[5] As used in the above formula, "Q" denotes the "Quantity (Q) of active substance dissolved in a specified time, expressed as the percentage of product label claim."  *See* National Institutes of Health, National Library of Medicine, *Developing Clinically Relevant Dissolution Specifications for Oral Drug Products—Industrial and Regulatory Perspectives* at 11 (Dec. 23, 2019), *available at* https://perma.cc/K8CH-TKC6 (last visited Dec. 31, 2024).

[6] As noted *supra*, Vanda's claims involving Inventia are time-barred.

**CONFIDENTIAL MATERIAL REDACTED**

reviewer checked the NDA Annual report for the above-mentioned specification for the [reference listed drug (RLD)].") (footnote omitted).  Following Lupin's adoption of the FDA's alternative dissolution rate, its generic drug was formally approved as safe and effective on May 5, 2022.

In the interim, on January 31, 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon).  The FDA rejected Teva's proposed dissolution specification of Q = {█}% in {█} minutes, instead recommending the rate previously proposed and approved for Hetlioz® (i.e., Q = {█}% in {█} minutes).  Citing Vanda's U.S. Patent Application No. 20170190683A1 (Highly Purified Pharmaceutical Grade Tasimelteon) (published July 6, 2017),[7] the agency also inquired whether the generic manufacturer was capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed Teva to produce supporting data including limits of detection and quantification and linearity.  The FDA also suggested that tasimelteon "may be subject to micronization" and, upon that assumption, directed the generic manufacturer to describe their micronization procedures and submit batch and stability data.  ECF 29-7 at 2.  Following Teva's adoption of the FDA's proposed alternative dissolution specification, and the generic manufacturer's submission of the requested impurity and micronization information, its generic drug was approved by the FDA as safe and effective on December 12, 2022.

Concomitantly, Apotex submitted ANDA No. 211607 for generic Hetlioz® (tasimelteon) on January 31, 2018.  As with Teva's application, the FDA rejected Apotex's proposed dissolution specification of Q = {█}% in {█} minutes and, instead, recommended the rate previously proposed and approved for Hetlioz® (i.e., Q = {█}% in {█} minutes).  Likewise, the FDA instructed Apotex to clarify its capabilities related to detecting, quantifying, and controlling specified impurities in the generic drug and, if applicable, instructed Apotex to produce supporting data, including limits of detection and quantification and linearity.  The FDA also inquired:

> Please clarify whether your drug substance may be subject to any particle size reduction. If so, please provide the following:
> a. [x-ray diffraction (XRD)] data for a batch of micronized drug substance.
> b. Stability data for a micronized batch of drug substance to ensure solid form stability.
> c. A detailed process description of the micronization procedure . . . .

ECF 29-6 at 3, *quoted in part in* ECF 1 at 38.  On December 20, 2022, following Apotex's adoption of the FDA's proposed dissolution rate, and the manufacturer's

---

[7] *See* https://perma.cc/8TF3-E3H9 (last visited Dec. 31, 2024).  The USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020.  *See* https://perma.cc/8FEV-3W6L at 1 (last visited Dec. 31, 2024).

submission of the requested impurity data and micronization information, its generic drug was approved by the FDA as safe and effective.

Vanda alleges the FDA improperly disclosed the brand manufacturer's trade secrets and confidential and proprietary information by offering recommendations to generic competitors and, thus, breached its duty of confidentiality. More specifically, Vanda alleges the FDA's communications to the ANDA applicants regarding dissolution rates, impurities testing, and micronization revealed Vanda's confidential manufacturing information and caused economic injury to the brand manufacturer.[8] In sum, the FDA's alleged improper disclosures of Vanda's claimed confidential trade secrets and confidential and proprietary information to generic competitors, include:

| Competitor | Pioneer Model | ANDA Submitted | FDA's Alleged Disclosures | FDA Approval |
|---|---|---|---|---|
| Lupin | Fanapt® (Iloperidone) | May 8, 2014 | • Dissolution Rate | May 5, 2022 |
| Teva | Hetlioz® (Tasimelteon) | Jan. 31, 2018 | • Dissolution Rate<br>• Impurities Testing<br>• Particle Size/ Micronization | Dec. 12, 2022 |
| Apotex | | | | Dec. 20, 2022 |

Following the FDA's approval of these generic drugs, Vanda initiated ANDA patent infringement suits against the companies in federal district court.[9]  Prior to

---

[8] Throughout its complaint, Vanda references additional competitors seeking to bring generic versions of Fanapt® and Hetlioz® to market, including Alembic Pharmaceuticals Ltd., MSN Pharmaceuticals Inc. (MSN), Roxanne Laboratories Inc. (n/k/a Hikma Labs Inc. and transferred to West-Ward Pharmaceuticals Corp.), and Taro Pharmaceutical Industries Ltd.  To date, Vanda has not alleged any improper FDA disclosures to these generic manufacturers.  Accordingly, any such claims are waived.

[9] *See, e.g.*, *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 18-651, 2022 WL 17593282 (D. Del. Dec. 13, 2022) (judgment entered for defendants Teva and Apotex following four-day bench trial), *aff'd*, No. 23-1247, 2023 WL 3335538 (Fed. Cir. May 10, 2023), *cert. denied*, __ U.S. __, 144 S. Ct. 1393 (2024); *Vanda Pharms., Inc. v. Lupin Ltd.*, No. 15-1073 (D. Del. July 15, 2020) (voluntarily dismissed following settlement wherein Lupin deferred commercialization of generic product until Nov. 2, 2027); *compare Vanda Pharms., Inc. v. Inventia Healthcare PVT. LTD.*, No. 15-921 (D. Del. Dec. 5, 2024), *with* https://perma.cc/4WDE-ZFPS at 18–19 (Vanda's Quarterly Report (Form 10-Q) for the period ending March 31, 2022) (district court litigation remains pending despite confidential stipulation wherein Inventia has not launched or commercialized generic drug) (last visited Dec. 31, 2024); *see also* https://vandapharmaceuticalsinc.gcs-web.com/node/16186/html at 21 (Vanda's Q-10 for the period ending Sept. 30, 2024) (noting non-exclusive licensing agreement with MSN and Impax Laboratories, LLC to manufacture and market MSN's generic version of Hetlioz®) (last visited Dec. 31, 2024); *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 23-152 (D. Del. filed Dec. 27, 2022) (pending patent litigation against Teva and Apotex); *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, No. 24-18 (D. Del. filed Jan. 29, 2023) (pending false advertising case against Teva); *Vanda Pharms. Inc. v. MSN Pharms. Inc.*, No. 24-815 (D. Del. filed July 12, 2024) (pending patent litigation against MSN).

commencing this action against the United States on May 1, 2023, Vanda also filed several civil suits against the FDA in federal district court.[10]

**DISCUSSION**

## I.    Standard of Review

"[W]hen considering a motion under RCFC 12(c), the court applies substantially the same test as it does for a motion to dismiss for failure to state a claim under RCFC 12(b)." *Sikorski Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 719 (2015) (citing *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011)). That is, "the court must assume 'each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (quoting *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988)). Legal conclusions presented as factual assertions are not, however, entitled to such deference. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Upon these premises, "[j]udgment on the pleadings is appropriate where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Lab'ys, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007) (citing *N.Z. Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994)).

Relevant here, "[w]hen deciding a motion for judgment on the pleadings, the court may review 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice.'" *T.H.R. Enters., Inc. v. United States*, 160 Fed. Cl. 236, 239 (2022) (quoting 5C Charles

---

[10] *See, e.g.*, *Vanda Pharms., Inc. v. FDA*, No. 23-1674 (D.D.C. Oct. 1, 2024) (Freedom of Information Act (FOIA) voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-938 (D.D.C. Mar. 27, 2023) (summary judgment granted in favor of plaintiff in FOIA litigation); *Vanda Pharms., Inc. v. FDA*, No. 23-280 (D.D.C. filed Jan. 31, 2023) (Administrative Procedures Act (APA) challenge to FDA's decision to approve Teva's ANDA of generic Hetlioz® remains pending); *Vanda Pharms., Inc. v. FDA*, Nos. 22-3413, 22-3807, 22-3808, 24-2203 to -2205 (D.D.C. filed Nov. 7, 2022) (FOIA litigation remains pending); *Vanda Pharms., Inc. v. FDA*, No. 22-3052 (D.D.C. Aug. 29, 2023) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 22-2775 (D.D.C. Oct. 30, 2024) (summary judgment granted in favor of Vanda in APA challenge to FDA's alleged failure to issue a decision on Vanda's December 2018 Supplemental NDA for Hetlioz® and delay in scheduling a hearing); *Vanda Pharms., Inc. v. FDA*, No. 22-1432 (D.D.C. Aug. 2, 2023) (summary judgment for defendant in APA challenge to FDA's decision denying Vanda "Fast Track" designation for tradipitant–a drug to treat gastroparesis), *appeal docketed*, No. 23-5200 (D.C. Cir. Sept. 11, 2023); *Vanda Pharms., Inc. v. FDA*, No. 22-1405 (D.D.C. June 21, 2023) (FOIA litigation voluntarily dismissed following settlement); *Vanda Pharms., Inc. v. FDA*, No. 23-2325 (D.D.C. Apr. 22, 2024) (same); *Vanda Pharms., Inc. v. FDA*, No. 23-2884 (D.D.C. Jan. 17, 2024) (same); *Vanda Pharms., Inc. v. FDA*, No. 23-2327 (D.D.C. filed Aug. 11, 2023) (FOIA litigation pending); *Vanda Pharms., Inc. v. FDA*, No. 23-2812 (D.D.C. filed Sept. 25, 2023) (APA challenge to FDA's approval of MSN's tasimelteon ANDA remains pending).

9

**Appx24**

A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2004)). Documents considered "central to the complaint" can include exhibits "whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Toon v. United States*, 96 Fed. Cl. 288, 298–99 (citing cases). The facts material to deciding this case are rooted in the detailed accounts included in Vanda's pleading, matters of public record, or otherwise uncontroverted. Accordingly, the Court need not convert defendant's motion to one for summary judgment.[11] *See id.* at 299.

## II.  Fifth Amendment Taking

The Takings Clause of the Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. AMEND. V, cl. 4. In determining whether a viable takings claim has been adequately pled, courts apply a two-part test. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citing cases). Where, as here, the claimant fails to assert a cognizable property interest, the court's inquiry begins and ends on the first step. *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275 (Fed. Cir. 2023) (quoting *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir 2004)).

As explained by the United States Court of Appeals for the Federal Circuit:

The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 (1992).

---

[11] The Court rejects Vanda's contention that the issues raised in this case are too fact-intensive to be resolved under RCFC 12(c). *See Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004) ("Whether a compensable taking has occurred is a question of law based on factual underpinnings.") (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1350–51 (Fed. Cir. 2003)); *Econ. Rsch. Servs. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 232–33 (D.D.C. 2016) ("Although the question of whether a piece of information is a trade secret is typically a question of fact, information is not a trade secret as a matter of law if it is 'easily ascertainable by the public or generally known within an industry.'") (citation omitted).

**Appx25**

*Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (footnote omitted).  Under these principles, cognizable property interests extend to both tangible and intangible property, including commercial data.  *Acceptance*, 583 F.3d at 854 ("Real property, tangible property, and intangible property, all may be the subject of takings claims.").

Over forty years ago, the United States Supreme Court expressly extended Fifth Amendment protections to legally recognized trade secrets.  *Monsanto*, 467 U.S. at 1003–04.  In *Monsanto*, the Supreme Court considered whether a pesticide inventor, developer, and producer had a cognizable property interest in research and test data the company generated and submitted to the U.S. Environmental Protection Agency (EPA) during the pesticide registration process.  *Id.* at 1000–01.  As authorized by statute, EPA officials used the submitted data to evaluate a competitor's registration application and then published certain data.  *Id.* at 990 (citing Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq.).  Citing state law defining property as including trade secrets protected from disclosure, the Supreme Court held that the claimant had a vested property interest in the intangible asset.  *Id.* at 1002–04.

As in *Monsanto*, applicable local law recognizes trade secrets consistent with the definition of property included in the Restatement of Torts.  In Washington, DC where Vanda is headquartered:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of reasonable efforts to maintain its secrecy.

D.C. Code § 36-401(4) (2024).[12]  Federal law includes a similar definition:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–

---

[12] Under Maryland state law, where the FDA is headquartered, the definition of trade secret is nearly identical.  *See* Md. Code, Com. Law § 11-1201(e).

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C. § 1839(3) (2016). Comparatively cited in *Monsanto*, the Restatement of Torts includes the following definition: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement (First) of Torts § 757 (1939), *quoted with approval in* 467 U.S. at 1001–02. These definitions, as well as the intended confidentiality of trade secret information submitted to the FDA as part of the drug approval process, is codified by the federal agency's regulations. 21 C.F.R. § 20.61(a) (2022) ("A trade secret may consist of any commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort. There must be a direct relationship between the trade secret and the productive process."); *id.* § 20.61(c) ("Data and information submitted or divulged to the [FDA] which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure.").[13]

Notwithstanding the foregoing, Vanda fails to plead a viable Fifth Amendment taking based upon the claimed government disclosures of dissolution specifications and impurities testing and micronization information. The dissolution specifications ultimately adopted for Fanapt® and Hetlioz® were not developed by Vanda or submitted to the FDA. Rather, they were generated by the FDA and proposed to and accepted by Vanda during the NDA process in order to secure approval to market.[14] In turn, the impurities testing and micronization information related to the active pharmaceutical ingredient in Hetlioz® (i.e. tasimelteon) was already in the public domain at the time of the agency's alleged disclosures: Vanda included the cited data in a publicly filed patent application six months before the FDA reportedly used the

[13] The FDA regulation similarly defines (and protects) confidential and privileged commercial and financial information as "valuable data or information which is used in one's business and is of a type customarily held in strict confidence or regarded as privileged and not disclosed to any member of the public by the person to whom it belongs." 21 C.F.R. § 20.61(b).

[14] During oral argument, the government acknowledged that a dissolution specification proffered by a drug manufacturer and approved (as originally submitted) by the FDA "may qualify for some [nondisclosure] protection." ECF 57 at 44–45. The government immediately qualified the statement, explaining: "That's not the case here. That's not to say that we are conceding the matter, but we're not making this argument. I think [the Court's hypothetical presents] a much more complicated argument." *Id.* at 45.

**Appx27**

**CONFIDENTIAL MATERIAL REDACTED**

information in reviewing ANDAs.  Accordingly, defendant is entitled to judgment on the pleadings.[15, 16]

### A.  Dissolution Specifications

Whether an adopted dissolution specification constitutes a property interest cognizable under the Fifth Amendment is an issue of first impression.  In answering this question in the negative, the Court examines Vanda's claims in the context of the governing regulatory scheme, applicable federal and state law, and relevant caselaw.  None support Vanda's claim.

FDA regulations define trade secret as "the end product of either innovation or substantial effort," adding that "[t]here must be a direct relationship between the trade secret and the productive process."   21 C.F.R. § 20.61(a).   The dissolution specifications in issue do not satisfy either criterion.  Vanda did not develop or propose the approved rates to the FDA.  Instead, as captured in the chart below, the FDA rejected Vanda's proffered dissolution rates for both Fanapt® and Hetlioz® and proposed an alternative for each brand-name drug.  Vanda then adopted the FDA-recommended dissolution rates and secured NDA approval.

| Drug | Vanda's Proposed Rate | FDA's Alternative Rate |
|------|----------------------|------------------------|
| Fanapt® | Q = {███}% at {███} minutes | Q = {███}% at {███} minutes |
| Hetlioz® | Q = {███}% at {███} minutes | Q = {███}% at {███} minutes |

While Vanda developed the brand-name drugs, the trade secret and confidential and proprietary information claimed to have been taken by the government was, in fact, proposed and recommended *to Vanda by the FDA*.  Though the FDA used information included in Vanda's NDA to generate the alternative rates, the revised dissolution specifications cannot be said to be the "end product" of Vanda's innovation or effort, let alone directly related to Vanda's productive process.  Logic dictates that the

---

[15] The Court rejects Vanda's assertion that the pending dispositive motion must be limited to trade secret claims due to defendant's alleged failure to separately address Vanda's simultaneous assertions that the contested information also qualifies as confidential and proprietary.  Throughout these proceedings the government's position has been clear: no matter the label, Vanda fails to assert a cognizable property interest in the contested dissolution specifications and impurity testing and micronization information.

[16] In resolving the pending dispositive motion, the Court similarly rejects defendant's blanket assertion that Vanda's reported disclosures of the subject dissolution specifications in collateral litigation extinguishes plaintiff's claims that the information qualifies as a trade secret and confidential and proprietary information.  Vanda's reported disclosures (whether inadvertent or intentional) took place in early 2023—over four years *after* the FDA's purportedly shared the information with Vanda's competitors and over a year *after* the generic drugs hit the marketplace.  By then, any claimed damage was done.  *See CardioVention, Inc. v. Medtronic, Inc.*, 483 F. Supp. 2d 830, 835 (D. Minn. 2007) ("[I]nformation that become[s] publicly available after the time of the misappropriation is irrelevant to the existence of a trade secret at the time of the misappropriation.") (citing *B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500, 505–06 (9th Cir. 2006)).

**CONFIDENTIAL MATERIAL REDACTED**

government cannot be credibly accused of taking information generated by a federal agency in the course of its regulatory review and then proposed to the applicant to secure regulatory approval.  This case is readily distinguishable from *Monsanto*, where the contested trade secret data was wholly generated by the claimant and presented to the regulatory agency.  *See* 467 U.S. at 1002–03 ("Th[e] general perception of trade secrets as property is consonant with a notion of 'property' that extends beyond land and tangible goods and includes the products of an individual's 'labour and invention.'") (citation omitted); *cf. United States v. Fuller*, 409 U.S. 488, 492 (1973) ("[T]he Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain."), *cited in Conti*, 291 F.3d at 1340–41 (no cognizable property right lies in increased property value attributable to revokable permits and licenses).[17]

Further highlighting the implausibility of Vanda's claimed compensable property interest in the dissolution specifications adopted to secure regulatory approval is the disconnect between the alleged trade secret and the company's productive process.  As this case illustrates, dissolution specifications are not unique to the end product or the productive process employed.  In adopting the alternative FDA-recommended dissolution specifications, nothing in the record suggests—nor has there been any representation—that Vanda altered the composition of Fanapt® or Hetlioz® or modified the production of the brand-name drugs.  It cannot be said that there is a direct relationship between the dissolution specification and the productive process if an identical manufacturing process can yield multiple dissolution specifications. In response, Vanda argues the company's proposed dissolution rates were close to the ones the FDA ultimately required: a {██}-minute delta for Hetlioz® and a {██}-percent dissolution delta for Fanapt®.  Proposing dissolution specifications requires more precision than horseshoes and hand grenades particularly where, as here, Vanda claims that the rates are the company's trade secrets and confidential and proprietary information.

In the realm of dissolution specifications for immediate release solid oral drugs, the array of dissolution specifications is narrow.  The specification is generally limited to the following combinations: 75%, 80%, or 85% over 15-, 30-, or 45-minutes.[18]  As

---

[17] On this point, Vanda's citation to *Carpenter v. United States*, 484 U.S. 19 (1987), and *Formax, Inc. v. United States*, 841 F.2d 388 (Fed. Cir. 1988), is not persuasive.  In *Carpenter*, the contested confidential business information was the contents of as yet published financial columns generated by a newspaper reporter, who repeatedly misappropriated the information in a stock tip fraud conspiracy. 484 U.S. at 20–23.  *Formax* involved a terminated employee's theft of company-generated drawings claimed to be trade secrets.  841 F.2d at 389.  The courts in both matters noted that the claimant owned the contested information.  *Carpenter*, 484 U.S. at 26; *Formax*, 841 F.2d at 389.

[18] *See* McAllister et al., *Developing Clinically Relevant Dissolution Specifications for Oral Drug Products—Industrial and Regulatory Perspectives*, PHARMS. at 4 (Dec. 2019) ("For immediate release solid oral dosage forms . . . the mean dissolution of 12 units minus 10%, rounded to the nearest 5%,

**CONFIDENTIAL MATERIAL REDACTED**

illustrated in the chart below, the dissolution specifications included in the generic manufacturers' ANDAs were about as close as Vanda's original NDA proposals to the FDA-sanctioned rates.  And, in Apotex's case, the generic manufacturer was more closely aligned with the FDA's alternative dissolution specification than Vanda.

| Drug | Vanda NDA | Generic ANDA | FDA Approved |
|------|-----------|--------------|--------------|
| Fanapt® | Q = {█}% at {█} minutes | Lupin:  Q = {█}% at {█} minutes | Q = {█}% at {█} minutes |
|  |  | Teva:    Q = {█}% at {█} minutes |  |
| Hetlioz® | Q = {█}% at {█} minutes | Apotex: Q = {█}% at {█} minutes | Q = {█}% at {█} minutes |

Put simply, the FDA-generated and recommended dissolution specifications lack the regulatory hallmarks of a drug manufacturer's trade secret or confidential and proprietary information.[19]

Vanda's claims fare no better under federal and state law.  As quoted *supra*, relevant here, federal and Washington, DC (and Maryland) trade secret laws were enacted to protect scientific formulas, methods, techniques, and processes that derive independent economic value from their secrecy.  18 U.S.C. § 1839(3); D.C. Code § 36-401(4); Md. Code, Com. Law § 11-1201(e); *cf. Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 771 (4th Cir. 2023) ("[F]or information to constitute a 'trade secret' under Virginia and federal law, it must '[d]erive[ ] independent economic value' from its secrecy.") (quoting Va. Code § 59.1-336; 18 U.S.C. § 1839(3)(B)).  Contrary to the arguments advanced by Vanda, there is no inherent independent economic value in a drug's dissolution specification.  Nor can the FDA be reasonably expected to withhold from generic manufacturers the dissolution specifications generated by the agency and provided to the brand manufacturer in carrying out its regulatory obligation of ensuring bioequivalence between brand-name and generic drugs.

Vanda's assertion that the FDA-recommended dissolution specification of a brand-name drug provides generic manufacturers significant insight and information about the manufacturing process is undermined by the reality of the situation and

---

should be used as the Q value and set as Q = 75%, 80% or 85% in 15/30/45 min."), *available at* https://perma.cc/5ZFY-BCQJ (last visited Dec. 31, 2024); U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances*, at 8 (Aug. 2018) ("For immediate release solid oral drug products containing a high solubility drug substance . . . the dissolution criterion is Q=80% in 30 minutes."), *quoted in Collaza v. Johnson & Johnson Consumer, Inc.*, No. 23-6030, 2024 WL 3965933, at *2 (S.D.N.Y. Aug. 27, 2024), *appeal docketed*, No. 24-2568 (2d Cir. Sept. 27, 2024), *and Musikar-Rosner v. Johnson & Johnson Consumer Inc.*, No. 23-11746, 2024 WL 3596897, at *4 (D. Mass. July 31, 2024), *and Bischoff v. Albertsons Cos.*, 678 F. Supp. 3d 518, 524 (S.D.N.Y. 2023). During oral argument Vanda's counsel suggested that a 20- or 60-minute interval could be used, raising the total standard combinations from nine to fifteen.  ECF 57 at 94–95.

[19] As discussed *infra*, Vanda's assertions that the FDA-generated and recommended dissolution specifications qualify as the company's confidential and privileged information seemingly fail for the additional reason that they have no inherent independent value as required under 21 C.F.R. § 20.61(b).

the facts presented.  Because the brand-name drug is first to market, generic manufacturers can determine, or at least approximate, the dissolution rate through independent lab testing.  This is particularly true where, as here, the dissolution test method is publicly available for replication.[20]  Moreover, the record presented strongly suggests that, like Vanda, none of the generic manufacturers modified the composition, dosage, form, strength, or performance characteristics of their drugs after the FDA recommended an alternative dissolution specification.  They simply revised their originally proposed specifications to reflect the FDA-generated and approved dissolution specification.[21]  As such, no independent economic value can be readily ascribed to the claimed information.

Vanda's assertions of proprietary secrecy in the dissolution specifications in issue further run afoul of the FDA's regulatory authority and obligations of ensuring bioequivalence in brand-name and generic drugs and in uniformly treating market competitors.  To this end, the FDA's dissolution testing guidelines publicly state: "In the case of a generic drug product, the dissolution specifications are generally the same as the reference listed drug (RLD) [or brand-name drug]."[22]  It is seemingly impractical if not impossible for the FDA to align dissolution specifications between brand-name and generic drugs if the agency is prohibited from accessing or referencing the NDA-approved dissolution specification in its subsequent ANDA review.[23]  As initially raised in the Court's prior decision in this matter:

> [W]ithout comparing the data and information of an approved NDA to the proposed data and information included in a generic's ANDA under review, the FDA may authorize inconsistent results. In that case, Vanda might claim the FDA improvidently delayed the brand[-]name product to market or, in the alternative, hastened the generic drug's review and approval. The FDA could also reject a generic's proposed dissolution

---

[20] *Compare* ECF 29-2 at 3 (Lupin dissolution testing data), *with* U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing and Acceptance Criteria for Immediate-Release Solid Oral Dosage Form Drug Products Containing High Solubility Drug Substances*, at 7–8 (Aug. 2018) (Standard Dissolution Testing Conditions).

[21] *Compare* ECF 29-1 at 102–03 (Fanapt®) *and* ECF 29-3 at 6–9 (Hetlioz®), *with* ECF 29-2 at 2–6 (Lupin) *and* ECF 29-4 at 3–4 (Teva) *and* ECF 29-5 at 8 (Apotex).  This comparative information was referenced in Vanda's complaint.  *See* ECF 1 at 19–20, 33.

[22] *See* U.S. Department of Health & Human Services, Food & Drug Administration, Center for Drug Evaluation & Research, *Guidance for Industry: Dissolution Testing of Immediate Release Solid Oral Dosage Forms* at 3 (Aug. 1997), *available at* https://perma.cc/K4QU-3EXX (last visited Dec. 31, 2024).

[23] On this point, agency guidance further provides: "Once the specifications are established in an NDA, the dissolution specifications for batch-to-batch quality assurance are published in the United States Pharmacopeia (USP) as compendial standards, which become the official specifications for all subsequent [immediate release] products with the same active ingredients."  *Id.* at 2.  During oral argument counsel clarified that Vanda did not consent to the "optional" USP publication.  ECF 57 at 27 (government), 81–82 (Vanda).

> specification previously accepted for a brand manufacturer or another generic, subjecting the agency to accusations of delaying a generic drug's approval.

*Vanda*, 169 Fed. Cl. at 206.  *See Am. Wild Horse Preservation Campaign v. Perdue,* 873 F.3d 914, 927–28 (D.C. Cir. 2017) (federal agency's failure to acknowledge or explain departure from past practice found "arbitrary and capricious") (citing cases). Despite advanced notice of the Court's practical considerations, Vanda has failed to allay these concerns.[24]  The FDA-recommended dissolution specifications adopted by Vanda to gain approval to bring the brand-name drugs to market necessarily served as the benchmarks for the FDA's subsequent ANDA reviews and approvals of generic drugs.  As such, Vanda's claimed proprietary interest in this regulatory-generated data is unfounded.[25]

### B. Impurities Testing

On July 6, 2017, Vanda publicly filed U.S. Patent Application No. 2017/ 0190683 A1, titled Highly Purified Pharmaceutical Grade Tasimelteon.  The abstract provides: "A process for preparing a batch of highly purified, pharmaceutical grade tasimelteon comprises analyzing a batch of tasimelteon synthesized under [good manufacturing practice (GMP)] conditions for the presence of one or more identified impurities."[26]  Under Field of the Invention, Vanda's patent application states: "The disclosure relates generally to the synthesis of tasimelteon.  In some embodiments, impurities, which may be by-products or degradation products, are analyzed and controlled in order to keep the impurities below pre-set specifications."[27]

---

[24] In fact, in ongoing collateral litigation, Vanda seeks to invalidate the FDA's approval of MSN's generic version of Hetlioz® (tasimelteon), citing the federal agency's claimed failure to compare the proffered dissolution specification and other bioequivalence data to the brand-name drug (a/k/a RLD) and an FDA-approved generic drug.  *See Vanda Pharms., Inc. v. FDA*, No. 23-2812 (D.D.C.) (ECF 24-1 at 33 filed Apr. 22, 2024).  The government's counterargument in that case—that "there is no *requirement* that the agency look outside the confines of the ANDA" so long as the FDA performs the necessary due diligence and treats all applicants equally, *see id.* (ECF 27-1 at 21–22 filed May 20, 2024) (emphasis in original)—does not move the proverbial needle on this issue in Vanda's direction. *See* ECF 57 at 106–07 ("THE COURT: So to the extent that they are arguing the opposite of what they're arguing today, Vanda seems to be doing the same of no, no, you have to look at that stuff and you have to make sure that they're bioequivalent.").

[25] The fact that the FDA redacted the dissolution specifications in response to a FOIA request— perhaps out of an abundance of caution—does not confer on Vanda a compensable Fifth Amendment property interest in the information.  Put simply, an agency's FOIA redaction policies and practices— as well as a specific employee's good faith adherence to them—are not dispositive regarding the Court's independent conclusion that the FDA-generated and recommended dissolution specifications are not trade secrets or protected confidential or proprietary information.

[26] *See* https://perma.cc/NM95-EZ9Z at 1 (last visited Dec. 31, 2024).  As noted *supra*, the USPTO granted Vanda's patent (U.S. Patent No. 10,829,465 B2) on November 10, 2020.

[27] *Id.* at 2.

**CONFIDENTIAL MATERIAL REDACTED**

The Summary of the Invention and Detailed Description of the Invention go on to identify specific impurities generally found in tasimelteon through testing, claiming Vanda's ability to purify the bulk drug substance to within fixed acceptable levels.[28]

Six months later, on January 31, 2018, Teva submitted ANDA No. 211601 for generic Hetlioz® (tasimelteon). That same day, Apotex followed with ANDA No. 211607. Citing Vanda's July 6, 2017 patent application, the agency inquired whether Teva and Apotex were likewise capable of detecting, quantifying, and controlling specified impurities in the drug and, if so, instructed the generic manufacturers to produce supporting data, including limits of detection and quantification and linearity. Vanda maintains that referencing the brand manufacturer's patent application in the course of Teva's and Apotex's ANDA reviews improperly or, at a minimum, improvidently revealed a trade secret and proprietary and confidential information: the fact that Vanda {██████████} in its production of Hetlioz®.

Under similar circumstances, the Supreme Court stated: "Information that is public knowledge or that is generally known in an industry cannot be a trade secret. If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Monsanto*, 467 U.S. at 1002 (citations omitted). In the patent context, the Federal Circuit aptly explained:

> "It is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain. Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law."

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (quoting *Stutz Motor Car of Am. v. Reebok Int'l*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (additional citation omitted)). Comparing the detailed information included in Vanda's patent application with the more general inquiry the FDA posed to Teva and Apotex regarding the generic manufacturers' comparable capabilities does not yield the improper disclosure of any novel or unknown part of Vanda's production process. *See, e.g., Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) ("In some cases, a novel or unique combination of elements may constitute a trade secret. However, as here, 'mere variations on widely used [information] cannot be trade secrets.' . . . 'Simply to assert a trade secret resides in some combination of otherwise known data, is not sufficient . . . .'") (citations omitted). Accordingly, Vanda's claimed trade secret and confidential and proprietary interest in the brand manufacturer's self-publicized impurities

---

[28] *Id.* at 3–12.

**CONFIDENTIAL MATERIAL REDACTED**

testing information involving the precise drug in issue (tasimelteon) fails to plead a viable Fifth Amendment takings claim.

### C. Micronization

Next, Vanda claims the FDA further disclosed to Teva and Apotex the brand manufacturer's trade secret and confidential and proprietary interest in particle size control techniques used in milling the active pharmaceutical ingredient in Hetlioz® (tasimelteon). In support, Vanda cites the FDA's July 12, 2018 responses to Teva's and Apotex's January 31, 2018 ANDAs, wherein the federal agency: suggested that tasimelteon "may be subject to micronization" and, upon that assumption, directed the generic manufacturers to describe their micronization procedures and submit batch and stability data. ECF 29-7 at 2 (FDA letter to Teva); *accord* ECF 29-6 at 3 (FDA letter to Apotex inquiring whether their generic drug "may be subject to any particle size reduction"). Vanda also cites an internal FDA memorandum reviewing Teva's ANDA, wherein the federal agency documented: "The [generic drug substance (DS)] is {▮▮▮▮▮▮} . . . . [The reference listed drug (RLD)] is {▮▮▮▮▮▮}."[29] ECF 47-4 at 4.

Vanda's micronization-based claims fail for the same reason as their impurities testing claims: Vanda's July 6, 2017 Highly Purified Pharmaceutical Grade Tasimelton patent application, discussed *supra*, specifies the brand manufacturer's particle size reduction techniques—including {▮▮▮▮}. In fact, the publicly filed patent application describes the particle size reduction techniques {▮▮▮▮▮} in preparing highly purified, pharmaceutical grade tasimelteon in greater detail than included in the cited FDA correspondence.[30] The fact that Teva's generic drug is {▮▮▮▮} rather than {▮▮▮▮} does not preclude the FDA from inquiring about comparable capabilities derived from other techniques highlighted in related patent applications or discussed in scientific literature. Under the caselaw summarized in the previous section, no cognizable Fifth Amendment takings claim can be based on a government agency's regulatory use of information already made public by its reported owner.[31]

---

[29] Nothing in the record presented suggests the internal FDA memorandum was shared with Vanda's competitors or otherwise made public. Further, contrary to Vanda's current assertion, the Court does not ascribe nefarious intent to the agency's decision to redact the above-quoted second sentence in a collateral FOIA response. ECF 47-4 at 4 ("NOT for FOIA: RLD is {▮▮▮▮▮}"). The unredacted version of this document was produced in discovery in this case.

[30] *See, e.g.*, https://perma.cc/8TF3-E3H9 at 10 ("It has been found that use of a jet mill and a dry nitrogen atmosphere is advantageous in achieving uniform particle size with good handling characteristics and minimal loss.") (last visited Dec. 31, 2024); *id.* at 11–12 ("A process for preparing a batch of highly purified tasimelteon that comprises . . . milling the tasimelteon to meet particle size specifications . . . .").

[31] Vanda's reliance upon a cherry-picked quote in *Delice Global, Inc. v. Coco Int'l, Inc.*, No. 90-3541, 2009 WL 2905466 (D.N.J. Sept. 9, 2009), is misplaced and otherwise unpersuasive. In *Delice Global*,

## III.    Leave to Amend

In closing out its brief, Vanda generally requests leave to amend its complaint to allege additional facts in the event the Court is inclined to grant defendant's dispositive motion.  Vanda does not, however, proffer what those facts are or otherwise tie them to the record currently before the Court or the fundamental issues resolved today.  Three months later—after the Court scheduled oral argument—Vanda filed a motion to compel discovery.  The discovery demanded relates back to Vanda's initial request to produce documents, propounded in February 2024 following the Court's partial dismissal of Vanda's claims.  As with the conditional request to amend, Vanda's motion to compel is not focused on the foundational issues raised in the dispositive motion addressed herein—i.e., Vanda's claimed compensable property interests in the dissolution specifications and impurities testing and micronization information.  Instead, the broad production request seeks documents pertaining to the FDA's regulatory review of Vanda's NDAs and several generics' ANDAs as well as the federal agency's suspected disclosures to third parties.[32]  Vanda's entitlement to these documents presumes that which the Court finds critically lacking: a compensable Fifth Amendment property interest.  This litigative approach is particularly troubling given that the Court placed Vanda on formal written notice a year ago regarding the perceived shortcomings of the brand manufacturer's claimed property interests in the contested data and information.

To be clear, defendant's apparent slow-walking and eventual suspension of the FDA's responses to Vanda's discovery request does not represent the government's finest hour.  Prior to filing the dispositive motion decided herein, defendant informally requested a stay of discovery.  It was denied.  In a compromise proposed by the Court, defendant agreed to continue producing documents in response to Vanda's pending production request in exchange for plaintiff's agreement not to propound further discovery.  The arrangement was expected to continue throughout briefing and the Court's resolution of defendant's dispositive motion.  After several months of production, and coinciding with the completion of briefing in July 2024, document production unjustifiably ceased.  Following an exchange of formal discovery letters initiated by plaintiff, and the scheduling of oral argument on defendant's

---

the district court distinguished between a product's recipe and the patented device used to manufacture it, stating: "a patent regarding an instrument of production does not preclude the assertion of a trade secret concerning the formula of production." *Id.* at \*5.  Here, the FDA did not share the formula Vanda used to produce Hetlioz®.  Rather, the regulatory agency simply asked the generic manufacturers about their respective capabilities regarding what Vanda publicly described as "advantageous" techniques "in achieving uniform particle size [in tasimelton] with good handling characteristics and minimal loss."  *Compare* ECF 29-7 at 2 (FDA letter to Teva) *and* ECF 29-6 at 3 (FDA letter to Apotex), *with* https://perma.cc/8TF3-E3H9 at 10 (Vanda's patent application) (last visited Dec. 31, 2024).

[32] Vanda's production request also seeks documents related to drugs never in issue in this case as well as claims previously dismissed by this Court.

dispositive motion,[33] the discovery dispute was brought to the Court's attention. The more judicious approach would have been for the government to file a renewed (formal) motion to stay discovery pending the once-briefed dispositive motion. Nevertheless, given the disconnect between the requested discovery and the factual and legal issues material to the resolution of this case, Vanda's demand for additional documents must fail. *See Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery*, not to find out if it has any basis for a claim. That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request") (emphasis in original; collecting cases).

At bottom, the Court concludes Vanda's generic (and provisional) request for leave to file an amended complaint and subsequent motion to compel discovery are insufficient and futile efforts to further prolong this case. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed. Cir. 2006) ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.") (citing cases); *Shoshone Indian Tribe of the Wind River Rsrv., Wyoming v. United States*, 71 Fed. Cl. 172, 176 (2006) ("Where the proposed amendment would be subject to the same legal defect found by the court to justify dismissal of claims under the original complaint, leave to amend may be denied.") (first citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1333 (Fed. Cir. 2000); and then citing *Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1404 (Fed. Cir. 1989)). Vanda simply cannot overcome the fundamental hurdles that the dissolution specifications and impurities testing and micronization information do not constitute cognizable property interests under the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings (ECF 29) is GRANTED. Plaintiff's provisional request for leave to file an amended complaint (ECF 47) and motion to compel discovery (ECF 51) are DENIED. The Clerk of Court is directed to enter judgment accordingly. No costs.

---

[33] The Court proposed to schedule oral argument in mid-November 2024. At the parties' joint request, the matter was continued to December 17, 2024.

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge

22

**Appx37**

# In the United States Court of Federal Claims

**No. 23-629 C**
**Filed: January 8, 2025**

```
************************************
VANDA PHARMACEUTICALS, INC.,    *
            Plaintiff,          *               JUDGMENT
                                *
        v.                      *
                                *
THE UNITED STATES,              *
            Defendant.          *
************************************
```

  Pursuant to the court's Opinion and Order, filed January 7, 2025, granting defendant's motion for judgment on the pleadings,

  IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant. No costs.

Lisa L. Reyes
Clerk of Court

By: s/ Ashley Reams
   Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, *see* RCFC 58.1, re number of copies and listing of all plaintiffs. Effective December 1, 2023, the appeals fee is $605.00.

**Appx38**

# US Court of Federal Claims
# United States Court of Federal Claims (COFC)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00629-AOB

VANDA PHARMACEUTICALS, INC. v. USA
Assigned to: Judge Armando O. Bonilla
Case in other court: 25-01434
Cause: 28:1491 Tucker Act

Date Filed: 05/01/2023
Date Terminated: 01/08/2025
Jury Demand: None
Nature of Suit: 514 Taking - Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**VANDA PHARMACEUTICALS, INC.**    represented by    **Paul Whitfield Hughes , III**
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
202-756-8988
Email: phughes@mwe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**    represented by    **Borislav Kushnir**
U.S. Department of Justice - Civil Division
(G)
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
202-307-5928
Fax: 202-353-0461
Email: steven.kushnir@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Igor Helman**
Federal Communications Commission
Office of General Counsel
45 L Street NE
Washington, DC 20554
202-418-7182
Email: igor.helman@usdoj.gov
*TERMINATED: 08/30/2024*

**John Jacob Todor**
U.S. Securities and Exchange Commission
100 F Street, N.E.

**Appx39**

Washington, DC 20549
202-746-1016
Email: todorj@sec.gov
*TERMINATED: 11/15/2023*

**Amicus**

**ASSOCIATON FOR ACCESSIBLE MEDICINES**              represented by   **Joshuah Turner**
Goodwin Procter LLP
1900 K Street NW
Washington, DC 20036
571-230-8184
Email: joshuahturner@goodwinlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/01/2023 | 1 | COMPLAINT against USA (514) (Filing fee $402, Receipt number AUSFCC-8683145) (Copy Served Electronically on Department of Justice), filed by VANDA PHARMACEUTICALS, INC..**Answer due by 6/30/2023.** (Attachments: # 1 Civil Cover Sheet)(py) (Entered: 05/02/2023) |
| 05/02/2023 | 2 | Notice of Random Assignment Pursuant to Rule 40.1(a) to Judge Armando O. Bonilla. (py) (Entered: 05/02/2023) |
| 05/02/2023 | 3 | NOTICE of Designation of Electronic Case. (py) (Entered: 05/02/2023) |
| 05/26/2023 | 4 | NOTICE of Appearance by John Jacob Todor for USA . (Todor, John) (Entered: 05/26/2023) |
| 06/21/2023 | 5 | Consent MOTION for Extension of Time until 7/31/2023 to File Answer re 1 Complaint, , filed by USA.**Response due by 7/5/2023.**(Todor, John) (Entered: 06/21/2023) |
| 06/21/2023 | 6 | ORDER granting defendant's 5 Unopposed Motion for an Enlargement of Time. Defendant shall **FILE** an Answer or dispositive motion on or before **July 31, 2023**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 06/21/2023) |
| 08/01/2023 | 7 | MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by USA.**Response due by 8/29/2023.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Todor, John) **Filed by leave of the Judge.** (Entered: 08/01/2023) |
| 08/01/2023 | 8 | ORDER: The Clerk of Court is directed to **FILE** by leave of the Court defendant's 7 Motion to Dismiss effective August 1, 2023. Accordingly, plaintiff's response is due on **August 29, 2023**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 08/01/2023) |
| 08/16/2023 | 9 | Consent MOTION for Extension of Time until 9/28/2023 to File Response as to 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by VANDA PHARMACEUTICALS, INC..**Response due by 8/30/2023.**(Hughes, Paul) (Entered: 08/16/2023) |
| 08/16/2023 | 10 | ORDER **granting** 9 Motion for an Enlargement of Time is **GRANTED**. Plaintiff shall **FILE** their Response to Defendant's 7 Motion to Dismiss on or before **September 28, 2023**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 08/16/2023) |

| | | |
|---|---|---|
| 09/28/2023 | 11 | RESPONSE to 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by VANDA PHARMACEUTICALS, INC..**Reply due by 10/12/2023.** (Hughes, Paul) (Entered: 09/28/2023) |
| 10/05/2023 | 12 | Consent MOTION for Extension of Time until 10/26/2023 to File Reply as to 11 Response to Motion [Dispositive], 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by USA.**Response due by 10/19/2023.**(Todor, John) (Entered: 10/05/2023) |
| 10/05/2023 | 13 | ORDER: Defendant's 12 Unopposed Motion for an Enlargement of Time is **GRANTED**. Defendant shall **FILE** their Reply to Plaintiff's 11 Response to Defendant's Motion to Dismiss on or before **October 26, 2023**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 10/05/2023) |
| 10/26/2023 | 14 | REPLY to Response to Motion re 7 MOTION to Dismiss pursuant to Rules 12 (b)(1) and (6) , filed by USA. (Todor, John) (Entered: 10/26/2023) |
| 11/15/2023 | 15 | NOTICE of Appearance by Igor Helman for USA . (Helman, Igor) (Entered: 11/15/2023) |
| 12/11/2023 | 16 | ORDER: The Court hereby **SCHEDULES** Oral Argument for **Monday, January 8, 2024, at 10:00 AM (EST)**. The proceeding will be held at the Howard T. Markey National Courts Building, 717 Madison Place, NW, Washington, DC. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 12/11/2023) |
| 01/08/2024 | | Minute Entry - Was the proceeding sealed to the public? No. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, D.C. 1/8/2024 before Judge Armando O. Bonilla: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(ead) (Entered: 01/08/2024) |
| 01/18/2024 | 17 | OPINION AND ORDER: Defendant's 7 motion to dismiss is **DENIED-IN-PART** and **GRANTED-IN-PART** as follows: defendant's motion to dismiss Count I (Fifth Amendment taking) is **DENIED**; and defendant's motion to dismiss Count II (breach of contract) and plaintiff's claims involving Inventia are **GRANTED**. In accordance with RCFC 12(a)(4)(A)(i), defendant shall file an answer on or before **February 1, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 01/18/2024) |
| 01/26/2024 | 18 | Notice of Filing Certified Transcript for proceedings held on January 8, 2024 in Washington, D.C. (ac7) (Entered: 01/26/2024) |
| 01/26/2024 | 19 | CERTIFIED TRANSCRIPT of proceedings held on January 8, 2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-149. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 2/2/2024. Redacted Transcript Deadline set for 2/23/2024. Release of Transcript Restriction set for 4/22/2024. (ac7) (Entered: 01/26/2024) |
| 01/30/2024 | 20 | Unopposed MOTION for Extension of Time until 3/1/2024 to File Answer re 1 Complaint, , filed by USA.**Response due by 2/13/2024.**(Helman, Igor) (Entered: 01/30/2024) |
| 01/30/2024 | 21 | ORDER granting defendant's 20 unopposed motion for an enlargement of time. Defendant shall **FILE** an answer on or before **March 1, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 01/30/2024) |
| 02/29/2024 | 22 | ORDER: The Clerk of Court is directed to **FORWARD** to the Court Reporter the transcript for the oral argument conducted on January 8, 2024 (ECF 19). The corrected transcript shall be **REFILED** as corrected. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Main Document 22 replaced on 3/5/2024 to correct order) (py). (Entered: 02/29/2024) |

| 03/01/2024 | 23 | ANSWER to 1 Complaint, , filed by USA.**JPSR due by 4/19/2024.**(Helman, Igor) (Entered: 03/01/2024) |
|---|---|---|
| 03/07/2024 | 24 | Notice of Filing Corrected Transcript for proceedings held on January 8, 2024 re: 19 Certified Transcript. (ac7) (Entered: 03/07/2024) |
| 03/07/2024 | 25 | CORRECTED TRANSCRIPT of proceedings held on January 8, 2024. To order a copy of the corrected transcript and for the Release of Transcript Restriction date, see docket text of 19 Certified Transcript. (ac7) (Entered: 03/07/2024) |
| 04/19/2024 | 26 | JOINT PRELIMINARY STATUS REPORT , filed by VANDA PHARMACEUTICALS, INC.. (Hughes, Paul) (Entered: 04/19/2024) |
| 04/22/2024 | 27 | ORDER: The Court hereby **SCHEDULES** a status conference for **Tuesday, April 23, 2024, at 11:00 AM (EDT)**. The proceeding will be held telephonically and counsel for each party will be provided with the dial-in information. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 04/22/2024) |
| 04/22/2024 | | Scheduled Proceeding Hearing Set: Status Conference set for 4/23/2024 11:00 AM in Chambers/VTC (Zoom-Telephonic) before Judge Armando O. Bonilla. (fm) (Entered: 04/22/2024) |
| 04/23/2024 | | Minute Entry - Was the proceeding sealed to the public? No. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, DC 4/23/2024 before Judge Armando O. Bonilla: **Preliminary Scheduling Conference.** . [Total number of days of proceeding: 1]. Official record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE. (ead) Modified on 4/23/2024 to edit docket text. (py) (Entered: 04/23/2024) |
| 04/23/2024 | 28 | **SCHEDULING ORDER**: On April 23, 2024, the Court held a preliminary scheduling conference to discuss the parties' joint preliminary status report filed on April 19, 2024 ECF 26 . Defendant shall **FILE** a motion for judgment on the pleadings pursuant to RCFC 12(c) and/or for summary judgment pursuant to RFC 56 on or before **April 30, 2024**; Plaintiff shall **FILE** a response to defendant's dispositive motion on or before **May 30, 2024**. Defendant shall **FILE** a reply brief on or before **June 13, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 04/23/2024) |
| 04/30/2024 | 29 | **SEALED** MOTION for Judgment on the Pleadings , filed by USA.**Response due by 5/30/2024.** (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Helman, Igor) Modified on 5/1/2024 to update response date pursuant to order. (py) (Entered: 04/30/2024) |
| 05/01/2024 | 30 | **ORDER**: The Court hereby **SCHEDULES** a status conference for **Monday, May 6, 2024, at 2:00 PM (EDT)**. The proceeding will be held telephonically and counsel for each party will be provided with the dial-in information. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 05/01/2024) |
| 05/01/2024 | | Scheduled Proceeding Hearing Set: PROCEEDING SEALED. Status Conference set for 5/6/2024 02:00 PM in Chambers/VTC (Zoom-Telephonic) before Judge Armando O. Bonilla. (py) (Entered: 05/01/2024) |
| 05/06/2024 | | Minute Entry - Was the proceeding sealed to the public? Yes. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, DC 5/6/2024 before Judge Armando O. Bonilla: **Status Conference**. [Total number of days of proceeding: 1]. Official record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE.(ead) (Entered: 05/06/2024) |

**Appx42**

| 05/06/2024 | 31 | **ORDER**: The parties' joint request to enter a protective order is **GRANTED**. Plaintiff's request for the inclusion of broader disclosure language is **DENIED** without prejudice. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 05/06/2024) |
| --- | --- | --- |
| 05/06/2024 | 32 | **PROTECTIVE ORDER** re 31 . Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 05/06/2024) |
| 05/07/2024 | 33 | Notice of Filing Certified Transcript for proceedings held on April 23, 2024 in Washington, D.C. (aoc). (Entered: 05/07/2024) |
| 05/07/2024 | 34 | CERTIFIED TRANSCRIPT of proceedings held on 04/23/2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-24. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 5/14/2024. Redacted Transcript Deadline set for 6/4/2024. Release of Transcript Restriction set for 8/2/2024. (aoc) (Entered: 05/07/2024) |
| 05/08/2024 | 35 | Notice of Filing Certified Transcript for proceedings held on May 6, 2024 in Washington D.C. (aoc). (Entered: 05/08/2024) |
| 05/08/2024 | 36 | **SEALED**CERTIFIED TRANSCRIPT of Proceedings held on 05/06/2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-34.To the parties in the case only: to order a copy of the transcript, click HERE; and Release of Transcript Restriction set for 8/5/2024. (aoc) (Entered: 05/08/2024) |
| 05/10/2024 | 37 | **ORDER**: The Clerk of Court is directed to **FORWARD** to the Court Reporter the transcript for the status conference conducted on May 6, 2024 (ECF 36 ) and the corrected transcript shall be **REFILED** as corrected under seal. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 05/10/2024) |
| 05/15/2024 | 38 | Notice of Filing Corrected Transcript for proceedings held on 05/06/2024 re: 36 Certified Transcript,. (aoc). Modified on 5/16/2024 to correct proceeding date.(py) (Entered: 05/15/2024) |
| 05/15/2024 | 39 | **SEALED**CORRECTED TRANSCRIPT of proceedings held on 05/06/2024. To order a copy of the corrected transcript and for the Release of Transcript Restriction date, see docket text of 36 Certified Transcript,. (aoc). (Entered: 05/15/2024) |
| 05/21/2024 | 40 | MOTION to Amend Schedule , filed by VANDA PHARMACEUTICALS, INC..**Response due by 6/4/2024.**(Hughes, Paul) (Entered: 05/21/2024) |
| 05/22/2024 | 41 | **ORDER** granting 40 motion for an enlargement of time. Plaintiff shall **FILE** their response to defendant's motion for judgment on pleadings (ECF 29 ) on or before **June 20, 2024**; and defendant shall **FILE** a reply brief on or before **July 3, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 05/22/2024) |
| 06/11/2024 | 42 | REDACTED DOCUMENT redacting 29 Motion for Judgment on the Pleadings,, filed by USA. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Helman, Igor) (Entered: 06/11/2024) |
| 06/18/2024 | 43 | Consent MOTION for Extension of Time until 7/22/24 to File Response as to 29 MOTION for Judgment on the Pleadings *and Reply until 8/26/24*, filed by VANDA PHARMACEUTICALS, INC..**Response due by 7/2/2024.**(Hughes, Paul) (Entered: 06/18/2024) |
| 06/18/2024 | 44 | **ORDER** granting plaintiff's 43 unopposed motion for an enlargement of time (ECF 43 ) is **GRANTED**. Plaintiff shall **FILE** their response to defendant's motion for judgment on pleadings (ECF 29) on or before **July 22, 2024**. Defendant shall **FILE** a reply brief on or |

| | | |
|---|---|---|
| | | before **August 26, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 06/18/2024) |
| 06/28/2024 | 45 | MOTION for Leave to File Amicus Brief , filed by Association for Accessible Medicines.**Response due by 7/12/2024.** (Attachments: # 1 Proposed Amicus Brief, # 2 Rule 7.1 Disclosure Statement)(Turner, Joshuah) **FILED BY LEAVE OF THE COURT.** (Entered: 06/28/2024) |
| 07/15/2024 | 46 | **ORDER** granting the Association for Accessible Medicines' (AAM) 45 motion for leave to file an amicus curiae brief. The Clerk of Court is directed to **ADD** AAM as an amicus curiae party in this matter. The Clerk of Court is directed to **FILE** by leave of the Court AAM's brief (ECF 45-1) and Rule 7.1 Disclosure Statement (ECF 45-2); The remaining deadlines included in the Courts April 23, 2024 scheduling order (ECF 28), as amended on May 22, 2024 (ECF 41) and June 18, 2024 (ECF 44), remain in effect. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 07/15/2024) |
| 07/22/2024 | 47 | **\*\*SEALED\*\*RESPONSE to 29 MOTION for Judgment on the Pleadings , filed by VANDA PHARMACEUTICALS, INC.. **Reply due by 8/26/2024.** (Attachments: # 1 Affidavit Declaration of Mark Robbins, # 2 Affidavit Declaration of Paul W. Hughes, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(Hughes, Paul) Modified on 7/23/2024 defendant's reply date pursuant to the scheduling order (py). (Entered: 07/22/2024) |
| 08/26/2024 | 48 | **\*\*SEALED\*\*REPLY to Response to Motion re 29 MOTION for Judgment on the Pleadings , filed by USA.(Helman, Igor) (Entered: 08/26/2024) |
| 08/30/2024 | 49 | NOTICE of Appearance by Borislav Kushnir for USA . (Kushnir, Borislav) (Entered: 08/30/2024) |
| 10/17/2024 | 50 | **ORDER:** The Court hereby **SCHEDULES** Oral Argument for **Tuesday, December 17, 2024, at 10:00 AM (EST)**. The proceeding will be held at the Howard T. Markey National Courts Building, 717 Madison Place, NW, Washington, DC. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 10/17/2024) |
| 10/21/2024 | | Scheduled Proceeding Hearing Set: PROCEEDING SEALED. REPORTER PRESENT. Oral Argument set for 12/17/2024 10:00 AM in Courtroom 8 before Judge Armando O. Bonilla. (tb) (Entered: 10/21/2024) |
| 10/21/2024 | 51 | MOTION to Compel *Discovery*, filed by VANDA PHARMACEUTICALS, INC..**Response due by 11/4/2024.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Hughes, Paul) (Entered: 10/21/2024) |
| 10/31/2024 | 52 | MOTION for Extension of Time until 11/18/2024 to File Response as to 51 MOTION to Compel *Discovery* , filed by USA.**Response due by 11/14/2024.**(Kushnir, Borislav) (Entered: 10/31/2024) |
| 11/06/2024 | 53 | **ORDER** granting defendant's 52 motion for an enlargement of time. Defendant shall FILE their response to plaintiffs motion to compel discovery (ECF 51) on or before November 18, 2024. Plaintiff shall **FILE** their reply to defendant's response on or before **November 25, 2024**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 11/06/2024) |
| 11/18/2024 | 54 | RESPONSE to 51 MOTION to Compel *Discovery* , filed by USA.**Reply due by 11/25/2024.** (Kushnir, Borislav) (Entered: 11/18/2024) |
| 11/25/2024 | 55 | REPLY to Response to Motion re 51 MOTION to Compel *Discovery* , filed by VANDA PHARMACEUTICALS, INC.. (Hughes, Paul) (Entered: 11/25/2024) |

**Appx44**

| | | |
|---|---|---|
| 12/17/2024 | | **Minute Entry -** Was the proceeding sealed to the public? Yes. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, DC on **Tuesday, December 17, 2024** before Judge Armando O. Bonilla: **Oral Argument**. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(ead) (Entered: 12/17/2024) |
| 12/19/2024 | 56 | Notice of Filing Certified Transcript for proceedings held on December 17, 2024 in Washington, D.C. (aoc) (Entered: 12/19/2024) |
| 12/19/2024 | 57 | **SEALED**CERTIFIED TRANSCRIPT of Proceedings held on December 17, 2024 before Judge Armando O. Bonilla. Total No. of Pages: 1-158.To the parties in the case only: to order a copy of the transcript, click HERE; and Release of Transcript Restriction set for 3/17/2025. (aoc) (Entered: 12/19/2024) |
| 01/07/2025 | 58 | **SEALED** **OPINION AND ORDER:** Defendant's motion for judgment on the pleadings (ECF 29 ) is **GRANTED**. Plaintiff's provision request for leave to file an amended complaint (ECF 47 ) and motion to compel discovery (ECF 51 ) are **DENIED**. The Clerk of Court is directed to enter judgment accordingly. No costs. *This decision is filed under seal in accordance with the protective order entered in this case. Withinten days, on or before **January 17, 2025**, the parties shall jointly submit any proposed redactions accompanied by a concise explanation.* Signed by Judge Armando O. Bonilla. (ead)Copy to parties. (Entered: 01/07/2025) |
| 01/08/2025 | 59 | JUDGMENT entered pursuant to Rule 58, that judgment is entered in favor of defendant. No costs. (Service on parties made.) (ar) (Entered: 01/08/2025) |
| 01/17/2025 | 60 | **ORDER:** The Clerk of Court is directed to **FORWARD** to the Court Reporter the transcript for the oral argument conducted on December 17, 2024 (ECF 57). The corrected transcript shall be **REFILED** as corrected under seal. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 01/17/2025) |
| 01/17/2025 | 61 | **SEALED**NOTICE, filed by VANDA PHARMACEUTICALS, INC., USA re 58 Order on Motion to Compel,,, Order on Motion for Judgment on the Pleadings,,, Sealed Opinion/Order,, . (Attachments: # 1 Proposed Redactions)(Kushnir, Borislav) (Entered: 01/17/2025) |
| 01/22/2025 | 62 | **OPINION AND ORDER** *reissued* 58 **SEALED** OPINION AND ORDER: Defendant's motion for judgment on the pleadings (ECF 29 ) is **GRANTED**. Plaintiff's provision request for leave to file an amended complaint (ECF 47 ) and motion to compel discovery (ECF 51 ) are **DENIED**. Signed by Judge Armando O. Bonilla. (ead) Service on parties made. (Entered: 01/22/2025) |
| 02/06/2025 | 63 | NOTICE OF APPEAL as to 59 Judgment, filed by VANDA PHARMACEUTICALS, INC.. Filing fee $ 605, receipt number AUSFCC-10194672. Copy to CAFC. (Hughes, Paul) (Entered: 02/06/2025) |
| 02/06/2025 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 63 Notice of Appeal. (ac7) (Entered: 02/06/2025) |
| 02/12/2025 | | CAFC Case Number 2025-1434 for 63 Notice of Appeal filed by VANDA PHARMACEUTICALS, INC. (ac7) (Entered: 02/12/2025) |

---

| **PACER Service Center** |
|---|
| **Transaction Receipt** |

**Appx45**

Receipt number AUSFCC-8683145

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |
|---|---|
| VANDA PHARMACEUTICALS INC., | Civ. No. _____ 23-629 C |
| Plaintiff, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**COMPLAINT**

Plaintiff Vanda Pharmaceuticals Inc. (Vanda) brings this Complaint against Defendant the United States of America and alleges as follows:

**NATURE OF THE ACTION**

1.     Vanda brings this action for the uncompensated taking of property in violation of the Fifth Amendment to the U.S. Constitution and for breach of an implied-in-fact contract.

2.     Developing new pharmaceutical therapies that save and improve lives is a costly and time-consuming endeavor. Drug innovators invest millions of dollars and years (if not decades) of research and development in each new product. Hundreds of millions of Americans—and billions of people around the globe—benefit from these life-saving and life-changing drugs.

3.     To fund their massive expenditures in research and development, innovators protect their novel creations through intellectual property. Absent such legal protections, manufacturers could not realize a return on their enormous investments. Intellectual property is thus the fuel of

1

**Appx46**

the pharmaceutical development engine; without strong protections, the development of break-through new drugs would grind to a halt.

4.      Drug researchers patent many of their inventions, securing the benefit of the patent bargain: Broad protections are provided for time-limited periods, while information is disclosed to the public.

5.      Other intellectual property assets are maintained as trade secrets and other proprietary, confidential information. Drug developers maintain substantial confidential information related to the development, testing, and manufacturing of pharmaceutical products. Pharmaceutical innovators go to great lengths to protect the confidentiality of this information, ensuring that it is not publicly disclosed. This confidentiality is essential to allowing developers to realize a return on their enormous investments of money and time.

6.      The complex (and in some respects highly arbitrary) regulatory approval necessary to market drugs in the United States greatly enhances the costs associated with commercializing a new product. Before a company can begin recouping its research and development costs, it must secure regulatory approval from the Food and Drug Administration (FDA) through the submission of a New Drug Application (NDA).

7.      The FDA approval process involves the submission of hundreds (if not thousands) of pages of information, covering sensitive topics such as a drug's chemical composition, details relating to its manufacture and quality control, studies demonstrating a drug's safety and effectiveness, and much more. Many of these details constitute trade secrets and other confidential information that companies carefully protect to safeguard their extensive investments.

**Appx47**

8. In recognition of the value of drug sponsors' confidential commercial information, FDA regulations and federal statutes strictly limit the extent to which the agency can disclose information submitted in an NDA to the public or to competing drug companies. These regulations prohibit the disclosure of confidential commercial information and trade secrets even after applications are approved. FDA has repeatedly confirmed this promise and obligation of confidentiality of drug sponsor information through its guidance and public statements.

9. Vanda submitted New Drug Application No. 022192 to FDA on September 27, 2007. This application sought approval to market Fanapt® for the acute treatment of schizophrenia in adults. Iloperidone is the active ingredient in Fanapt®.

10. Vanda submitted New Drug Application No. 205677 to FDA on May 31, 2013. This application sought approval to market Hetlioz® for the treatment of Non-24 hour sleep-wake disorder. Tasimelteon is the active ingredient in Hetlioz®.

11. Vanda's applications contained highly confidential information about its manufacturing processes for Fanapt® and Hetlioz®, much of which constituted trade secrets. Vanda supplied FDA this information in reliance on FDA's promise to maintain strict confidentiality of this information. To this day, details of the manufacturing process Vanda actually uses to manufacture the active ingredients for its drugs and those drugs' formulations remain strictly confidential.

12. Federal law authorizes generic drug manufacturers, after certain periods of patent and other exclusivities have elapsed, to seek marketing approval to sell generic versions of drugs. These generic manufacturers have done none of the innovative work required to develop the new drug: They have not developed the molecule or product at issue; they have not invested in

3

**Appx48**

substantial and expensive pre-clinical and clinical research; and they have not navigated FDA's complex approval process to reach approval. Rather, generic manufacturers simply seek to mimic the branded company's product, relying on the groundbreaking scientific and clinical information painstakingly developed by the drug innovator.

13.    In order to gain marketing approval, one of the few things a generic manufacturer must accomplish is to prove that its generic product meets the statutory requirement of bioequivalence. Congress has provided a calibrated way to enable this: An innovator pharmaceutical manufacturer must supply sample product to the generic on a commercially reasonable basis, which allows the generic to perform dissolution and bioequivalence testing on both the genuine product and its attempted clone. But Congress did *not* obligate a branded company to disclose its confidential information regarding the product's composition, its manufacture, or the testing results that the branded company performed.[1]

14.    When a generic manufacturer wishes to market a clone of an innovator's branded product, the generic submits an Abbreviated New Drug Application (ANDA) to FDA. FDA then

---

[1]    The secrecy of the branded product's dissolution testing is, among other things, an important anti-fraud tool. One large generic drug manufacturer, Ranbaxy USA Inc., the U.S. subsidiary of the then-giant generic manufacturer Ranbaxy Laboratories Limited, pleaded guilty to felony charges—and paid $500 million—in connection with massive fraud regarding dissolution and bioequivalence data. *See* Office of Public Affairs, *Generic Drug Manufacturer Ranbaxy Pleads Guilty and Agrees to Pay $500 Million to Resolve False Claims Allegations, cGMP Violations and False Statements to the FDA*, DOJ (May 13, 2013) https://perma.cc/X8TX-2PGJ; *see also* Katherine Eban, *Bottle of Lies: The Inside Story of the Generics Drug Boom* (2019). To gain approval, generics must do their *own* dissolution and bioequivalence testing on the product, verifying that they in fact did the underlying tests.

**Appx49**

reviews this submission, often resulting in discussions between FDA and the generic about steps the generic must take to achieve an approvable product.

15.    FDA has previously acknowledged the impropriety of relying on and sharing data from a pioneer drug's application when considering whether to approve proposed generic drugs. Doing so violates a host of laws and regulations—and results in the unlawful disclosure of an innovator's confidential information.

16.    FDA, however, has breached its confidentiality obligations with respect to Vanda. As documents Vanda has obtained detail, FDA blatantly and forthrightly relied on data in one of Vanda's drug applications and then disclosed that information to Vanda's competitors. All the while, FDA continued to refuse to release that same information to the public, on the basis that it constituted trade secret or confidential commercial information. And FDA's misconduct does not appear isolated: The material available thus far through public record requests demonstrates that FDA routinely directly or indirectly discloses confidential portions of drug sponsors' applications to competitors seeking to market generic knockoffs.

17.    FDA's disclosure of Vanda's trade secrets and confidential commercial information to Vanda's competitors constitutes a taking under the Fifth Amendment for which Vanda has never received compensation. It also constitutes a breach of implied-in-fact contact, as a result of which Vanda has suffered substantial monetary damages.

**PARTIES**

18.    Plaintiff Vanda Pharmaceuticals Inc., is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high-impact

**Appx50**

unmet medical needs and improve the lives of patients. Vanda is incorporated in Delaware and maintains its principal place of business in Washington, DC.

19.    Defendant is the United States, acting through its various authorized agencies and personnel, including, but not limited to, the United States Food and Drug Administration. Dr. Robert M. Califf is the current Commissioner of Food and Drugs—the head of FDA.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1491, which provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department."

21.    Venue is appropriate only in this Court because the claim is for more than $10,000. 28 U.S.C. § 1491(a)(1); *see U.S. Marine, Inc. v. United States*, 57 F.3d 1360, 1366 (Fed. Cir. 2013).

22.    Vanda is not required to further exhaust any administrative remedies because there is no remedial administrative scheme in the Federal Food, Drug, and Cosmetic Act (FDCA) that would permit it to seek redress for FDA's unlawful disclosure of Vanda's trade secrets or any other unlawful takings. In the alternative, any such administrative procedure would be futile, as Vanda has already suffered harm due to FDA's unlawful disclosure.

## BACKGROUND

23.    Vanda is a small pharmaceutical company whose business model largely consists of acquiring compounds that other companies failed to develop into useful treatments, identifying

6

**Appx51**

potential medical uses for them, devoting substantial resources to developing them, seeking FDA approval, and commercializing them.

24.     Through this model, Vanda develops and markets innovative pharmaceutical products to address high-impact unmet patient needs. Two of its drugs are Fanapt® (iloperidone), an atypical antipsychotic, and Hetlioz® (tasimelteon), a circadian-rhythm regulator.

### A.    New Drug Applications.

25.     Under the FDCA, to obtain marketing approval for a new drug, a drug sponsor must submit a New Drug Application to the FDA. See 21 U.S.C. § 355. And the drug sponsor must demonstrate by "substantial evidence," based on the sponsor's clinical trials and other supportive evidence, that the drug is safe and effective for its intended use. *Id*. § 355(d).

26.     The pharmaceutical research and development process is both lengthy and expensive. Estimates suggest that it typically takes $2.6 billion and "at least ten years for a new medicine to complete the journey from initial discovery to the marketplace." Biopharmaceutical Research & Development: *The Process Behind New Medicines*, PhRMA at 1 (2015), perma.cc/PL5Y-YW7P.

27.     An NDA must include "full reports" of clinical trials "which have been made to show whether [the] drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A)(i).

28.     An NDA must also include "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packaging of [the] drug." 21 U.S.C. § 355(b)(1)(A)(iv).

**Appx52**

29.     The implementing regulations for the FDCA require that each NDA contain a "Chemistry, manufacturing, and controls" (CMC) section. 21 C.F.R. § 314.50(d)(1).

30.     The CMC section of an NDA must contain "[a] full description of the drug substance including its physical and chemical characteristics and stability; the name and address of its manufacturer; the method of synthesis (or isolation) and purification of the drug substance; the process controls used during manufacture and packaging; and the specifications necessary to ensure the identity, strength, quality, and purity of the drug substance and the bioavailability of the drug products made from the substance, including, for example, tests, analytical procedures, and acceptance criteria relating to stability, sterility, particle size, and crystalline form." 21 C.F.R. § 314.50(d)(1)(i).

31.     The CMC section of an NDA must also contain "[a] list of all components used in the manufacture of the drug product (regardless of whether they appear in the drug product) and a statement of the composition of the drug product; the specifications for each component; . . . a description of the manufacturing and packaging procedures and in-process controls for the drug product; the specifications necessary to ensure the identity, strength, quality, purity, potency, and bioavailability of the drug product, including, for example, tests, analytical procedures, and acceptance criteria relating to sterility, dissolution rate, container closure systems; and stability data with proposed expiration dating." 21 C.F.R. § 314.50(d)(1)(ii)(A).

32.     Since at least 1987, FDA has published guidance concerning the information NDA applicants must include to satisfy the FDCA's manufacturing and controls requirements. Ctr. For

8

**Appx53**

Drugs & Biologics, *Guideline for Submitting Documentation for the Manufacture of and Controls for Drug Products*, FDA (Feb. 1987), perma.cc/A82V-YJR8 ("Manufacturing Guidance").

33.    FDA's Manufacturing Guidance provides that applicants should "submit a copy of the proposed or actual master/batch production and control records or a comparably detailed description." *Id.* at 4-5. The applicant must also "[d]escribe the manufacturing and packaging process for a representative batch, including a description of each production step, actual operating conditions, equipment to be utilized and points of sampling for in-process controls." *Id.*

34.    FDA's Manufacturing Guidance also requires the identification of analytical methods. *Id.* at 6. Applicants must identify "[t]he significant chemical and physical parameters important to clinical response of the drug product." *Id.* at 6-7. Applicants must "demonstrate that the manufacturing, sampling, and control processes have been designed to provide a consistent product." *Id.* at 7.

35.    As part of these requirements, FDA's Manufacturing Guidance mandates compliance with "regulatory specifications," which are "the defined limits . . . within which test results for a drug substance or drug product should fall when determined by the regulatory methodology." *Id.* at 8. "All drug products require assay and identity tests and specifications." *Id.* at 9. But "[a]dditional specifications or alternative analytical methods (e.g., tests for impurities, a stability indicating assay, a second identity test, etc.) may be required as necessary." *Id.*

36.    For tablets, capsules, and other solid dosage forms, the FDA Manufacturing Guidance requires proof of compliance with regulatory specifications for: "(1) Uniformity of dosage units. (2) Rate of release of the active ingredient from the dosage form by methodology … (3)

9

**Appx54**

Moisture content, where applicable... [and] (4) Softening or melting points for suppositories." *Id.* at 10.

37.     Confidential manufacturing information is shared with FDA under an assurance that it will remain confidential. *See generally* Richard A. Epstein, *The Constitutional Protection of Trade Secrets and Patents under the Biologics Price Competition and Innovation Act of 2009*, 66 Food & Drug L.J. 285, 289-291 (2011).

38.     Specifically, FDA regulations assure applicants that "[d]ata and information submitted or divulged to the Food and Drug Administration which fall within the definitions of a trade secret or confidential commercial or financial information are not available for public disclosure." 21 C.F.R. § 20.61(c). Regulations also allow applicants to "designate part or all of the information in such records as exempt from disclosure." *Id.* § 20.61(d).

39.     The Federal Trade Secrets Act also categorically prohibits agency employees from disclosing confidential information submitted to them in the course of their work for agencies. 18 U.S.C. § 1905; *see Demodulation v. United States*, 103 Fed. Cl. 794, 806-07 (2012) ("[T]he parties' 'tacit understanding' that the Government would not share Plaintiff's trade secrets is established by the fact that federal employees are prohibited by statute from disseminating trade secrets. *See* 18 U.S.C. § 1905."); *see also* 21 U.S.C. § 331(j).

40.     Courts have expressly held that the Federal Trade Secrets Act "prohibits . . . public disclosure of application data." *Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135, 141 n.7 (3d Cir. 1987).

**Appx55**

41.    FDA has emphasized that it may not rely on or disclose data from an underlying NDA when considering a related ANDA. Letter from Janet Woodcock, M.D., Director, CDER, to Katherine M. Sanzo, Esq. and Lawrence, S. Ganslaw, Esq., Morgan, Lewis & Bockius, LLP; Jeffrey B. Chasnow, Esq., Pfizer; Stephan E., Lawton, Esq. and Gillian R. Woollett, Ph.D., BIO; and William R. Rakoczy, Esq., Lord, Bissell & Brook, LLP, Docket No. FDA-2003-P-0014 (formerly 2003P-0408), PDN 1, at 10 n. 14 (Oct. 14, 2003) ("FDA may rely on its earlier conclusions regarding safety and effectiveness to whatever extent the conclusions are appropriate for the drug under review in the 505(b)(2) application. Although reliance on an FDA finding of safety and effectiveness for an NDA is certainly indirect reliance on the data submitted in the original NDA, reliance on the conclusions supported by that data is not the same as manipulating those data to reach new conclusions not evident from the existing approval."); *see also* Citizen Petition Denial Response from FDA CDER to Covington & Burling LLP (Abbot Laboratories), FDA-2012-P-0317, at 13 (Sept. 23, 2016); Epstein, *supra*, at 294-95 & nn. 47-48.

42.    FDA has "conceded" in litigation "that it may not actually look at the data in" an approved NDA "when reviewing" an ANDA. *Epstein*, *supra*, at 294 (citing Federal Defendants' Motion for Stay of Proceedings at 3, *Pfizer v. FDA*, No. 03-2346 (D.D.C. Feb. 18, 2004).

43.    FDA regulations prohibit it from disclosing "[m]anufacturing methods or processes, including quality control procedures" even after approval of an application. 21 C.F.R. § 314.430(g)(1).

44.    The primacy of confidentiality in FDA's review process is in part a recognition that "health regulation should not distort the competitive balance between two firms that would

11

**Appx56**

otherwise exist in the absence of regulation." Epstein, *supra*, at 291. "FDA's power is granted for specific purposes, and its coercive power should be exercised only for the purposes for which it was granted." *Id.* at 292. FDA "should not be pressed into service as a roaming veto power over existing property rights." *Id.*

45.    Pharmaceutical manufacturers, including Vanda, rely on this confidentiality obligation when they disclose highly valuable, confidential information to FDA. Drug developers invest millions upon millions in the development of each new molecule, and this investment turns in large part on the exclusivity that confidentiality helps supply. Developers thus have extensive, investment-backed expectations that, when they share confidential information with FDA, FDA will maintain this information in the utmost confidence and secrecy.

46.    FDA's guarantees of confidentiality are material in that they significantly inform what confidential material sponsors, including Vanda, submit and when and how they submit it.

47.    Pharmaceutical manufacturers, including Vanda, consider the viability of their intellectual property rights and the corresponding effect on their ability to recoup their investments when deciding whether to develop new drugs and/or to submit those drugs for FDA approval.

48.    Indeed, a "governmental guarantee" of confidentiality—which is present here—necessarily provides "the basis of a reasonable investment-backed expectation." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984).

**B.    Abbreviated New Drug Applications**

49.    As described above, FDA's regulatory approval process for new drugs is lengthy and expensive.

**Appx57**

50.     Congress passed the Hatch-Waxman Amendments "to induce name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to market." *Abbot Labs. V. Young*, 920 F.2d 984, 991 (D.C. Cir. 1990) (Edwards, J., dissenting); *accord Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1358 (Fed. Cir. 2003) ("The Hatch–Waxman Act was accordingly a compromise between two competing sets of interests: those of innovative drug manufacturers, who had seen their effective patent terms shortened by the testing and regulatory processes; and those of generic drug manufacturers, whose entry into the market upon expiration of the innovator's patents had been delayed by similar regulatory requirements.").

51.     The Amendments created a new mechanism—the Abbreviated New Drug Application (ANDA)—by which generic manufacturers could obtain accelerated, less burdensome approval by piggybacking off the pioneer drug's NDA. *See* 21 U.S.C. § 355(j).

52.     The ANDA provision "allows manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 612 (2011). Instead, generic manufacturers need only submit "information to show that the new drug is bioequivalent to the listed drug" and that the labeling, route of administration, dosage form, and strength is the same. 21 U.S.C. § 355(j)(iii)-(v).

53.     The FDCA's ANDA provisions specify that one ground for rejection of an ANDA is if "the methods used in, or the facilities and controls used for, the manufacture, processing, and

13

**Appx58**

packaging of the drug are inadequate to assure and preserve its identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A).

54. FDA thus requires that ANDAs conform to the same CMC requirements as NDAs. 21 C.F.R. § 314.94(a)(9) (stating that an ANDA "must submit" "[t]he information required under § 314.50(d)(1).").

55. The FDCA specifies the precise and limited manner in which brand drug sponsors must cooperate with attempts by generic manufacturers to copy their drugs. A sponsor must, for example, provide "sufficient quantities of" its product "on commercially reasonable, market-based terms." 21 U.S.C. § 355-2(b)(1). The statute does not require brand drug sponsors to provide information about its manufacturing processes or the composition of its drugs beyond that which is already publicly available.

56. Congress's desire to facilitate generic drugs was thus not absolute. Its goal was to allow the expedited creation of generic drugs while respecting the intellectual property rights of companies that develop pioneer drugs. Generics were allowed to enter the market only after the expiration or invalidation of relevant patents, and pioneer drug sponsors were not required to disclose trade secrets about their manufacturing processes to teach the generics exactly how to copy their drugs. Nor could Congress have directed a taking of drug innovators valuable intellectual property without providing just compensation.

**Appx59**

## FACTUAL ALLEGATIONS

**A.      Vanda's NDA for Fanapt®**

57.      Fanapt® is among a class of drugs known as atypical antipsychotics. Fanapt® helps patients suffering from schizophrenia (particularly those who have not benefitted from other anti-psychotic therapies) think more clearly, feel less nervous, and experience fewer hallucinations.

58.      Iloperidone is the active ingredient in Fanapt®.

59.      Vanda licensed iloperidone from a large pharmaceutical company that tried, but failed, to develop it into a useful FDA-approvable therapy.

60.      On September 27, 2007, after years of development work and clinical trials, Vanda submitted NDA 022192 to FDA seeking approval to market Fanapt® for the acute treatment of schizophrenia in adults.

61.      FDA approved Fanapt® on May 6, 2009.

62.      Vanda's Fanapt® NDA contained sensitive and highly confidential details about its manufacturing process for Fanapt®, including its synthesis of iloperidone. Additionally, the NDA contained sensitive and highly confidential details about the formulation of Fanapt®.

63.      The Fanapt® NDA, for example, contained a proposed "dissolution specification" that indicated how much of the label-listed iloperidone drug must dissolve by a specified point after administration in order for the drug to be safe and effective.

64.      The dissolution specification contained in the Fanapt® NDA is the result of significant research expenditures by Vanda.

**Appx60**

65.   The details of Vanda's manufacturing process for Fanapt® and the composition of Fanapt® are not public and are not readily ascertainable by any member of the public.

66.   Vanda is the owner of all rights, title, and interest in several patents that grant it various exclusive rights with respect to the making, using, offering for sale, and selling of iloperidone and in the method for using and process for making iloperidone, including patents relating to the use of iloperidone to treat schizophrenic patients.

67.   Vanda has devoted millions of dollars and many years into the research, development, and regulatory approval of Fanapt®.

**B.   Vanda's NDA for Hetlioz®**

68.   Hetlioz® is among a class of drugs known as melatonin receptor agonists, which bind to and activate receptors in the brain for melatonin, a hormone that regulates the sleep cycle.

69.   Tasimelteon is the active ingredient in Heltioz®.

70.   Vanda licensed tasimelteon from a large pharmaceutical company that tried, but failed, to develop it into a useful, FDA-approvable therapy.

71.   On May 31, 2013, after years of development work and clinical trials, Vanda submitted NDA 205677 to FDA seeking approval to market Hetlioz® to treat non-24-hour sleep-wake disorder (Non-24), a condition in which an individual's circadian rhythms become misaligned with the 24-hour day.

72.   FDA approved Vanda's Hetlioz® NDA on January 31, 2014. FDA also granted Vanda's request for orphan drug designation. Since 2014, Vanda has marketed tasimelteon under the brand name Hetlioz®.

**Appx61**

73.     Vanda's Hetlioz® NDA contained sensitive and highly confidential details about its manufacturing process for Hetlioz®, including its synthesis of tasimelteon and the composition of Hetlioz®.

74.     In the Hetlioz® NDA, for example, Vanda explained its process for detecting and controlling for impurities in tasimelteon.

75.     The impurities present in the synthesized drug product and the levels at which those impurities are present vary greatly depending on the particulars of the relevant manufacturing process.

76.     The specific impurities that Vanda controls for, the levels at which those impurities are controlled, and the methods by which those impurities are controlled have actual or potential economic value as a result of their secrecy. This information is the result of significant research expenditures by Vanda, and is a core part of its confidential manufacturing process for Hetlioz®.

77.     The specific impurities that Vanda controls for, the levels at which those impurities are controlled, and the methods by which those impurities are controlled are the subject of reasonable efforts to maintain their secrecy. Vanda has not publicly disclosed this information except where required under the FDCA.

78.     Vanda's NDA also includes highly confidential information about the methods through which it controls the size of tasimelteon crystals in its drug product. The need to do so and the methods actually used to do so are not widely known or readily ascertainable.

79.     The details of Vanda's overall manufacturing process for tasimelteon and the composition of Heltioz® are not public and not readily ascertainable by any member of the public.

17

**Appx62**

80.     Vanda is the owner of all rights, title, and interest in several patents that grant it various exclusive rights with respect to the making, using, offering for sale, and selling of tasimelteon and in the method for using and process for making tasimelteon, including patents relating to the use of tasimelteon to treat SMS patients.

81.     Vanda has devoted millions of dollars and many years into the research, development, and regulatory approval of Hetlioz®.

### C.     FDA's review and approval of ANDAs

82.     FDA has considered and approved several ANDAs for generic copies of both iloperidone and tasimelteon.

#### 1.     Iloperidone ANDAs

83.     To date, FDA has reviewed and approved at least five ANDAs seeking permission to market generic versions of Fanapt®.

84.     On information and belief, Lupin Limited and/or Lupin Pharmaceuticals, Inc. submitted ANDA No. 206890 on or about May 8, 2014.

85.     On information and belief, FDA issued a tentative approval for Lupin's ANDA on August 25, 2021. FDA issued a final approval for Lupin's ANDA on May 5, 2022.

86.     On information and belief, Roxane Laboratories Inc. submitted ANDA No. 205480 in 2013.

87.     Ownership of ANDA No. 205480 "transferred from Roxane Laboratories Inc. to" West-Ward Pharmaceuticals Corp. *Vanda Pharmaceuticals Inc. v. West-Ward Pharmaceuticals Int'l Ltd.*, 887 F.3d 1117, 1122 n.3 (Fed. Cir. 2018).

18

**Appx63**

88.     FDA issued a tentative approval for West-Ward's ANDA on November 22, 2017.

89.     On information and belief, FDA has never finally approved West-Ward's ANDA.

90.     On information and belief, Taro Pharm Inds. Ltd. submitted ANDA No. 207098.

91.     On information and belief, FDA issued a final approval for Taro's ANDA on July 22, 2019.

92.     On information and belief, Inventia submitted ANDA No. 207231.

93.     On information and belief, FDA issued a final approval for Inventia's ANDA on November 28, 2016.

94.     On information and belief, Alembic Pharms. LTD submitted ANDA No. 207409.

95.     On information and belief, FDA issued a tentative approval of Alembic's ANDA on or about July 2, 2018.

96.     On information and belief, FDA has never finally approved Alembic's ANDA.

97.     Vanda obtained information relating to FDA's review of Lupin's iloperidone ANDA (No. 206890) through a FOIA request submitted to FDA. On March 27, 2023, Vanda submitted a FOIA request seeking the final approval letter, the approved label, any bioequivalence review produced during FDA's evaluation, and any other readily available materials relating to Lupin's ANDA. On April 12, 2023, FDA produced 143 pages of responsive records to Vanda.

98.     During its review of Lupin's iloperidone ANDA, FDA sent Lupin notice of a deficiency. In that notice, FDA informed Lupin that its proposed dissolution specification was not acceptable, and requested that Lupin "acknowledge" a specified "FDA-recommended dissolution method and specification":

**Appx64**

BIOEQUIVALENCE DEFECIENCY TO BE PROVIDED TO THE APPLICANT
(PROCESSED BY BIO-PM)
EASILY CORRECTABLE DEFICIENCY-10 (ECD-10).

ANDA:             206890

APPLICANT:        Lupin Limited

DRUG PRODUCT:     Iloperidone Tablets, 1 mg, 2 mg, 4 mg, 6 mg, 8 mg,
                  10 mg, and 12 mg

The Division of Bioequivalence (DB) has completed its review of the dissolution testing
portion of your submission acknowledged on the cover sheet. The review of the
bioequivalence (BE) studies and the waiver requests will be conducted later.

Your dissolution testing using the FDA-recommended method is acceptable. However,
your proposed specification, NLT (b)(4)% (Q) in (b)(4) minutes, is not acceptable. Please
acknowledge the following FDA-recommended dissolution method and specification:

| USP Apparatus:    | II (paddle)                            |
|-------------------|----------------------------------------|
| Rotational Speed: | 50 rpm                                 |
| Temperature:      | 37°C ± 0.5°C                           |
| Media:            | 0.1 N Hydrochloric Acid                |
| Volume:           | 500 mL                                 |
| Specification:    | NLT (b)(4)% (Q) dissolved in 30 minutes |

Sincerely yours,

*{See appended electronic signature page}*

Ethan M. Stier, Ph.D. R.Ph.
Director
Division of Bioequivalence II
Office of Generic Drugs
Center for Drug Evaluation and Research

(Lupin FOIA Response at 142).

20

**Appx65**

99.     The dissolution specification in an NDA or ANDA is an important component of the manufacturing process. Solid oral dosage forms (such as tablets and capsules) must make the active drug bioavailable at a consistent rate in order to guarantee safety and efficacy.

100.    On information and belief, "NLT [b4]% (Q) dissolved in 30 minutes" means that not less than a redacted percentage of the label-approved active drug must be dissolved into the media after 30 minutes under the specified dissolution method.[2]

101.    In the Division of Bioequivalence Dissolution Review conducted as part of FDA's review of Lupin's ANDA, the FDA reviewer explained the origin of FDA's substitute dissolution specification:

---

[2]   When FDA provided Vanda this material pursuant to a FOIA request, it redacted certain information on the basis of 5 U.S.C. § 552(b)(4), which authorizes the government to withhold from a FOIA requestor "trade secrets and commercial or financial information obtained from a person and privileged or confidential." FDA's designation of this information as (b)(4) confidential thus confirms FDA's own awareness of the confidentiality of this sort of information. In discovery, Vanda will seek unredacted copies of these documents—subject to any protective order—in order to further demonstrate FDA's unlawful disclosure of confidential information.

**Appx66**

**II.2   Dissolution Method As Posted on the FDA Website**

| Drug Name | Dosage Form | USP Apparatus | Speed (RPMs) | Medium | Volume (mL) | Recommended Sampling Times (minutes) | Date Updated |
|---|---|---|---|---|---|---|---|
| Iloperidone | Tablet | II (Paddle) | 50 | 0.1 N Hydrochloric Acid | 500 | 5, 10, 15, 30, 45, & 60 minutes | 08/5/2010 |

Specification (firm's proposed):  NLT (b)(4)% (Q) in (b)(4) minutes
Specification (from RLD):  NLT (b)(4)% (Q) in 30 minutes[1]

Reviewer's Note: the reviewer checked the NDA Annual report for the above mentioned specification for the RLD[2]

(Lupin FOIA Response at 125).

102.    On information and belief, "RLD" means "reference listed drug"—in this case, Fanapt®.

103.    The footnotes on this page make clear that the "Specification (from RLD)" was taken directly from the Fanapt® NDA:

[1] DARRTS: NDA-022192: REV-CLINPHARM-01(General Review): 07/10/2008: JACKSON, ANDRE J
[2] DARRTS: NDA-022192: New/Annual Report with PMR/PMC Status: Annual Report-3: 06/29/2012

(Fanapt FOIA Response at 125).

104.    On information and belief, DAARTS is the "Document Archiving, Reporting, and Regulatory Tracking System," which is FDA's archival system of record for internal application files. And NDA-022192 refers to Vanda's NDA for Fanapt®, including FDA's review of the information that Vanda submitted.

22

**Appx67**

105.    FDA made similar disclosures to Inventia.

106.    Vanda obtained information relating to FDA's review of Inventia's iloperidone ANDA (No. 207231) through a FOIA request submitted to FDA. On March 27, 2023, Vanda submitted a FOIA request seeking the final approval letter, the approved label, any bioequivalence review produced during FDA's evaluation, and any other readily available materials relating to Inventia's ANDA. On April 20, 2023, FDA produced 143 pages of responsive records to Vanda.[3]

107.    During its review of Inventia's iloperidone ANDA, FDA sent Inventia notice of a deficiency. In that notice, FDA informed Inventia that its proposed dissolution specification was not acceptable, and requested that Inventia "acknowledge" a specified "FDA recommended dissolution method and specification":

---

[3] Counsel for Vanda received FDA's response on physical media by mail on May 1, 2023.

23

**Appx68**

BIOEQUIVALENCE DEFICIENCIES TO BE PROVIDED TO THE APPLICANT (PROCESSED BY BIO-PM)

ANDA:              207231

APPLICANT:         Inventia Healthcare Private Limited

DRUG PRODUCT:   Iloperidone Tablets1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, 12 mg

The Division of Bioequivalence I (DBI) has completed its review of the dissolution testing portion of your submission acknowledged on the cover sheet. DB will review the fasting and fed BE studies and waiver requests later.

Your dissolution testing data are acceptable; however, your proposed specification is too liberal and not acceptable. Please acknowledge the following FDA recommended method and specification for your test product:

| USP Apparatus: | II (paddle) |
|---|---|
| Rotational Speed: | 50 rpm |
| Temperature: | 37°C ± 0.5°C |
| Media: | 0.1 N Hydrochloric Acid |
| Volume: | 500 mL |
| Specification: | NLT (b)(4)% (Q) dissolved in 30 minutes |

The bioequivalence comments provided in this communication are comprehensive as of issuance. However, these comments are subject to revision if additional concerns raised by chemistry, manufacturing and controls, microbiology, labeling, other scientific or regulatory issues or inspectional results arise in the future. Please be advised that these concerns may result in the need for additional bioequivalence information and/or studies, or may result in a conclusion that the proposed formulation is not approvable.

Sincerely yours,

*{See appended electronic signature page}*

Wayne I. DeHaven, Ph.D.
Acting Director, Division of Bioequivalence I
Office of Bioequivalence
Office of Generic Drugs
Center for Drug Evaluation and Research

(Inventia FOIA Response at 55).

24

**Appx69**

108. In the Division of Bioequivalence Dissolution Review conducted as part of FDA's review of Inventia's ANDA, the FDA reviewer made clear that the recommended dissolution specification was derived from Vanda's Fanapt® NDA:

> - The firm's proposed specification 'Not less than [(b)(4)]% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes' is too liberal. Based on the data submitted, the DB recommends specification of NLT [(b)(4)]% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes.
>
> - The DB recommended specification 'NLT [(b)(4)]% (Q) in 30 minutes' is the same as recommended by the NDA applicant for the RLD product. The reviewer checked the NDA Annual report for the above mentioned specification for the RLD product.

(Inventia FOIA Response at 53).

109. Despite its disclosures to Lupin and Inventia, FDA continues to regard the sponsor's proposed dissolution specification as trade secret and confidential even after an NDA is approved.

110. In the Clinical Pharmaceutical Biopharmaceutics Review FDA published as part of the publicly available approval package for Fanapt®, for example, FDA redacted the proposed dissolution specification as trade secret and/or confidential commercial information:

25

**Appx70**

Item 3

Dissolution Method and Specification (from OCP's review of July 10, 2008) – for convey to the Sponsor:

The dissolution method and specification for all strengths of the immediate release tablets should be:

Apparatus 2 (rotating paddle)
500 ml 0.1 N HCl
50 rpm rotation speed.
Q= —— in 30 minutes                                    b(4)

(Fanapt Clinical Biopharmaceutics Review at 4).

111. FDA regulations prohibit it from disclosing "[m]anufacturing methods or processes, including quality control procedures" even after approval of an application. 21 C.F.R. § 314.430(g)(1).

112. FDA's direction to Lupin and Inventia constitutes a disclosure of Vanda's proposed dissolution specification. The recipients of the deficiency notices would have understood that FDA adopted and was communicating to it information contained in the Fanapt® NDA.

113. The result of FDA's approach to the dissolution specification is that it is willing to provide the confidential information directly to Vanda's competitors without notification to Vanda, but unwilling to provide it publicly.

114. FDA has historically emphasized the difference between reliance on the public fact of NDA approval and reliance on actual data contained in the NDA:

26

**Appx71**

<sup>14</sup> When FDA approves a stand alone NDA submitted under section 505(b), the approval is based on the data and information submitted in the application. Later approvals under section 505(j) of duplicates or minor modifications to this listed drug will rely on the Agency's conclusions that a drug with those specific characteristics (e.g., active ingredient, strength, dosage form, conditions of use) was previously found to be safe and effective. Similarly, when reviewing a 505(b)(2) application that relies in part on the earlier approval of a listed drug, FDA may rely on its earlier conclusions regarding safety and effectiveness to whatever extent the conclusions are appropriate for the drug under review in the 505(b)(2) application. Although reliance on an FDA finding of safety and effectiveness for an NDA is certainly indirect reliance on the data submitted in the original NDA, reliance on the conclusions supported by that data is not the same as manipulating those data to reach new conclusions not evident from the existing approval. For example, if the NDA for the listed drug contained studies indicating that the drug may be effective for indications X and Y, but the listed drug is not approved for use Y, a 505(b)(2) applicant could not rely on those

studies to get approval for indication Y; it could only rely on the fact that the Agency found the drug to be effective for use X.

(Woodcock Letter, 2003P-0404-CP1, at 10-11 n.4); *see also* Epstein, *supra*, at 294-95 & nn. 47-48).

115.    In subsequent litigation, FDA has admitted that it is inappropriate for it to base its approval decisions on information contained in the RLD's NDA:

27

**Appx72**

> During the course of preparing its Citizen Petition response to Pfizer's scientific challenge to NDA 21-435 and collecting the administrative record for the response, FDA became aware that a first line reviewer made reference to certain studies of Pfizer's in the documentation of his review of NDA 21-435. In light of this discovery, FDA determined that it should reevaluate whether the approval of NDA 21-435 was based upon data from appropriate sources. Thus, on February 5, 2004, FDA issued an Administrative Stay of Approval (attached as Exhibit D) pending its reevaluation of the source of the data FDA relied on in approving NDA 21-435. If FDA determines upon reevaluation that the approval of NDA 21-435 is appropriate, FDA will promptly complete its Citizen Petition response to Pfizer's scientific challenge to FDA's approval of NDA 21-435 and will lift the Administrative Stay.

Motion for Stay of Proceedings at 3, *Pfizer v. FDA*, No. 03-cv-2346 (D.D.C. Feb. 18, 2004).

116.    FDA's reliance on Vanda's NDA for the dissolution specification during its review of Lupin and Inventia's ANDAs is directly contrary to its publicly stated approach to ANDA review.

117.    At the time FDA disclosed Vanda's dissolution specification to Lupin and Inventia, it was not generally known to or ascertainable by the public. A drug's dissolution profile cannot be ascertained simply from knowledge of the drug's formulation. Accurate and supportable conclusions about dissolution profile and appropriate dissolution specifications can only be made by reliance on data from dissolution testing. That is why FDA relied on Vanda's data, provided in its NDA, when communicating with Lupin.

**Appx73**

118.    At all times, the dissolution specification was the subject of reasonable efforts by Vanda to maintain its secrecy.

119.    As an integral part of Vanda's manufacturing process, the dissolution specification had economic value to Vanda (and to its competitors) from its secrecy. The dissolution specification is a core component of Vanda's processes for ensuring that its drugs are consistent, safe, and effective.

120.    Because dissolution rate is correlated with physical properties of solid oral dosage forms, disclosure of the dissolution specification also discloses confidential information about the viscosity of the drug formulation, and thus confidential information about the formulation itself.

121.    Disclosure of the confidential dissolution specification would greatly accelerate Vanda's competitors' efforts to copy the formulation of Fanapt®.

122.    The dissolution specification constitutes a trade secret under relevant state and/or federal law.

123.    Apart from whether the information at issue qualifies for protection as a trade secret, FDA's maintenance of information as confidential—an express condition upon which Vanda and other drug manufacturers provide information to FDA—creates a cognizable property interest under District of Columbia, Maryland, and/or federal law. *See Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential business information has long been recognized as property."); *id*. ("'[I]nformation acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.'" (quoting

29

**Appx74**

3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986)); *Formax, Inc. v. Hostert*, 841 F.2d 388, 390 (Fed. Cir. 1988) ("[C]onfidential business information is property."); *see also Cleveland v. United States*, 531 U.S. 12, 19 (2000). Indeed, the Maryland Court of Special Appeals has relied on *Carpenter* for the conclusion that "confidential business information constitutes property of the company and that its premature and improper disclosure can constitute a misappropriation of corporate property." *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 639 A.2d 173, 180 (1994), *aff'd* 665 A.2d 1038 (1995). *See also Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 38, 382 A.2d 564, 568 (1978) (distinguishing claims between misappropriation of "trade secrets and confidential information"); *Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 551 A.2d 947, 949 (1989) (similar).

124.    Information need not qualify as a trade secret for it to qualify as property protected under the Takings Clause. *Cf. United States v. Mahaffy*, 693 F.3d 113, 135 (2d Cir. 2012) ("Information may qualify as confidential under *Carpenter* even if it does not constitute a trade secret."); *United States v. Hager*, 879 F.3d 550, 555 (5th Cir. 2018) ("Although state law is a valid source for defining the scope of property rights protected by federal laws, it is not the sole source."); *id.* (placing emphasis on the use of "such as" in the holding from *Monsanto* that "property interests.... are created and their dimensions defined by existing rules or understandings that stem from an independent source *such as* state law" (quoting *Monsanto*, 467 U.S. at 1001)); *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021) (recognizing "a property right in trade secrets *or* confidential business information" (emphasis added)).

**Appx75**

125.   FDA's disclosure of Vanda's dissolution specification was without Vanda's express or implied consent.

126.   FDA's disclosure of Vanda's trade secret and/or confidential commercial information to Vanda's competitors eliminated or greatly reduced the value of Vanda's intellectual property.

127.   Vanda has suffered significant economic damage and irreparable losses to consumer goodwill due to FDA's disclosure of its trade secret and/or confidential information.

128.   Vanda had no awareness of FDA's wrongful disclosure to Lupin until April 12, 2023, when it received a FOIA response from FDA. And Vanda categorically could not have learned of this information any time prior to May 2022.

129.   That is, the documents detailing FDA's disclosures to Lupin were definitely unavailable to the public (including Vanda) until at least May of 2022. FDA categorically refuses to release information relating to pending or otherwise unapproved applications. 21 C.F.R. § 314.430(d)(1) ("[N]o data or information contained in the application or abbreviated application is available for public disclosure before the agency sends an approval letter.").[4] Vanda thus had

---

[4]   Indeed, Vanda has filed litigation against FDA to obtain access to FDA reviews of its *own* pending submissions to FDA. Vanda recently prevailed in that litigation. *Vanda Pharms., Inc. v. Food & Drug Admin.*, No. 22-CV-938 (CRC), 2023 WL 2645714 (D.D.C. Mar. 27, 2023). Throughout that litigation, FDA maintained its position that information of this sort was forbidden from release "under the deliberative process privilege." *Id.* at *1. But this litigation addressed solely prohibition from release under (b)(5), addressing the deliberative process privilege and related privilege grounds. It does not establish that a third party may obtain FDA reviews or related documents of not-yet-approved drugs submitted by *other* entities.

**Appx76**

no way of knowing that FDA disclosed its trade secrets or confidential commercial information to Lupin prior to May of 2022, when FDA approved Lupin's ANDA. And even then, it took Vanda filing a FOIA request to learn this information.

130. On information and belief, FDA's reliance on the pioneer drug NDA in evaluating ANDAs is not limited to these disclosures.

131. On information and belief, FDA made similar disclosures of data drawn from the Fanapt® NDA during its review of the other iloperidone ANDAs.

### 2. *Tasimelteon ANDAs*

132. To date, FDA has reviewed and approved three ANDAs seeking permission to market generic versions of Hetlioz®.

133. On information and belief, Teva Pharmaceuticals submitted ANDA No. 211601 to FDA on or about January of 2018. FDA received the ANDA on January 31, 2018.

134. FDA issued a tentative approval for Teva's ANDA on September 27, 2021. FDA issued a final approval for Teva's ANDA on December 12, 2022.

135. On information and belief, Apotex Corp. submitted ANDA No. 211607 to FDA on or about January of 2018. FDA received Apotex's ANDA on January 31, 2018.

136. FDA issued a tentative approval for Apotex's ANDA on February 3, 2020. FDA issued a final approval for Apotex's ANDA on December 20, 2022.

137. On information and belief, MSN Pharmaceuticals Inc. submitted ANDA No. 211654 to FDA on or about January of 2018. FDA received the ANDA on January 31, 2018.

**Appx77**

138.   FDA issued a tentative approval for MSN's ANDA on May 28, 2020. FDA issued a final approval for MSN's ANDA on January 12, 2023.

139.   Like with the Lupin and Inventia iloperidone ANDAs, FDA sent correspondence to tasimelteon ANDA applicants concerning their proposed dissolution specification.

140.   On information and belief, in a Discipline Review Letter signed by Astrid Inniss on July 16, 2018, FDA rejected Teva's proposed dissolution specification. Instead, FDA asserted that "[b]ased on test bio-lot dissolution data, the dissolution acceptance criterion of 'not less than [b4]% (q) of label claimed amount of Tasimelteon dissolved in 15 min' is recommended."[5] FDA instructed Teva to "[u]pdate the drug product specification table and other relevant section of [the] ANDA accordingly."

141.   On information and belief, in a Discipline Review Letter signed by Astrid Inniss on July 12, 2018, FDA rejected Apotex's proposed dissolution specification. Instead, FDA asserted that "[b]ased on test bio-lot dissolution data, the dissolution acceptance criterion of 'not less than [b4]% (q) of label claimed amount of Tasimelteon dissolved in 15 min' is recommended."[6] FDA instructed Apotex to "[u]pdate the drug product specification table and other relevant section of [the] ANDA accordingly."

---

[5]   Vanda obtained the discipline review letters sent to Teva in response to a request submitted on March 14, 2023. FDA designated that request as Request No. 2023-2013 and produced 12 responsive pages on April 19, 2023, along with a response letter dated April 4, 2023.

[6]   Vanda obtained the discipline review letters sent to Apotex in response to a request submitted on March 14, 2023. FDA designated that request as Request No. 2023-2002 and produced 19 responsive pages on April 19, 2023, along with a response letter dated April 6, 2023.

142.    On information and belief, FDA's rejection of Apotex and Teva's proposed dissolution specifications and substitution of a different specification was based on information drawn from Vanda's Hetlioz® NDA.

143.    On information and belief, FDA's insistence that Apotex and Teva modify their dissolution specifications would have been understood to indicate that the replacement specification was based on information drawn from Vanda's Hetlioz® NDA.

144.    Additionally, when FDA "determines that [it] will not approve [an] application or abbreviated application in its present form," the agency "will send the applicant a complete response letter" (CRL). 21 C.F.R. § 314.110(a). A CRL "reflects FDA's complete review of the data submitted in an original application or abbreviated application." 21 C.F.R. § 314.110(a)(2). The CRL "will describe all of the specific deficiencies that the agency has identified in an application or abbreviated application" and will "[w]hen possible . . . recommend actions that the applicant might take to place the application or abbreviated application in condition for approval." 21 C.F.R. § 314.110(a)(1), (3).

145.    During its review of Apotex's ANDA, FDA issued a CRL on July 12, 2018.[7]

---

[7]   The CRL was submitted as a public trial exhibit during prior litigation between Vanda and Apotex concerning patents relating to tasimelteon. *See Vanda Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 18-cv-651, JTX-071 (D. Del. 2022).

146.    During its review of Teva's ANDA, FDA issued a CRL to the drug manufacturer who produces the tasimelteon used in Teva's ANDA product on July 12, 2018.[8]

147.    In its CRL to Apotex, FDA highlighted five impurities that "are possible impurities of the drug substance reported in patent US20170190683A1." FDA asked Apotex to "clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities" and to "provide supporting data including LOD, LOQ, and linearity." It further instructed Apotex to "control these impurities in the drug substance release specification at justified limits, or provide justification as to why controls are not needed."

148.    FDA made a similar demand in a CRL to Teva's tasimelteon manufacturer. There, FDA called out Impurities "4 and 7" as "possible degradants of the drug substance" and also pointed to "impurities 2, 3, 5, and 6" as impurities "reported in patent US20170190683A1." FDA instructed Teva's manufacturer to "clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities," to "provide supporting data including LOD, LOQ, and linearity," and to "control these impurities in the drug substance specification at justified limits, or provide justification as to why controls are not needed."

149.    US20170190683A1 (the "Impurities Patent Application") is a patent application covering "[a] process for preparing a batch of highly purified, pharmaceutical grade tasimelteon"

---

[8]    The CRL to Zhejiang Ausun Pharmaceutical Co. Ltd. was submitted as a public trial exhibit during prior litigation between Vanda and Apotex concerning patents relating to tasimelteon. *See Vanda Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 18-cv-651, PTX-153 (D. Del. 2022).

**Appx80**

which "comprises analyzing a batch of tasimelteon synthesized under GMP conditions for the presence of one or more identified impurities." The Impurities Patent Application was published by the U.S. Patent and Trademark Office on July 6, 2017.

150.    The Impurities Patent Application discloses seven listed impurities. *Id.* at 2. Impurities 1, 2, 3, 5, and 6 "may be by-products of certain steps of the synthesis of tasimelteon." "[I]mpurities 4 and 7 may be degradation products."

151.    The Impurities Patent Application was eventually approved on September 11, 2018. The Impurities Patent was submitted to FDA on November 17, 2020, and was subsequently listed in the Orange Book. The Orange Book is an index maintained by FDA of patents provided by sponsors of approved NDAs that relate to their approved drugs.

152.    The impurities listed in the Impurities Patent Application are specific to the manufacturing process disclosed in the Application. Different manufacturing processes for tasimelteon will result in the presence or absence of different impurities.

153.    In fact, Apotex indicated in its CRL response that certain of the impurities identified in the Impurities Patent Application do not or cannot occur in its manufacturing process.

154.    Nothing in the Impurities Patent Application discloses which portions of the Application match the methods listed in Vanda's NDA for Hetlioz® for the commercial manufacture of tasimelteon.

155.    The filing of a patent application does not disclose that a patentee actually practices the patent. *King Instruments Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995) ("A patentee need not make, use, or sell an invention to gain patent protection.").

36

**Appx81**

156.    Even if the Impurities Patent Application discloses portions of Vanda's manufacturing process, the overall process as a combination of those disclosed elements remains a confidential trade secret. *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 78 (D.D.C. 2007) ("Even if individual elements are known to the public, a trade secret can exist in a unique combination of those otherwise publicly available elements.").

157.    FDA has continued to recognize that Vanda's manufacturing process, including the impurities for which Vanda controlled and the mechanisms it used to do so, is confidential even after approval of Vanda's NDA. For example, FDA redacted impurity information as confidential and/or trade secret in the administrative correspondence and chemistry review that it published as part of the action package for approval for Hetlioz®.

158.    FDA's reference to the Impurities Patent Application would be understood to its intended recipients as an indication that Vanda does, in fact, practice the impurities patent.

159.    Further, FDA's reference to the Impurities Patent Application and insistence that applicants control for some of the seven listed impurities (or provide an explanation for failure to do so) constitutes a disclosure that the manufacturing process disclosed in the Impurities Patent Application is substantially similar to Vanda's actual commercial manufacturing process for tasimelteon.

160.    Additionally, FDA's reference to the Impurities Patent Application and insistence that applicants control for some of the seven listed impurities (or provide an explanation for failure to do so) constitutes a disclosure that Vanda practices the Impurities Patent Application (and the later-granted Impurities Patent).

37

**Appx82**

161.    FDA's reference to the Impurities Patent Application and insistence that applicants control for some of the seven listed impurities (or provide an explanation for failure to do so) constitutes a disclosure of Vanda's confidential commercial information and trade secrets.

162.    Further, FDA disclosed to at least one of competitors of Vanda that, during the manufacturing process, tasimelteon "may be subject to micronization." In its CRL to Apotex, FDA queried Apotex whether its "drug substance may be subject to any particle size reduction." FDA thus implicitly, if not expressly, disclosed that a generic *should* use micronization techniques when manufacturing tasimelteon. Irrespective of Vanda's manufacturing process, that disclosure constitutes an improper disclosure of Vanda's confidential information that was supplied to FDA. Indeed, FDA could not inform Teva and Apotex directly of Vanda's manufacturing process; it cannot circumvent its confidentiality obligations through indirect questions or suggestions, as those themselves qualify as disclosures.

163.    FDA's disclosure of Vanda's trade secret and confidential information was without Vanda's express or implied consent.

164.    At the time FDA disclosed Vanda's trade secret and/or confidential commercial information, FDA knew or had reason to know that it acquired the underlying information from Vanda under circumstances giving rise to a duty to maintain its secrecy and/or limit its use.

165.    FDA's disclosure of Vanda's trade secrets to Vanda's competitors and confidential information erases or substantially decreases their value.

* * *

38

**Appx83**

166.    FDA's disclosures here are even more egregious than the facts of *Monsanto*, in which the Supreme Court found an unconstitutional taking. 467 U.S. at 1016. Like FDA's regulations here, EPA between 1972 and 1978 provided guarantees that confidential information would be kept secret. *Id.* at 1010. "This explicit governmental guarantee formed the basis of a reasonable investment-backed expectation." *Id.* In 1972, Congress amended FIFRA to allow EPA "to consider data submitted by one applicant . . . in support of another application pertaining to a similar chemical." *Id.* at 992. Recognizing the problem with this regime, Congress conditioned this use on the subsequent applicant's "offer[] to compensate the applicant who originally submitted the data." *Id.* The Court explained that the statute created a "mandatory data-licensing scheme" in which compensation would be provided to the owner of the trade secrets through an arbitration process. *Id.* While FIFRA envisioned compensation by the recipient of the confidential information, FDA's regime does not. *Id.* at 1013-14. Thus, while the scheme in *Monsanto* might have resulted in a taking, FDA's disclosure certainly does. The lack of a parallel compensation process, especially against the backdrop the well-established legal landscape following *Monsanto*, is conclusive evidence that Congress did not intend for disclosure in the FDCA context. And either way, the lack of compensation makes any disclosure regime in the FDCA context even *less* constitutionally permissible.

**Appx84**

## CLAIMS FOR RELIEF

### COUNT I

#### Uncompensated Taking in violation of the Fifth Amendment

167.    Vanda hereby incorporates and re-alleges the foregoing paragraphs 1-166 as though fully set forth herein.

168.    The Fifth Amendment provides that private property cannot "be taken" by the Government "for public use without just compensation." U.S. Const. Amend. V.

169.    Vanda possessed cognizable property rights in the protectable trade secrets and other confidential information that it owns. Specifically, information about Vanda's manufacturing process for tasimelteon and iloperidone—including its dissolution specifications, manufacturing processes, and details of its control of various impurities—constitute protectable trade secrets. That Vanda does in fact practice the Impurities Patent in its manufacture of tasimelteon is also a trade secret. These facts also constitute confidential information.

170.    The Supreme Court has held disclosure of a trade secret can constitute a taking for purposes of the Fifth Amendment. *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1001-04 (1984).

171.    Similarly, the Fifth Amendment protects against disclosure of a party's protected confidential information, regardless of whether it qualifies as a trade secret. All confidential information a drug developer provides to FDA under a reasonable expectation that it will be kept confidential qualifies as property, the improper disclosure of which is actionable. Here, regardless of whether FDA disclosures of Vanda's information qualifies as misappropriation of trade secrets, it surely qualifies as disclosure of confidential information.

40

**Appx85**

172.   At all times, the trade secret and confidential information disclosed to FDA was kept secret by Vanda. Vanda employs industry-standard measures to safeguard its proprietary information.

173.   Vanda's trade secrets and confidential commercial information, as relevant here, had significant economic value, including (and especially) to Vanda's competitors such as Lupin, Inventia, Apotex, and Teva. The information that constitutes those trade secrets and confidential information was the product of significant expenditure of Vanda's time and resources.

174.   Vanda's trade secrets and confidential commercial information had value as a result of their secrecy, as evidenced by their commercial value to Vanda's competitors.

175.   Upon information and belief, and as alleged above, the United States took Vanda's proprietary information and, via duly authorized actions of Government personnel, provided it to others, including Vanda's competitors without payment of just compensation to Vanda.

176.   The United States did not have express or implied consent to appropriate or disclose Vanda's proprietary information apart from the limited purpose of evaluating Vanda's related applications.

177.   To the extent that FDA has conditioned access to the U.S. pharmaceutical market on a sponsor's forfeiture of its intellectual property (including trade secrets and other confidential commercial information), that imposition constitutes an unconstitutional condition that itself qualifies as a taking. *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 172 n.7 (1979); *Nollan v. California Coastal Comm'n*, 483 U.S. 833 n.2 (1987); *Philip Morris v. Reilly*, 312 F.3d 24, 46-47 (1st Cir. 2002) (holding that imposing disclosure requirements in exchange for "allowing a

41

**Appx86**

manufacturer to simply sell its legal product" is unconstitutional). *See generally* Epstein, *supra*, at 301-313. Such a regime is also inconsistent with congressional mandates to safeguard trade secret and confidential commercial information.

178. The United States, at the time of the disclosures, knew or should have known that its knowledge of Vanda's proprietary information was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

179. Though FDA "does not have explicit statutory authority to regulate drug prioritizing," the agency nonetheless attempts to do so by prioritizing and incentivizing the approval of generics. Agata Dabrowska, Cong. Rsch. Serv. IF11075, *FDA and Drug Prices: Facilitating Access to Cheap Drugs* (Jan. 17, 2019). On information and belief, FDA's unlawful and uncompensated disclosure of Vanda's trade secrets and/or confidential information was in furtherance of its goal of altering the market by favoring generics.

180. FDA's disclosures of Vanda's confidential commercial information and trade secrets to Vanda's competitors has erased or substantially diminished their value.

181. As a direct and proximate result of the United States' taking of Vanda's proprietary information, Vanda has suffered monetary damages in excess of millions of dollars.

## COUNT TWO

### Breach of Implied-in-Fact Contract

182. Vanda hereby incorporates and re-alleges the foregoing paragraphs 1-181 as though fully set forth herein.

42

**Appx87**

183.    An implied-in-fact contract was created when Vanda revealed trade secrets and confidential commercial information to FDA and thereby imposed on FDA an obligation to maintain the confidentiality of Vanda's trade secrets and confidential commercial information without providing compensation to Vanda or seeking Vanda's consent.

184.    Statutes and regulations constitute a standing, unambiguous offer by FDA to receive new drug applications (including required trade secret and confidential commercial information) on the condition that FDA will respect the confidentiality of that information.

185.    Vanda unambiguously accepted FDA's standing offer by submitting its NDA for Hetlioz® and Fanapt®.

186.    FDA's guarantee of confidentiality was material to Vanda's decision to submit its NDA for Hetlioz® and Fanapt®.

187.    FDA breached this implied-in-fact contract by failing to maintain Vanda's trade secrets and confidential commercial information in confidence and by in fact disclosing those trade secrets and confidential commercial information to Vanda's competitors.

188.    As a direct and proximate result of FDA's breach of the implied-in-fact contract, Vanda has been irreparably harmed and suffered significant financial damage.

## PRAYER FOR RELIEF

WHEREFORE, Vanda respectfully requests that this Court enter judgment in its favor and that the Court:

**Appx88**

1. Declare that FDA's disclosure of confidential commercial information contained in an NDA to ANDA applicants constitutes a taking for purposes of the Fifth Amendment to the United States Constitution;

2. Declare that the United States has taken Vanda's proprietary information without providing just compensation in violation of the Fifth Amendment to the United States Constitution;

3. Declare that the United States has breached an implied-in-fact contract by failing to maintain the confidentiality of Vanda's trade secret and confidential commercial information;

4. Award to Vanda just compensation and/or damages for the taking and breach in an amount to be determined at trial;

5. Award Vanda its costs and reasonable attorney's fees incurred in this action to the extent allowable under any applicable law; and

6. Award Vanda such other and further relief as the Court may deem just and proper.

**Appx89**

Dated: May 1, 2023

Respectfully submitted,

*/s/ Paul W. Hughes*

Paul W. Hughes
Andrew A. Lyons-Berg (*pro hac vice* forthcoming)
Charles Seidell (*pro hac vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*

**Appx90**

# In The United States Court of Federal Claims
## Form 2
## Cover Sheet

Plaintiff(s) or Petitioner(s)

**23-629 C**

Names: Vanda Pharmaceuticals, Inc.

Location of Plaintiff(s)/Petitioner(s) (city/state): Washington, DC

(If this is a multi-plaintiff case, pursuant to RCFC 20(a), please use a separate sheet to list additional plaintiffs.)

Name of the attorney of record (See RCFC 83.1(c)): Paul W. Hughes
   Firm Name: McDermott Will & Emery LLP

Contact information for pro se plaintiff/petitioner or attorney of record:

Post Office Box:
Street Address: 500 North Capitol St NW
City-State-ZIP: Washington DC 20001
Telephone Number: 202 756 8981
E-mail Address: phughes@mwe.com

Is the attorney of record admitted to the Court of Federal Claims Bar?  ✓ Yes ☐ No

Nature of Suit Code: 514
Select only one (three digit) nature-of-suit code from the attached sheet.

Agency Identification Code: HHS
Number of Claims Involved: _____

Amount Claimed: $ At least several million dollars
      Use estimate if specific amount is not pleaded.

Bid Protest Case (required for NOS 138 and 140):
Indicate approximate dollar amount of procurement at issue: $ _____
   Is plaintiff a small business? ☐ Yes ☐ No
   Was this action proceeded by the filing of a ☐ Yes ☐ No      Solicitation No. _____
   protest before the GAO?
   If yes, was a decision on the merits rendered? ☐ Yes ☐ No

Income Tax (Partnership) Case:
Identify partnership or partnership group: _____

Takings Case:
Specify Location of Property (city/state): Washington, DC

Vaccine Case:
Date of Vaccination: _____

Related case:
Is this case directly related to any pending or previously filed ☐ Yes ☐ No
case(s) in the United States Court of Federal Claims? If yes, you
are required to file a separate notice of directly related case(s). See RCRC 40.2.

182
**Appx91**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

23-629C
(Judge Bonilla)

---

VANDA PHARMACEUTICALS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION TO DISMISS

---

|  | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
|---|---|
|  | PATRICIA M. MCCARTHY<br>Director |
|  | L. MISHA PREHEIM<br>Assistant Director |

| OF COUNSEL: | |
|---|---|
| SAMUEL R. BAGENSTOS<br>  General Counsel<br>  U.S. Department of Health and Human<br>  Services<br>WENDY VICENTE<br>  Deputy Chief Counsel, Litigation<br>JONATHAN SILBERMAN<br>JAMES ALLRED<br>  Associate Chief Counsels<br>  Office of the Chief Counsel<br>  Food and Drug Administration | JOHN J. TODOR<br>Senior Trial Counsel<br>Commercial Litigation Branch<br>Civil Division<br>Department of Justice<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Tel.: (202) 616-2382<br>Fax: (202) 514-8640<br>Email:  john.todor@usdoj.gov |
| July 31, 2023 | Attorneys for Defendant |

**Appx101**

Template Version: July 8, 2014

## DIVISION OF BIOEQUIVALENCE DISSOLUTION REVIEW

| | |
|---|---|
| **ANDA No.** | 207231 |
| **Drug Product Name** | Iloperidone Tablets |
| **Strength (s)** | 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, 12 mg |
| **Applicant Name** | Inventia Healthcare Private Limited |
| **Applicant Address** | Unit 703 and 704, 7th floor<br>Hubtown solaris<br>N.S.Phadke Marg, Andheri (East)<br>Mumbai, Maharashtra, India 400069 |
| **US Agent Name and the mailing address** | SciRegs International, Inc.<br>Jeanne Taborsky<br>6333 Summercrest Drive<br>Columbia, MD 21045 |
| **US Agent's Telephone Number** | 410-309-3145 |
| **US Agent's Fax Number** | 410-309-6145 |
| **Original Submission Date(s)** | 05/21/2014 |
| **Submission Date(s) of Amendment(s) Under Review** | 04/02/2015 |
| **Reviewer** | Susan L Young |
| | |
| **Dissolution Method** | ADEQUATE |
| **OVERALL REVIEW RESULT** | INADEQUATE |

## I. EXECUTIVE SUMMARY

This is a review of dissolution testing only.

The application references Fanapt (iloperidone) Tablets, 1mg, 2mg, 4mg, 6mg, 8mg, 10mg, 12mg (NDA # N022192 currently held by Vanda Pharmaceuticals, Inc and approved May 6, 2009).

There is no USP monograph for this product but there is an FDA- recommended method: 500 mL 0.1N HCl using USP apparatus II (paddle) at 50 rpm. Recommended sampling times are 5, 10, 15, 30, 45 and 60 minutes. The firm only performed the 5 minute sampling for the pilot studies, but not for the exhibit batches. For the dosage strengths 6 mg, 8 mg, 10 mg, 12 mg manufactured from a common granule lot, there is a slightly slower drug release than for the dosage strengths 1 mg, 2 mg, 4 mg. The firm's dissolution testing data utilizing the recommended method are acceptable.

The firm's proposed specification of 'Not less than (NLT) <sup>(b)(4)</sup>% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes' is too liberal. Based on the data submitted, the DB recommends a more appropriate specification of NLT <sup>(b)(4)</sup>% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes.

1

**Appx151**

Appx160

**Table 5 Summary of In Vitro Dissolution Studies**

| Dissolution Conditions | Apparatus: | USP Type II (Paddle) |
|---|---|---|
| | Speed of Rotation: | 50 RPM |
| | Medium: | 0.1 N Hydrochloric acid |
| | Volume: | 500 mL |
| | Temperature: | 37°C ± 0.5°C |
| Firm's Proposed Specifications | For 30 mins - Not Less Than (b)(4) % (Q) | |
| Dissolution Testing Site (Name, Address) | INVENTIA HEALTHCARE PVT. LTD, Plot No.F1 & F-1/1, Additional MIDC, Ambernath (East)-421 506  District: Thane, Maharashtra, India | |

| Study Ref No. | Testing Date | Product ID \ Batch No. (Test - Manufacture Date) (Reference – Expiry Date) | Dosage Strength & Form | No. of Dosage Units | | Collection Times (mins) | | | | | Study Report Location |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10 | 15 | 30 | 45 | 60 | |
| EXB/624/01 | Nov. 2013 | Test Product: Iloperidone Tablets  Mfg date: Jul. 2013 | 12 mg Tablet | 12 | Mean | 82 | 89 | 98 | 100 | 100 (b)(4) | Section 2.7.1.2 |
| | | | | | Range | | | | | | |
| | | | | | % CV | 4.4 | 2.5 | 2.8 | 2.5 | 2.8 | |
| Lot No. KKTF | Nov. 2013 | Reference Product: Fanapt® Iloperidone Tablets  Exp. date: Dec. 2015 | 12 mg Tablet | 12 | Mean | 92 | 96 | 100 | 101 | 101 (b)(4) | Section 2.7.1.2 |
| | | | | | Range | | | | | | |
| | | | | | % CV | 1.5 | 1.7 | 1.6 | 1.2 | 1.4 | |

| Dissolution Method SOP effective at the time of testing (Yes/No) | Yes, method    validation done concurrently |
|---|---|
| ere the drug product units pooled during the dissolution testing (Yes/No) | No |
| as the dissolution testing conducted on the bio-batch | Yes |
| Age of the test product at the time of dissolution testing. | 4 months |
| as the reference product e pired at the time of dissolution testing (Yes/No) | No |
| Comments on the variability of the dissolution data | acceptable |
| For two-stage dissolution testing, comment on the method of medium change from acid stage to buffer stage. | NA |

## III.   Reviewer's Comments for Dissolution Testing

- The application references Fanapt (iloperidone) tablets, 1mg, 2mg, 4mg, 6mg, 8mg, 10mg, 12mg (NDA   N022192 currently held by Vanda Pharmaceuticals, Inc and approved May 6, 2009).

- There is no USP monograph for this product but there is an FDA-recommended method:   500mL 0.1N HCl using USP apparatus II (paddle) at 50 rpm. Recommended sampling times are 5, 10, 15, 30, 45 and 60 minutes.  The firm only performed the 5 minute sampling for the pilot studies, but not for the e hibit batches.  For the dosage strengths 6 mg, 8 mg, 10 mg, 12 mg manufactured from a common granule lot, there is a slightly slower drug release than for the dosage strengths 1 mg, 2 mg, 4 mg.  The firm's dissolution testing data utili ing the recommended method are acceptable.

- The firm's proposed specification  Not less than (b)(4)% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes' is too liberal.  Based on the data submitted, the DB recommends specification of NLT (b)(4)% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes.

- The DB recommended specification  NLT (b)(4)% (Q) in 30 minutes' is the same as recommended by the NDA applicant for the RLD product.  The reviewer checked the NDA Annual report for the above mentioned specification for the RLD product.

- The firm's dissolution method is **inadequate.**

## IV.   Deficiency Comments for Dissolution Testing

The firm's proposed specification is:

11

**Appx161**

Not less than ⟨(b)(4)⟩% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes. Based on the data submitted, the firm's specification is too liberal.  The firm should acknowledge the FDA recommended specification of NLT ⟨(b)(4)⟩% (Q) of the labeled amount of iloperidone is dissolved in 30 minutes.

## V.  Dissolution Recommendations

The in vitro dissolution conducted by Inventia Healthcare Private Limited on its test product Iloperidone Tablets, 1 mg (batch    E  B/618/01 manufactured  uly 2013), 2 mg (batch    E  B/619/01 manufactured  uly 2013), 4 mg (batch    E  B/620/01 manufactured  uly 2013), 6 mg (batch     E  B/621/01  manufactured  uly 2013), 8 mg (batch  E  B/622/01 manufactured  uly 2013), 10 mg (batch    E  B/623/01 manufactured  uly 2013), 12 mg (batch    E  B/624/01 manufactured  uly 2013), comparing them to Fanapt (iloperidone) Tablets, 1 mg (batch    FF  N e  piration April 2014), 2 mg (batch    FF  P e  piration April 2014), 4 mg (batch    FF  M e  piration April 2014), 6 mg (batch    FYPB e  piration  uly 2014), 8 mg (batch    FYPC e  piration April 2014), 10 mg (batch D  FY e  piration April 2014), 12 mg (batch        TF e  piration December 2015), is **inadequate** due to the deficiency comment above.

**Appx162**

BIOEQUIVALENCE DEFICIENCIES TO BE PROVIDED TO THE APPLICANT (PROCESSED BY BIO-PM)

ANDA:                    207231

APPLICANT:              Inventia Healthcare Private Limited

DRUG PRODUCT:    Iloperidone Tablets1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, 12 mg

The Division of Bioequivalence I (DBI) has completed its review of the dissolution testing portion of your submission acknowledged on the cover sheet. DB will review the fasting and fed BE studies and waiver requests later.

Your dissolution testing data are acceptable  however, your proposed specification is too liberal and not acceptable.   Please acknowledge the following FDA recommended method and specification for your test product:

| | |
|---|---|
| **USP Apparatus:** | II (paddle) |
| **Rotational Speed:** | 50 rpm |
| **Temperature:** | 37ºC ± 0.5ºC |
| **Media:** | 0.1 N Hydrochloric Acid |
| **Volume:** | 500 mL |
| **Specification:** | NLT (b)(4)% (Q) dissolved in 30 minutes |

The bioequivalence comments provided in this communication are comprehensive as of issuance.  However, these comments are sub ect to revision if additional concerns raised by chemistry, manufacturing and controls, microbiology, labeling, other scientific or regulatory issues or inspectional results arise in the future.  Please be advised that these concerns may result in the need for additional bioequivalence information and/or studies, or may result in a conclusion that the proposed formulation is not approvable.

Sincerely yours,

*{See appended electronic signature page}*

   ayne I. DeHaven, Ph.D.
Acting Director, Division of Bioequivalence I
Office of Bioequivalence
Office of Generic Drugs
Center for Drug Evaluation and Research

**Appx163**

**IN THE UNITED STATES COURT
OF FEDERAL CLAIMS**

| | |
|---|---|
| VANDA PHARMACEUTICALS INC., | 23-629C |
| Plaintiff, | Judge Bonilla |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

may ultimately be relevant in deciding whether a taking has occurred, they do not assist the court in deciding whether [p]laintiffs have stated a plausible taking claim." *Fredericks*, 125 Fed. Cl. at 421 (alterations in original) (quoting *Aviation & Gen. Ins. Co.,* 121 Fed. Cl. at 366). Instead, all that is required at the pleading stage is that "[t]he plaintiffs have identified a cognizable property interest" and "allege these interests were diminished by the government's action," which Vanda has done here. *Id.*; *see also United Affiliates Corp.*, 143 Fed. Cl. at 266-267 (requiring only minimal allegations of government action and diminution in value "to state a regulatory takings claim under the *Penn Central* framework"). The government's attempted arguments under *Penn Central* should therefore be rejected at the outset.

In any event, the government's arguments are wrong. Vanda has adequately alleged FDA's impermissible use and disclosure of Vanda's confidential information and trade secrets.

### i.    *FDA impermissibly used and disclosed Vanda's protected information.*

Vanda has plausibly alleged that FDA impermissibly used and disclosed Vanda's confidential information and trade secrets during its evaluation of iloperidone and tasimelteon ANDAs.

### 1.  *Dissolution specification*

**a.** Vanda's complaint alleges a straightforward disclosure of its dissolution specification to generic applicants. FDA expressly compared the "firm's proposed" specification against the specification "from [Vanda's] RLD." Compl. ¶ 101; *see also* Compl. ¶ 108. It then rejected the generic applicant's proposed dissolution specification, asking instead that the applicant use an "FDA-recommended dissolution … specification," which Vanda alleges is the same figure derived by FDA reviewers from its application materials. Compl. ¶¶ 98, 107. FDA acknowledges that Vanda's specification is confidential. Mot. 8. Vanda's allegation, in simplest form, is that FDA took secret information from its application and disclosed that information to a competitor. There can be little doubt that such a claim plausibly constitutes a taking. *See Monsanto*, 467 U.S. at 1011-13.

**Appx244**

The government argues that FDA's recommended dissolution specification was "based on review of the ANDA applicant's data" and not Vanda's application. Mot. 28. But this argument attempts to impermissibly substitute the government's preferred factual narrative for the complaint's well-pleaded allegations, including the words of the FDA reviewers themselves. *See* Compl. ¶¶ 101, 108. The government's assertion (at 26) that "the most plausible inference is that all these immediate release solid oral dosage forms met FDA's standard value for dissolution as set forth in guidance and, accordingly, FDA assigned each product the standard specification after reviewing each product's test batches" wholly disregards Vanda's well-pleaded factual allegations and interpretation of a document that is, at best, ambiguous.[3] The Court's role at this early stage is not to determine "the most plausible inference." *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017) ("[I]t is improper at this stage of the proceedings to weigh alternatives and which is more plausible."). And, although the government claims (at 26) this "consult[ation]" with Vanda's proprietary information was "[a]fter FDA determined an appropriate dissolution specification," it provides no support for that statement, which is directly contrary to Vanda's allegations and interpretation of the review language. Of course, "[w]hen ruling on a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff." *Nalco Co.*, 883 F.3d at 1347.

Again arguing (contrary to the complaint's allegations) that FDA did not actually disclose anything, the government also asserts that "FDA has stated for decades that approvable generics will usually dissolve in the same way as the referenced product and will therefore have the same dissolution specification." Mot. 26. But the dissolution specification is not a physical property of

---

[3]   It is also contradicted by the government's admission that "the reviewer consulted the Fanapt specification for internal consistency purposes prior to communicating a deficiency to the generic applicants." Mot. 26.

**Appx245**

the drug substance. Instead, it is an "acceptance criterion for a manufactured batch of drug product." Mot. 5. There is no strict requirement that they be the same—consider, for example, a pioneer drug that suggests a more stringent acceptance threshold in order to hold itself to a higher standard of quality. When a generic happens to suggest an identical dissolution specification to the RLD, there has been no inappropriate reference to confidential commercial information. But when FDA rejects out of hand a generic's proposed specification and substitutes a different one drawn from the RLD, it discloses confidential information, and in a way the generic will understand the information's origin—a point which is only confirmed by FDA's arguments in this case. Compl. ¶¶ 112, 143. The complaint therefore adequately alleges that FDA both appropriated and disclosed Vanda's dissolution specification information for both Fanapt® and Hetlioz®.

**b.** On top of FDA's disclosures, the facts alleged show—in black and white from the documents disclosed by FDA in response to Vanda's FOIA requests—that FDA impermissibly *used* Vanda's protected information, including the dissolution specification derived from Vanda's Fanapt® and Hetlioz® NDAs, in making recommendations to generic manufacturers Lupin, Inventia, Teva, and Apotex. Such appropriations of intellectual property can give rise to a taking as much as disclosure, because both undermine "[t]he right to exclude others," which is "central to the very definition of the property interest." *Monsanto*, 467 U.S. at 1011.

As a starting point, the government admits that FDA used Vanda's information contained within the Fanapt® NDA. Mot. 26 ("[T]he reviewer consulted the Fanapt specification for internal consistency purposes prior to communicating a deficiency to the generic applicants."). Rather than deny FDA's use of Vanda's protected information, the government argues this use was permissible

21

**Appx246**

as a "consistency check[]."[4] *Id.* In the Division of Bioequivalence Dissolution Review conducted as part of FDA's review of Lupin's ANDA, the FDA reviewer explained the origin of FDA's substitute dissolution specification, stating "the reviewer checked the NDA Annual report for the above mentioned specification for the RLD." Compl. ¶ 101. The specification provided by the reviewer to the generic manufacturer is characterized as "Specification (from RLD)." *Id.* "RLD" means "reference listed drug" and the footnotes in this document make clear that the specification was taken directly from the Fanapt® NDA. Compl. ¶¶102-104; *see also* Mot. 3.

The government's claims that FDA's use of Vanda's protected information was limited to a post-determination "consistency check[]," (Mot. 26) is belied by the text of the reviewer's note and the citations provided by FDA to the Fanapt® NDA. The reviewer's note does not state that the reviewer checked the NDA Annual report *against* an independently derived dissolution specification based on Lupin's data. Rather, it states "the reviewer checked the NDA Annual report *for* the above mentioned specification"—*i.e.*, the specification was derived from the NDA Annual report. Compl. ¶ 101 (emphasis added). At the very least, that is a plausible interpretation of the documents, satisfying Vanda's pleading burden under *Twombly* and *Iqbal*.

The same is true for FDA's improper use of Vanda's protected information in its review, recommendations, and approval of Inventia's application. Compl. ¶¶ 105-108. In the Division of Bioequivalence Dissolution Review conducted as part of FDA's review of Inventia's ANDA, the FDA reviewer made clear that the recommended dissolution specification was derived from

---

[4]   The government's argument that there is no prohibition against referring to data within NDAs as a "consistency check[]" is in direct contradiction to FDA's consistent defense of the Hatch-Waxman Amendments: that the law is constitutional because the data submitted for NDAs are not used for other applications. *See* Compl. ¶ 114-115. FDA offers no persuasive argument that the dissolution specification—which it "categorically considers … to be confidential commercial information" submitted, "reviewed[,] and approved in an application"—is immune from this prohibition. Mot. 8.

22

**Appx247**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

VANDA PHARMACEUTICALS, INC.,    )
                                )
          Plaintiff,            )
                                )
     v.                         )    No. 23-629
                                )    (Judge Bonilla)
THE UNITED STATES,              )
                                )
          Defendant.            )

**DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT**

For its answer to the complaint, defendant admits, denies, and alleges as follows:

1.    The allegations contained in paragraph 1 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

2.    The allegations contained in paragraph 2 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

3.    The allegations contained in paragraph 3 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

4.    The allegations contained in paragraph 4 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

5.    The allegations contained in paragraph 5 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx304**

6.      The allegations contained in paragraph 6 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

7.      Admits the allegation in the first sentence of paragraph 7 that the FDA approval process involves the submission of information, covering topics such as a "drug's chemical composition, details relating to its manufacture and quality control, studies demonstrating a drug's safety and effectiveness."  The remaining allegations contained in paragraph 7 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

8.      The allegations contained in paragraph 8 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

9.      Admits.

10.     Admits.

11.     The allegations contained in the first and second sentence of paragraph 11 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  Denies the allegations contained in the third sentence of paragraph 11 for lack of knowledge or information sufficient to form a belief as to their truth.

12.     Admits the allegations contained in the first sentence of paragraph 12.  The remaining allegations contained in paragraph 12 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

2

**Appx305**

13.     The allegations contained in the first and second sentence of paragraph 13 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  The allegations contained in the third sentence of paragraph 13 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  Denies the allegations contained in footnote 1 of paragraph 13 for lack of knowledge or information sufficient to form a belief as to their truth.

14.     The allegations contained in paragraph 14 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

15.     Denies the allegations contained in the first sentence of paragraph 15 for lack of knowledge or information sufficient to form a belief as to their truth.  The remaining allegations contained in paragraph 15 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

16.     Denies.

17.     Denies.

18.     Denies the allegations contained in paragraph 18 for lack of knowledge or information sufficient to form a belief as to their truth.

19.     Admits.

20.     The allegations contained in paragraph 20 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

3

**Appx306**

21. The allegations contained in paragraph 21 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

22. The allegations contained in paragraph 22 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

23. Denies the allegations contained in paragraph 23 for lack of knowledge or information sufficient to form a belief as to their truth.

24. Denies the allegations contained in the first sentence of paragraph 24 for lack of knowledge or information sufficient to form a belief as to their truth. Admits the allegations contained in the second sentence of paragraph 24.

25. The allegations contained in paragraph 25 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

26. Denies the allegations contained in paragraph 26 for lack of knowledge or information sufficient to form a belief as to their truth.

27. The allegations contained in paragraph 27 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

28. The allegations contained in paragraph 28 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

29. The allegations contained in paragraph 29 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

30. The allegations contained in paragraph 30 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

31. The allegations contained in paragraph 31 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx307**

32.     Admits the allegations contained in paragraph 32 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

33.     Admits the allegations contained in paragraph 33 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

34.     Admits the allegations contained in paragraph 34 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

35.     Admits the allegations contained in paragraph 35 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

36.     Admits the allegations contained in paragraph 36 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

37.     The allegations contained in paragraph 37 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

38.     Admits the allegations contained in paragraph 38 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

39.     The allegations contained in paragraph 39 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

40.     The allegations contained in paragraph 40 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

41.     The allegations contained in the first sentence of paragraph 41 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  Admits the allegations quoted in the parenthetical of the second sentence in paragraph 41 to the extent supported by the document cited, which is the

5

**Appx308**

best evidence of its contents; otherwise denies the allegations. Denies any remaining allegations in paragraph 41.

42.     The allegations in paragraph 42 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

43.     The allegations in paragraph 43 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

44.     The allegations in paragraph 44 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

45.     The allegations in paragraph 45 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

46.     The allegations in paragraph 46 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

47.     The allegations in paragraph 47 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

48.     The allegations in paragraph 48 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

6

**Appx309**

49.     Denies the allegations contained in paragraph 49 for lack of knowledge or information sufficient to form a belief as to their truth.

50.     Denies the allegations contained in paragraph 50 for lack of knowledge or information sufficient to form a belief as to their truth.

51.     Denies.

52.     The allegations contained in the first sentence of paragraph 52 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  Admits the allegations in the second sentence of paragraph 52 that to be approved, generic manufacturers need to submit "'information to show that the new drug is bioequivalent to the listed drug' and that the labeling, route of administration, dosage form, and strength is the same," and denies the remaining allegations in paragraph 52.

53.     The allegations contained in paragraph 53 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

54.     The allegations contained in paragraph 54 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

55.     The allegations contained in paragraph 55 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

56.     The allegations contained in paragraph 56 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

57.     Admits the allegations contained in the first sentence of paragraph 57.  Denies the allegations contained in the second sentence of paragraph 57 for lack of knowledge or information sufficient to form a belief as to their truth.

**Appx310**

58.   Admits.

59.   Denies the allegations contained in paragraph 59 for lack of knowledge or information sufficient to form a belief as to their truth.

60.   Admits the allegation in paragraph 60 that on "September 27, 2007 . . . Vanda submitted NDA 022192 to FDA seeking approval to market Fanapt for the acute treatment of schizophrenia in adults."  Denies the remaining allegations contained in paragraph 60 for lack of knowledge or information sufficient to form a belief as to their truth.

61.   Admits.

62.   Admits the allegations in paragraph 62 that Vanda's Fanapt NDA contained "details about its manufacturing process for Fanapt, including its synthesis of iloperidone" and "details about the formulation of Fanapt" to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.  The remaining allegations contained in paragraph 62 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

63.   Admits the allegations in paragraph 63 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

64.   Denies the allegations contained in paragraph 64 for lack of knowledge or information sufficient to form a belief as to their truth.

65.   The allegations contained in paragraph 65 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx311**

66.     The allegations contained in paragraph 66 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

67.     The allegations contained in paragraph 67 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

68.     Admits.

69.     Admits.

70.     Denies the allegations contained in paragraph 70 for lack of knowledge or information sufficient to form a belief as to their truth.

71.     Admits the allegations contained in paragraph 71 that on May 31, 2013, Vanda submitted NDA 205677 to FDA seeking approval to market Hetlioz to treat non-24-hour sleep-wake disorder (non-24), a condition in which an individual's circadian rhythms become misaligned with the 24-hour day.  The remaining allegations contained in paragraph 71 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

72.     Admits.

73.     The allegations contained in paragraph 73 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

74.     The allegations contained in paragraph 74 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

9

**Appx312**

75. The allegations contained in paragraph 75 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

76. The allegations contained in paragraph 76 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

77. The allegations contained in paragraph 77 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

78. The allegations contained in paragraph 78 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

79. The allegations contained in paragraph 79 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

80. The allegations contained in paragraph 80 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

81. The allegations contained in paragraph 81 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

82. Admits.

83. Denies.

10

**Appx313**

84. Admits.

85. Denies the allegations in the first sentence of paragraph 85. Admits the allegations in the second sentence of paragraph 85.

86. The allegations in paragraph 86 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

87. The allegations in paragraph 87 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

88. The allegations in paragraph 88 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

89. The allegations in paragraph 89 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

90. The allegations in paragraph 90 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

**Appx314**

91.    The allegations in paragraph 91 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

92.    The allegations in paragraph 92 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

93.    The allegations in paragraph 93 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

94.    The allegations in paragraph 94 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

95.    The allegations in paragraph 95 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

96.    The allegations in paragraph 96 do not set forth a claim of relief or aver facts in support of a claim. *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required

**Appx315**

and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

97.     Admits.

98.     Admits the allegations contained in paragraph 98 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

99.     The allegations contained in paragraph 99 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

100.     Admits the allegations contained in the textual sentence of paragraph 100 and the first sentence in footnote 2 of paragraph 100.  The remaining allegations in footnote 2 of paragraph 100 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

101.     Denies the allegation contained in paragraph 101 that the "FDA reviewer explained the origin of FDA's substitute dissolution specification."  Admits the remaining allegations contained in paragraph 101 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

102.     Admits.

103.     The allegations contained in paragraph 103 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

104.     Admits.

105.     The allegations in paragraph 105 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 14-15.  Accordingly, no answer is required and the Court

13

**Appx316**

should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

106. The allegations in paragraph 106 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 14-15. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

107. The allegations in paragraph 107 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 14-15. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

108. The allegations in paragraph 108 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 14-15. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

109. The allegations contained in paragraph 109 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

110. Admits the allegations contained in paragraph 110 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

111. The allegations contained in paragraph 111 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

14

**Appx317**

112.    The allegations contained in paragraph 112 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

113.    The allegations contained in paragraph 113 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

114.    Admits the language quoted from the Woodcock Letter to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations. The remaining allegations contained in paragraph 114 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

115.    Admits the language quoted in paragraph 115 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations. The remaining allegations contained in paragraph 115 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

116.    The allegations contained in paragraph 116 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

117.    The allegations contained in the first and fourth sentences of paragraph 117 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied. Denies the

allegations contained in the second and third sentences of paragraph 117 for lack of knowledge or information sufficient to form a belief as to their truth.

118. Denies the allegations contained in paragraph 118 for lack of knowledge or information sufficient to form a belief as to their truth.

119. The allegations contained in paragraph 119 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

120. The allegations contained in paragraph 120 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

121. The allegations contained in paragraph 121 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

122. The allegations contained in paragraph 122 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

123. The allegations contained in paragraph 123 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

124. The allegations contained in paragraph 124 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

16

**Appx319**

125.    The allegations contained in paragraph 125 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

126.    The allegations contained in paragraph 126 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

127.    The allegations contained in paragraph 127 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

128.    Admits the allegation contained in paragraph 128 that Vanda received a FOIA response from FDA on April 12, 2023.  The remaining allegations contained in paragraph 128 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

129.    Denies the allegation contained in the first sentence of paragraph 129.  Admits the allegations in footnote 4 of paragraph 129.  The remaining allegations contained in paragraph 129 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

130.    The allegations contained in paragraph 130 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

131.    The allegations contained in paragraph 131 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

17

**Appx320**

132.   Admits.

133.   Admits.

134.   Admits.

135.   Admits.

136.   Admits.

137.   The allegations in paragraph 137 do not set forth a claim of relief or aver facts in support of a claim.  *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

138.   The allegations in paragraph 138 do not set forth a claim of relief or aver facts in support of a claim.  *See* Op. & Order, ECF No. 17, at 7 n.10.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

139.   Admits.

140.   Admits the allegations contained in paragraph 140 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

141.   Admits the allegations contained in paragraph 141 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

142.   The allegations contained in paragraph 142 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx321**

143.    The allegations contained in paragraph 143 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

144.    The allegations contained in paragraph 144 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

145.    Admits the allegations contained in paragraph 145 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

146.    Admits the allegations contained in paragraph 146 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

147.    Admits the allegations contained in paragraph 147 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

148.    Admits the allegations contained in paragraph 148 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

149.    Admits the allegations contained in paragraph 149 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

150.    Admits the allegations contained in paragraph 150 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

151.    Admits the allegations contained in the first and third sentence of paragraph 151 to the extent supported by the documents cited, which is the best evidence of their contents; otherwise denies the allegations.  Denies the allegations contained in the second sentence of paragraph 151.

152.    Denies the allegations contained in paragraph 152 for lack of knowledge or information sufficient to form a belief as to their truth.

19

**Appx322**

153.    Admits the allegations contained in paragraph 153 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.

154.    Denies the allegations contained in paragraph 154 for lack of knowledge or information sufficient to form a belief as to their truth.

155.    Admits.

156.    The allegations contained in paragraph 156 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

157.    The allegations contained in the first sentence of paragraph 157 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.  Admits the allegation contained in the second sentence of paragraph 157 that "FDA redacted impurity information as confidential and/or trade secret in the administrative correspondence and chemistry review that it published as part of the action package for approval for Hetlioz" and denies the remaining allegations.

158.    The allegations contained in paragraph 158 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

159.    The allegations contained in paragraph 159 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

160.    The allegations contained in paragraph 160 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

161.    The allegations contained in paragraph 161 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

162.    Admits the allegations contained in the first and second sentences of paragraph 162 to the extent supported by the document cited, which is the best evidence of its contents; otherwise denies the allegations.  The remaining allegations contained in paragraph 162 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

163.    The allegations contained in paragraph 163 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

164.    The allegations contained in paragraph 164 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

165.    The allegations contained in paragraph 165 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

166.    The allegations contained in paragraph 166 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

167.    Defendant's responses to paragraphs 1-166 are incorporated by reference.

168.    The allegations contained in paragraph 168 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx324**

169.     The allegations contained in paragraph 169 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

170.     The allegations contained in paragraph 170 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

171.     The allegations contained in paragraph 171 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

172.     Denies the allegations contained in the first sentence of paragraph 172.  Denies the allegations contained in the second sentence of paragraph 172 for lack of knowledge or information sufficient to form a belief as to their truth.

173.     The allegations contained in paragraph 173 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

174.     The allegations contained in paragraph 174 constitute plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

175.     The allegations contained in paragraph 175 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

176.     The allegations contained in paragraph 176 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

**Appx325**

177. The allegations contained in paragraph 177 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

178. The allegations contained in paragraph 178 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

179. The allegations contained in paragraph 179 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

180. The allegations contained in paragraph 180 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

181. The allegations contained in paragraph 181 constitute conclusions of law or plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

182. Defendant's responses to paragraphs 1-181 are incorporated by reference.

183. The allegations in paragraph 183 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13.  Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

184. The allegations in paragraph 184 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13.  Accordingly, no answer is required and the Court

**Appx326**

should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

185. The allegations in paragraph 185 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

186. The allegations in paragraph 186 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

187. The allegations in paragraph 187 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

188. The allegations in paragraph 188 relate to Vanda's claim that has been dismissed. *See* Op. & Order, ECF No. 17, at 12-13. Accordingly, no answer is required and the Court should strike the allegations in this paragraph as immaterial and impertinent matters pursuant to Rule 12(f).

Denies that plaintiff is entitled to the relief set forth in the prayer for relief immediately following paragraph 188, or to any relief whatsoever.

Denies each and every allegation not previously admitted or otherwise qualified.

**Appx327**

WHEREFORE, defendant respectfully requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

## RESERVATION OF DEFENSES

Defendant reserves all affirmative defenses under Rule 8(c) of the Rules of the United States Court of Federal Claims and any other defenses, at law or in equity, that may now exist or in the future may be available based on discovery and further factual investigation in this case.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

 s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

*Of Counsel:*

SAMUEL R. BAGENSTOS
General Counsel
U.S. Dep't of Health & Human Services

WENDY VINCENTE
Deputy Chief Counsel, Litigation

JAMES ALLRED
Associate Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Ave.
White Oak 31
Silver Spring, MD 20993-0002

 s/Igor Helman
IGOR HELMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7576
Fax: (202) 514-7965
Igor.Helman@usdoj.gov

25
**Appx328**

March 1, 2024                                     *Attorneys for Defendant*

**Appx329**

23-629

████████████

---

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

VANDA PHARMACEUTICALS, INC.,
Plaintiff,

v.

UNITED STATES,
Defendant.

---

## DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

OF COUNSEL:

SAMUEL R. BAGENSTOS
  General Counsel
  U.S. Department of Health and
  Human Services

WENDY VICENTE
  Deputy Chief Counsel, Litigation

JAMES ALLRED
LEAH EDELMAN
  Associate Chief Counsel
  Office of the Chief Counsel
  U.S. Food and Drug
  Administration
  10903 New Hampshire Ave.
  White Oak 31
  Silver Spring, MD 20993-0002

April 30, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

IGOR HELMAN
Senior Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:    (202) 305-7576
Facsimile:    (202) 514-7965
Email:  Igor.Helman@usdoj.gov

*Attorneys for Defendant*

**Appx490**

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Deutsche Bank AG v. United States*, 95 Fed. Cl. 423 (2010), *aff'd*, 742 F.3d 1378 (Fed. Cir. 2014) (internal quotation marks omitted); *see Alt. Carbon Res., LLC v. United States*, 939 F.3d 1320, 1328 (Fed. Cir. 2019); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The moving party bears the burden of demonstrating the absence of genuine issues of material fact" and "all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 325, and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (same). Once it has done so, "the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor." *Chittenden v. United States*, 126 Fed. Cl. 251, 261, *aff'd*, 663 F. App'x 934 (Fed. Cir. 2016); *see Anderson*, 477 U.S. at 256. A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 248, 250.

"Whether a compensable taking has occurred is a question of law based on factual underpinnings." *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004). The question of law as to whether a plaintiff alleging a taking holds a cognizable property interest is appropriate to resolve when there is no dispute over the facts material to that property interest. *See Nw. La. Fish & Game Pres. Comm'n v. United States*, 79 Fed. Cl. 400, 405 (2007); *see also, e.g.*, *Fala Corp. v. United States*, 53 Fed. Cl. 86, 88 (2002). "[I]f a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation

was a taking under the analysis set forth in *Penn Central* [*Transportation Co. v. New York City*, 438 U.S. 104, 123 (1978).]"  *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002). Instead, "where a claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end."  *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1275 (Fed. Cir. 2023) (cleaned up).

## II. Vanda Lacks A Cognizable Property Interest In The Three Items That It Contends FDA Disclosed To Generic Applicants

As a "threshold matter, the [C]ourt must determine whether the claimant has established a [cognizable] property interest for purposes of the Fifth Amendment."  *Am. Pelagic*, 379 F.3d at 1372 (citing *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003)); *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (explaining that resolving the existence of a valid property interest is a "[f]irst" step of a Fifth Amendment taking case, and courts "do not reach th[e] second step without first identifying a cognizable property interest."). Here, Vanda lacks a compensable property interest in any of the alleged property at issue.  And because Vanda cannot "demonstrate the existence of a legally cognizable property interest, the court's task is at an end."  *Fishermen's Finest*, 59 F.4th at 1275 (cleaned up).

### A. The Dissolution Specifications That FDA Provided To Vanda Does Not Constitute A Cognizable Property Interest

Vanda's claim of a cognizable property interest in the dissolution specifications for Fanapt and Hetlioz fails because it was FDA that provided Vanda the very specifications that Vanda now claims the Government took.  Thus, even assuming for the sake of argument that a dissolution specification can be a valuable trade secret—a proposition which is far from established and one that we dispute—Vanda cannot seek compensation from the Government for value the Government itself created.

21

**Appx518**

FDA created the alleged property at issue here in a literal sense, by analyzing Vanda's dissolution data and determining sufficiently strict dissolution specifications from that data that it then recommended to Vanda.[9]  In addition, any value inherent in the specifications derives from the role of those specifications in a regulatory scheme also created by FDA.  In such circumstances, as a matter of law, there is no cognizable property interest subject to compensation under the Taking Clause.

As an initial matter, the Court must define the scope of the alleged property interest. Although "every sort of real property interest the citizen may possess counts as a property interest under the Fifth Amendment," *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003), the same is not true for other forms of property.  Instead, when addressing non-real property, such as the alleged trade secrets at issue here, the court must examine the claimed interest in accordance with "background principles" and "existing rules or understandings" to

---

[9]  Vanda argues to this Court that FDA impermissibly looked at and relied on its dissolution testing data in approving Apotex and Teva's tasimelteon generic applications, *see, e.g.*, Compl. ¶ 142, even as it argues to another Federal court that FDA was *required* to consider that very testing data in deciding whether a generic tasimelteon drug product was bioequivalent.  In that case, Vanda's challenge to FDA's approval of MSN's generic application is predicated in part on FDA's allegedly wrongful failure to consider Vanda's Hetlioz dissolution data.  *See, e.g.*, Compl. ¶¶ 83-84, 133, *Vanda Pharms. Inc. v. FDA*, No. 23-cv-2812 (D.D.C.), ECF No. 1.  Thus, in its recently filed summary judgment motion, Vanda argues that "FDA failed to consider critical pharmacokinetic and dissolution testing discrepancies" between its testing data and MSN's.  Mem. in Supp. of Pl.'s Mot. for Summ. J. at 20, *Vanda Pharms.*, No. 23-cv-2812, ECF No. 24-1; *see id.* at 21.  Vanda even argues that FDA should have considered not only its testing data but Apotex's as well.  *See id.*  And contrary to its argument here, Vanda argues:  "If FDA attempts to claim that it did not consider the known dissolution and pharmacokinetic profile of Hetlioz® from either Vanda's sNDA or from another ANDA under review at the same time, its failure to consider this information would itself be arbitrary and capricious.  An agency is obligated to consider evidence at its disposal that bears on the problem before it."  *Id.* at 23.  Moreover, "it need only have looked to the data in its possession—indeed, its *own* written analysis of that data— describing the dissolution and pharmacokinetic testing results obtained independently by both Vanda and Apotex *for the reference listed drug*."  *Id.* at 24 (emphasis in original).  Vanda should not be able to have it both ways.

determine whether the interest is cognizable. *Am. Pelagic*, 379 F.3d at 1376 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992)).  Thus, for example, an "owner of personal property, as opposed to land, may have a lowered expectation that he has a property interest in using his personal property for commercial dealings," given "the State's traditionally high degree of control over commercial dealings." *Id.* at 1377.  Accordingly, a property owner claiming a taking of other than real property must establish the "*right* to that use of the property," and not merely enjoyment "that the government chose not to disturb." *Id.*  Moreover, "[t]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with the other collateral interests which may be incident to his ownership." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 217 (Fed. Cir. 1993) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)).  As such, courts have distinguished between the plaintiff's actual property and its "collateral interest" in the use of property. *Acceptance Ins. Cos. v. United States*, 84 Fed. Cl. 111, 116-17 (2008), *aff'd*, 583 F.3d 849 (Fed. Cir. 2009); *see Air Pegasus*, 424 F.3d at 1215.

Here, Vanda's alleged property interest is narrow, and narrowly defined.  In its complaint, Vanda makes clear that it is alleging disclosure and use of its "dissolution specification," which it regards as a "trade secret." Compl. ¶¶ 109-10, 112-13, 122-23, 139-43.  But the only part of a dissolution specification that is not published immediately upon a drug's approval is the Q value.  *See* Compl. ¶ 110.  And the Q value is not kept from the public forever; rather, it may be published in a USP monograph prior to or after a drug's approval, or through some other public release.[10]  Because it is axiomatic that a trade secret cannot have been

---

[10] As FDA's draft guidance for iloperidone and tasimelteon makes clear, the other elements of the dissolution specification, including the time at which the measurement is taken and the

"publicly disclose[d]," these parameters cannot constitute a trade secret. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."); *see Gal-Or v. United States*, 113 Fed. Cl. 540, 554 (2013) ("[D]isclosing trade secrets without taking the minimal steps necessary to maintain trade secret protection is fatal to a taking claim." (cleaned up)).

More importantly, Vanda has no compensable property interest in the dissolution specification for its two approved drug products because Vanda did not create that information, but rather was provided the information by FDA. Ex. 1 at 77, 98, 102; Ex. 3 at 1-2. Additionally, Q=██, the only element of the dissolution specifications that were not publicly disclosed at approval, is a standard value regularly applied to readily dissolvable drug products. Vanda seeks to turn a standard recommendation given to it by FDA into a protectable trade secret, and thereby exclude FDA from providing similar recommendations to generic applicants that seek approval of their ANDAs for drugs that *must be* bioequivalent. This Court should reject Vanda's attempt to use the Taking Clause to usurp the careful balance that Congress struck between pioneer drugs and generic competition in the Hatch-Waxman Amendments.

1.  **The Dissolution Specifications For Vanda's Fanapt And Hetlioz Are Not Trade Secrets Because They Are Not The Result Of Vanda's Labor And Invention But Were Recommended To Vanda By FDA**

Vanda cannot claim a trade secret (and therefore a cognizable property interest) in something that it did not create but, rather, was given to it by FDA. Simply put, Vanda did not

---

testing parameters, are public. *See Draft Guidance on Iloperidone* (directing users to FDA's dissolution methods database, which then lists volumes, recommended sampling times, and other measurements for iloperidone); *Draft Guidance on Tasimelteon* (referring users to FDA's Dissolution Guidance, 2018, for similar details); *see also, e.g.,* Compl. ¶ 98.

create the dissolution specifications it ultimately adopted.  In *Monsanto*, the Supreme Court found that the "general perception of trade secrets as property" was "consonant with a notion of 'property' that extends beyond land and tangible goods and includes the products of an individual's 'labour and invention.'"  *Monsanto*, 467 U.S. at 1002-03 (quoting 2 W. Blackstone, Commentaries *405).  Applying that "perception," the Supreme Court recognized a compensable property interest in "the health, safety, and environmental data [Monsanto] *has submitted to EPA*."  *Id.* at 1001 (emphasis added); *see also id.* ("EPA has stipulated that 'Monsanto has certain property rights in its information, research and test data *that it has submitted* under FIFRA *to EPA* and its predecessor agencies.'" (emphasis added)); *id.* at 1003 ("Having determined that Monsanto has a property interest in the data *it has submitted to EPA . . . .*" (emphasis added)).  Thus, the Supreme Court recognized a cognizable property interest in the intellectual property precisely because the trade secret information was the result of the plaintiff's "labo[]r and invention" and was submitted *to* the Government, not received *from* the Government.

Conversely, the Supreme Court has recognized the "general principle" that "the Government as condemnor may not be required to compensate a condemnee for elements of value that *the Government has created*."  *United States v. Fuller*, 409 U.S. 488, 492 (1973) (emphasis added) (collecting cases for this general principle).  In *Fuller*, for example, the Supreme Court explained that there is a "significant difference between the value added to property by a completed public works project, for which the Government must pay, and the value added to fee lands by a revocable permit authorizing the use of neighboring lands that the Government owns."  *Id.*  The Federal Circuit has also previously concluded that a plaintiff had no cognizable property interest in a permit issued by the Government.  *Conti*, 291 F.3d at 1340.

25

**Appx522**

PUBLIC

Under the principle established by *Fuller* and its progeny, there is no cognizable property interest in the dissolution specifications at issue here.  The dissolution specifications are not the product of Vanda's labor and invention because they were provided to Vanda by FDA.  Vanda does not dispute that FDA authored the dissolution specifications for both Fanapt and Hetlioz that were ultimately adopted in the approved applications.  FDA scientists analyzed Vanda's dissolution data and determined that Vanda's proposed dissolution specifications were insufficiently strict and recommended stricter dissolution specifications for Vanda's products, and Vanda then adopted those recommended specifications.  Vanda did not *submit* the dissolution specification *to* FDA; it *received* the dissolution specification *from* FDA.[11]

Vanda has previously contended that the fact that FDA redacted Q values in records that it produced under FOIA means that FDA considers those values to be a trade secret.  *See* Compl. 21 n.2.  But as a matter of operational efficiency, FDA categorically redacts any product acceptance criteria that are not already published in a USP monograph or otherwise publicly known.  This occurs regardless of whether it is sponsor-proposed or FDA-accepted, and without assessing the individual trade secret or confidential commercial nature of the information.  The agency does so because it is frequently not in a position to assess the confidential nature of the information.  For example, FDA would not be in a position to know, when providing records in response to a FOIA request, whether each applicant has actually kept the information

---

[11] The fact that Vanda developed and submitted dissolution *data* and an initial dissolution specification to FDA is beside the point.  FDA does not dispute that Vanda generated dissolution data, but those data are not the alleged property at issue.  *See* Compl. ¶¶ 112, 116-17, 121-22, 169.  Similarly, Vanda's originally proposed dissolution specifications cannot support its taking claim, because FDA rejected Vanda's proposals as insufficiently strict.  Thus, even if the initial dissolution specifications could be considered property in the abstract, they lack any value because they were rejected.  Furthermore, even if the initial dissolution specification could have value, as discussed *infra*, Vanda's lacks any cognizable property interest in its initial dissolution specification for Hetlioz because it has repeatedly disclosed that information to the public.

**Appx523**

confidential or whether the information at issue relates to the production process or merely the end product.  *See* 21 C.F.R. § 314.430(g); *cf. Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 150-51 (D.C. Cir. 2001) (holding that information that addresses only product features, quality control, or other areas unrelated to the production process are not trade secrets).

Moreover, given the volume of review documents that FDA must publicly post, the agency cannot readily assess whether individual product acceptance criteria are ascertainable by the public.  In all events, redaction of the Q value in the dissolution specification is not dispositive of whether Vanda has a cognizable property interest for purposes of a taking analysis. *See Am. Pelagic*, 379 F.3d at 1376-77 (a claim of a taking of intellectual property requires further analysis beyond a mere interest in keeping information confidential to make the interest compensable).  The mere fact that the Q value was redacted for purposes of the FOIA does not substitute for the full analysis of a taking claim, where "[n]ot all losses generate a Fifth Amendment taking."  *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993) (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943)).  And in this case, despite the categorical redaction by FDA's disclosure office, application of the *Monsanto* standard demonstrates that Vanda lacks a cognizable property interest in the information that FDA provided to Vanda.

**2.     Dissolution Specifications Are Not Cognizable Property Interests Because Any Value They Possess Derives From, And Is Intertwined With, Their Role In FDA's Regulatory Scheme**

Even if the dissolution acceptance criteria that FDA provided to Vanda could be considered consonant with some notion of property for Vanda, any affected "right of use" would

PUBLIC

not be compensable because it was entirely dependent upon the regulatory scheme underlying review and approval of new drugs.  This is so for two reasons.

First, pervasive Government control over the area of manufacturing finished drug products undermines any compensable property interest under the Fifth Amendment.  "[W]hen a plaintiff voluntarily enters into an area which, from the start, is subject to pervasive government control, its enforceable rights sufficient to support a takings claim against the United States are extinguished."  *Acceptance Ins.*, 84 Fed. Cl. at 116-17; *see Air Pegasus of D.C., Inc. v. United States*, 60 Fed. Cl. 448, 453-54 (2004) ("If a party voluntarily enters into an area that Is subject to pervasive government control, then a property right that would justify compensation under the Takings Clause may not exist.").  As the Federal Circuit has explained, "[t]he chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession—the right to exclude strangers, or for that matter friends, but especially the Government.'" *Mitchell Arms*, 7 F.3d at 215 (quoting *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991)); *see also Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330-31 (Fed. Cir. 2005); *Am. Pelagic*, 379 F.3d at 1375-77; *Acceptance Ins.*, 84 Fed. Cl. at 116-17.  "The reason enforceable rights sufficient to support a taking claim cannot arise in such an area is that when a citizen voluntarily enters such an area, the citizen cannot be said to possess 'the right to exclude' because it is impossible for a citizen in an area subject to government control to possess this right." *Mitchell Arms*, 7 F.3d at 215 (quoting *Hendler*, 952 F.2d at 1374).

Second, and relatedly, the alleged property interest is not compensable because the right of use itself derives from or is dependent on the regulatory scheme.  In evaluating whether a claimed property interest is compensable, "courts must consider whether the affected 'right of

28

**Appx525**

use' is dependent upon the regulatory scheme or whether 'an independent or preexisting right of use under common law applies.'" *Page v. United States*, 51 Fed. Cl. 328, 339 (2001) (quoting *Maritrans, Inc. v. United States*, 40 Fed. Cl. 790, 798 (1998)).  Accordingly, courts have found a compensable property interest where the claimed interest exists "independent of the regulatory scheme." *Acceptance Ins.*, 84 Fed. Cl. at 117; *cf. Cienega Gardens*, 331 F.3d at 1334 (noting that the "industry of private mortgage loans is *not* at all one that is highly regulated").  In contrast, "courts have found property interests to be dependent on a regulatory scheme when *pervasive* regulation exists in the area." *Acceptance Ins.*, 84 Fed. Cl. at 117 (emphasis added); *see, e.g.*, *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986); *Conti*, 291 F.3d at 1339.  Thus, courts have found no compensable property interest in rights of use in, for example, tracts of land set aside as tribal reservations, *see Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1375-76 (Fed. Cir. 2000), or fishing permits, even where those permits were transferable, exclusive, and irrevocable, *see Fishermen's Finest*, 59 F.4th at 1275-79; *see also Am. Pelagic*, 379 F.3d at 1374; *Conti*, 291 F.3d at 1341-42.

Here, Vanda has no right to exclude the Government from regulating its batch release dissolution acceptance criteria.  First, there can be no doubt that drug manufacturing is an area of highly pervasive Government control.  *See, e.g.*, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 237 (2011).  As the Supreme Court observed, "FDA's regulations—more than 90 of them— . . . pervasively regulate [every aspect of the pharmaceutical] manufacturing process, down to the requirements for plumbing and ventilation systems at each manufacturing facility."  *Id.*  Moreover, for the particular property Vanda claims, it would be nonsensical to claim a right to exclude the Government.  An important purpose of a dissolution specification is to enable the Government to assess the manufacture of drug product batches and ensure that this manufacture

PUBLIC

complies with the Government's regulatory scheme.  Not only does Vanda have no right to exclude the Government from the dissolution specification it ultimately adopted, but even if it did, the dissolution specification would have little regulatory purpose.

To illustrate, consider what would happen to Vanda's claim if the dissolution specification for one of Vanda's products were to change.  The Taking Clause does not require the Government "to compensate a condemnee for elements of value that . . . it might have destroyed under the exercise of governmental authority other than the power of eminent domain." *Fuller*, 409 U.S. at 492.  If FDA were to determine that the dissolution specification for Vanda's drug was inadequate to ensure quality, or if a manufacturing change required a change in the specification, FDA could request, recommend, and approve a new dissolution specification.  *See, e.g.*, 21 U.S.C. § 355(c)(5)(A)-(B) (providing for review of supplemental NDAs); 21 C.F.R. § 314.70 (requiring FDA review and approval of a supplemental application for any change affecting production process or quality controls, among other elements).  In that circumstance, the prior dissolution specification—that Vanda contends is a valuable trade secret—would be worthless, both to Vanda and to others.  Thus, any value in a dissolution specification is entirely due to the regulatory significance of the specification.  Accordingly, there is no value in the numbers apart from their use as a regulatory tool by FDA to ensure product quality.

In addition, Vanda's alleged property right in its approved dissolution specifications lacks fundamental hallmarks of property.  For example, Vanda cannot assign or sell its dissolution specification to another drug or manufacturer of that drug, because the specification is a specific regulatory assessment particular to, and based on, the dissolution data for its own drug product. *Cf. Acceptance Ins.*, 583 F.3d at 858 (holding insurer "did not possess the unfettered right to sell

30

**Appx527**

or otherwise transfer [insurance] policies, thus precluding the existence of a cognizable property interest"); *Am. Pelagic*, 379 F.3d at 1374 (finding no property interest in fishery permits because they were specific to the assigned ship and could not be assigned, sold, or transferred to another ship); *Conti*, 291 F.3d at 1341-42 (same).  Nor can Vanda destroy its dissolution specification or unilaterally change the specification:  FDA requires the specification, and only FDA can approve a change.  Vanda cannot exclude the Government from its specification.

Ultimately, federal law prohibits the marketing of drugs unless approved by FDA, 21 U.S.C. § 355(a), and the dissolution specification is one condition for FDA approval of a drug product entering into interstate commerce, *see* 21 C.F.R. § 211.165(f).  The establishment of this quality assessment specification does not thereby create a claim against the Government because the value of the specification is limited to its function in the regulatory scheme.

> 3.   **Vanda Cannot Claim A Protected Property Interest In The Hetlioz Dissolution Specification Because It Previously Revealed Its Specification And Underlying Dissolution Data To The Public**

Even if this Court were to conclude that at one time Vanda had a property interest in its dissolution specifications—and it should not—Vanda's claimed property interest in the Hetlioz dissolution specification fails for another independent reason:  A foundational principle of trade secret law is that "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  *Monsanto*, 467 U.S. at 1002; *see, e.g., In re Iowa Freedom of Info. Council*, 724 F.2d 658, 662 (8th Cir. 1983) (observing that "[t]rade secrets are a peculiar kind of property.  Their only value consists in their being kept private.  If they are disclosed or revealed, they are destroyed."); *Gal-Or*, 113 Fed. Cl. at 554.  Vanda previously

publicly disclosed the Hetlioz dissolution information and that public disclosure terminated whatever property interest in the information it may have had.

Vanda's public disclosure of its proposed dissolution specifications and "Complete Dissolution Profile Data" for study batches of Hetlioz extinguishes any alleged property right in the information.  On at least three separate occasions, Vanda has disclosed its proposed dissolution specification and complete dissolution data for Hetlioz to the public.  Twice, Vanda filed its dissolution specification to a public docket in a Federal court proceeding, where the materials remain to this day.  *See* Compl. Ex. 11 at 12, *Vanda Pharms. Inc. v. FDA*, No. 23-cv-00280 (D.D.C. filed Jan. 31, 2023), ECF No. 1-11; Mot. for Prelim. Inj. Ex. 11 at 12, No. 23-cv-00280 (D.D.C. filed Feb. 8, 2023), ECF No. 7-16.  Additionally, Vanda has publicly filed its dissolution data in a Citizen Petition to FDA which is placed before the public, with no redaction or indication that the information is to be kept secret.  Citizen Petition Ex. 10 at 12, Dkt. FDA-2023-P-0313-0012, https://www.regulations.gov/document/FDA-2023-P-0313-0012; *see* 21 C.F.R. §§ 10.20, 10.35 (stating that all submissions "will be on public display and will be available for public examination" unless the submitter segregates and clearly marks the information as exempt from public examination).  These filings also contain other data that more directly speak to product design, including detailed descriptions of the drug product's solubility and permeability.  Vanda did not take any steps to protect the dissolution data or other data in any of the three disclosures.  As a result, any property interest in the information is "extinguished." *Monsanto*, 467 U.S. at 1002.

Here, Vanda's disclosures were not casual or slight.  Instead, they came in formal, carefully reviewed documents:  two submitted publicly before a Federal court in litigation challenging its competitors' approvals, in which its competitors would soon join as parties, and

one posted on a government website inviting comment from the public, including its competitors.  Because public disclosure "extinguishe[s]" any property right, *Monsanto*, 467 U.S. at 1002, and "is fatal to a taking claim," *Gal-Or*, 113 Fed. Cl. at 554, Vanda's repeated public disclosure of its Hetlioz dissolution specifications merits dismissal of any taking claim based on that information.

Vanda alleges that it only learned about the alleged disclosures by FDA upon receipt of FOIA-requested records in April 2023.  *See* Compl. ¶¶ 106, 128-29, 140-41.  Yet, all three of Vanda's public disclosures occurred before Vanda alleges that it learned of the purported taking.  Thus, Vanda's disclosure was not in response to any belief that the value of the information had diminished from any alleged FDA disclosure.  Rather, Vanda's repeated disclosures indicate that it does not actually consider the information confidential, or that Vanda failed to exercise "reasonable measures" to protect information it considers to be a valuable trade secret from disclosure.  *See, e.g.*, *ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 986 (Fed. Cir. 2014).  Either way, Vanda's claim fails.

**B.     Vanda Lacks Any Cognizable Property Interest In Information It Disclosed In Its Published Patent Application**

Vanda has no cognizable property interest under the Fifth Amendment for the only impurity information for which it seeks compensation, because it disclosed that information in a published patent application.  Vanda alleges that FDA, by "highlight[ing] five impurities that 'are . . . reported in patent [application] US20170190683A1" to one active ingredient manufacturer and six impurities in the patent to a second active ingredient manufacturer, "took" Vanda's property rights in that impurity information in violation of the Taking Clause.  Compl. ¶¶ 147-48.  Vanda's argument fails because "it is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain.  Once the

information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009). Here, the Vanda patent application disclosed possible impurities that may be formed in the manufacture of tasimelteon. The identity of these impurities and the fact that they may be formed in tasimelteon manufacture thus cannot be trade secrets. *See Monsanto*, 467 U.S. at 1002.

In an attempt to avoid this conclusion, Vanda suggests that by referring a third party to the existence of a published patent application and the information described therein, FDA necessarily implied that Vanda practices the (subsequently issued) patent. Compl. ¶¶ 158-61. But Vanda nowhere explains why this must be so. Vanda does not allege that it practices the patent, identify which, if any, of the various manufacturing processes in the patent it practices, or explain how the questions FDA posed disclose which process, if any, it practices. All these facts are necessary predicates to a taking claim. The only information that Vanda alleges that FDA disclosed was the impurity information in the public patent application, and precedent forecloses any property interest based on that information. *Ultimax Cement*, 587 F.3d at 1355.

Moreover, even if Vanda practices the patent—which is unclear—FDA cannot be barred from discussing impurities identified in a published patent application that other manufacturers may also practice. By adding information about impurities in the manufacture of tasimelteon to the patent disclosure, Vanda made those impurities part of the public domain and FDA is free to refer to them. Simply put, Vanda cannot both patent an inventive idea regarding the manufacture of tasimelteon and shield it from the public by keeping it a trade secret at the same time. *Ultimax Cement*, 587 F.3d at 1355.

**Appx531**

The public, including the Government, has the unfettered right to read and refer to information disclosed in a patent (or published patent application), for "[i]f the public had absolutely no right to use the disclosure without the patent holder's consent until after the patent expired, it would make little sense to require that the disclosure be made freely available to the public at the outset of the patent term." *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1324 (Fed. Cir. 2013) (Newman, J., concurring), *aff'd*, 573 U.S. 208 (2014). This disclosure is the price of the "patent bargain" Vanda accepted: public disclosure in exchange for a limited term of commercial protection. *Amgen Inc. v. Sanofi*, 143 S. Ct. 1243, 1251 (2023); *see J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) ("The disclosure required by the Patent Act is 'the quid pro quo of the right to exclude.'"). Vanda cannot use the Taking Clause to change the terms of the patent bargain.

## C.   Vanda Cannot Establish A Cognizable Property Interest In The General Concept Of Active Ingredient Particle Size

Finally, Vanda alleges that FDA disclosed Vanda's confidential information when, in a Complete Response Letter issued to the manufacturer of the drug substance used in Apotex's generic drug, FDA asked the drug substance manufacturer whether its product "may be subject to any particle size reduction." Compl. ¶ 162. However, the complaint provides no basis to conclude that FDA's question to the drug substance manufacturer implicates any property interest of Vanda's. The complaint does not allege that Vanda's manufacturing process uses micronization techniques or particle size reduction. Indeed, in conclusory form, Vanda alleges that FDA's question to the drug substance manufacturer constitutes an improper disclosure of Vanda's confidential information "[i]rrespective of Vanda's manufacturing processes." *Id.* Because Vanda does not allege that its own manufacturing process for tasimelteon uses micronization techniques or particle size reduction, there is no basis to conclude that Vanda

**Appx532**

possesses a trade secret, or any other cognizable property interest, regarding particle size reduction in the drug substance tasimelteon. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1222 (Fed. Cir. 2013) ("[A] trade secret may consist of any formula, pattern, device or compilation of information *which is used in one's business*." (quoting Restatement (First) of Torts § 757, cmt. b) (emphasis added)).

Even if Vanda did use particle size reduction to manufacture tasimelteon, that basic information still falls outside the definition of a trade secret. The Restatement of Torts defines a "trade secret" as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it" and that generally "relates to the production of goods." Restatement (First) of Torts § 757, cmt. b (1939). FDA's regulations are in accord, defining a "trade secret" as "any commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort. There must be a direct relationship between the trade secret and the productive process." 21 C.F.R. § 20.61(a). The statement that a manufacturer engages in particle size reduction, the recommendation that another should, or even a question about whether another should, is not a "plan, formula, process, or device." It does not disclose the process, formula, method, or means by which the manufacturer engages in particle size reduction. It is akin to disclosing that a manufacturer controls the presence of impurities, without describing the process or method used. Such general information reveals nothing about "the productive process" or the plan, formula, or device used in manufacturing. *See* 21 C.F.R. § 20.61(a). Accordingly, it is outside the scope of a trade secret, and outside any cognizable property interest under the Taking Clause.

Finally, even if Vanda could hold a cognizable property interest in the general concept of particle size reduction, Vanda has publicly disclosed the potential of tasimelteon to undergo particle size reduction, destroying any claimed property interest. In *the same* Vanda patent application in which Vanda disclosed impurities, Vanda also discloses techniques "wherein a particle size of [tasimelteon] crystals . . . is reduced to meet particle size specifications for pharmaceutical grade tasimelteon." U.S. Patent Pub. No. 2017/0190683, at Claim 16. In the description, Vanda describes applying the particle size reduction technique of "milling," especially by "use of a jet mill and a dry nitrogen atmosphere" for "achieving uniform particle size with good handling characteristics and minimal loss." *Id.* ¶¶ 75, 77. Vanda also recommends "other particle size reduction techniques, e.g., sieving, high shear fluid processing" or "milling techniques other than jet milling, e.g. grinding, cryogenic grinding, cutting or impacting" to achieve the desired particle size reduction. *Id.* ¶ 79. Vanda describes these techniques for particle size reduction as ones that "the skilled person will recognize." *Id.* In light of these extensive disclosures, Vanda cannot seriously maintain that it possesses a trade secret, or that its trade secret was disclosed, when FDA asked a tasimelteon active ingredient manufacturer whether its "drug substance may be subject to any particle size reduction." Compl. ¶ 162. When Vanda disclosed this particle size reduction information in its public patent application, any trade secret in the information was "extinguished." *Monsanto*, 467 U.S. at 1002.

III.   **Recognizing Vanda's Taking Claim Here Threatens The Drug Approval System And Risks Upsetting The Carefully Calibrated Balance Set By Congress**

Beyond the technical reasons set forth above for why Vanda's claims fails, the fundamental equities of fairness, and the potential consequences of finding a property right in a regulatory recommendation, counsel against extending Taking Clause precedent to include dissolution specifications. "The constitutional requirement of just compensation derives as much

37

**Appx534**

content from the basic equitable principles of fairness, *United States v. Commodities Trading Corp.*, 339 U.S. 121, 124 (1950), as it does from technical concepts of property law." *Fuller*, 409 U.S. at 490.

Here, assigning a compensable property interest in a dissolution specification to the NDA sponsor would not only prove fundamentally unfair, but it would undermine the regulatory system governing approval of generic drugs enacted in the Hatch-Waxman Amendments. To receive approval from FDA, a generic drug must be bioequivalent to its RLD, which means that the rate and extent of absorption of the generic drug must not show a significant difference from the rate and extent of absorption of the reference listed drug at the site of action in the body. 21 U.S.C. § 355(j)(2)(A)(iv); 21 C.F.R. §§ 314.3(b), 314.94(a)(7). Because the dissolution profile of a drug typically reflects its rate and extent of absorption in the body, *Dissolution Testing Guidance* at 1, and generic drugs must be bioequivalent to the RLD to be approved, generic drugs generally have nearly identical dissolution profiles to the brand name drug and therefore merit the same dissolution specifications. Assigning a compensable property interest in the dissolution specification to the sponsor of the first drug to be approved would essentially allow the sponsor to lay claim to the dissolution profile of the entire class of drugs, and thereby leverage its first-in-time approval position to exclude others from the market, potentially indefinitely. This would run counter to the delicate balance that Congress struck between branded and generic drugs in the Hatch-Waxman Amendments.

Moreover, FDA must be able to compare a regulatory recommendation for one applicant with its past recommendation for a like applicant to avoid inconsistent results. Indeed, in certain instances FDA may be obligated to consider its past practice for similarly situated applicants when reviewing applications. *See, e.g.*, *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*,

# Exhibit 1

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)

███████████████

**Appx539**

 CHEMISTRY REVIEW

# NDA 22-192

## FANAPTA (Iloperidone)
## Tablets
## 1, 2, 4, 6, 8, 10 and 12 mg

## Vanda Pharmaceuticals Inc.

## Division of Psychiatry Drug Products

## Donghao (Robert) Lu, Ph.D.
## Division I of Pre-Marketing Assessment
## Office of New Drug Quality Assessment

1

Appx540

  **CHEMISTRY REVIEW**

# Table of Contents

Table of Contents ........................................................................................................2

Chemistry Review Data Sheet.....................................................................................3

The Executive Summary ..............................................................................................7

I. Recommendations......................................................................................................7
   A. Recommendation and Conclusion on Approvability................................................7
   B. Recommendation on Phase 4 (Post-Marketing) Commitments, Agreements, and/or Risk
      Management Steps, if Approvable...................................................................7

II. Summary of Chemistry Assessments.........................................................................7
   A. Description of the Drug Product(s) and Drug Substance(s) .....................................7
   B. Description of How the Drug Product is Intended to be Used....................................8
   C. Basis for Approvability or Not-Approval Recommendation......................................8

III. Administrative.......................................................................................................9
   A. Reviewer's Signature.............................................................................9
   B. Endorsement Block................................................................................9
   C. CC Block ............................................................................................9

Chemistry Assessment ...............................................................................................10

I. Review Of Common Technical Document-Quality (Ctd-Q) Module 3.2: Body Of Data.......10
   S. DRUG SUBSTANCE.............................................................................10
   P. DRUG PRODUCT ...............................................................................48
   A. APPENDICES .....................................................................................87
   R. REGIONAL INFORMATION .................................................................87

II. Review Of Common Technical Document-Quality (Ctd-Q) Module 1 .............................90
   A. Labeling & Package Insert .....................................................................90
   B. Environmental Assessment Or Claim Of Categorical Exclusion ...............................94

III. Establishment Evaluation Report............................................................................94

IV. List Of Deficiencies And Responses ........................................................................97

Appx541

 **CHEMISTRY REVIEW**

Chemistry Assessment Section

# Chemistry Review Data Sheet

1. **NDA 22-192**

2. **REVIEW NUMBER:** 1

3. **REVIEW DATE:** 29 FEBRUARY 2008

4. **REVIEWER:**  Donghao (Robert) Lu, Ph.D.

5. PREVIOUS DOCUMENTS:

| PREVIOUS DOCUMENTS | DOCUMENT DATE |
|---|---|
| | |

6. SUBMISSION(S) BEING REVIEWED:

| SUBMISSION REVIEWED | DOCUMENT DATE |
|---|---|
| NDA 22-192 | 27-SEPT-07 |
| NDA 22-192 (Amendment 005, stability) | 17-MAR-07 |
| NDA 22-192 (Amendment 006, labeling) | 18-APR-07 |
| NDA 22-192 (Amendment 007, CMC response) | 25-APR-07 |

7. NAME & ADDRESS OF APPLICANT:

| | |
|---|---|
| **NAME:** | Vanda Pharmaceuticals Inc. |
| **ADDRESS:** | 9605 Medical Center Drive, Suite 300<br>Rockville, MD 20850 |
| **REPRESENTATIVE:** | Paolo Baroldi, M.D., Ph.D., Chief Medical Officer |
| **TELEPHONE:** | 240-599-4500 |

3

## CONFIDENTIAL MATERIAL REDACTED

### CHEMISTRY REVIEW

Chemistry Assessment Section

8. DRUG PRODUCT NAME/CODE/TYPE:

| | |
|---|---|
| PROPRIETARY NAME | FANAPTA (Iloperidone) |
| NON-PROPRIETARY NAME (USAN) | Iloperidone |
| CODE NAME/ NUMBER (ONDC ONLY) | HP 873 (Hoechst-Roussel), P88 8736 (Hoechst-Roussel), ILO522 (Novartis) ILO522-NXA (Novartis), VYV-683 (Vanda), ———————— |
| CHEMISTRY TYPE / SUBMISSION PRIORITY | 1S |



9.  LEGAL BASIS FOR SUBMISSION:    505(b)1

10. PHARMACOL. CATEGORY:    Antagonist at selected dopaminergic, serotoninergic, and adrenergic receptors

11. DOSAGE FORM:    Tablet

12. STRENGTH/POTENCY:    1, 2, 4, 6, 8, 10 and 12 mg

13. ROUTE OF ADMINISTRATION:    Oral

14. $R_x$/OTC DISPENSED:    _x_ $R_x$    ___OTC

15. SPOTS (SPECIAL PRODUCTS ON-LINE TRACKING SYSTEM):
_____SPOTS product – Form Completed
___x__Not a SPOTS product

16. CHEMICAL NAME, STRUCTURAL FORMULA, MOLECULAR FORMULA, MOLECULAR WEIGHT:

Name (USAN, INN): Iloperidone
Name (CAS):    1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]propoxy]-3-methoxyphenyl]ethanone
Other Name:    1-[4-[3-[4-(6-fluorobenzo[d]isoxazol-3-yl)-1-piperidinyl]propoxy]-3-methoxyphenyl]ethanone
(CAS) Registry Num: 133454-47-4
Structural Formula:

Mol. Formula:    $C_{24}H_{27}N_2O_4F$
Mol. Wt.:    426.5

4

**Appx543**

**PUBLIC**

## CONFIDENTIAL MATERIAL REDACTED

**CHEMISTRY REVIEW**

Chemistry Assessment Section

## 17. RELATED/SUPPORTING DOCUMENTS:

### A. DMFs:

| DMF # | TYPE | HOLDER | ITEM REFERENCED | CODE | STATUS | DATE REVIEW COMPLET |
|-------|------|--------|-----------------|------|--------|---------------------|
|  |  |  |  | 4 | N/A |  |
|  |  |  |  | 4 | N/A |  |
|  |  |  |  | 4 | N/A |  |
|  |  |  |  | 4 | N/A |  |
|  |  |  |  | 4 | N/A |  |
|  |  |  |  | 4 | N/A |  |

b(4)

**Note: DMFs** —————————————————————

**system is used for solid oral drug products – see CMC Review MaPP.**

[1] Action codes for DMF Table:
    1 – DMF Reviewed.

Other codes indicate why the DMF was not reviewed, as follows:
    2 – Type 1 DMF
    3 – Reviewed previously and no revision since last review
    4 – Sufficient information in application
    5 – Authority to reference not granted
    6 – DMF not available
    7 – Other (explain under "Comments")

[2] Adequate, Inadequate, or N/A: There is enough data in the application, therefore the DMF did not need to be reviewed.

### B. Other Documents:

| DOCUMENT | APPLICATION NUMBER | DESCRIPTION |
|----------|--------------------|-------------|
|  |  |  |

5

**Appx544**

 **CHEMISTRY REVIEW**

Chemistry Assessment Section

## 18. STATUS:

| CONSULTS & CMC RELATED REVIEWS | RECOMMENDATION | DATE | REVIEWER |
|---|---|---|---|
| **EES** | Acceptable | 11-JAN-08 | Shawnte Adams |
| **Methods Validation** | No validation request | 25-FEB-08 | Donghao Lu, Ph.D. |
| **ODS DMETS** | Pending | | |
| **EA** | Acceptable | 11-FEB-08 | Donghao Lu, Ph.D. |
| **Micro Consultation** | N/A | | |

**APPEARS THIS WAY ON ORIGINAL**

6

Appx545

**CONFIDENTIAL MATERIAL REDACTED**

 **CHEMISTRY REVIEW**

Chemistry Assessment Section

# The Chemistry Review for NDA 22-192

## *The Executive Summary*

### I.     Recommendations

#### A.     Recommendation and Conclusion on Approvability

The drug product FANAPTA (iloperidone) immediate-release tablets, 1, 2, 4, 6, 8, 10, and 12 mg, is recommended as APPROVAL from a CMC perspective, pending DMETS's recommendation.

#### B.     Recommendation on Phase 4 (Post-Marketing) Commitments, Agreements, and/or Risk Management Steps, if Approvable

### II.     Summary of Chemistry Assessments

#### A. Description of the Drug Substance and Drug Product

1. Drug Substance

The drug substance is iloperidone. The chemical name is 1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]propoxy]-3-methoxyphenyl]ethanone. It has a molecular formula of $C_{24}H_{27}N_2O_4F$ and its molecular weight is 426.5.

Data from the studies of elemental analysis, UV, IR, NMR and MS demonstrated that the structure was adequately defined. The _____ appear adequate for the manufacturing of the iloperidone drug substance.

**b(4)**

The impurities detected during the _____ and development of the drug substance were evaluated. Analytical methods were developed for the control of the impurities listed in the submission. Comprehensive information for all the impurities at the starting material level, at the intermediate level and at the final _____ level were adequately presented.

**b(4)**

Iloperidone was subjected to heat, heat and moisture, light, and chemical stresses. The drug substance was physically and chemically stable based on evaluation of the testing data. The drug substance has a retest period of _____

7

CONFIDENTIAL MATERIAL REDACTED

## CHEMISTRY REVIEW

Chemistry Assessment Section

2. Drug Product

The drug product is Fanapta (iloperidone) immediate-release tablets, 1, 2, 4, 6, 8, 10, and 12 mg. It is intended for oral administration.

The tablets contain 1, 2, 4, 6, 8, 10, and 12 mg iloperidone, respectively. All strengths are white, round, flat, beveled-edge tablets with the tablet strength debossed on the upper face (e.g., "8" for the 8 mg strength) and the Vanda (Vanda Pharmaceuticals Inc.) company logo debossed on the lower face. The tablet diameters are different for each strength except for the _____ · strengths. Iloperidone tablets are packed in

**b(4)**

placed inside dose titration/maintenance cards.

Inactive ingredients consist of lactose monohydrate, microcrystalline cellulose, hydroxypropyl methylcellulose, crospovidone, magnesium stearate, colloidal silicon dioxide. The manufacturing process for iloperidone tablets consists of _____

**b(4)**

### B. Description of How the Drug Product is Intended to be Used

Iloperidone tablet drug products contain antagonist at selected dopaminergic, serotoninergic, and adrenergic receptors and are indicated for the treatment of schizophrenia.

The recommended target dosage of iloperidone tablets is 12 mg/day administered BID during the acute phase. The recommended titration schedule to target dose is 1, 2, 4, and 6 mg BID on days 1, 2, 3, and 4 respectively. After reaching the target 12 mg/day dose, titration to the maximum daily dose of 12 mg BID should occur over a 3-day period. During the maintenance phase, iloperidone can be administered at a target dose of _____    _____    _____    iloperidone can be administered without regard to meals. The products should be stored at controlled room temperature, 25°C (77°F); excursions permitted to 15°-30°C (59°- 86°F). The products should be protected from light and moisture. The products have an expiration period (shelf life) of 36 months.

**b(4)**

### C. Basis for Approvability or Not-Approval Recommendation

From a CMC perspective, Vanda has submitted sufficient and appropriate information to support the approval of the drug product. There were several CMC concerns that were sent to the sponsor on April 2, 2008. Vanda has adequately addressed these CMC comments. Their responses and the CMC evaluations for these responses are described at the end of this document.

8



**CHEMISTRY REVIEW**

Chemistry Assessment Section

## III.   Administrative

### A.   Reviewer's Signature

\s\      Donghao (Robert) Lu, Ph.D.

### B.   Endorsement Block

\s\      Ramesh Sood, Ph.D.

### C.   CC Block

93 pages of CCI/TS (b4) was withheld after this page.

CMC_#1_93 pgs.pdf

9

**Appx548**

# ___*93*___ Page(s) Withheld

___X___ Trade Secret / Confidential (b4)

_____ Draft Labeling (b4)

_____ Draft Labeling (b5)

_____ Deliberative Process (b5)

# CONFIDENTIAL MATERIAL OMITTED

----------------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
----------------------------------------------------------------------------------------

/s/
---------------------
Donghao Lu
5/1/2008 11:46:02 AM
CHEMIST


Ramesh Sood
5/1/2008 04:42:41 PM
CHEMIST

# Exhibit 2

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)

## DIVISION OF BIOEQUIVALENCE
## DISSOLUTION ACKNOWLEDGEMENT REVIEW

| ANDA No. | 206890 |
|---|---|
| **Drug Product Name** | Iloperidone Tablets |
| **Strength (s)** | 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg and 12mg |
| **Applicant Name** | Lupin Limited |
| **Applicant Address** | 159, CST Road<br>Kalina, Santacruz (East)<br>Mumbai, India 400098 |
| **US Agent Name and the mailing address** | Dr. William McIntyre<br>Lupin Pharmaceuticals, Inc.<br>111 South Calvert Street<br>Harborplace Tower, 21st Floor<br>Baltimore, Maryland 21202 |
| **US Agent's Telephone Number** | (410) 576-2000 |
| **US Agent's Fax Number** | (410) 576-2221 |
| **Original Submission Date(s)** | 05/08/2014 |
| **Submission Date(s) of Amendment(s) Under Review** | 03/18/2015 |
| **First Generic** | No |
| **Reviewer** | Tiffany Pokora, Pharm.D. |
| | |
| **OVERALL DISSOLUTION REVIEW RESULT** | **ADEQUATE** |

## EXECUTIVE SUMMARY

This is a review of the dissolution method and/or specification acknowledgement from the firm. The firm has accepted the following FDA-recommended dissolution method and specification(s).

| USP Apparatus: | II (paddle) |
|---|---|
| **Rotational Speed:** | 50 rpm |
| **Temperature:** | 37°C ± 0.5°C |
| **Media:** | 0.1 N Hydrochloric Acid |
| **Volume:** | 500 mL |
| **Specification:** | NLT 80% (Q) dissolved in 30 minutes |

1

**Appx644**

## CONFIDENTIAL MATERIAL REDACTED

**RESPONSE FROM FIRM:**

The Division of Bioequivalence (DB) has completed its review of the dissolution testing portion of your submission acknowledged on the cover sheet. The review of the bioequivalence (BE) studies and the waiver requests will be conducted later.

Your dissolution testing using the FDA-recommended method is acceptable. However, your proposed specification, NLT [(b)(4)] % (Q) in [(b)(4)] minutes, is not acceptable. Please acknowledge the following FDA-recommended dissolution method and specification:

| USP Apparatus: | II (paddle) |
|---|---|
| Rotational Speed: | 50 rpm |
| Temperature: | 37°C ± 0.5°C |
| Media: | 0.1 N Hydrochloric Acid |
| Volume: | 500 mL |
| Specification: | NLT 80% (Q) dissolved in 30 minutes |

As recommended by the agency, we have revised the Dissolution Specification from "NLT [(b)(4)] % (Q) in [(b)(4)] Minutes" to "NLT 80% (Q) in 30 Minutes". We acknowledge the FDA recommended Dissolution Method and Specification. The brief summary of the same is provided in the Table below for the reference.

| USP Apparatus | Type II (Paddle) |
|---|---|
| Rotational Speed | 50 rpm |
| Temperature | 37°C ± 0.5°C |
| Media | 0.1 N Hydrochloric Acid [(b)(4)] |
| Volume | 500 mL |
| Specification | NLT 80% (Q) dissolved in 30 minutes |

2

**Appx645**

**RECOMMENDATIONS**

From a bioequivalence point of view, the firm has met the requirements for in-vitro dissolution testing. The dissolution testing section of the application is adequate and we have no further questions at this time.

3

**Appx646**

DISSOLUTION COMMENT TO BE PROVIDED TO THE APPLICANT

| ANDA: | 206890 |
|---|---|
| APPLICANT: | Lupin Limited |
| DRUG PRODUCT: | Iloperidone Tablets, 1 mg, 2 mg, 4 mg, 6 mg, 8 mg, 10 mg, and 12 mg |

The Division of Bioequivalence II (DBII) has completed its review of your submission acknowledged on the coversheet and has no further questions at this time. We acknowledge that you will conduct the dissolution testing of your test product using the following FDA-recommended dissolution method and specification:

| USP Apparatus: | II (paddle) |
|---|---|
| Rotational Speed: | 50 rpm |
| Temperature: | 37ºC ± 0.5ºC |
| Media: | 0.1 N Hydrochloric Acid |
| Volume: | 500 mL |
| Specification: | NLT 80% (Q) dissolved in 30 minutes |

Sincerely yours,

*{See appended electronic signature page}*

Ethan M. Stier, Ph.D., R.Ph.
Director
Division of Bioequivalence II
Office of Generic Drugs
Center for Drug Evaluation and Research

4

**Appx647**

*COMPLETED ASSIGNMENT FOR 206890 ID: 25732*

**Reviewer:**   Pokora, Tiffany       **Date Completed:** 04/10/2015

**Verifier:**      ,              **Date Verified:**

**Division:**     Division of Bioequivalence

**Description:** Dissolution Acknowledgement

---

*Productivity:*

| D | Letter Date | Productivity Category | Sub Category | Productivity | Subtotal |
|---|---|---|---|---|---|
| 25732 | 4/10/2015 | Dissolution Data (REGULAR) | Dissolution Acknowledgement | 1 | 0 |
| | | | | Total: | 0 |

5

**Appx648**

# Exhibit 3

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)

**Appx649**

## CONFIDENTIAL MATERIAL REDACTED

<table>
<tr><td colspan="4" align="center"><b>BIOPHARMACEUTICS REVIEW</b><br><b>Office of New Drug Quality Assessment</b></td></tr>
<tr><td><b>Application No.:</b></td><td>NDA 205-677</td><td colspan="2" rowspan="2"><b>Reviewer:</b> Kareen Riviere, Ph.D.</td></tr>
<tr><td><b>Submission Dates:</b></td><td>5/31/13; 8/20/13; 10/10/13; 10/25/13</td></tr>
<tr><td><b>Division:</b></td><td>DNP</td><td colspan="2"><b>Acting Biopharmaceutics Team Leader:</b><br>Sandra Suarez, Ph.D.</td></tr>
<tr><td><b>Applicant:</b></td><td>Vanda Pharmaceuticals</td><td colspan="2"><b>Biopharmaceutics Supervisor:</b> Richard Lostritto, Ph.D.</td></tr>
<tr><td><b>Trade Name:</b></td><td>Hetlioz</td><td><b>Date Assigned:</b></td><td>6/4/13</td></tr>
<tr><td><b>Generic Name:</b></td><td>tasimelteon</td><td><b>Date of Review:</b></td><td>10/30/13</td></tr>
<tr><td><b>Indication:</b></td><td>Treatment of Non-24-Hour Disorder in the totally blind</td><td colspan="2" rowspan="3"><b>Type of Submission:</b> 505(b)(1) Original NDA</td></tr>
<tr><td><b>Formulation/strengths:</b></td><td>IR Capsule/ 20 mg</td></tr>
<tr><td><b>Route of Administration:</b></td><td>Oral</td></tr>
</table>

### SUMMARY:

*Submission:* This submission is a 505(b)(1) New Drug Application for 20 mg tasimelteon immediate release capsules. The proposed indication is for the treatment of Non-24-Hour Disorder in the totally blind.

*Review:* The Biopharmaceutics review for this NDA is focused on the evaluation and acceptability of 1) the proposed dissolution methodology, 2) the proposed dissolution acceptance criterion.

### A. Dissolution Method

The proposed dissolution method is shown below.

| USP Apparatus | Rotation Speed | Media Volume | Temp | Medium |
|---|---|---|---|---|
| II | 50 rpm | 500 mL | 37 °C | 0.1 N HCl |

The proposed dissolution method is deemed acceptable.

### B. Dissolution Acceptance Criterion

The proposed acceptance criterion is shown below.

| Acceptance Criterion |
|---|
| Q = ▨ (b) (4) |

The proposed dissolution acceptance criterion is not supported by the data and is not acceptable. Therefore, in an IR letter to the Applicant dated September 20, 2013, the ONDQA Biopharmaceutics Team recommended a dissolution acceptance criterion of **Q = 80% at 15 minutes** based on the mean in-vitro dissolution profiles of the pivotal clinical and primary stability batches at release and 12 month stability. In a submission dated October 25, 2013, the Applicant

1

**Appx650**

# CONFIDENTIAL MATERIAL REDACTED

submitted a revised specifications sheet reflecting the recommended dissolution accetpance criterion.

## C. Evalaution of Data to Support BCS Class $^{(b)(4)}$ Designation

The solubility and dissolution data demonstrate that the drug substance is $^{(b)(4)}$ soluble and the proposed product is $^{(b)(4)}$ However, the Clinical Pharmacology reviewer, Dr. Jagan Parepally, has not yet determined as of October 30, 2013 whether the drug substance can be classified as $^{(b)(4)}$ permable. Thus, the determination of BCS Class $^{(b)}$ Designation for this proposed product is still pending.


**RECOMMENDATION:**

1.  Hetlioz (tasimelteon) capsules, 20 mg is recommended for approval from a Biopharmaceutics standpoint.
    - The following dissolution method and acceptance criterion are recommended and have been agreed upon with the Applicant (submission dated October 25, 2013):
        i.  <u>Dissolution method</u>: Apparatus II, 50 rpm agitation rate, 500 mL media volume, 37 °C, 0.1 N HCl.
        ii. <u>Acceptance criterion</u>: Q = 80% at 15 minutes.


**Kareen Riviere, Ph.D.**
Biopharmaceutics Reviewer
Office of New Drug Quality Assessment

**Sandra Suarez, Ph.D.**
Acting Biopharmaceutics Team Leader
Office of New Drug Quality Assessment

cc: Dr. Richard Lostritto

2

# CONFIDENTIAL MATERIAL REDACTED

## ASSESSMENT OF BIOPHARMACEUTICS INFORMATION

### 1. Background

**Drug Substance**

The structure of tasimelteon is shown in Figure 1. The applicant reports that tasimelteon is BCS Class (b)(4) compound.

**Figure 1.** Chemical structure of tasimelteon

The solubility of tasimeltion at pH 1, 4.6, and 7.6 is shown in Table 1.

**Table 1.** Solubility of Tasimelteon at 37°C

| pH | Media | Average Solubility at 37 °C (mg/ml) |
|---|---|---|
| 1.0 | 0.1 N HCl | 1.5 |
| 4.6 | 0.1N Sodium Acetate Buffer | 1.5 |
| 7.6 | 0.1N Sodium Phosphate Buffer | 1.2 |

**_Reviewer's Assessment:_**
_From these data, it can be concluded that the solubility of tasimelteon is not pH dependent in the physiological pH range. For sink conditions to be achieved, the solubility of tasimelteon needs to be at least_ (b) (4) _in the proposed medium. Hence, sink conditions are achieved in the physiological pH range. Less than_ (b) (4) _of aqueous buffer with pH 1-7.6 is required to dissolve 20 mg of tasimelteon._

**Drug Product**

The composition of the proposed drug product is shown below.

**Table 2.** Composition of 20 mg Tasimelteon IR Capsule

| Component | Function | Quantitative composition weight per capsule (mg) |
|---|---|---|
| Tasimelteon drug substance | Active ingredient | 20.00[1] |
| Lactose anhydrous | | (b) (4) |
| Microcrystalline cellulose (b) (4) | | |
| Colloidal silicon dioxide | | |
| Croscarmellose sodium | | |
| Magnesium stearate (b) (4) | | |
| (b) (4) | | |
| Size 1, dark blue opaque, hard gelatin capsules printed with "VANDA 20 mg" in white[2] | | |
| Total capsule weight for size 1 | NA | 376.00 |

### 2. Dissolution Method

3

**Appx652**

# Exhibit 4

*Vanda Pharmaceuticals, Inc. v. United States,*

Fed. Cl. No. 23-629

(Judge Bonilla)

**Appx659**

| BIOPHARMACEUTICS REVIEW | |  |  |  |
|---|---|---|---|---|
| **Office of New Drug Products** | | | | |
| **Application No.** | ANDA-211601-ORIG-1-AMEND-16 | | | |
| **Applicant** | Teva Pharmaceuticals USA Inc. | | | |
| **US Agent** | NA | | | |
| **Generic Name** | Tasimelteon Capsules | | | |
| **Trade Name** | N/A | | | |
| **Dosage Form/Strengths** | Immediate Release Capsules / 20 mg | | | |
| **Route of Administration** | Oral | | | |
| **Indication** | Treatment of Non-24-Hour Sleep-Wake Disorder (Non-24) | | | |
| **Submission date(s)** | 01/28/2020 | | | |
| **Type of Submission** | Resubmission / major | | | |
| **Date Assigned** | 02/28/2020 | | | |
| **Date of Review** | 07/06/2020 | | | |
| **Due Date(s)** | **QMRD/DRL** | **QDD-2** | **ODD** | **GDUFA** |
|  | --- | 8/28/2020 | 09/13/2020 | 09/27/2020 |
| **Primary Reviewer** | Huong Moldthan, Ph.D. | | | |
| **Secondary Reviewer** | Poonam R. Delvadia, Ph.D. | | | |
| **Key review points** | Evaluate the response to CR letter dated 11/09/2018 in term of dissolution acceptance criteria. | | | |
| **Recommendation** | **ADEQUATE** | | | |

**Appx660**

## EXECUTIVE SUMMARY

***Background:***

Teva Pharmaceuticals USA Inc. on behalf of Zhejiang Ausun Pharmaceutical Co., Ltd. is seeking approval for its proposed generic, Tasimelteon Capsules based on the Reference List Drug (RLD) Hetlioz® (NDA 205677). Tasimelteon Capsules was originally submitted to the Agency on 01/31/2018. The original submission received CR on 11/09/2018 due to pharmaceutical quality and facility inspection, bioequivalence and labelling deficiencies

***Submission:***

In this amendment 16 dated 01/28/2020[1], the Applicant submitted CR response which is the subject of the current review cycle (Appendix).

***Assessment:*** The Biopharmaceutics assessment focuses on the evaluation of the Applicant's response and available data of release and stability studies to support recommended acceptance criteria. In the amendment-16, the Applicant agreed with the Agency's recommendation for acceptance criteria of NLT 80% (Q) of label claimed amount of Tasimelteon dissolve in 15 min. The dissolution acceptance criteria for release and stability was revised, accordingly. Also, the data of 24 month-controlled room temperature stability samples meet the revised specification. Detail of Agency's dissolution method and acceptance criteria presented in table below:

| USP Apparatus | Speed (rpm) | Medium/Temperature | Volume (mL) | Acceptance criterion(a) |
|---|---|---|---|---|
| II (3 prong VanKel type capsule weights sinker ) | 50 | 0.1 N HCl/37°C ± 0.5°C | 900 | Not less than 80% (Q) of the labelled amount of is dissolved in 15 minutes |

***Recommendations: Based on the assessment of Amendment 16 and Applicant's response to the CRL received 01/28/2020, ANDA-211601 is adequate from a Biopharmaceutics perspective.***

---

[1] \\cdsesub1\evsprod\anda211601\0016\m1\us\resp-to-fda-crl-09nov2018.pdf

PUBLIC

## CONFIDENTIAL MATERIAL REDACTED

### APPENDIX

**Dissolution Comments Communicated to the Applicant in the CR letter**

**Biopharmaceutics**

**Comment 19:**

**The submitted in vitro dissolution data does not support the proposed dissolution acceptance criterion of "not less than ▨ % (Q) of label claimed amount of Tasimelteon dissolved in ▨ min" for your proposed drug product, Tasimelteon Capsules, 20 mg. Our current practice for setting dissolution acceptance criterion is based on average batch release dissolution data of test bio-lot under study using USP <711> stage 2 criteria. Therefore, sometimes stage 2 testing and occasional stage 3 dissolution testing may be needed for quality control of the product. Based on test bio-lot dissolution data, the dissolution acceptance criterion of "not less than 80% (Q) of label claimed amount of Tasimelteon dissolved in 15 min" is recommended for finished product batch release and stability of your proposed product. Update the drug product specification table and other relevant sections of your ANDA accordingly. Please be advised that all proposed exhibit batches are expected to meet these revised dissolution specifications in your stability program through your proposed expiry period. If dissolution failures are observed on stability, these should be described. Discuss any corrective actions to avert such dissolution failures and provide a new batch to demonstrate correction of the issue if needed.**

**Applicant's Response**
In response to this acknowledgement, the Applicant provided with data for release and stability to support recommended acceptance criteria of NLT 80% (Q) of label claimed amount of Tasimelteon dissolved in 15 min. The drug product specifications were revised in M 3.2.P.5.[2] Justification of specification was updated (Table 1). The standard test procedure was revised accordingly. [3] All available long term stability study data (24 month controlled room temperature) was provided that supports criterion of NLT ▨ min. [4]

**Table 1:    Justification of Specification**

| Test | Acceptance Criteria | Justification |
|---|---|---|
| Description | Hard gelatin capsule, Light Blue Opaque Cap and Light Blue Opaque Body Imprinted with 'A44' On Cap in Black Ink containing white to off white colour granular powder. | Description of the Tasimelteon Capsules is based on the visual results. |
| Identification by HPLC | | (b) (4) |
| Identification by UV | | |
| Dissolution | | |
| Water by KF | | |
| Uniformity of Dosage Unit by Content Uniformity | Meets the requirements of USP <905>, content uniformity. | The acceptance criterion is in accordance with USP general chapter <905> Uniformity of Dosage Units by content uniformity. |

**Reviewer's Assessment:** The Applicant's response is acceptable

---

[2] \\cdsesub1\evsprod\anda211601\0016\m3\32-body-data\32p-drug-prod\tasimelteon-caps-all\32p5-contr-drug-prod\32p51-spec\dp-spec.pdf
[3] \\cdsesub1\evsprod\anda211601\0016\m3\32-body-data\32p-drug-prod\tasimelteon-caps-all\32p8-stab\dp-spec-goa.pdf
[4] \\cdsesub1\evsprod\anda211601\0016\m3\32-body-data\32p-drug-prod\tasimelteon-caps-all\32p8-stab\stablity-room-temp-long-term.pdf



Huong
Moldthan

Digitally signed by Huong Moldthan
Date: 7/07/2020 09:57:04AM
GUID: 5ae328d00016b322ad761cc7bf7f0978

Poonam
Delvadia

Digitally signed by Poonam Delvadia
Date: 7/07/2020 10:19:24AM
GUID: 5388edae000671a12787e2fcf4cde1bb

**Appx663**

PUBLIC

# Exhibit 5

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)

**Appx664**




**OPQ/ONDP/Division of Biopharmaceutics**
**CHAPTER VII**

| BIOPHARMACEUTICS REVIEW for ANDA SUBMISSIONS | |
|---|---|
| Application No. | ANDA-211607-Org-1 |
| Product Name | Tasimelteon Capsules |
| Applicant | Apotex Inc. |
| Dosage Form/Strengths | Capsules/20 mg |
| Route of Administration | Oral |
| Indication for Use | Tasimelteon capsules are a melatonin receptor agonist indicated for the treatment of Non-24-Hour Sleep-Wake Disorder (Non-24). |
| Submission Date | 01/31/2018 |
| Review Date | 05/02/2018 |
| Primary Reviewer | Meng Wang |
| Secondary Reviewer | Poonam Delvadia |
| Recommendation | ADEQUATE |

## 1. REVIEW SUMMARY:

**Background:**
The Applicant is seeking approval for the generic version of Tasimelteon Capsules based on the Reference List Drug (RLD) HETLIOZ® (Tasimelteon)® (NDA# 205677).

**Review's Objective:**

The Biopharmaceutics assessment focuses on the evaluation of the in vitro dissolution testing data in support of the proposed dissolution method and acceptance criterion for quality control (finished product batch release and stability) of Tasimelteon Capsules, 20 mg.

**Reviewer's Assessment:**

There is no USP monograph for Tasimelteon Capsules (As of 05/08/2018). The Applicant used the dissolution method listed in the FDA Dissolution Method Database ▮▮▮▮▮ (b) (4) ▮▮▮▮▮ (b) (4) for quality control of the product which is acceptable (note that sinker is not proposed for this product which is justified and acceptable). However, the dissolution data did not support the proposed dissolution acceptance criterion of "NLT ▮ (b)% (Q) of label claimed amount dissolved in ▮▮▮▮▮▮ (b) (4) based on dissolution data of bio-batch. An acceptance criterion of "NLT 80% (Q) of label claimed amount dissolved in 15 min" was recommended to the Applicant in the discipline review letter (DRL). The Applicant accepted the recommended criterion and implemented the same for QC testing.

Based on the risk assessment provided by the Applicant, the risk with regards to the dissolution is low because the drug has high solubility and no surfactant is added in the dissolution medium.

**CONFIDENTIAL MATERIAL REDACTED**
**Appx665**

PUBLIC

|  | OPQ/ONDP/Division of Biopharmaceutics<br>**CHAPTER VII** |  |
|---|---|---|

*Conclusion and Recommendation:*

From a Biopharmaceutics perspective, ANDA 211601 for Tasimelteon Capsules is recommended for approval.

**Dissolution Method and Acceptance Criterion**

| USP Apparatus | Speed (RPMs) | Medium/Temperature | Volume (mL) | Sampling Times | Acceptance criterion |
|---|---|---|---|---|---|
| II | 50 | 0.1 N HCl/37°C ± 0.5°C | 500 | 5, 10, 15, 20, 30 min | Not less than 80% (Q) of the labelled amount of Tasimelteon is dissolved in 15 minutes. |

## 2. SUBMISSION CONTENT CHECKLIST:

| | INFORMATION | YES | NO | N/A |
|---|---|---|---|---|
| 1 | Is there a USP dissolution method? | ☐ | ☒ | ☐ |
| 2 | Did the Applicant use the USP dissolution method? | ☐ | ☒ | ☐ |
| 3 | Is there an FDA-Database dissolution method? | ☒ | ☐ | ☐ |
| 4 | Did the Applicant use the FDA-Database dissolution method? | ☒ | ☐ | ☐ |
| 5 | Did the Applicant conduct dissolution testing with a proposed in-house dissolution method? | ☐ | ☐ | ☒ |
| 6 | Did the Applicant use 12 individual units of the test (proposed) drug product in the dissolution testing? | ☒ | ☐ | ☐ |
| 7 | Did the Applicant provide complete dissolution data for the test (proposed) drug product (all raw data, range, mean, % CV, date of dissolution testing)? | ☒ | ☐ | ☐ |
| 8 | Was the dissolution/release testing and pivotal bioequivalence study conducted using an unexpired test (proposed) drug product? | ☒ | ☐ | ☐ |
| 9 | Does the proposed product (any strength) have a functional scoring? | ☐ | ☒ | ☐ |
| 10 | If there is a functional scoring, did the Applicant provide complete dissolution data for the whole vs. split tablets? | ☐ | ☐ | ☒ |
| 11 | Is there significant change in the dissolution of stability samples? | ☐ | ☒ | ☐ |

**Appx666**

 **OPQ/ONDP/Division of Biopharmaceutics**
**CHAPTER VII**

## 3. REVIEW:

### a) List Submissions being reviewed (table):

| 01/31/2018 | ANDA 211607/Original submission |
|---|---|
| 08/13/2018 | ANDA 211607/Response to the DRL |

### b) Highlight Key Outstanding Issues from Last Review Cycle:

Tightening of dissolution acceptance criterion (Refer Appendix 2)

### c) Concise Description of Outstanding Issues:

None. The Applicant adequately addressed biopharmaceutics deficiency on dissolution acceptance criterion.

### d) Dissolution method and acceptance criterion proposed by the Applicant:

| Method Source | USP Apparatus | Speed (RPMs) | Medium/Temperature | Volume (mL) | Sampling Times | Acceptance criterion |
|---|---|---|---|---|---|---|
| | | | | | | (b) (4) |

### e) In Vitro Dissolution Data

Table 1: Summary of mean in vitro dissolution data for the proposed drug product

(Bio-batch: FD291-17)

| | Time (minutes) | | | | |
|---|---|---|---|---|---|
| | 5 | 10 | 15 | 20 | 30 |
| Mean | 86 | 94 | 96 | 96 | 96 |
| Min | | | | | (b) (4) |
| Max | | | | | |
| RSD% | | | | | |

Refer to Appendix 1 for the tables of detailed dissolution data.

CONFIDENTIAL MATERIAL REDACTED
Appx667




OPQ/ONDP/Division of Biopharmaceutics
## CHAPTER VII

f)  Additional information contained within the submission supporting the proposed dissolution method and acceptance criteria? (i.e. clinical relevance, QbD, etc.)

(b) (4)

4.  **REVIEWER'S ASSESSMENT:**

**Dissolution Method:**

The Applicant proposed to use the dissolution method for Tasimelteon Capsules, 20 mg listed in the FDA Dissolution Method Database for the QC. It is acceptable.

4

**CONFIDENTIAL MATERIAL REDACTED**
**Appx668**



**OPQ/ONDP/Division of Biopharmaceutics**
**CHAPTER VII**



### *Dissolution Acceptance Criteria:*

The proposed dissolution acceptance criterion of "Not less than (b) % (Q) of the labelled amount of Tasimelteon is dissolved in ⬚⬚⬚ (4), (4)    The test biobatch dissolution data supports criterion of "NLT 80% (Q) of the labelled amount of Tasimelteon is dissolved in 15 minutes" was recommended in the DRL to the Applicant based on the submitted dissolution data in the IR#1. This recommendation is also supported by the guidance "Dissolution Testing and Specification Criteria for Immediate-Release Solid Oral Dosage Forms Containing Biopharmaceutics Classification System Class 1 and 3 Drugs" since based on the Applicant's claim, Tasimelteon is a BCS class 3 drug. The Applicant implemented the above recommended criterion for both batch release and stability testing of the proposed product. For detailed reviewer's assessment of the Applicant's response, refer Appendix 2.

## 5. LIST OF BIOPHARMACEUTICS COMMENTS:

Refer to Appendix 2 for specific details on the Biopharmaceutics Information Requests (IR) and the Applicant's responses.

## 6. CONCLUSION and RECOMMENDATION:

### Recommended dissolution method and acceptance criterion

| Method Source | USP Apparatus | Speed (RPMs) | Medium/Temperature | Volume (mL) | Sampling Times | Acceptance criterion/criteria |
|---|---|---|---|---|---|---|
| FDA Dissolution Method Database | II | 50 | 0.1 N HCl/37°C ±0.5°C | 500 | 5, 10, 15, 20, 30 min | Not less than (b) (4) (Q) of the labelled amount of Tasimelteon is dissolved in 15 minutes. |

## 7. SIGNATURE BLOCK:

**Primary Biopharmaceutics Reviewer:**
*Meng Wang, Ph.D., 05/08/2018 (For DRL)*
*Poonam Delvadia, Ph.D., 09/04/2018 (Response to DRL)*

**Secondary Biopharmaceutics Reviewer**
*Poonam Delvadia, Ph.D., 05/08/2018 (For DRL)*
*Kimberly Raines, Ph.D., 09/04/2018 (Response to DRL)*

**CONFIDENTIAL MATERIAL REDACTED**
**Appx669**



**OPQ/ONDP/Division of Biopharmaceutics**
**CHAPTER VII**



# *APPENDIX 1*

### *Dissolution Data Tables*

**Table 1. The comparative dissolution data of proposed drug product (Lot# FD291-17)**

| Time (minutes) | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 | V10 | V11 | V12 | Range | Mean | %RSD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Dissolved | | | | | | | |
| 5 | | | | | | | | | | | | | (b) (4) | 86 | 4 |
| 10 | | | | | | | | | | | | | | 94 | 3 |
| 15 | | | | | | | | | | | | | | 96 | 3 |
| 20 | | | | | | | | | | | | | | 96 | 3 |
| 30 | | | | | | | | | | | | | | 96 | 3 |

**Table 2. The comparative dissolution data of proposed drug product (Lot# FD291-18)**

| Time (minutes) | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 | V10 | V11 | V12 | Range | Mean | %RSD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Dissolved | | | | | | | |
| 5 | | | | | | | | | | | | | (b) (4) | 82 | 4 |
| 10 | | | | | | | | | | | | | | 91 | 4 |
| 15 | | | | | | | | | | | | | | 95 | 3 |
| 20 | | | | | | | | | | | | | | 97 | 3 |
| 30 | | | | | | | | | | | | | | 98 | 3 |

**Table 3. The comparative dissolution data of proposed drug product (Lot# FD291-19)**

| Time (minutes) | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 | V10 | V11 | V12 | Range | Mean | %RSD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | % Dissolved | | | | | | | |
| 5 | | | | | | | | | | | | | (b) (4) | 83 | 6 |
| 10 | | | | | | | | | | | | | | 95 | 3 |
| 15 | | | | | | | | | | | | | | 96 | 3 |
| 20 | | | | | | | | | | | | | | 97 | 3 |
| 30 | | | | | | | | | | | | | | 98 | 3 |

CONFIDENTIAL MATERIAL REDACTED
Appx670



**OPQ/ONDP/Division of Biopharmaceutics**
**CHAPTER VII**



## APPENDIX 2

## Biopharmaceutics Information Requests and Applicant Responses

1. The submitted in vitro dissolution data do not support the proposed dissolution acceptance criterion of "not less than (b)(4)% (Q) of label claimed amount of Tasimelteon dissolved in (b)(4) min" for your proposed drug product, Tasimelteon Capsules, 20 mg. Our current practice for setting dissolution acceptance criterion is based on average batch release dissolution data of test bio-lot under study using USP<711> stage 2 criteria. Therefore, sometimes stage 2 testing and occasional stage 3 dissolution testing may be needed for quality control of the product. Based on test bio-lot dissolution data, the dissolution acceptance criterion of "not less than 80% (Q) of label claimed amount of Tasimelteon dissolved in 15 min" is recommended for finished product batch release and stability of your proposed product. Update the drug product specification table and other relevant sections of your ANDA accordingly. Please be advised that all proposed exhibit batches are expected to meet these revised dissolution specifications in your stability program through your proposed expiry period. If dissolution failures are observed on stability these should be described. Discuss any corrective actions to avert such dissolution failures and provide a new batch to demonstrate correction of the issue, if needed.

*Applicant's Response*: *The Applicant's response can be accessed at the below link*

*\\cdsesub1\evsprod\anda211607\0004\m1\us\12-cover-letters\response-document.pdf*

*Reviewer's Assessment*: *The Applicant implemented the recommended criterion of NLT 80% (Q) in 15 min for both batch release and stability testing of the proposed product. The specification tables (M 3.2.P.5.1) are updated with the revised dissolution acceptance criterion. The dissolution results for 12 month stability time point meet the revised dissolution acceptance criterion as well. The Applicant performed monte-carlo simulation to calculate probability of acceptance (Pa) for a future batch using dissolution results of stability batches to demonstrate the product capability of meeting the revised dissolution specification during stability. The Pa for stage 1, 2, and 3 was 77.81%, 99.97%, >99.99% respectively which further support the criterion of NLT 80% (Q) in 15 min. The Applicant's response is acceptable.*

**CONFIDENTIAL MATERIAL REDACTED**
**Appx671**



Poonam
Delvadia

Digitally signed by Poonam Delvadia
Date: 9/04/2018 12:56:24PM
GUID: 5388edae000671a12787e2fcf4cde1bb

Kimberly
Raines

Digitally signed by Kimberly Raines
Date: 9/04/2018 12:41:44PM
GUID: 508da6fd000284a73fdbe11d01b3132f

# Exhibit 6

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring, MD 20993**

DMF #031843

**GDUFA DMF COMPLETE RESPONSE**

DMF HOLDER: Apotex Pharmachem Inc.

ATTN: Lori Brownell                       EMAIL: lbrownell@apotexpharmachem.com
      Apotex Pharmachem Inc.              FAX: (519) 751-2242
      Manager, Regulatory Affairs

FROM: Astrid Inniss, PhD, RDN, LD          RBPM PHONE: (301) 348-1512
                                           EMAIL: Astrid.Inniss@fda.hhs.gov

Dear Lori Brownell:

This communication is in reference to your Drug Master File (DMF) #031843 for TASIMELTEON, submitted pursuant to 21 CFR 314.420 of the Federal Food, Drug and Cosmetic Act. This DMF was reviewed under the letter of authorization dated 07/31/2017 in support of ANDA 211607, held by APOTEX Inc.

We have completed our review of this DMF and have determined that it is not adequate in its present form. We have described our reasons for this conclusion below and, where possible, our recommendations to address these issues.

## CHEMISTRY

A.  This drug master file is deficient for the following reasons:

1.  In S.1.3, please revise the general physicochemical properties of solubility and hygroscopicity for your drug substance to include experimental data from the drug substance manufactured using your process. Currently, for solubility of your drug substance you only review the solubility in organic media; please also include aqueous media.

2.  Please tighten the acceptance criteria of the following tests in the TAS10 starting material specification:
    a.  total impurities test, and
    b.  specified unidentified impurity at ≈ RRT 2.20.

3.  The specification for propionic anhydride starting material includes a test for a specified unidentified impurity at ≈ RRT 1.16, and the result is not provided in the COA. Please provide data to justify that this limit is appropriate, or if it is not please tighten the acceptance criterion. Also, it appears as if you have identified this impurity as isovaleric propionic anhydride. If this is accurate, please update your in-house specification.

**Appx674**

DMF #31843
Page 2

4.  Please provide the current intermediate specifications in S.2.4. The intermediate specifications provided in S.2.4 Controls of Critical Steps and Intermediates and used on for process validation in S.2.5 Process Validation and/or Evaluation do not match.
    Below are a few examples:
    a.  Each intermediate specification has an assay with a different acceptance criterion, in intermediate TAS20, TAS50, and TAS60.
    b.  Each intermediate specification has in S.2.4 has two identification test, whereas the intermediate specifications in S.2.5 have only one identification test.
    c.  TAS50 specification in S.2.4 has a different acceptance criterion for water content test the in S.2.5.
    d.  TAS20 specification is missing the test for TAS-10-I in the S.2.4.

5.  The drug substance contains two stereogenic centers, and four stereoisomers are possible. Please address the following using drug substance manufactured by your process:
    a.  Provide the specific optical rotation for the drug substance in S.1.3.
    b.  Provide data that unambiguously establishes that the absolute stereochemistry of the drug substance is the same as that of the RLD. Provide method descriptions and comparative data as applicable.

6.  Please clarify whether your drug substance may be subject to any particle size reduction. If so, please provide the following:
    a.  XRD data for a batch of micronized drug substance.
    b.  Stability data for a micronized batch of drug substance to ensure solid form stability.
    c.  A detailed process description of the micronization procedure in S.2.2.

7.  The polymorphic data that you have provided is not sufficient. You have only provided XRD from one batch of material. Please provide XRD scans from at least three batches of manufactured material to show consistency of form at your intended production scale. Include a tabular summary of the 2-theta values for each batch, and scans.

8.  You are controlling the potentially genotoxic impurity, TAS-10-I, via ICH M7 Option 3. The discussion you provided does not demonstrates that this impurity is controlled at 30% of the TTC, which is required as part of option 3. Please either provide data to demonstrate that this impurity is controlled below 30% or add a test to a specification at the appropriate level.

9.  Please discuss your control strategy for the (1$S$,2$R$)-diastereomer, and provide any relevant data to show that is purged from your process.

10. We acknowledge the multiple batch data showing absence of the epoxide (TAS30/TAS50-IV) and isopropyl (1$S$)-(+)-10-camphorsulfonate. These impurities contain a structural alert for genotoxicity. We recommend the evaluation of this impurity using approaches described in ICH M7 (Genotoxic Impurities) to establish appropriate control for it in the process based on the TTC concept. This guidance also describes in vitro / in vivo studies that determine compound mutagenicity. Please provide full reports for any in silico or in vitro studies that are being used to support your proposal. If TTC control is set later than the impurity's point of origin, your control strategy should also consider drug substance analogs that may be formed during the manufacturing process. If upstream controls are established at higher than the acceptable limit or where control is achieved through process capability, spike/purge studies at greater than the proposed limit should be performed (batch sizes should be reported) and/or sufficient batch data should be supplied to support these proposals. Spike/purge studies should be performed in a

**Appx675**

DMF #31843
Page 3

manner representative of the commercial process for the results to be predictive. Please also provide analytical methods with information about LOD/LOQ.

11. Impurities 1, 2, 3, 5, and 6, which are shown below, are possible impurities of the drug substance reported in patent US20170190683A1. Please clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities. Please provide supporting data including LOD, LOQ, and linearity. Please control these impurities in the drug substance release specification at justified limits, or provide justification as to why controls are not needed.

N-(((1R,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl)methyl)-3-methylbutanamide (Impurity 1)

N-(((1R,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl)methyl)-pentanamide (Impurity 2)

1,3-Bis(((1R,2R)-2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl)methyl)urea (Impurity 3)

N-((2-(2,3-dihydrobenzofuran-4-yl)-1-((2-(2,3-dihydrobenzofuran-4-yl)cyclopropyl)(propionamido)methyl)cyclopropyl)methyl)propionamide (Impurity 5)

2-hydroxy-6-(2-(propionamidomethyl)cyclopropyl)phenethyl 2-(2-hydroxyethyl)-3-(2-(propionamidomethyl)cyclopropyl)phenyl carbonate (Impuritiy 6)

12. Please address the following in your drug substance release and stability specifications:
    a. Add a test for melting point.
    b. Add a test for specific optical rotation.

DMF #31843
Page 4

13. The data provided are not sufficient to assess the robustness for the methods intended to determine the assay, related substance, enantiomer purity, and residual solvents in the drug substance. Please provide the results measured by the varied chromatographic conditions as well as the results measured by the normal conditions described in the corresponding analytical methods, preferably in a tabular format.

14. For the related substance, enantiomer purity, and residual solvents methods for the drug substance, please examine the LOD and demonstrate that it has been set appropriately using a method such as signal to noise.

15. Please provide the potency of the working reference standard and formula for the potency calculation of the reference standards.

16. Please provide updated accelerated and long-term stability data. Currently, the stability data provided does not support the proposed re-test date per ICH Q1E.

17. On the label, you allow transportation excursion up to 60 °C. Based on ICH Q1E, this is not permitted without additional data to demonstrate that this temperature does not have negative impact on the drug substance. A discussion should be provided to address the effect of short-term excursions outside the labeled storage condition (e.g., during shipping or handling). This discussion can be supported, if appropriate, by further testing on a single batch of the drug substance at the accelerated condition for a period shorter than 3 months. Please refer ICH 1E.

B.  In addition to the deficiencies above, we have following information requests and comments:

1. Your document in your electronic submission titled "Control of Materials" is not located in the 3.2. S.2.3 "Control of Materials" folder, but in the general 3.2.S.2 Manufacture folder, please place this document in the right location.

2. There is a note in the enantiomer purity method that the stock standard solution, working standard solution, and sample solution are stable for up to 48 hours at room temperature ($20 \pm 5$ °C) or in the refrigerator ($5 \pm 3$ °C). However, only data conducted at $5 \pm 3$ °C were provided under the solution stability for this method. Please either provide the data collected at room temperature or revise your statement in your analytical protocol.

3. Please clarify if reference standard TAS-VIII-061-1 is made using the same route of synthesis as described in this DMF.

4. Please clarify the differences between stability protocol SP(TAS)-001 and SP(TAS)-002.

**FACILITY INSPECTIONS**

We have not yet completed inspection(s)/compliance evaluation of your manufacturing facility(s) named or referenced in this DMF. We must perform a complete evaluation of the information associated with the inspection before determining that the site(s) are satisfactory and the referencing ANDA may be approved.

**Appx677**

DMF #31843
Page 5

## OTHER

A partial response to this letter will not be considered for review. A response stating an item "will be addressed in a future submission" is not acceptable.

Prominently identify the submission with the following wording in bold capital letters at the top of the cover letter of the submission:

### MASTER FILE GDUFA COMPLETE RESPONSE

The cover letter of your response to this letter should state that it is a response to FDA's GDUFA DMF Complete Response letter. Provide a list of questions from FDA's letter and either a direct response to each or a reference to where the information requested can be found in the DMF. If the response to each deficiency results in a change of information in Module 2 and 3 of the DMF, update the appropriate section(s) of the DMF.

Your response can be submitted in electronic format through the Electronic Submission Gateway (ESG) or on physical media to the address below. Responses sent by facsimile, e-mail or desk copies will not be accepted.

The FDA Electronic Submissions Gateway (ESG) is the central transmission point for sending information electronically to the FDA and enables the secure submission of regulatory information for review. For more information on the ESG see:
http://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway/default.htm.

If submitting in paper format or physical media, mail two (2) copies of your complete response to:

Food and Drug Administration
Center for Drug Evaluation and Research
Central Document Room
5901-B Ammendale Road
Beltsville, MD 20705

All DMF submissions must be in electronic format as of **May 5, 2018**. For more information see:
- Guidance for Industry: Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications,
- New Requirements for Electronic Submissions of DMF factsheet, or
- Drug Master Files (DMFs) webpage.

We will notify Apotex Inc. that the information in your DMF is inadequate to support their ANDA. When you amend your DMF, notify Apotex Inc. in accordance with 21 CFR 314.420(c) and notify the DMF Review Team (DMFOGD@fda.hhs.gov    ) that your DMF has been amended. Do not provide a copy of the amendment to the DMF Review Team.

You may request a 30 minute teleconference for first cycle letters to discuss the contents of the letter. The written request should be received within 20 business days of receiving this letter by e-mailing DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above) for information on submitting the teleconference request. In lieu of a teleconference, you have the option of submitting your questions

**Appx678**

DMF #31843
Page 6

regarding this letter by email.  Submit the request for an email exchange within 20 business days to DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above).  The subject field of the email should include the DMF number and "Request for Email Exchange."  The email should include the date of the letter and repeat the deficiency item(s) as received from FDA followed by your specific questions for each item.

FDA will grant one follow up email if additional clarification is needed based on our initial email response.  Submit the request for a follow up email to DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above).  The subject field of the email should include the DMF number and "Request for Email Exchange Follow Up."  The email should include the date of the letter and the specific questions for follow up.  FDA will strive to grant teleconferences or respond to email exchange requests within 30 days, giving priority to DMFs based on the priority of the referencing ANDA.  If you do not have a secure email address, we will fax the responses to your request for email exchange to the fax number on file for the DMF.

If you have any questions, contact the RBPM listed above.

Sincerely yours,

*{See appended electronic signature page}*

David Skanchy, Ph.D.
Director, Division of Lifecycle API
Office of Pharmaceutical Quality
Center for Drug Evaluation and Research

**THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.**
If received by someone other than the addressee or a person authorized to deliver this document to the addressee, you are hereby notified that any disclosure, dissemination, copying, or other action to the content of this communication is not authorized.  If you have received this document in error, please immediately notify us by telephone and return it to us by mail at the above address.

 Erin Skoda

Digitally signed by Erin Skoda
Date: 7/12/2018 02:35:30PM
GUID: 53b5a7d40000543543e2ff10669411e1

**Appx680**

# Exhibit 7

*Vanda Pharmaceuticals, Inc. v. United States*,

Fed. Cl. No. 23-629

(Judge Bonilla)

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring, MD 20993**

DMF #032077

**GDUFA DMF COMPLETE RESPONSE**

DMF HOLDER: Zhejiang Ausun Pharmaceutical Co Ltd.

TO: Pharma in one, LLC

ATTN: Wendy Ou                                    EMAIL: wendyyou@pharma-in1.com
     Chief executive officer                      FAX: 713-489-3769

FROM: Astrid Inniss, PhD, RDN, LD             RBPM PHONE: (301) 348-1512
                                                                        EMAIL: Astrid.Inniss@fda.hhs.gov

Dear Ms. Ou:

This communication is in reference to your Drug Master File (DMF) #032077 for TASIMELTEON, submitted pursuant to 21 CFR 314.420 of the Federal Food, Drug and Cosmetic Act. This DMF was reviewed under the letter of authorization dated 01/16/2018 in support of ANDA #211601, held by Teva Pharmaceuticals USA.

We have completed our review of this DMF and have determined that it is not adequate in its present form. We have described our reasons for this conclusion below and, where possible, our recommendations to address these issues.

## CHEMISTRY

A. This drug master file is deficient for the following reasons:

1. Please add specific identification tests (such as IR or NMR) to all regulatory starting material and purchased intermediate specifications in your process.

2. The drug substance may be subject to micronization as per a customer request. Please provide the following:
   a. DSC data for a batch of micronized drug substance.
   b. Long-term stability study data for a micronized batch of drug substance.
   c. A detailed process description of the micronization procedure in S.2.2.

3. (1$R$,2$R$)-2-(2,3-Dihydrobenzofuran-4-yl) cyclopropane-1-carboxylic acid (coded as TSM-5 in-house) is proposed as the starting material for the synthesis of tasimelteon. However, the stereochemistry of the drug substance is set in steps prior to the cGMP process, and the proposed starting material does not allow for adequate evaluation of the control of the process and/or the critical quality attributes of the drug substance. Per ICH Q11 guideline "Manufacturing steps that have an impact on the impurity profile of the drug substance should normally be included in the manufacturing process", we recommend that you designate the regulatory starting material from an earlier point (TSM-1 or earlier) in the manufacturing process. Please be reminded that

**Appx682**

DMF #032077
Page 2

the GMP compliance applies to the steps from the introduction of the re-designated regulatory starting materials. Please also be reminded that some other sections, such as S.2.2, S.2.3, S.2.4, S.3.2, S.4, S.5, and S.7 may need to be updated accordingly due to the re-designation of the starting material(s) and that the re-designation of starting material(s) and associated facility information should be provided to the ANDA applicant(s), who reference(s) this DMF for compliance purpose. Alternatively, you may reference that information to other DMF(s) with appropriate LOA(s).

4. In step 1 of your manufacturing process there are no in-process controls and no data were provided in your validation beyond the intermediate analysis results for TSM-7. Please address the following:
    a. You state that in the formation of TSM-6, the reaction should be stirred at 35-45 °C for 5-6 h. Please provide the temperatures and times that were used in the validation batches for this step and justify these limits given that there is no reaction monitoring used.
    b. Please clarify what in-process controls are established to monitor reaction completion for the formations of TSM-7 and Tasimelteon in steps 1 and 3 given the varied reaction time ranges, and provide the reaction times used in the validation batches.

5. Please tighten acceptance criteria for specified impurities and total impurities test in the following specifications, or provide data to justify the current limits:
    a. (1$R$,2$R$)-2-(2,3-dihydrobenzofuran-4-yl) cyclopropane-1-carboxylic acid (TSM-5): limits for TSM-5-IMB + TSM-5-IMC and single unspecified impurity.
    b. Propionic chloride: limit for propionic acid.

6. The drug substance contains two stereogenic centers, and four stereoisomers are possible. Please address the following:
    a. Add a test for specific optical rotation in the drug substance release and stability specifications.
    b. Provide data that unambiguously establishes that the absolute stereochemistry of the drug substance manufactured by your process is the same as that of the RLD. Provide method descriptions and comparative data as applicable.

7. Under the photodegradation study forced degradation conditions there were several unspecified impurities that arose to over 1%; please discuss any efforts made to identify these impurities.

8. Impurities 4 and 7 (shown below) are possible degradants of the drug substance. These impurities as well as impurities 2, 3, 5, and 6 are reported in patent US20170190683A1. Please clarify whether the current related substances analytical method is capable of detecting and quantifying these impurities. Please provide supporting data including LOD, LOQ, and linearity. Please control these impurities in the drug substance specification at justified limits, or provide justification as to why controls are not needed.

**Appx683**

DMF #032077
Page 3

Impurity 2

Impurity 3

Impurity 4

Impurity 5

Impuritiy 6

Impurity 7

9. Impurities TSM-1 and TSM-2 contain a structural alert for genotoxicity. We recommend the evaluation of each of these impurities using approaches described in ICH M7 (Genotoxic Impurities) to establish appropriate control for it in the process based on the TTC concept. This guidance also describes in vitro / in vivo studies that determine compound mutagenicity. Please provide full reports for any in silico or in vitro studies that are being used to support your proposal. If TTC control is set later than the impurity's point of origin, your control strategy should also consider drug substance analogs that may be formed during the manufacturing process. If upstream controls are established at higher than the acceptable limit or where control is achieved through process capability, spike/purge studies at greater than the proposed limit should be performed (batch sizes should be reported) and/or sufficient batch data should be supplied to support these proposals. Spike/purge studies should be performed in a manner representative of the commercial process for the results to be predictive. Please also provide analytical methods with information about LOD/LOQ. Additionally, please discuss and provide data to demonstrate that your total potentially genotoxic impurity content of the drug substances is < 5 µg/day as per ICH M7. The total potentially genotoxic impurities should include, but are not limited to, TSM-1, TSM-2, TSM-3, CMAC, and benzene.

10. Benzene is a potential impurity in ethanol. Please add a test for benzene in either the methanol or drug substance specification with an acceptance criterion that is in line with ICH Q3C.

11. Please justify with data that no residual propionyl chloride is present in the final drug substance.

12. Please address the following in your drug substance release and stability specifications:
    a. Tighten the water content test in the drug substance release and stability specification.
    b. Add a test for melting point.
    c. Add a test for specific optical rotation.

**Appx684**

DMF #032077
Page 4

13. For the drug substance assay method system suitability, please tighten the %RSD of five replicate injections of standard solution per USP <621>.

14. Please provide the %RSD at the specification limit for each specified impurity for the validation of the related substance method.

15. Please provide the potency of the working reference standard and formula for the potency calculation of the reference standards.

16. We understand that you have provided a statement that your polyethylene plastic bag used in your container closure system are approved by Chinese State Food and Drug Administration; this is not sufficient. Please clarify if the primary contact material complies with 21CFR175.1520. Provide an updated statement or use a primary container closure that is in line with the CFR regulation.

17. Please provide updated long-term stability data to justify the proposed re-test date. We refer you to ICH Q1A and ICH Q1E.


B. In addition to the deficiencies above, we have following information requests and comments:

1. Section S.2.5 is missing information on the analysis of the starting materials used in your process validation. Please provide the COAs of starting materials and all isolated intermediates.

2. Please provide the method description for the analytical method used for your elemental impurities analysis, and include the LOD for each metal in the description.

3. Please explain the wide mean difference seen under intermediate precision for each analyst under the enantiomer and the residual solvent for THF methods.

4. Please clarify if TSM-20161204 (RS-TSM-0002) is made using the same process provided in this DMF.

5. For each specified impurity reference standard, please provide potency and UV.


**FACILITY INSPECTIONS**

We have not yet completed inspection(s)/compliance evaluation of your manufacturing facility(s) named or referenced in this DMF. We must perform a complete evaluation of the information associated with the inspection before determining that the site(s) are satisfactory and the referencing ANDA may be approved.


**OTHER**

A partial response to this letter will not be considered for review. A response stating an item "will be addressed in a future submission" is not acceptable.

Prominently identify the submission with the following wording in bold capital letters at the top of the cover letter of the submission:


**Appx685**

DMF #032077
Page 5

## MASTER FILE GDUFA COMPLETE RESPONSE

The cover letter of your response to this letter should state that it is a response to FDA's GDUFA DMF Complete Response letter. Provide a list of questions from FDA's letter and either a direct response to each or a reference to where the information requested can be found in the DMF. If the response to each deficiency results in a change of information in Module 2 and 3 of the DMF, update the appropriate section(s) of the DMF.

Your response can be submitted in electronic format through the Electronic Submission Gateway (ESG) or on physical media to the address below. Responses sent by facsimile, e-mail or desk copies will not be accepted.

The FDA Electronic Submissions Gateway (ESG) is the central transmission point for sending information electronically to the FDA and enables the secure submission of regulatory information for review. For more information on the ESG see:
http://www.fda.gov/ForIndustry/ElectronicSubmissionsGateway/default.htm.

If submitting in paper format or physical media, mail two (2) copies of your complete response to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Central Document Room
> 5901-B Ammendale Road
> Beltsville, MD 20705

All DMF submissions must be in electronic format as of **May 5, 2018**. For more information see:
- Guidance for Industry: Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications,
- New Requirements for Electronic Submissions of DMF factsheet, or
- Drug Master Files (DMFs) webpage.

We will notify Teva Pharmaceuticals USA that the information in your DMF is inadequate to support their ANDA. When you amend your DMF, notify Teva Pharmaceuticals USA in accordance with 21 CFR 314.420(c) and notify the DMF Review Team (DMFOGD@fda.hhs.gov) that your DMF has been amended. Do not provide a copy of the amendment to the DMF Review Team.

You may request a 30 minute teleconference for first cycle letters to discuss the contents of the letter. The written request should be received within 20 business days of receiving this letter by e-mailing DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above) for information on submitting the teleconference request. In lieu of a teleconference, you have the option of submitting your questions regarding this letter by email. Submit the request for an email exchange within 20 business days to DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above). The subject field of the email should include the DMF number and "Request for Email Exchange." The email should include the date of the letter and repeat the deficiency item(s) as received from FDA followed by your specific questions for each item.

**Appx686**

DMF #032077
Page 6

FDA will grant one follow up email if additional clarification is needed based on our initial email response. Submit the request for a follow up email to DMFOGD@fda.hhs.gov (and carbon copy the RBPM listed above). The subject field of the email should include the DMF number and "Request for Email Exchange Follow Up." The email should include the date of the letter and the specific questions for follow up. FDA will strive to grant teleconferences or respond to email exchange requests within 30 days, giving priority to DMFs based on the priority of the referencing ANDA. If you do not have a secure email address, we will fax the responses to your request for email exchange to the fax number on file for the DMF.

If you have any questions, contact the RBPM listed above.

Sincerely yours,

*{See appended electronic signature page}*

David Skanchy, Ph.D.
Director, Division of Lifecycle API
Office of Pharmaceutical Quality
Center for Drug Evaluation and Research

**THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.**
If received by someone other than the addressee or a person authorized to deliver this document to the addressee, you are hereby notified that any disclosure, dissemination, copying, or other action to the content of this communication is not authorized. If you have received this document in error, please immediately notify us by telephone and return it to us by mail at the above address.

Appx687



Ee-Sunn (Joanne) Chia

Digitally signed by Ee-Sunn (Joanne) Chia
Date: 7/12/2018 03:10:17PM
GUID: 522a33990002ab8777245f8ac9cb6532

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VANDA PHARMACEUTICALS, INC.,          )
          Plaintiff,                  ) Case No.
     vs.                              ) 23-629C
THE UNITED STATES OF AMERICA,         )
          Defendant.                  )



Via Telephone

Tuesday, April 23, 2024

11:00 a.m.

Status Conference



BEFORE:   THE HONORABLE ARMANDO O. BONILLA



Transcribed by:  Elizabeth M. Farrell, CERT

2

Vanda Pharmaceuticals v. USA                                    4/23/2024

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PAUL W. HUGHES, III, ESQ.

EDWARD B. DISKANT, ESQ.

McDermott Will & Emery

500 N. Capital Street NW

The McDermott Building

Washington, DC 20001

(202) 756-8981

phughes@mwe.com


ON BEHALF OF THE DEFENDANT:

IGOR HELMAN, ESQ.

U.S. Department of Justice - Civil Division(G)

Post Office Box 480

Ben Franklin Station

Washington, DC 20044

(202) 305-7576

igor.helman@usdoj.gov


ALSO PRESENT:

Leah Edelman, Counsel, FDA

3

Vanda Pharmaceuticals v. USA                                    4/23/2024

P R O C E E D I N G S

-   -   -   -   -

(Proceedings called to order.)

THE COURT:  Good morning, Counsel.  This is Judge Bonilla.  Thank you for making yourselves available on short notice for this status conference in Vanda Pharmaceuticals, Inc. versus United States, Docket Number 23-629.

Who do we have representing the Plaintiff?

MR. DISKANT:  Good morning, Your Honor, Edward Diskant and Paul Hughes on behalf of Plaintiff, Vanda Pharmaceuticals.

THE COURT:  Good morning, Counsel.

And for the United States?

MR. HELMAN:  Good morning, Judge.  Igor Helman for the United States, and I have on the line with me Leah Edelman from the FDA.

THE COURT:  Good morning, Counsel.

I scheduled this call to discuss two issues in the parties' joint preliminary status report filed on April 19th, 2024, ECF Number 26.  The first is the proposed briefing schedule for the Government's plan to motion for judgment on the pleadings, or in the alternative, for summary judgment under Rules 12(c) and 56 of the Rules of the United States Court of Federal

Claims, and the second is a potential discovery issue -- or discovery schedule and the two sub-issues are whether discovery should be stayed pending resolution of the Government's dispositive motion and, if not, I have a few questions about the year for a need -- or the need for a year of fact discovery, because as I understand this case, it is fairly straightforward factually, and we can get into that in a few minutes.

Turning first to the Government's dispositive motion, Mr. Hughes, I understand -- or is it Mr. Diskant? I'm not sure who's speaking today.

MR. DISKANT:  It will be Mr. Diskant, Your Honor.

THE COURT:  Okay.  And, I'm sorry, can you pronounce that for me one more time?

MR. DISKANT:  Sure, Diskant.

THE COURT:  With a V or a B?

MR. DISKANT:  Neither, actually.  D as in dog --

THE COURT:  Oh.

MR. DISKANT:  -- I-S-K-A-N-T.

THE COURT:  Okay, thank you.  Sorry.  Diskant?

MR. DISKANT:  Of course.  Yes, correct.

THE COURT:  Okay.  Yes, thank you.  And I understand that you and Mr. Hughes take issue with the

Government's proposed Rule 12(c) motion after it failed to litigate the issue in Defendant's original 12(b)(1) and (b)(6) motion, but as the Court decision on January 18th, 2024, made clear, the Defendant did not -- may have waived -- I'm sorry, the Defendant may have waived the issue for that round of briefing, but specifically reserved the right to pursue it another day.

And to be fair to Mr. Helman, I teed up the issue for a 12(c) motion by directing the parties to address the issue as the case moved forward.

Mr. Helman, do you still plan on filing the motion on or before April 30th, 2024, which is a week from today?

MR. HELMAN:  Yes, Your Honor, that's still our plan.

THE COURT:  Okay.  Mr. Diskant, will Plaintiff be able to respond within 30 days as prescribed by the rules, May 30th of 2024?

I'm not sure why Mr. Helman was discounting two days from that in the proposal.

MR. DISKANT:  Yes, Your Honor, I believe we will be prepared to respond within the 30 days.

THE COURT:  And, Mr. Helman, I'm curious as to why you asked for 28 or 30 days for yourself on a reply brief when the rules generally ask or propose or

Vanda Pharmaceuticals v. USA                                          4/23/2024

give you 14.

MR. HELMAN:  That's a good question, Your Honor.  I'm not sure why we discounted Vanda's response by two days.  I think we were counting in terms of weeks, but then also -- I'm trying to think if there was a -- generally, we are able to respond in the reply brief in 14 days.  I'm not sure why we thought -- maybe scheduling additional time here to account for additional agency review, but as I said here today, I don't see a reason why we wouldn't be able to provide a reply in 14 days, as provided by the rules.

THE COURT:  Okay.  I will issue a short order scheduling briefing April 30th, 2024, for the Government's motion; May 30th, 2024, for Plaintiff's response; and June 13th, 2024, for the Government's reply.  If either party can show good cause for additional time necessary, the Court will consider the motion and we can decide that at a later date.

Turning to the issue of discovery, first, Mr. Diskant, are you aware of any outstanding discovery requests?

MR. DISKANT:  Yes, Your Honor.  We served our initial requests for production on February 23rd.  We received Defendant's responses and objections to those on April 15th, and they teed up a number of issues on which

the parties need to meet and confer, and we have tried to schedule such a meet-and-confer session for this week.

THE COURT:  Okay.

MR. DISKANT:  But we have not yet received documents, so they are outstanding.

THE COURT:  I'm sorry, you have not received any documents or you haven't received all the documents you've asked for?

MR. DISKANT:  I don't believe we've received any documents yet, at least through discovery.

THE COURT:  Oh, because the Government made it seem, at least in my reading of the joint preliminary status report, is that you -- I'm sorry, you, the royal you, the Plaintiffs -- Plaintiff would not be prejudiced because they've already received documents from the United States.

Mr. Helman, can you help me out there?

MR. HELMAN:  Sure, Your Honor.  I think what we were referring to is that, as you know, Vanda has made a number of FOIA requests and a lot of their document requests in this litigation are essentially the same as the FOIA requests or at least will be answered by the same documents, albeit without redactions when they're produced here once we get a protective order in place.

So I think that's what we were alluding to when

Vanda Pharmaceuticals v. USA                          4/23/2024

we said that Vanda has -- you know, I think as we discussed during the argument in front of Your Honor, there has been a number of FOIA requests and documents produced pertaining to those.  So that's what we were referring to.

THE COURT:  Okay.  Mr. Helman, I will ask you, moving forward, to be a little more precise in your language because you led me to believe that there was a document request and a response and we were starting fresh on new ground today with new discovery requests, and apparently -- or, clearly, that is not the case.

MR. HELMAN:  And I certainly will be, and my apologies, Your Honor.  I think there's two things going on.  There's been a number of FOIA requests for which documents have been produced, and then, in this litigation, as Mr. Diskant has alluded to, Vanda served us with requests for production of documents.  We have responded in the sense that we have said we will produce some and we need to meet and confer regarding others. But the actual documents for those requests have not yet been produced.  We don't yet have a protective order, which is one of the reasons why those documents haven't been produced.  But I will certainly be more clear in the future about that distinction.

THE COURT:  Thank you, Mr. Helman.

Mr. Diskant, can you explain why a year is necessary?  Because my view of what's remaining in this case are questions like, who within the FDA interacted with Lupin, Teva, and Apotex in their abbreviated new drug applications, or ANDA reviews, and what, if any, information about Vanda was shared, as well as the reasons for asking about impurity detection and micronization capabilities.  I don't know that what's left in this case goes beyond that, but I'm all ears. And perhaps I'm just over --

MR. DISKANT:  So, Your Honor, I -- I'm sorry, I apologize.

THE COURT:  No, no.  I added a thought and you didn't anticipate it because we're not in person.  But I assume that I'm oversimplifying this, but I want to hear from you to make sure that my head is on straight when I decide these discovery issues.

MR. DISKANT:  Sure.  So I think, in some respects, we agree with Your Honor that the issues here are relatively straightforward.  Part of the reason that we built in as much time as we did is in our initial meeting -- our early meeting of counsel, Mr. Helman indicated to us that the Government would need considerable time to collect and produce material in this case.  As a former government lawyer myself, I am not

Vanda Pharmaceuticals v. USA                        4/23/2024

unsympathetic to the fact that the Government takes time and moves slowly.  But that is a meaningful part of the additional time we built in.

I will say, to just briefly respond to the point that was made a moment ago, I do think our discovery requests in this case go meaningfully beyond prior FOIA requests and productions in response to them and, in particular, with respect to the factual issue of the FDA's treatment of the information at issue in this case as confidential and as trade secret.  You know, that's something we clearly need to understand and is a core part of our pending discovery requests.  But to be clear, a meaningful part of the reason that we proposed the discovery requests -- the discovery schedule that we did was taking into account what Defendant had told us about the amount of time they would need.

The only other issue I will add with respect to both the timeline and the complexity, is that the FDA, both in their initial disclosures and in the joint preliminary status report, has indicated that third parties, that is the, you know, drug manufacturers, may have relevant knowledge, and indeed, they go so far in the joint status report as to say they may need to be added as parties.

And so we -- you know, we are -- as a

Vanda Pharmaceuticals v. USA                                4/23/2024

protective measure at this point, wanted to build in enough time for third-party discovery in the event that, consistent with the FDA's position, you know, people at these third parties have information that is relevant to the case.

THE COURT:  Thank you, Mr. Diskant.

Mr. Helman, anything to add to that?

MR. HELMAN:  Certainly, I think that's part of it.  I think the other part, too, is obviously depending on the outcome of threshold issues, such as cognizable property interests and the such, for the Government, there are factual issues that would need to be developed in discovery later on, such as whether Vanda had reasonable investment-backed expectations.  And, certainly, the question of damages and whether Vanda -- what steps Vanda took to safeguard its trade secrets, to the extent it had protectable trade secrets, those are all issues that would need to be fleshed out in discovery and we didn't want to shortchange ourselves certainly in setting a very short discovery period initially and then having to go back to the Court and ask for larger extensions.

THE COURT:  And, Mr. Diskant, are the parties anticipating asking the Court to enter standard Form 8 with regard to a protective order?

Vanda Pharmaceuticals v. USA                           4/23/2024

MR. DISKANT:  Your Honor, the parties have exchanged drafts of a slightly modified protective order. We actually were emailing as recently as last evening about that.  I think we anticipate having what I hope will be a joint proposal for the Court this week.

THE COURT:  Okay.  Mr. Helman, anything to add?

MR. HELMAN:  No, that's accurate, Your Honor.

THE COURT:  Thank you.  And, Mr. Diskant, why not -- if the parties are going to brief this dispositive motion, which would be, if granted, completely dispositive of this case, and briefing will conclude by mid-June of 2024, and the Court will softly commit to ruling upon it with a matter of weeks, why not allow that to be resolved rather than spend your firm's time and your client's money [connection issue] --

MR. DISKANT:  So, Your Honor, I guess I -- sorry, I lost you after our "client's money," I apologize.

THE COURT:  Oh, yes, I stopped because I was told that I was no longer online.

Mr. Helman, are you still on the phone?

MR. HELMAN:  I am still, Your Honor.  I can still hear you.

THE COURT:  Okay.  Mr. Diskant?

MR. DISKANT:  So, Your Honor, I guess I have a

**Appx705**

Vanda Pharmaceuticals v. USA                        4/23/2024

couple of responses to that.  The first is that we continue to believe -- and I think Your Honor alluded to this at the argument on the motion to dismiss -- we continue to believe that the issue that Defendant now wants to tee up in their second dispositive motion is incredibly fact-intensive.  And in particular -- and we identified some of this in our complaint, but want to explore it through discovery -- the manner in which the FDA has treated this issue historically, which is fact-intensive, you know, significantly undercuts or, at very minimum, goes to the issue of whether or not, you know, this constitutes trade secret and whether or not there's a property interest at issue.

And so given the fact that we think discovery is going to be necessary in order to resolve this issue, while we respectfully disagree with, you know, Defendant's position that this can be resolved in a dispositive motion, we don't want to prejudice our client by not moving the case forward and moving into discovery.

There's a second reason, though, that we think discovery should proceed here, which is -- I would respectfully push back on the notion that this motion, even if granted, would dispose of the entire case.

You know, we haven't seen the motion yet and so I want to be careful not to prejudge it.  But I imagine,

Vanda Pharmaceuticals v. USA                                    4/23/2024

based on, you know, prior discussions and the nature of the representations in the parties' joint preliminary status report, that the thrust of the motion is going to focus on the dissolution specification issue.  And while that is certainly a meaningful part of the complaint, it is not all of it.

And as I'm sure Your Honor recalls, you know, the complaint also alleges improper disclosures regarding the manufacturing process for tasimelteon, which would, I don't believe, be impacted by this motion.  They certainly don't naturally lend themselves to it, given that I can't imagine the FDA would dispute that the manufacturing process submitted by a drug manufacturer is not the trade secret.  So that's another reason that we believe that it's appropriate to allow discovery to proceed, even if they are going to make the motion.

(Pause in the proceedings.)

MR. DISKANT:  I'm sorry, Your Honor, can you hear me?  I...

(No response.)

MR. DISKANT:  Can anyone else hear me?

MR. HELMAN:  I can hear you, and I'm not sure if we lost Judge Bonilla.

MR. DISKANT:  Okay.

MR. HELMAN:  I'm also not sure if anybody else

Vanda Pharmaceuticals v. USA                                4/23/2024

is still on the line.

MR. DISKANT:  Well, you and I are here so...

MR. HUGHES:  This is Paul Hughes.  I'm still here.

MS. EDELMAN:  And the FDA, Leah Edelman is still on the line.

(Pause in the proceedings.)

THE COURT:  Mr. Diskant, are you still with us?

MR. DISKANT:  Yes, I am here, Your Honor.  I apologize.  I think we may have lost you for a minute there.

THE COURT:  No, you did, and it was on our end. They are doing new wiring in the courthouse and apparently that interrupted the call and may have also prompted the "unmute yourself," even though no one was muted.

Mr. Helman, are you still there?

MR. HELMAN:  I am still here, Your Honor.

THE COURT:  And, Ms. Edelman?

MS. EDELMAN:  Yes, Your Honor.

THE COURT:  Excellent, thank you.

Mr. Diskant, I believe the floor is still yours.

MR. DISKANT:  Sure, and I apologize, Your Honor, if I am repeating myself.  I don't know where in

Vanda Pharmaceuticals v. USA                                    4/23/2024

that I lost you, but my -- the pending question, as I recall, was why the motion shouldn't stay discovery, and I think we have, on behalf of Vanda, two responses.

The first is, you know, as Your Honor may recall from the prior briefing and prior argument, our position is and will be an opposition to any second motion, that the issue at the heart of that second motion is incredibly fact-specific and is going to require discovery and, therefore, we submit can't be resolved at the motion stage at all.

And we talked, for example, in our complaint about the manner in which the FDA has treated this information historically, for example, in the context of FOIA requests as confidential and trade secret. We believe we need to explore that. We believe it is going to preclude, you know, adjudicating the motion at this stage. And so we are eager to see that component of discovery move forward, even if Defendant is going to file the motion.

But the second point that I would draw the Court's attention to is I would -- we would disagree with the notion that this motion, even if granted, is dispositive of the entire case. As you may recall, you know, while the dissolution specification, which we believe to be -- we understand to be the core of the

Vanda Pharmaceuticals v. USA                                    4/23/2024

motion the FDA now wants to make, is a meaningful part of the complaint, it is not the only part of the complaint. And, you know, we allege improper disclosures regarding our manufacturing process for tasimelteon. We don't understand there to be any meaningful dispute that we have a protected property interest in our manufacturing process, that that is a trade secret, and these were the allegations with respect to disclosures around impurities and micronization.

So our view is that, even if granted, this motion would not resolve the entire case and, therefore, yet another reason why discovery should move forward.

THE COURT: Thank you, Mr. Diskant. And let me ask you, with regard to discovery, in addition to the pending requests for information -- and I'm just talking about documents, and I understand you're going to want requests for admissions and depositions, obviously, but with regard to documents, are there multiple rounds of requests for the production of documents anticipated, or once you receive the current or outstanding document requests, to the extent that they are fulfilled and complete, that would end -- or at least substantially cover the requests anticipated?

MR. DISKANT: So it's difficult, Your Honor, to completely preclude right now the possibility of having

**Appx710**

Vanda Pharmaceuticals v. USA                                    4/23/2024

follow-up document requests, and part of that is, as we noted a moment ago, you know, the FDA's response, not unsurprisingly or unfairly, is that we need to meet and confer on some of our requests.  And I anticipate that out of those discussions may come, you know, additional thoughts or focus or narrowing.

So I can't rule out the possibility that we may have more.  We did try to put together a relatively focused first category of requests.  So there may be more to come.  But, again, we've tried to highlight in our initial requests what we think to be the most important documents to the case.

THE COURT:  And I don't want to probe too much into your litigation strategy, I'm just trying to get a sense of whether you've asked for what you believe is the universe and depending on what you get back, you may ask for additional documents or more tailored requests or whether you have set out in the first instance to ask for basically round one, already knowing that there's going to be a round two and round three.

MR. DISKANT:  Yeah, I think the answer is closer to the former than the latter, which is to say I think we have tried to identify in round one, you know, what we think is most central to the case.  You know, we would need to spend some more time with our client and

Vanda Pharmaceuticals v. USA                                    4/23/2024

with the documents we get to determine whether there's going to be a round one, but we have, in good faith, tried to identify right up front what we believe to be sort of the core documents to the case.

THE COURT:  And if I were to break down the Government's anticipated motion, and assuming that it's both a 12(c) and a 56, wouldn't an appropriate defense or offense to the motion be by the Plaintiffs that there are too many factual disputes to resolve this legal issue at this point under the 12(c) --

MR. DISKANT:  Oh, yes.

THE COURT:  -- and under a 56, that you would need discovery in order to appropriately respond, and so we would be in a place where we are now anyway?

MR. DISKANT:  Yes, Your Honor, that's exactly right.  I think that not only would be, but will be our opposition to the motion, which is why we think it's -- it's premature for the issue to be, you know, briefed anyway.  We obviously, you know, can't tell the FDA what to do, but that obviously -- that will be a core part of our opposition.

THE COURT:  And what about a hybrid approach of having the Government continue to respond to all outstanding discovery requests, but no new discovery requests until the Court rules on the motion or the

Vanda Pharmaceuticals v. USA                                      4/23/2024

planned dispositive motion, unless Plaintiff comes back and argues that they need additional discovery to respond specifically to the motion?

MR. DISKANT:  Your Honor, I think, on behalf of Plaintiff, that would be acceptable.  I assume that what the Court is envisioning is that means that Defendant needs to move forward with the pending requests and meeting and conferring on the pending requests and responding to them, but no new requests from Plaintiff until a resolution of the motion, and that would be very acceptable to us.

THE COURT:  Okay.  And to be clear, it's -- you all can agree to continue any informal discovery, but the Court will not compel any, other than the outstanding discovery requests.  At least that's my proposal for right now.

MR. DISKANT:  Understood, Your Honor.

THE COURT:  Mr. Helman, what are your thoughts?

MR. HELMAN:  I think that's an acceptable and workable hybrid, Your Honor, that will satisfy Plaintiff's need to, again, keep the case moving forward, while, at the same time, allow us to bring our -- what we believe to be dispositive motion.  Certainly, if Plaintiff doesn't agree or thinks that additional factual development is needed, we can provide an affidavit or

Vanda Pharmaceuticals v. USA                    4/23/2024

declaration as in the rules.

But at the same time, it would avoid the potential of much bigger discovery, such as the depositions that Your Honor alluded to, from potentially having to be dealt with when there's a dispositive issue on the table.  So I think that would work for the Government as well.

THE COURT:  Okay.  Then that's how we will proceed.  I will issue a short order setting forth a briefing schedule on the Government's motion.

Mr. Helman, is it going to be a 12(c) and a Rule 56 or limited to a 12(c) motion?  Or do you know at this point?  And I don't want to make -- I'm just trying to figure out whether I can anticipate Plaintiff coming back at your motion with a need for discovery, which will prolong briefing.

MR. HELMAN:  Well, we believe that there's no additional discovery that needs to happen to resolve the legal questions, and that's why I'm having a little bit of a hard time kind of putting it in either bucket, because, I think, as Your Honor knows, the legal standard for deciding the questions is essentially the same under either 12(c) or Rule 56, and from our standpoint, the facts are not in dispute and there's not additional factual development that needs to happen to address the

Vanda Pharmaceuticals v. USA                                    4/23/2024

threshold legal issues.

I think we're still kind of trying to make sure we've captured the full nuance.  It's either a 12(c) or a Rule 56, or maybe it's sort of one and then, in the alternative, the other.  So that's why I'm having a little bit of a hard time kind of pinning it down at this point.  But -- and candidly, I'm not sure that our characterization will deter Plaintiff from coming back and saying, no, there needs to be additional factual development, regardless of how we style it.

THE COURT:  Mr. Helman, to be fair, you're holding all of the documents and, so, Plaintiff is at a disadvantage.  They know what their client has, but they don't necessarily know what the Government has at this point.  So I will leave you to decide, within the Department of Justice and the FDA, which version of the motion you are going to file by next Wednesday and allow Plaintiff the full opportunity to review that before deciding on their litigation strategy as they move forward.  But in the interim, I would ask that the parties meet and confer, decide on a path forward with regard to document production.

The Court will grant, when it comes in the door, the joint request for a protective order.  If there are any issues with regard to provisions within the

**Appx715**

Vanda Pharmaceuticals v. USA                                    4/23/2024

protective order that one or both parties are not in agreement with, I would appreciate an email to chambers requesting a status conference to resolve those. I do not want a briefing war on a protective order to the extent that it can be avoided. If we can't resolve it on the phone, then I will set forth an expedited briefing schedule to address any lingering issues.

Any questions on that, Mr. Diskant?

MR. DISKANT: No, Your Honor. Thank you.

THE COURT: Mr. Helman?

MR. HELMAN: No, Your Honor.

THE COURT: Is there anything else I need to know or decide today, Mr. Diskant?

MR. DISKANT: No, Your Honor.

THE COURT: Mr. Helman?

MR. DISKANT: I think that's all we had, Your Honor.

THE COURT: Okay. Thank you, Counsel. We stand adjourned.

MR. HELMAN: Thank you.

MR. DISKANT: Thank you, Your Honor.

(Whereupon, the hearing was adjourned.)

24

Vanda Pharmaceuticals v. USA                                    4/23/2024

                        CERTIFICATE OF TRANSCRIBER


        I, Elizabeth M. Farrell, court-approved
transcriber, certify that the foregoing is a correct
transcript from the official electronic sound recording
of the proceedings in the above-titled matter.




DATE:  5/7/2024                    s/Elizabeth M. Farrell
                                   ELIZABETH M. FARRELL, CERT

**CONFIDENTIAL MATERIAL OMITTED**

CONFIDENTIAL MATERIAL OMITTED

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

<table>
<tr><td>VANDA PHARMACEUTICALS INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>       Defendant.</td><td>Civ. No. 23-629 C<br><br>Hon. Armando O. Bonilla</td></tr>
</table>

**PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

To date, FDA has done essentially nothing to meet its discovery obligations even though (i) FDA received Vanda's RFPs nearly eight months ago, (ii) FDA agreed to produce documents responsive to many of those RFPs, and (iii) this Court previously ordered FDA to do so. In fact, FDA has produced a total of approximately 300 documents thus far, which primarily consist of (i) publicly available policies and procedures, and (ii) unredacted versions of documents previously produced to Vanda pursuant to prior Freedom of Information Act ("FOIA") requests. Moreover, notwithstanding numerous requests that call for internal FDA communications relevant to the case – requests FDA agreed to honor and this Court ordered FDA to comply with – the FDA has to date not produced a *single* email responsive to Vanda's RFPs.

As set forth herein, Vanda has repeatedly attempted to confer with counsel regarding these concerns, most recently by sending FDA a detailed written account of its deficiencies and seeking assurances that FDA would promptly address them. Instead, in response the FDA drew into question its willingness to honor this Court's order to produce discovery, while offering to "ultimately" produce some of the requested materials – nearly eight months after Vanda's RFPs were served – on a rolling basis with the "first" such production coming "in the coming weeks *and months*." Ex. 4 at 3 (emphasis added).  Four weeks after that promise was made, no such production

1

**Appx1058**

did not request the "unredacted documents" referenced in the aforementioned RPFs, but rather *all* documents and communications concerning those documents.

Moreover, with respect to RFPs 27, 28, 30, and 31, FDA states that it is "prepared to produce them at [Vanda's] request," and that it has apparently failed to do so by now because Vanda "informed [FDA] that Vanda prioritizes the production of … certain sections of the Lupin ANDA." Ex. 4 at 3. But the fact that Vanda agreed to prioritize the production of certain documents on April 26, *i.e.,* over five months ago, does not absolve FDA of its obligation to continue producing documents responsive to the remainder of Vanda's requests.

In sum, it is increasingly clear that FDA has failed to undertake any meaningful efforts to meet its discovery obligations and is unabashedly violating the Court's order that it comply with Vanda's pending discovery requests. Even taking at face value FDA's September 18 letter, FDA has *just now* started collecting documents it was ordered to collect and produce five months ago. This is plainly insufficient.

## II.    FDA is Required to Comply with its Discovery Obligations

Under RCFC 26(b)(1), a party may "obtain discovery regarding any nonprivileged matter this is relevant to any party's claim or defense and proportional to the needs of the case." Parties have a "duty to respond" to requests for production, and failure to produce documents is grounds for a motion to compel under RCFC 37. *See Dairyland Power Co-op v. United States*, 79 Fed. Cl. 722, 728 (2007); *see also* RCFC 37(a)(3)(B)(iii). This Court may grant a motion to compel when the responding party has relevant, non-privileged documents in its "possession, custody, or control," but has failed to produce such documents. *Dairyland Power Co-op*, 79 Fed. Cl. at 728. Compelling discovery is warranted where a party would otherwise be "deprive[d] of discovery that is reasonably necessary to afford [the party] a fair opportunity to develop and prepare the case." *Hermann v. United States*, 127 Fed. Cl. 22, 40 (2016).

**Appx1062**

Vanda's RFPs seek documents and communications concerning information that is plainly relevant to the central issues in this case. As described in the parties' Joint Preliminary Status Report, ECF No. 26, those issues include: (1) whether Vanda can assert a cognizable property interest in the relevant disclosed information, including the dissolution specification that FDA presented to generic manufacturers; (2) whether FDA's actions amount to disclosure of Vanda's trade secrets to generic competitors, including by offering recommendations to such competitors; (3) whether FDA's disclosure of Vanda's confidential information constitutes a *per se* or regulatory taking; and (4) whether FDA owes compensation to Vanda for its disclosures.

As a general matter, Vanda's RFPs fall into four broad categories: (1) documents and communications relating to FDA's review of NDAs, ANDAs, confidential information, and dissolution specifications (*e.g.*, RFP Nos. 1-8); (2) documents and communications signed by, sent to, or received by FDA employees responsible for reviewing the NDAs and ANDAs at issue in this case (*e.g.*, RFP Nos. 9-15); (3) documents and communications concerning key documents Vanda identified in its complaint (*e.g.*, RFP Nos. 18-22, 25, 26, 29); and (4) documents and communications relating to specific ANDAs (*e.g.*, RFP Nos. 23, 24, 27, 28, 30, 31). Each of these categories bears directly on one or more of the issues described above. For example, FDA's treatment of confidential information and dissolution specifications – including through its internal communications and external communications with generic applicants – bears directly on the issues of whether Vanda can assert a cognizable property interest in the disclosed information and whether FDA owes compensation to Vanda for its disclosures.

To be sure, FDA does not claim that any material sought by Vanda is privileged. Nor do they contend they are not relevant or not discoverable. Instead, at the very most, FDA claims that several of Vanda's outstanding RFPs should not be discoverable *now* because, according to FDA, they "do not concern the existence of a cognizable property interest, and they therefore do not relate to step one of the takings analysis applicable to Vanda's claims." Ex. 4 at 2. Thus, according

**Appx1063**

to FDA, Vanda's requests are "irrelevant unless and until the Court determines that the information is, in fact, the kind of property interest protected by the Takings Clause." *Id.*

There are at least three independent problems with that argument. First, it was not advanced in FDA's responses and objections to Vanda's requests for productions and is thus waived.[1] *See Kansas City Power & Light Co. v. United States*, 139 Fed. Cl. 546, 564 (2018) ("The failure to make a proper objection to a document production request may result in the waiver of that objection.").

Second, it is in direct conflict with the Court's instruction at the April 23 status conference that FDA "continue to respond to *all outstanding discovery requests* … until the Court rules on [FDA's 12(c)] motion." (Tr. 19:23-20:3) (emphasis added). Notably, as discussed above and as the Court recalls, in issuing that order, the Court *rejected* substantially the same argument that FDA made at the time – *i.e.*, that discovery should be stayed pending resolution of the motion.

According to FDA, the "context" of this order was "Vanda's argument that it required additional discovery to respond to our motion for judgment on the pleadings," and "[w]hen viewed within this limiting context, Judge Bonilla's directive is entirely consistent with the principles of proportionality articulated in RCFC 26(b)." Ex. 4 at 3. This is false. At the April 23 status conference, counsel for Vanda cited two reasons why the Court should not stay discovery: (1) Vanda's RFPs seek information relevant to the issues in FDA's 12(c) motion, *and* (2) FDA's 12(c) motion would not be dispositive of the entire case. *See* Tr. 16:4-17:9. And this Court imposed no such limiting instruction when it directed FDA to respond to "*all* outstanding discovery requests."

But third, the FDA may not unilaterally decide what is relevant based on its view of the legal issues at this stage in the case. *See, e.g., Gulf Coast Shippers Ltd. v. DHL Express (Usa), Inc.*, 2015 WL 127857, at *2 (D. Utah Jan. 7, 2015) ("[T]he standard for relevance in discovery is lower than the standard for admissibility at trial … [and] [t]his court is not willing to allow one

---

[1]    In fact, FDA only objected to a single request as "premature." *See* Ex. 2 at RFP No. 35.

**Appx1064**

# EXHIBIT 4



**U.S. Department of Justice**

Civil Division

PMM:LMP:BSKushnir

DJ No. 154-23-629

Telephone: (202) 307-5928

Steven.Kushnir@usdoj.gov

_Washington, DC 20530_

September 18, 2024

By Email

Paul W. Hughes

McDermott Will & Emery LLP

500 North Capitol Street, NW

Washington, DC 20001

     Re:     _Vanda Pharmaceuticals, Inc. v. United States_, Case No. 23-629C (Fed. Cl.)

Dear Paul:

This letter serves as a response to your letter from August 28, 2024, in which you contend that the United States has not adequately responded to the requests for the production of documents (RFPs) served by plaintiff Vanda Pharmaceuticals, Inc. (Vanda) in the above-captioned case. As explained more fully below, although we disagree about the scope of discovery that is appropriate at this stage of the litigation, the Food and Drug Administration (FDA) will continue retrieving certain relevant, responsive, and non-privileged documents in its possession, and it agrees to produce such documents to Vanda on a rolling basis.

Vanda alleges a taking of property without just compensation. As you know, the Court of Federal Claims must analyze takings claims in two steps: First, the Court must determine whether the plaintiff has identified a legally cognizable property interest; and second, the Court must determine whether the alleged Governmental action amounts to a taking of that property interest. _See Fishermen's Finest, Inc. v. United States_, 59 F.4th 1269, 1274-75 (Fed. Cir. 2023). These two parts of the analysis are sequential, such that the second step only becomes relevant if the plaintiff can satisfy the first step. _Id._ at 1275 ("[W]here a claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end." (internal quotations and alterations omitted)). And the Federal Circuit has made clear that any step two questions related to whether a taking has occurred—such as questions about the nature of the alleged Governmental action—are irrelevant to the analysis at step one. _See id._ at 1278 n.6 (declining to consider the nature of the Governmental action at step one of the takings analysis because "such considerations may go to whether a property was 'taken,' not to whether it was cognizable property in the first place").

**Appx1105**

- 2 -

In February 2024, shortly after the Court issued an order granting-in-part and denying-in-part our motion to dismiss, Vanda served 35 RFPs seeking extensive materials about every facet of its claim.[1]  Two of Vanda's RFPs arguably seek discovery related to, at least in part, the nature of the property in dispute, including the allegedly proprietary information that Vanda claims as property.  *See* RFP Nos. 5, 8.  But rather than seek documentation related to *Vanda's* new drug applications (NDAs) or the information contained therein, these RFPs seek documents and communications related to FDA's "policies or practices" and "training" in connection with NDA review generally.  We have already produced materials sufficient to show FDA's policies, practices, and trainings related to both NDAs and abbreviated new drug applications (ANDAs).  *See* FDA_000001-001447.

The rest of Vanda's RFPs focus on the Governmental action that allegedly amounts to a taking of property:  FDA's alleged disclosure of confidential information to third parties.  *See, e.g.,* RFP Nos. 1-4, 7, 9-15, 22-23, 27, 30; *see also* Pl. Initial Disclosures (listing each of the individuals named in RFP Nos. 9-12 and 14-15, and describing their subject of potentially discoverable information as the "Lupin ANDA," the "Taro ANDA," the "Inventia ANDA," the "Apotex ANDA," the "MSN ANDA," and/or the "Teva ANDA").[2]  These RFPs do not concern the existence of a cognizable property interest, and they therefore do not relate to step one of the takings analysis applicable to Vanda's claims.

On April 30, 2024—after Vanda served its RFPs, and after the parties met and conferred about FDA's discovery efforts—the Government filed a motion for judgment on the pleadings.  In it, we argue that Vanda has not identified a property interest cognizable under the Takings Clause, and that the Court must therefore dismiss Vanda's claims without reaching step two of the takings inquiry.  *See* Def. Mot. for J. at 21, ECF No. 29.  Our motion is now fully briefed, and we await the Court's decision.

In light of this procedural posture, we believe that undertaking a costly and time-consuming effort to retrieve, review, and produce extensive materials relevant only to step two of the takings inquiry is premature.  Questions about what FDA did with Vanda's allegedly proprietary information are irrelevant unless and until the Court determines that the information is, in fact, the kind of property interest protected by the Takings Clause.  *See Fishermen's Finest*, 59 F.4th at 1274-75.  Because the Court may dispose of the entire case without ever reaching such questions (by granting our pending motion), discovery about these questions is unduly burdensome and unnecessary at this time.  *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999) ("When a particular issue may be dispositive, the court may stay discovery concerning other issues until the critical issue is resolved.").

---

[1] At least one of Vanda's requests, RFP no. 26, sought documents related to Inventia.  The Court, however, has dismissed any claims related to Inventia.

[2] Erin Skoda, who is the subject of RFP No. 13 (though she is not listed in either party's initial disclosures), electronically signed a document to the DMF holder regarding the active pharmaceutical ingredient used in the Apotex ANDA.  The United States filed an unredacted copy of this communication as Exhibit 6 to our motion for judgment on the pleadings.

- 3 -

Our position is also consistent with the rules governing discovery in this case. Rule 26(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) provides that the scope of discovery must be "proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues[] and whether the burden or expense of the proposed discovery outweighs its likely benefit." Here, the substantial burden on FDA of retrieving, reviewing, and producing voluminous materials related only to step two of the takings inquiry would significantly outweigh any benefit such discovery may provide, especially considering that FDA's alleged disclosure of confidential information to third parties is immaterial to the preliminary question of whether a cognizable property interest exists. *See Fishermen's Finest*, 59 F.4th at 1278 n.6. Nor would such needless discovery efforts promote the "speedy[] and inexpensive determination" of Vanda's claims, as the Rules require. RCFC 1.[3]

Documents concerning FDA's review of ANDAs, including internal and external communications about ANDAs, relate exclusively to Vanda's allegations of disclosure of proprietary information and are therefore not related to step one of the takings analysis. Nonetheless, FDA has already engaged in extensive production of such documents in response to Vanda's RFPs. On April 26, 2024, you informed us that Vanda prioritizes the production of the ANDA and related review files for Lupin, and on June 11, 2024, you specifically requested certain sections of the Lupin ANDA. FDA has subsequently produced the requested sections. Although you have not requested any other sections from any other ANDA at issue in this case (such as Teva or Apotex), *see* RFP Nos. 27, 28, 30, 31, FDA remains prepared to produce them at your request.

Moreover, in an effort to avoid an unnecessary discovery dispute, we are willing to continue ongoing efforts to review and, ultimately, produce relevant, responsive, and non-privileged communications related to ANDAs. FDA has begun the process of collecting communications related to the iloperidone and tasimelteon ANDAs, including communications to and from the six individuals named in RFP Nos. 9-15. Those collections remain underway, and we expect the first of those collections to become available for review in the coming weeks and months. We intend to review and produce these communications on a rolling basis once they come available.

Separately, we agree that whether FDA created the information Vanda claims as property, including the relevant dissolution specifications for Vanda's drugs, may be probative to step one of the takings inquiry. *See* Pl. Opp'n to Mot. for J. at 12-14, ECF No. 47. We have already produced documentation sufficient to show that FDA personnel recommended the relevant dissolution specifications to Vanda, and their basis for doing so. These include the complete Chemistry Review, including dissolution specification review, for Fanapt (Exhibit 1 to our motion for judgment on the pleadings); and the Biopharmaceutics Review for Hetlioz, which

---

[3] You are correct, of course, that Judge Bonilla directed the Government to continue responding to Vanda's outstanding discovery requests. The context for this statement, however, was Vanda's argument that it required additional discovery to respond to our motion for judgment on the pleadings, which concerns only the existence of a cognizable property interest. When viewed within this limiting context, Judge Bonilla's directive is entirely consistent with the principles of proportionality articulated in RCFC 26(b).

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| VANDA PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-629C |
| | ) | |
| v. | ) | (Judge Bonilla) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that plaintiff Vanda Pharmaceuticals Inc., appeals to the United States Court of Appeals for the Federal Circuit from the January 8, 2025, final judgment in favor of defendant (Dkt. No. 59), along with all other orders and decisions that merge therein, including but not limited to the Court's memorandum opinion (Dkt. Nos. 58 and 62).

Dated:  February 6, 2025                             Respectfully submitted,

                                                             /s/ *Paul W. Hughes*

                                                             Paul W. Hughes*
                                                             MCDERMOTT WILL & EMERY LLP
                                                             500 North Capitol Street NW
                                                             Washington, DC 20001
                                                             (202) 756-8000
                                                             phughes@mwe.com

                                                             *Attorney of Record for Plaintiff Vanda*
                                                             *Pharmaceuticals Inc*

**Appx1334**

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I electronically filed the foregoing document with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

*/s/ Paul W. Hughes*
Paul W. Hughes
